UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OPTRONIC TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> NINGBO SUNNY ELECTRONIC CO., LTD., et al., <br><br> Defendants. | Case No. 5:16-cv-06370-EJD <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** <br><br> Re: Dkt. No. 17 |

This action tells the story of the universe of products available to amateur astronomers in the United States. The star players are Plaintiff Optronic Technologies, Inc. ("Plaintiff"), Defendant Ningbo Sunny Electric Co., Ltd. ("Ningbo Sunny"), and its satellite subsidiaries, Sunny Optics, Inc. and Meade Instruments Corp. (collectively, "Defendants"), all of whom supply and distribute a constellation of telescopes for beginner and intermediate consumers in one way or another. But Plaintiff alleges Ningbo Sunny's share of the market eclipses that of all other competitors in the space, and together with another market participant, has used its considerable gravity to unfairly compete.

Federal jurisdiction arises pursuant to 28 U.S.C. § 1331. Presently before the Court is Defendants' Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 17. Plaintiff opposes the motion.

Focusing on Plaintiff's allegations through an objective lens, the court concludes the Complaint has yet to reach a zenith of plausibility. The Motion to Dismiss will therefore be granted for the reasons explained below.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

   **A.  The Parties**

Plaintiff is a California-based importer and seller of recreational telescopes, binoculars and related accessories. Compl., at ¶¶ 8, 22. "It is the last significant U.S. independent telescope

1  brand." Id. at ¶ 1. Plaintiff selects or creates a telescope design and then works with a

2  manufacturer to build the product and its components. Id. at ¶ 22. It then sells telescopes to

3  consumers through a variety of channels, including direct-to-consumer internet and mail orders,

4  through third party dealers, and through other retail outlets. Id. at ¶ 27.

Ningbo Sunny is a Chinese telescope manufacturer, which owns two subsidiaries in the United States: Sunny Optics and Meade. Id. at ¶ 2. Sunny Optics is a shell holding company created by Ningbo Sunny to complete a 2013 merger with Meade. Id. at ¶ 17. Ningbo Sunny also sells telescopes to distributors through its own distributor brands. Id. at ¶ 33.

### B. The Relevant Market

Plaintiff alleges the relevant market is "telescopes for beginner to intermediate consumers." Id. at ¶ 24. As to that market, the Complaint specifies that Plaintiff occupies a dual role in antitrust terms. Within the "supply market," Plaintiff is a customer-consumer who obtains goods in the relevant market from Defendants. Id. at 29. One other participant in that market, JOC, is a "low-end telescope manufacturer with little market share." Id. at ¶ 71.

In the "distribution market," Plaintiff is a direct competitor of Ningbo Sunny's subsidiaries, including Meade. Id. at ¶ 35. "There are three or four major telescope distributors in the U.S.," including Plaintiff. Id. at ¶ 33.

Ningo Sunny controls the manufacture and supply of approximately 75% of the beginner to low-intermediate consumer telescope market in the United States, and possesses monopoly power over that market. Id. at ¶¶ 25, 28. Plaintiff alleges that Ningbo Sunny and another unidentified manufacturer of recreational telescope products - labeled in the Complaint as the "Settling Manufacturer" - control over 90% of the entire telescope manufacturing and supply market in the United States. Id. at ¶¶ 11, 25.

### C. Anticompetitive Conduct

Though they are seemingly competitors, Plaintiff alleges Ningbo Sunny and the Settling Manufacturer do not act independently and have agreed not to compete by dividing the supply market. Id. at ¶ 29. Plaintiff also alleges common ownership between Ningbo Sunny and the

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
2

Settling Manufacturer. Id. at ¶ 42. According to the Complaint, the Settling Manufacturer's principal told the Plaintiff's president he had transferred his interest in Ningbo Sunny to a sister-in-law, who holds the interest in her maiden name to mask the ownership. Id.

Plaintiff makes several other allegations in support of the purported anticompetitive conspiracy between Ningbo Sunny and the Settling Manufacturer. For example, Plaintiff alleges Ningbo Sunny and the Settling Manufacturer "share operations and coordinate in the manufacture of different lines of telescopes so as not to compete with one another," "share non-public, sensitive information about their businesses with each other, including intellectual property, business plans, and product pricing," "conspire to fix the prices of their products, including the credit terms offered thereon," have exchanged officers, and have retaliated against Plaintiff for trying to compete. Id. at ¶ 43. Plaintiff also alleges Ningbo Sunny manufactures products for the Settling Manufacturer. Id.

Furthermore Plaintiff alleges that Ningbo Sunny acquired Meade, the only other major independent telescope distributor in the United States at the time, as part of a joint effort to prevent its assets from being acquired by Plaintiff. Id. at ¶ 34.

### D. This Action

Plaintiff initiated this action on November 1, 2016. It asserts four causes of action in the Complaint: (1) price fixing and collusion in violation of the Sherman Act § 1, 15 U.S.C. § 1; (2) attempted monopolization and conspiracy to monopolize in violation of the Sherman Act § 2, 15 U.S.C. § 2 and the Clayton Act § 7, 15 U.S.C. § 18; (3) unfair competition in violation of the Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 et seq.; and (4) collusion to restrain trade in violation of the Cartwright Act, California Business and Professions Code § 16700 et. seq.

This motion followed the Complaint.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
3

it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Id. at 556-57. A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

When deciding whether to grant a motion to dismiss, the court must generally accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014) (providing the court must "draw all reasonable inferences in favor of the nonmoving party" for a Rule 12(b)(6) motion). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

Also, the court usually does not consider any material beyond the pleadings for a Rule 12(b)(6) analysis. Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). Exceptions to this rule include material submitted as part of the complaint or relied upon in the complaint, and material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-69 (9th Cir. 2001).

**III. DISCUSSION**

**A. Authority Governing Plaintiff's Federal Claims**

The first two sections of the Sherman Act address different anticompetitive problems. "Section 1 deals with concerted activity." Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 542 (9th Cir. 1991). "Section 2, on the other hand, concerns unilateral activity." Id.

The Sherman Act § 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "A § 1 claim requires: (1) a 'contract,

combination or conspiracy among two or more persons or distinct business entities'; (2) which is intended to restrain or harm trade; (3) 'which actually injures competition'; and (4) harm to the plaintiff from the anticompetitive conduct." name.space, Inc. v. Internet Corp. for Assigned Names & Numbers, 795 F.3d 1124, (9th Cir. 2015) (quoting Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012)). But "[b]ecause § 1 . . . does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." Twombly, 550 U.S. at 553.

The Sherman Act § 2 prohibits monopolization or attempted monopolization of trade or commerce. 15 U.S.C. § 2. An attempt claim has four elements: "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury." Rebel Oil Co., Inc. v. Atl. Richfield, Co., 51 F.3d 1421, 1434 (9th Cir. 1995). A monopoly claim has two elements, aside from antitrust injury: (1) defendant possessed monopoly power in the relevant market and (2) defendant willfully acquired or maintained that power. Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997).

The Clayton Act § 7 prohibits a corporation from acquiring the stock or assets of another corporation "in any line of commerce" in which the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. When examining a § 7 claim, the court must be mindful that "[e]very merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487 (1977). "But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects." Id.

**B. Standing**

The court addresses Defendants' standing arguments first because, at least as framed under Article III, they implicate this court's subject matter jurisdiction. See Laub v. U.S. Dep't of the

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
5

Interior, 342 F.3d 1080, 1085 (9th Cir. 2003); see also City of San Jose v. Office of the Comm'r of Baseball, 776 F.3d 686, 692 n.5 (9th Cir. 2015) (observing that "[u]nlike Article III standing, the question of standing to sue under the antitrust laws does not go to subject matter jurisdiction, and thus need not be considered before addressing the merits" (internal quotations marks omitted)).

### i. Constitutional Standing

The constitutional standing doctrine "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191 (2000). This "case or controversy" requirement is jurisdictional and cannot be waived. City of Los Angeles v. Cty. of Kern, 581 F.3d 841, 845 (9th Cir. 2009). The party asserting federal jurisdiction must carry the burden of establishing standing under Article III. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006).

Generally, the inquiry critical to determining the existence of standing under Article III of the Constitution is "'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" Allen v. Wright, 468 U.S. 737, 750-51 (1984) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). Three basic elements must be satisfied: (1) an "injury in fact," which is neither conjectural or hypothetical, (2) causation, such that a causal connection between the alleged injury and offensive conduct is established, and (3) redressability, or a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

A plaintiff must at the pleading stage "clearly . . . allege facts" demonstrating each of these elements. Warth, 422 U.S. at 518.

### ii. Antitrust Standing

"In order to assert a claim under Section 1 or Section 2 of the Sherman Act, a plaintiff must first demonstrate that it has suffered an 'antitrust injury' sufficient to provide standing." GSI Tech. v. United Memories, Inc., No. 5:13-cv-01081-PSG, 2014 WL 1572358, at *3 (N.D. Cal. Apr. 18, 2014) ("GSI Tech"). To that end, a private plaintiff seeking damages under § 4 of the

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
6

Clayton Act "can be compensated only for injuries that the antitrust laws were intended to prevent." Rebel Oil, 51 F.3d at 1433 (citing Brunswick Corp., 429 U.S. at 489). Moreover, "[o]nly those who meet the requirements for 'antitrust standing' may pursue a claim under the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'" Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 371 (9th Cir. 2013).

"Antitrust injury is made up of four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." Id. at 372 (internal quotation marks omitted). In addition, "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." Eagle v. Star-Kist Foods, Inc., 812 F.2d 538 (9th Cir. 1987).

In assessing antitrust standing, "courts are mindful that the law was designed for 'the protection of competition not competitors.'" GSI Tech., 2014 WL 1572358, at *3 (quoting Brunswick Corp., 429 U.S. at 488).

### iii. Application

#### a. Hayneedle Transaction

Defendants' challenge several aspects of Plaintiff's standing. They first argue Plaintiff lacks Article III and antitrust standing to assert claims based on the failed acquisition of the assets of another company, Hayneedle.com. More specifically, Defendants contend that Plaintiff did not suffer an injury as a result of Defendants' alleged anticompetitive conduct because a third party, Hayneedle, made an independent decision not to engage in the transaction with Plaintiff.

Hayneedle "is an e-commerce company where users can buy household goods, home décor and other items, including telescopes. Compl., at ¶ 75. Plaintiff alleges in 2014, Hayneedle decided to sell several of its URLs, including telescopes.com and binolculars.com. Id. Plaintiff placed the highest bid on the assets, and entered into a letter of intent with Hayneedle providing Plaintiff an exclusivity period on the purchase. Id. at ¶ 77. In response, Plaintiff alleges it

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
7

received identically-phrased emails from both Ningbo Sunny and the Settling Manufacturer revoking Plaintiff's credit line and cutting off its supply until Plaintiff paid its outstanding invoices. Id. at ¶¶ 78-79. In addition, Plaintiff alleges that before the asset purchase was due to close, Hayneedle "suddenly asserted" it had never agreed to a non-compete term. Id. at ¶82. Plaintiff asserts, on information and belief,[1] that "Ningbo Sunny's competitors and/or their agents were communicating with Hayneedle and threatening Hayneedle to not go through with the sale." Id. Once the exclusivity period ended, Plaintiff alleges Hayneedle raised the price for its assets to an amount Plaintiff could not pay because its lines of credit had been terminated. Id. at ¶ 83. In the end, the Hayneedle assets were acquired by one of Ningbo Sunny's conspiring competitors, and Plaintiff's lines of credit were restored. Id. at 84. Plaintiff alleges the "timing of these events . . . make clear that (a) Ningbo Sunny and its purported competitor colluded together and used their monopoly power to gain further market share and (b) that they would work together to punish [Plaintiff] for trying to compete against either one." Id. at ¶ 86. Plaintiff also alleges that "[c]ompetition and consumer choice" have been restrained from Plaintiff's loss of a possible distribution channel. Id. at ¶ 92.

Defendants' argument as to standing is misplaced under these factual allegations. Though Defendants speculate Plaintiff's transaction with Hayneedle would have fallen apart regardless of anything Defendants did, such speculation does not mandate dismissal of Plaintiff's plausible description of something more than simply an independent decision by a third party to do business with a company other than Plaintiff; to the contrary, the Complaint reveals Ningbo Sunny's reaction to Plaintiff's potential acquisition of the Hayneedle assets, resulting in Plaintiff's loss of a potentially valuable opportunity.

---

[1] Defendants urge the court to disregard this allegation as too speculative. The court will not do so for this motion in light of the additional consistent facts alleged by Plaintiff. See Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) ("The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); see also Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995) ("[W]e relax pleading requirements where the relevant facts are known only to the defendant.").

In that way, the allegations are distinguishable from the ones discussed in the two cases cited by Defendants, GSI Tech. and Space Exploration Technologies Corporation v. The Boeing Company, No. CV 05-0733 FMC (MANx), 2006 WL 7136649 (C.D. Cal. May 12, 2006), aff'd, 281 Fed. Appx. 769 (9th Cir. 2008) ("SpaceX"). In GSI Tech., the district court found the plaintiff's alleged injury did not "flow" from the defendants' conduct because "Cisco made the independent business decision" to award a contract to a company other than the plaintiff, and the plaintiff did not allege any facts to substantiate its claim of anticompetitive conduct. Here, Plaintiff essentially alleges Hayneedle's decision to pull out of its agreement with Plaintiff was not the result of an independent business decision, but the result of Defendants' intervention in that decision. And unlike the plaintiff in GSI, Plaintiff has alleged other facts to corroborate its theory.

SpaceX is even less helpful to Defendants. There, the district court, and ultimately the Court of Appeals, found the plaintiff did not have Article III standing to assert competitive disadvantage in its inability to compete for government procurement awards because the plaintiff could not offer a viable product and was not a "full-fledged" competitor. Consequently, any allegations concerning the defendant's anticompetitive conduct, even if true, would not have changed the outcome for the plaintiff. No similar facts are alleged or suggested in relation to the Hayneedle transaction; to the contrary, Plaintiff alleges facts that may have influenced Hayneedle's decision not to follow through with Plaintiff's purchase.

In sum, the court finds Plaintiff alleges sufficient facts to demonstrate Article III and antitrust standing for its failed purchase of the Hayneedle assets, which Plaintiff alleges it would otherwise own but for the interference.[2] Compl., at ¶ 89.

### b. Price Fixing and Market Allocation

Defendants argue against Plaintiff's standing to assert a claim for price fixing and market

---

[2] Defendant provides information outside the Complaint in its motion, such as the fact that Plaintiff has since acquired the Hayneedle assets. Defendants do not, however, cite a legal basis permitting the court to consider any of these facts on a Rule 12(b)(6) motion. Arpin v. Santa Clara Valley Transp. Auth. Agency, 261 F.3d 912, 925 (9th Cir. 2001) ("[E]xtraneous evidence should not be considered in ruling on a motion to dismiss."). Since the motion will not be converted into one for summary judgment, the court declines to do so.

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
9

allocation under the Sherman Act § 1 because as a competitor, "Plaintiff would stand to benefit from higher prices in the distribution market" rather than be injured by those prices. This argument is misplaced, given Plaintiff's dual role. See Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc., 140 F.3d 1228, (9th Cir. 2003) (holding that when a plaintiff is both a potential competitor and a customer of the defendant, the court must ask whether the plaintiff "has either competitor standing or purchaser standing" to assert an antitrust claim).

Relevant to the Sherman Act § 1 claim, Plaintiff alleges Defendants have engaged in horizontal price fixing and market allocation in the telescope supply market. Plaintiff states that Ningbo Sunny and the Settling Manufacturer divided the telescope supply by agreeing which products each would sell to Plaintiff. Compl., at ¶ 64. Plaintiff also alleges that because Defendant and the Settling Manufacturer have no competition, they can unilaterally set supracompetitive prices, leaving Plaintiff with no way to negotiate a better price. Id. at ¶¶ 64-66.

Defendants' argument based on increased prices in the *distribution* market is not responsive to these allegations. As described, the Complaint does not claim a conspiracy that benefits Plaintiff as a competitor in the supply market, such as the one described by the Supreme Court in Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574 (1986). The reasoning behind Plaintiff's argument, which was borrowed from Matsushita, does not apply. The Sherman Act § 1 claim will not be dismissed for lack of standing.

### c. Clayton Act § 7

Plaintiff alleges that Ningbo Sunny's acquisition of Meade violated the Clayton Act § 7. More specifically, Plaintiff alleges that after the Federal Trade Commission ("FTC") blocked efforts by Meade to merge with one of Ningbo Sunny's conspiring competitors, Ningbo Sunny purchased Meade without disclosing to the FTC that same conspiring competitor had an interest in Ningbo Sunny. Id. at ¶¶ 69-70. Plaintiff states that Ningbo Sunny's acquisition of Meade "has harmed competition because it transferred valuable intellectual property and manufacturing capabilities that competitors . . . could have used to compete against Ningbo Sunny. Id. at ¶ 71. Plaintiff further states that the acquisition "transferred market share to Ningbo Sunny" and that

Meade has avoided competing with Ningbo Sunny and its conspiring competitors. Id. at ¶¶ 71-72.

Defendants argue these allegations do not disclose a plausible antitrust injury from the acquisition of Meade. The court agrees. Even assuming, arguendo, that Ningbo Sunny's purchase of Meade constitutes unlawful conduct, Plaintiff has not described an injury flowing from Defendants' conduct that the antitrust laws were intended to prevent. As noted, the Supreme Court has recognized that even lawful mergers can produce adverse "economic readjustments," but those consequences do not make a merger unlawful . Brunswick Corp., 429 U.S. at 487. Moreover, "[i]f the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." Rebel Oil, 51 F.3d at 1433. "[L]oss incurred because of an unlawful acquisition that would also have been incurred had the acquisition been lawful is not antitrust injury because it does not flow from that which makes the defendant's conduct unlawful." Lucas Auto. Eng'g, 140 F.3d at 1233.

Here, Plaintiff alleges an injury stemming from the removal of Meade as a competitor of Ningbo Sunny in the distribution market, and from Ningbo Sunny's acquisition of Meade's intellectual property. As to Plaintiff, this conduct had a neutral effect on competition; Plaintiff must still compete with Meade and Ningbo Sunny as distributors in the market, even if the two are not competing with each other. And to the extent the acquisition had any negative effect on competition by increasing the market share of one competitor, this effect would have resulted whether Ningbo Sunny or another company purchased Meade, along with its assets. In short, Plaintiff describes only conduct that harms it as a competitor, but not harm to competition itself. Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir. 2007). That sort of harm is not protected by antitrust laws. Id.

Because Plaintiff has not plausibly pled antitrust standing, the Clayton Act § 7 claim will be dismissed.

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
11

## C. Plausibility and Failure to State a Claim

### i. Sherman Act § 1

Defendants' arguments against the Sherman Act § 1 claim are many, but only one need be discussed at this stage. As currently pled, the Sherman Act § 1 claim must be dismissed because it asserts an implausible theory of collusion.

To satisfy the first element of a § 1 claim, a complaint "must allege facts 'plausibly suggesting (not merely consistent with)' a conspiracy." name.space, 795 F.3d at 1129 (quoting Twombly, 550 U.S. at 557). "It is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion plausible." Id. "This standard does not impose a 'probability requirement,' but 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" Id.

Defendants argue the Complaint does not plausibly suggest collusion or a conspiracy between Ningbo Sunny and the Settling Manufacturer in the relevant market because other allegations establish that Ningbo Sunny already had the power to raise prices or set pricing terms without entering into an illegal agreement. The Complaint, in its present form, supports this argument. Plaintiffs allege that Ningbo Sunny "is the largest supplier of U.S. consumer telescopes and possesses monopoly power over the manufacture of beginner to low-intermediate telescopes for sale in the U.S." Id. at ¶ 28. Specifically, Plaintiffs allege that Ningbo Sunny "controls the manufacture of approximately 75% of the beginner to low-intermediate consumer telescope market in the U.S." Id. at ¶ 25.

These allegations are inconsistent with Plaintiff's contention that Ningbo Sunny's conduct is the result of an anticompetitive agreement. In other words, Plaintiff's theory that Ningbo Sunny and the Settling Manufacturer are involved in a conspiracy to restrain trade makes no economic sense in the face of allegations that Ningbo Sunny is already a monopolist in the low-intermediate consumer telescope market in the U.S. "Monopoly power is the ability to control prices and exclude competition in a given market." Broadcom, 501 F.3d at 307. If Ningbo Sunny desired to

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
12

increase prices or set price terms, it would be far easier for Ningbo Sunny to do just that than to collude with another company, given its purported level of control over the relevant market. See Universal Grading Serv. v. eBay, Inc., No. C-09-2755 RMW, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), aff'd, 563 Fed. Appx. 571 (9th Cir. 2014).

Plaintiff faults this argument for ignoring "that the reason for Ningbo Sunny's power in this segment of the market is that, in addition to economic factors, it has an unlawful agreement with the Settling Manufacturer to divide the market." But even assuming the market is divided in the manner Plaintiff asserts, the Complaint only alleges conduct consistent with such an agreement between Ningbo Sunny and the Settling Manufacturer. Plaintiff does not argue it is unlawful for participants in the same market to choose to not directly compete; indeed, there may be a host of business and other economic reasons why rational companies would make that type of decision. name.space, 795 F.3d at 1130 (holding that an anticompetitive agreement cannot be inferred when factual allegations "just as easily suggest rational, legal business behavior). This "lawful parallel conduct fails to bespeak unlawful agreement." Twombly, 550 U.S. at 556; accord Matsushita, 475 U.S. at 597 n. 21 (1986) ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.").

Nor are the allegations concerning the failed Hayneedle transaction substantial enough to plausibly demonstrate an anticompetitive conspiracy between Ningbo Sunny and the Settling Manufacturer. Though the Complaint suggests coordination between the two companies in response to Plaintiff's potential purchase of the Hayneedle assets and sufficiently alleges an antitrust injury, the Complaint just as easily suggests the rational exercise of leverage against a competitor. And notably, the strongest allegation of some nefarious, behind-the-scenes interference is not alleged to implicate Ningbo Sunny, the Settling Manufacturer, or the latter's wholly-owned distributors, but rather "Ningbo Sunny's competitors and/or their agents." Compl., at ¶ 82.

Plaintiff has not pled a plausible Sherman Act § 1 claim. It will be dismissed with leave to amend.

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
13

### ii. Sherman Act § 2

The Sherman Act § 2 prohibits monopolization or attempted monopolization of trade or commerce. 15 U.S.C. § 2. An attempt claim has four elements: "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury." Rebel Oil, 51 F.3d at 1434. A monopoly claim has two elements, aside from antitrust injury: (1) defendant possessed monopoly power in the relevant market and (2) defendant willfully acquired or maintained that power. Image Tech., 125 F.3d at 1202.

Plaintiff's Sherman Act § 2 claim is based on anticompetitive pricing under both a monopolization theory and an attempted monopolization theory. Compl., at ¶ 108. "In order unilaterally to raise prices above competitive levels, the predator must obtain sufficient market power," which may be shown in two ways. Rebel Oil, 51 F.3d at 1434. The first and less common way is through direct evidence of "restricted output and supracompetitive prices." Id. The second and more common way is through circumstantial evidence pertaining to the structure of the market, which requires the plaintiff to: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." Id.

The Complaint seeks to show market power circumstantially. Defendants argue the Complaint does not sufficiently allege the final element of showing, otherwise known as barriers to entry and barriers to expansion. "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme." Id. at 1439. "The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." Id.

Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants" or "factors in the market that deter entry while permitting

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
14

incumbent firms to earn monopoly returns." Id. "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." Id. "Entry barriers pertain not to those already in the market, but to those who would enter but are prevented from doing so." United States v. Syufy Enters., 903 F.2d 659, 671 n.21 (9th Cir. 1990). Barriers to expansion constrain "the ability of existing firms to quickly increase their own output in response to a contraction by the defendant." Rebel Oil, 51 F.3d at 1441.

The Complaint does not plausibly allege significant barriers to entry. The pleading superficially references "high capital investment costs," "key intellectual property rights," the time of "acquiring and building a suitable factory," and "the technical process of producing quality optics and telescope parts." Compl., at ¶¶ 30, 31. These references are a start, but they are not enough. Missing are any supporting facts taking the allegations from possible to plausible; what are the high capital investment costs and key intellectual property rights that pose a significant barrier to entry? How long does it take to acquire or build a suitable factory? What is the technical process for producing quality optics, and why is it so significant so as to prevent new market entrants? Without a better description of the purported entry barriers, the allegations are too conclusory to be entitled to an assumption of truth. See Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014) (holding that "to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action").

Allegations describing barriers to expansion are also conspicuously missing from the Complaint. Though Plaintiff identifies other competitors in the supply and distribution markets (Compl., at ¶¶ 33, 36, 71), there are no corresponding statements explaining why those participants cannot increase their own output in response to a contraction by Defendants. Plaintiff does not argue otherwise in its opposition.

Because Plaintiff has not plausibly pled barriers to entry and expansion, the Sherman Act §

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
15

2 claim will be dismissed.

### D. The State Law Claims

The jurisdiction of federal courts is limited, and is only properly exercised over those cases raising federal questions or involving parties with diverse citizenship. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). "[O]nce a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Id. However, a district court may properly decline to exercise supplemental jurisdiction over state-law claims if such claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction" or if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

Since this order will resolve the two federal claims asserted in this action, the court will decline supplemental jurisdiction over the state law claims. Those claims will again be dismissed without prejudice, but may be reasserted in an amended complaint. See 28 U.S.C. § 1367(c)(3); see also Acri v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th Cir. 1997) (en banc).

## IV. ORDER

Based on the foregoing, the Motion to Dismiss (Dkt. No. 17) is GRANTED. The federal claims are DISMISSED WITH LEAVE TO AMEND. The state law claims are DISMISSED WITHOUT PREJUDICE.

Any amended Complaint must be filed on or before **October 20, 2017.**

**IT IS SO ORDERED.**

Dated: September 28, 2017

EDWARD J. DAVILA
United States District Judge

Case No.: 5:16-cv-06370-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
16