1  J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
     borden@braunhagey.com
3  Lauren Zweier, Esq. (SBN: 291361)
     zweier@braunhagey.com
4  BRAUNHAGEY & BORDEN LLP
   220 Sansome Street, Second Floor
5  San Francisco, CA 94104
   Telephone:  (415) 599-0210
6  Facsimile:  (415) 276-1808

7  Attorneys for Plaintiff OPTRONIC
   TECHNOLOGIES, INC. d/b/a ORION
8  TELESCOPES & BINOCULARS®

9                      UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11

12 OPTRONIC TECHNOLOGIES, INC., d/b/a        Case No. 5:16-cv-06370-EJD
   Orion Telescopes & Binoculars®, a California
13 corporation,                              **FIRST AMENDED ANTITRUST
                                             COMPLAINT FOR VIOLATIONS OF
14            Plaintiff,                      SHERMAN ACT § 1; CARTWRIGHT
                                             ACT (Cal. Bus. & Prof. Code § 16700 *et
15       v.                                   seq.*); UNFAIR COMPETITION (Cal.
                                             Bus. & Prof. Code § 17200 *et seq.*)**
16 NINGBO SUNNY ELECTRONIC CO., LTD.,
   SUNNY OPTICS, INC., MEADE
17 INSTRUMENTS CORP., and DOES 1 - 25,
                                             **JURY TRIAL DEMANDED**
18            Defendants.

19

20

21

22

23

24

25

26

27

28

Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars ® ("Orion") alleges as for its First Amended Complaint as follows:

**INTRODUCTION**

1.     Plaintiff Orion has been selling telescopes since 1975, when its founder launched the business from his garage in Santa Cruz, California.  It is the last significant U.S. independent telescope brand and brings this action to remedy horizontal price fixing, market division and retaliation in the U.S. recreational telescope market by Chinese manufacturer Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny"), its U.S. subsidiaries Sunny Optics, Inc. ("Sunny Optics"), and Meade Instruments, Inc. ("Meade"), and their coconspirators, who have already settled with Orion (the "Settling Coconspirators").

2.     There are essentially two manufacturers for telescopes sold in the U.S.:  Ningbo Sunny and its wholly owned subsidiaries (including Meade), and the Chinese manufacturer that settled with Orion pre-suit (the "Settling Manufacturer").  Ningbo Sunny and the Settling Manufacturer agreed to divide the market whereby Ningbo Sunny produces low to medium end telescopes and the Settling Manufacturer makes the higher end models.  Absent the unlawful agreement between Ningbo Sunny and the Settling Manufacturer, which was orchestrated by Defendants' sole owner and controlling executive Peter Ni, the Settling Manufacturer would manufacture low end telescopes itself, as it had done in the past.  As a result of their unlawful agreement, both Ningbo Sunny and the Settling Manufacturer have long been free to, and do, fix prices, restrict output, and engage in other anticompetitive conduct.

3.     Defendants and the Settling Manufacturer leveraged their monopoly over supply into the U.S. distribution market.  Defendants' concerted action with the Settling Coconspirators included systematic acquisition of key U.S. distributors and brands to create a vertically integrated manufacturing, distribution, and sales conglomerate.  In 2013, Ningbo Sunny colluded with the Settling Coconspirators to acquire Meade despite U.S. regulators' concerns regarding such combinations.  Their collusion with the Settling Coconspirators has allowed them to accomplish precisely what the U.S. Federal Trade Commission ("FTC") sought to prevent years ago when it blocked the concentration of foreign telescope manufacturers and brands in the United States.  *See*

1   F.T.C. Press Release (May 29, 2002), https://www.ftc.gov/news-events/press-releases/2002/05/ftc-
2   authorizes-injunction-pre-empt-meade-instruments-purchase-all.
3           4.      Defendants have engaged in at least the following horizontal agreements with the
4   Settling Coconspirators, all of which are paradigmatic antitrust violations forbidden under federal
5   and state law as *per se* illegal because there is no legitimate purpose for such conduct:
6           •       Jointly setting the price at which Orion was allowed to purchase telescope
7   products.  *E.g.*, *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 986 (9th Cir. 2000)
8   ("agreements fixing or tampering with prices are illegal *per se*");
9           •       Jointly setting trade and credit terms for Orion's purchase of telescope
10  products.  *E.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (Because "credit
11  terms must be characterized as an inseparable part of the price[,]" an "agreement to terminate the
12  practice of giving credit to a customer is thus tantamount to an agreement to eliminate discounts,
13  and thus falls squarely within the traditional *per se* rule against price fixing") (per curium);
14          •       Jointly refusing to manufacture specific telescope products. *E.g.*, *U.S. v.
15  Andreas*, 216 F.3d 645, 667 (9th Cir. 2000) ("output restrictions have long been treated as *per se*
16  violations");
17          •       Jointly agreeing to divide the market for the production and distribution of
18  telescope products.  *E.g.*, *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 768
19  (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so
20  inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually
21  caused.");
22          •       Jointly threatening to refuse to trade with Orion should it pursue antitrust
23  claims.  *E.g.*, *Fashion Originators' Guild of America v. Fed. Trade Comm'n*, 312 U.S. 457, 465
24  (1941) (*per se* violation where group of conspirators "subjects all retailers and manufacturers who
25  decline to comply with the Guild's program to an organized boycott");
26          •       Jointly conspiring to ensure Defendants' purchase of Meade, including by
27  coordinating the use of the Coconspirators' employees to help run the acquired entity. *E.g.*, *Helix
28  Milling Co. v. Terminal Flour Mills Co*., 523 F.2d 1317, 1320 (9th Cir. 1975) (conspiring to sell

1   flour mill to co-defendant instead of to competitor "would violate the Sherman Act, no additional

2   showing of 'public injury' is necessary to support a private action for damages").

3        5.     Since the filing of the original complaint in this action, Defendants have doubled

4   down by refusing to deal with Orion. In this litigation, Orion seeks compensatory, treble and

5   punitive damages in excess of $10,000,000, injunctive relief, divestiture of Defendants' illegally

6   acquired assets, and all of its attorneys' fees and costs.

7   **JURISDICTION AND VENUE**

8        6.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337

9   and 15 U.S.C. § 15. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10        7.     Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. § 22, because

11   a "substantial part of the events or omissions" on which the claim is based occurred in this district.

12   Under N.D. Cal. Civil L.R. 3-2(c), (e), because a substantial part of the events or omissions alleged

13   occurred in Santa Cruz County, the case should be assigned to the San Jose Division.

14        8.     The Court has personal jurisdiction over the Defendants because they directed their

15   tortious conduct at persons and activities within the State of California.  The Court further has

16   jurisdiction over Defendant Meade, because its headquarters are in California. The Court further

17   has jurisdiction over Defendants Ningbo Sunny and Sunny Optics, Inc. because they share a

18   principal with Meade, as described further below.

19   **THE PARTIES**

20        9.     Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars is a U.S.

21   corporation that imports and sells telescopes, binoculars, and accessories online, through a network

22   of dealers, and through its catalog.  It was founded in 1975 and has corporate offices in

23   Watsonville, California with a retail store in Cupertino, California.  The company has built

24   substantial goodwill over its 42 years in business.

25        10.    Defendant Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") is a company

26   located in Yuyao, Zhejiang, China.  Ningbo Sunny's Chairman and/or President is Wenjun

27   ("Peter") Ni.

28

a.      The principal of Ningbo Sunny's primary manufacturing competitor, one of the Settling Coconspirators, has claimed in the past to have co-founded and owned 48% of Ningbo Sunny.  This cross-ownership has enabled Ningbo Sunny to coordinate its pricing, sales and manufacturing practices with the Settling Coconspirators to effectively monopolize the U.S. market.

b.      Orion has been forced by Ningbo Sunny to make payments through one of the Settling Coconspirators, even though Ningbo Sunny and the Settling Coconspirators hold themselves out as competitors in the market.

c.      Ningbo Sunny has exported and sold telescopes in this District through its U.S. subsidiary, Meade.

d.      On information and belief, Ningbo Sunny is an affiliate of a publicly traded company on the Hong Kong stock exchange, Sunny Optical Technology Co., Ltd. ("Sunny Optical").  On information and belief, Ningbo Sunny is controlled by a close family member of the Company's director and ultimate controlling shareholder, Mr. Wang Wenjian.

e.      On information and belief, Sunny Optical has direct or indirect control over Ningbo Sunny's conduct and activities related to Orion.

11.      Defendant Sunny Optics, Inc. is a Delaware corporation formed for the purpose of acquiring Meade Instruments Corp. ("Meade").  Upon information and belief, it is a subsidiary of Ningbo Sunny.  At one point in time, Peter Ni was the sole shareholder, officer and director of Sunny Optics, Inc.

12.      Defendant Meade Instruments Corp. is a Delaware Corporation with its principal place of business in Irvine, California.  It is a wholly-owned subsidiary of Ningbo Sunny.  Meade operates or has operated a factory in Tijuana, Mexico.  Peter Ni is Meade's Chief Executive Officer.

13.      Wenjun "Peter" Ni has been a longtime affiliate of Ningbo Sunny's publicly traded corporate parent, Ningbo Optical.

a.      On information and belief, Mr. Ni coordinated, led, entered and/or authorized the collusive agreements at issue between Ningbo Sunny and the Settling

1  Coconspirators described herein, including without limitation:  to jointly fix prices offered to

2  Orion, to jointly restrict and set Orion's trade and credit terms, to block Orion's purchase of Meade

3  by orchestrating the acquisition of Meade using the Settling Coconspirators' support and

4  assistance, and to retaliate and refuse to deal with Orion.

5        b.    Mr. Ni caused Defendant Sunny Optics, Inc. and Sunny Optics Merger Sub,

6  Inc. to be formed in the State of Delaware for purposes of consummating the Meade acquisition

7  and serving as the U.S. based holding company for Meade.

8        c.    Mr. Ni was, at relevant times, the sole stockholder of Sunny Optics, Inc. and

9  also was the sole director and sole officer of that entity.

10       d.    Mr. Ni funded the Meade acquisition.

11       e.    Mr. Ni executed the Meade acquisition agreement under U.S. law.

12  14.    The Settling Coconspirators are a manufacturer of recreational telescope products

13  ("Settling Manufacturer") and two of the Settling Manufacturer's wholly owned brands ("Settling

14  Distributors").  The Settling Coconspirators have participated as partners in the conduct alleged

15  herein but have settled and resolved Orion's claims and are therefore not named as parties.  *Ward v.*

16  *Apple Inc.*, 791 F.3d 1041, 1048-49 (9th Cir. 2015) (unnecessary to sue joint tortfeasors in antitrust

17  case).

18  15.    Defendants are controlled by their president, Mr. Ni.  Through Mr. Ni and other

19  agents, Defendants conspired with one another and with their competitors, the Settling

20  Coconspirators, to engage in the acts and omissions alleged herein.  Each Defendant acted with

21  knowledge of the conspiracy and worked with each other and unknown third parties to accomplish

22  their objective.  Each Defendant acted as the principal, agent and/or joint venturer of, and on behalf

23  of the other Defendants, regarding the acts, violations, and common course of conduct alleged

24  herein.

25        **SERVICE OF PROCESS ON CALIFORNIA-BASED AGENTS**
26        **IS EFFECTIVE AS TO THE FOREIGN DEFENDANTS**

27  16.    Defendant Ningbo Sunny's subsidiary, Meade, is located in Irvine, California, and is

28  registered as a corporation doing business in California.

17.     Peter Ni is the CEO of Meade and the Chairman and/or President of Ningbo Sunny.

18.     Meade is of sufficient rank and character to make it reasonably certain that Defendant Ningbo Sunny will be appraised of the service of this Complaint on Meade.  The relationship between Meade and Ningbo Sunny is extensive:

      a.    Ningbo Sunny controls the operations and business decisions of the U.S.-based Sunny Optics and Meade.

      b.    Ningbo Sunny has a financial interest in Sunny Optics and Meade's California and U.S. operations.

      c.    Ningbo Sunny benefits from the sale of Meade products in California and throughout the U.S.

      d.    Ningbo Sunny's arrangement with Meade offers Ningbo Sunny the same business advantages it would have if Ningbo Sunny opened its own offices or hired its own agents in California.

      e.    Meade offers Ningbo Sunny the opportunity for regular contact with California customers.

      f.    Meade offers Ningbo Sunny a channel for the continuous flow of business into California.

      g.    There is regular, frequent contact between Meade and Ningbo Sunny.

19.     Sunny Optics is a shell holding company created by Ningbo Sunny for purposes of completing Ningbo Sunny's merger with Meade in 2013.

20.     Ningbo Sunny and Mr. Ni relied upon their domestic agents, employees and affiliates, including without limitation Meade and Sunny Optics, to help implement and conceal the anticompetitive activities alleged herein, including the market division alleged below.

21.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals, under the control and explicit authority, implied authority or apparent authority of their principals.  Accordingly, the Defendant principals are liable for the acts of their agents.  Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents

1    within the scope of their explicit, implied or apparent authority.

2                                    **FACTS**

3         **A.      Consumer Telescopes and the Relevant Market**

4         22.    Astronomy is a popular hobby for many Americans.  The U.S. is one of the largest,

5    if not the largest, market for consumer astronomical telescopes (to be distinguished from advanced

6    telescopes used at universities and observatories) and generates well over $100 million in telescope

7    sales annually.

8         23.    Telescopes have two main optical components: the objective and the eye lens. A

9    reflector telescope uses mirrors to collect and focus light, and a refractor uses a concave lens.  In

10   addition to optical components, telescopes have mounts that enable the user to move the telescope.

11   Some telescopes employ motorized mounts and software that can automatically move the telescope

12   to point at objects in the sky.

13        24.    Orion sells telescopes for recreational use by consumers, including first-time

14   purchasers, beginners and intermediate-to-advanced users.  Orion selects or creates the design for a

15   telescope it wants to sell.  It then works with a contract-manufacturer to build the telescope and its

16   relevant components.

17        25.    Almost all recreational telescopes sold in the U.S. market are made by either Ningbo

18   Sunny or the Settling Manufacturer.

19        26.    The relevant market in this action is for telescopes for beginner to intermediate

20   consumers, comprising over 90% of U.S. recreational telescope sales.

21        27.    By working in concert with the Settling Coconspirators, Defendants have captured a

22   significant portion of that consumer telescope market for themselves.  But for their agreements

23   with one another to divide manufacturing and fix prices to companies like Orion, Defendants (and

24   Ningbo Sunny in particular) would not enjoy their enhanced market position.

25        28.    As is typical in a contract-manufacturing setting, Orion purchased its telescope

26   products on credit terms with its suppliers, including Ningbo Sunny and the Settling Manufacturer.

27   The credit terms provide for a period of time, between 30-90 days, from which to remit payment on

28   orders that Orion receives.

29.     This is an important element of the buyer-seller relationship and critical to smoothing cash flow to ensure the buyer has proceeds from its own sales before payment is due to the supplier.  Defendants have used this credit relationship as a weapon against Orion, as described in greater detail below.

30.     Orion sells its telescopes to consumers through a number of channels, including direct to consumer via the internet and mail orders, to third party dealers and through other retail outlets.

### 1.     Telescope Supply

31.     As noted, there are two primary telescope manufacturers making telescopes for the U.S. telescope market:  Ningbo Sunny and the Settling Manufacturer.

32.     Ningbo Sunny and the Settling Manufacturer were (and are) ostensibly competitors. Ningbo Sunny contends that it and the Settling Manufacturer are owned by separate persons and interests, and holds itself out to the market (and to this Court) as completely different entities under separate management and ownership.

33.     Despite representing themselves as competitors, during the relevant period, Ningbo Sunny and the Settling Manufacturer entered numerous agreements with one another to ensure that they jointly controlled the supply of telescopes into the U.S.[1]

34.     Ningbo Sunny and the Settling Manufacturer do not act independently and have unlawfully agreed not to compete in the supply market – at least as far as Orion products.  As a result of their unlawful agreement, both Ningbo Sunny and the Settling Manufacturer can, and do,

---

[1] As this Court noted in its Order on Defendants' Motion to Dismiss, Orion's original Complaint alleged that Ningbo Sunny had obtained monopoly power in the lower to mid-range telescope market.  (Dkt. No. 38 at 2.)  This allegation was based on a singular fact:  Ningbo Sunny's illegal collusion with the Settling Manufacturer is in violation of Sherman Act § 1. Absent such concerted dealings between would-be competitors, Ningbo Sunny would hold no monopoly power.  A key reason that Defendants entered those agreements was to maintain and support their respective market shares.  Orion has elected to focus its claims and case on Defendants' numerous improper combinations and restraints of trade with the Settling Coconspirators, even as that misconduct might also support attempted monopolization claims under Sherman Act § 2.  *E.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (market division agreements and concerted acquisition of competitors were an "unlawful and exclusionary" practice under § 2 of Sherman Act); *Schine Chain Theaters v. United States*, 334 U.S. 110, 119 (1948) (covenants not to compete were "additional weapons in [the defendant's] arsenal of power through the use of which its monopoly was sought to be extended" that violated both § 1 and § 2).

1  charge supracompetitive prices, restrict supply and engage in other unlawful, monopolistic conduct.

2  As part of this unlawful agreement, Ningbo Sunny and the Settling Manufacturer have, *inter alia*:

3      a.  Forced buyers such as Orion to order telescope products at a fixed

4  price that was not independently negotiable.

5      b.  Refused to independently negotiate the price for telescope products

6  that would be sold by Ningbo Sunny.

7      c.  Jointly set credit and trade terms affecting the delivery, shipment,

8  credit and other items affecting Orion's purchase of telescope products.

9      d.  Threatened the supply of Orion's telescope products should it seek to

10  upset Defendants and the Settling Coconspirators' stranglehold on the U.S. market.

11      35.  When Ningbo Sunny began supplying Orion, it stated that it would take over all

12  manufacture of the simpler, lower-end models, and that the Settling Manufacturer would supply the

13  more advanced telescopes.  Thereafter, the Settling Manufacturer transferred the specifications,

14  dies and molds used to make certain of Orion's lower-end models to Ningbo Sunny.  Absent an

15  unlawful agreement with Ningbo Sunny, the Settling Manufacturer would have continued

16  manufacturing the lower-end models, as it had done in the past.

17      36.  Because there is no effective competition, and due to significant market entry

18  barriers, Ningbo Sunny and the Settling Manufacturer each have a monopoly over the respective

19  products each sells Orion.

20      37.  Defendants' ability to control prices, influence output and charge supracompetitive

21  rates is likely to last for years because significant barriers to entry exist.  These barriers to entry

22  arise from unique market conditions, including the history of collusion between Defendants and the

23  Settling Coconspirators.

24      38.  First, telescope manufacturing has high capital investment costs, and the two key

25  manufacturers (Ningbo Sunny and the Settling Manufacturer) are vertically integrated with the

26  largest distributors.  Given the size of the market, there are not enough independent distributors to

27  make building a manufacturing facility profitable.

28

39.     Second, Defendants have sold products at below cost to the Settling Coconspirators to further frustrate market entry.

40.     Third, telescope manufacturing requires key intellectual property rights (for example, the rights to software that enables users to automatically find celestial objects, which beginning users demand). All these rights are owned by Defendants and the Settling Coconspirators, and the Plaintiff was blocked from acquiring this vital IP in the Meade acquisition by Defendant.

41.     Defendants and the Settling Coconspirators have colluded together to prevent market entry, such as when a small manufacturer attempted to purchase Meade, as discussed further below.

42.     No new manufacturers of any significance have entered the market in at least the last 10 years. With Ningbo Sunny's recent acquisition of Meade, which also had manufacturing capabilities (and will now not sell to Orion), the number of sources of supply essentially diminished to two: Ningbo Sunny and the Settling Manufacturer.

43.     As detailed below, when Orion filed this action, Ningbo Sunny retaliated and has been refusing to deal with Orion since December 2016. Orion has no alternative source of supply for several of the products manufactured by Ningbo Sunny. No new manufacturer has attempted to enter the market to try to satisfy this demand, which further underscores that substantial barriers to entry exist.

44.     Ningbo Sunny and the Settling Manufacturer have, on information and belief, restricted supply and charged monopoly prices because they have agreed to divide the supply market between themselves to eliminate any competition. Moreover, demand is inelastic for telescopes. Because there are few or no substitutes for the products made by Ningbo Sunny and the Settling Manufacturer, purchasers like Orion have little choice but to pay higher prices.

### 2.     U.S. Telescope Distributors and Brands

45.     The monopoly over telescope supply has impacted telescope distribution. Ningbo Sunny sells its telescopes to distributors through distributor brands, which then sell the telescopes through stores, dealers, and the internet to astronomy enthusiasts in the U.S. There are three or

1   four major telescope distributors in the U.S, including Orion, which is currently the only remaining

2   independent distributor with significant market share.

3        46.     In 2005, the Settling Manufacturer acquired one of the Settling Distributors, the

4   largest telescope distributor in the U.S. market.  As a result, until four years ago, the only other

5   major independent distributor of telescopes in the U.S. market aside from Orion was Meade.  In

6   2013, Meade was purchased by Ningbo Sunny as part of a joint effort to prevent its assets from

7   being acquired by Orion or any other competitor. Moreover, Meade has a manufacturing facility,

8   which Ningbo Sunny acquired, thereby eliminating this source of supply.

9        47.     This vertical integration took place alongside Ningbo Sunny's coordination of

10  manufacturing and sales activities with its only competitor, including their agreement to divide the

11  market by product type.  As a result, Meade has not seriously competed with any other major U.S.

12  brand other than Orion since the Ningbo Sunny acquisition and has not used its manufacturing

13  capabilities to diversify the supply of telescopes.

14       48.     Through vertical integration, Defendants and the Settling Coconspirators leveraged

15  their control over telescope supply to completely dominate U.S. telescope distribution.  Orion, with

16  approximately 15% of U.S. sales, is the only significant competitor to Defendants' brands.  The

17  remainder of sales in the U.S. is by a handful of other small brands, including Explore Scientific,

18  Bresser and others, which together account for less than 10% of the market.

19       49.     Telescope distribution was not historically this concentrated.  But Ningbo Sunny

20  and the Settling Coconspirators transformed the market through their supply monopoly.

21                    **3.     The Relevant Products**

22       50.     Telescopes for beginners through intermediate users in the U.S. can be divided into

23  five major sub-categories:  (1) reflector telescopes, (2) Dobsonian telescopes (which are actually a

24  type of reflector telescope), (3) refractor telescopes, (4) Maksutov-Cassegrain ("Mak-Cass")

25  telescopes, and (5) Schmidt-Cassegrain telescopes.

26       51.     On information and belief, Ningbo Sunny has conspired with the Settling

27  Coconspirators to divide the telescope distribution market, just as it has done with telescope

28  production.

52.     For example, Meade consistently has avoided producing products that would compete with the Settling Coconspirators, including in the entry-level Reflector telescopes – even though it often made such products for the Settling Coconspirators.

### 4.     Defendants' Anticompetitive Conduct

53.     Defendants have conspired and combined to dominate and monopolize telescope supply and distribution.  They have engaged in anticompetitive acts, including without limitation, market division and price maintenance, the anticompetitive acquisition of competitors, conspiring to prevent Orion from obtaining market share and tortiously interfering with Orion's ability to do so, providing discriminatory promotions and allowances, and dumping telescopes.  On information and belief, Defendants have or were engaged in similar anticompetitive conduct with regard to the supply and sales of telescopes in Europe.

### B.     Ningbo Sunny's Antitrust Conspiracy

54.     In its Order, the Court held that Orion had not made sufficient allegations to support the existence of an antitrust conspiracy because it controls 75% of the market for manufacturing low to intermediate telescopes and therefore has no economic rationale for conspiring.  (Dkt. No. 38 at 12.)

55.     As now explained in Paragraphs 33-38 and n.1 above, the only reason Ningbo Sunny enjoys and is able to maintain market power is that it has entered into unlawful agreements with the Settling Coconspirators; otherwise, the Settling Manufacturer could, and would, use its facilities, equipment and knowhow to produce the same products Ningbo Sunny manufactures, as it had done prior to its illegal agreement with Ningbo Sunny.  *E.g.*, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused.").

56.     Ningbo Sunny has every reason to continue to conspire to suppress competition, and as demonstrated below, Ningbo Sunny has gone to extensive lengths to collude with the Settling Coconspirators to eliminate competition, divide the market and fix prices.

57.     In its SEC filing disclosing its acquisition of Meade, Ningbo Sunny represented there was no common ownership between it and its main competitor, the Settling Manufacturer. However, the competitor has told Orion's President that is not true.  In fact, on July 21, 2013, the Settling Manufacturer's principal told Orion that he had transferred his interest in Ningbo Sunny to a sister-in-law, who held the interest in her maiden name to mask the ownership.  On that basis, and for the reasons below, Orion is informed, and thereby alleges, that Defendants have unlawfully colluded with the Settling Coconspirators.  Alternatively, Orion alleges that Defendants and the Settling Coconspirators have at least some common ownership and are operated for the benefit of at least some of the same individuals.

58.     Regardless of ownership, substantial evidence points to an anticompetitive alliance between Ninbgo Sunny and the Settling Manufacturer, its purported competitor, including without limitation:

a.   The two share operations and coordinate in the manufacture of different lines of telescopes so as not to compete with one another.

b.   They share non-public, sensitive information about their businesses with each other, including intellectual property, business plans, and product pricing.

c.   They conspire to fix the prices of their products, including the credit terms offered thereon.

d.   The purported competitor sent officers to work for Ningbo Sunny's subsidiary Meade immediately upon Ningbo Sunny's acquisition of Meade.

e.   Ningbo Sunny manufactures products for its purported competitor.

f.   Ningbo Sunny and its competitor have acted in concert to retaliate against Orion for trying to compete.

59.     Through such activities, each of which alone, and especially taken together, is sufficient to demonstrate an antitrust conspiracy to a jury, Ningbo Sunny has illegally combined and conspired with the only other major manufacturer of telescopes instead of competing against it. *E.g.*, *United States v. Container Corp.*, 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the

1  vigor of price competition.”); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.

2  Supp. 2d 896 (N.D. Cal. 2008) (“The “exchange of pricing information alone can be sufficient to

3  establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman

4  Act”) (quoting *Container Corp.*, 393 U.S. at 335); *In re Capacitrs Antitrust Litig.*, 106 F. Supp. 3d

5  1051, 1067 (N.D. Cal. 2015) (allegations that two parties “conducted an exchange of competitively

6  sensitive information” and agreed to exchange in the future is “enough to meet the *Twombly*

7  pleading standard”).

8                **1.**     **Ningbo Sunny's Purported Competitor Sells Products for Ningbo Sunny**

9       60.     Instead of trying to sell its products and prevent its customers from buying from the

10  competition, Ningbo Sunny shares sales staff with its supposed competition.  This underscores that

11  Ningbo Sunny is colluding with, rather than competing against its supposed rival.

12       61.     When Orion wants to purchase telescopes from Ningbo Sunny, Orion has done so

13  through Joyce Huang.  Huang, however, works for Ningbo Sunny's ostensible competitor, the

14  Settling Manufacturer, as is evinced by her email and physical addresses listed on her business

15  cards, as well as websites.

16       62.     Although she works for Ningbo Sunny's competitor, Huang quotes manufacturing

17  prices and takes sales orders for Ningbo Sunny.  For example, on December 20, 2014, Orion

18  inquired about pricing from Junwen (“James”) Chiu, Vice President of Marketing of Ningbo

19  Sunny, asking for quotes on “pricing, MOQ and lead time for 3 products.”

20       63.     The next day, Vice President Chiu responded on his Sunny Optics email account,

21  asking for specifications on the telescope from which a quote by Ningbo Sunny would be derived.

22       64.     A little over a week later, Orion received its price quote back.  However, instead of

23  coming from Ningbo Sunny, the quote came from Huang.  She then proceeded to detail the price

24  quotes and availability for each requested Ningbo Sunny product, even though she was clearly the

25  purported competitor's representative.

26       65.     In addition to showing the basic operational overlap and coordination between the

27  nominal competitors, Huang's email demonstrates that Ningbo Sunny and the Settling

28  Manufacturer were sharing and cooperating at the most basic business level of transmitting and

1   receiving sensitive customer orders and pricing information.

2        66.    Defendants' collusion is not limited to specific customer orders; upon information

3   and belief, they set their prices together.  Indeed, one company's representatives are responsible for

4   announcing the other's pricing policies to Orion.  The purported competitors even coordinate their

5   negotiations regarding customer credit terms – a key component of pricing.  For example, when

6   Orion sought to negotiate its Ningbo Sunny credit terms, it did so not with a Ningbo Sunny

7   representative but with the Settling Manufacturer's CEO.

8        67.    If Ningbo Sunny did not have an unlawful agreement to act in concert and suppress

9   competition with its only manufacturing rival, their officers would not jointly correspond with each

10   other's clients regarding sales orders, expected sales volumes, and credit terms.  Nor would they

11   routinely share non-public pricing and credit information with each other.  Likewise, Joyce Huang

12   would not be assisting Ningbo Sunny to obtain Orion's business; she would be trying to compete

13   for it.

14        **2.**    **Ningbo Sunny Coordinates Business Operations and Banking with Its Purported Competitor**

15

16        68.    The concerted action between Ningbo Sunny and its only rival also involves

17   integrating the booking of purchase orders, processing payment for such orders, and coordinating

18   the shipping of product to customers.  Ningbo Sunny and the Settling Manufacturer routinely

19   required Orion send money to one company's bank for goods ordered from, and made by, the

20   other, including by money transfers made over the wire and instrumentalities in interstate and

21   foreign commerce.

22        69.    Obviously, if Ningbo Sunny was a lawful competitor with its rival and did not have

23   an illegal agreement to suppress competition, they would not share a bank account.  They would

24   not work together to facilitate payments through Taiwan.  Nor would a true competitor help with

25   Ningbo Sunny's shipment of competitive products and fix the prices thereof; rather, it would be

26   trying to compete for Orion's business.

27

28

1

**3.     Ningbo Sunny Coordinated Its Acquisition of Meade with Its Rivals Who Sent Their Officers to Work for Meade**

2    70.    In addition to sharing business operations and banking, Ningbo Sunny and the

3    Settling Coconspirators shared in Ningbo Sunny's acquisition of Meade.

4    71.    Evidence recently produced by Defendants shows an astounding level of collusion

5    surrounding the Meade acquisition.  This information is set forth in a response filed by Ningbo

6    Sunny to FINRA after the agency opened an investigation into possible trading irregularities in

7    advance of the acquisition.  As part of the response, Defendants were obligated to disclose all

8    parties that knew of the acquisition before it was announced.

9    72.    Relevant sections of the FINRA response have been de-designated by Defendants

10    and are attached as **Exhibit 1**.

11    73.    The excerpted portions confirm Orion's allegations in this case:  that Ningbo Sunny

12    discussed the Meade acquisition with all the officers of the Settling Coconspirators – **before it ever**

13    **even made an offer to acquire Meade**.

14    74.    During the negotiation process, a top officer of the Settling Distributor, Joseph

15    Lupica, left the Settling Distributor to assist Ningbo Sunny in the acquisition.  Thereafter, he and

16    other officers from the Settling Distributor took over running Meade, all with the coordination and

17    support of Defendants' supposed trade competitor, the Settling Coconspirators.  The timeline of

18    Defendants' conspiracy is as follows:

19        a.    On May 16, 2013, Ningbo's Sunny's minor competitor, JOC, announced its

20    plan to acquire Meade.

21        b.    Seven days later, Ningbo Sunny discussed the potential acquisition of Meade

22    with the Chairman of the Settling Manufacturer, his sister, and her husband who operated one of

23    the Settling Coconspirators' business entities in Canada, the President/CEO of one of the Settling

24    Distributors, and Joseph Lupica, another executive of the Settling Distributor.

25        c.    On June 11, 2013, Ningbo Sunny submitted a bid to purchase Meade.  The

26    same day, Meade convened a special meeting to discuss Ningbo Sunny's offer.

27        d.    On June 14, 2013, Meade signed a confidentiality agreement with Ningbo

28    Sunny and began populating a data room for due diligence.

e.      On June 18, 2013, Meade began drafting a merger agreement with Ningbo Sunny.  The same day, Lupica quit his position at the Settling Distributor and began working to help Ningbo Sunny with the acquisition.

f.      When Ningbo Sunny acquired Meade, it officially replaced Meade's management with officers from the Settling Distributor.

g.      On July 26, 2013, Lupica signed the Schedule 13D filed with the U.S. Securities and Exchange Commission by Ningbo Sunny in conjunction with the Meade acquisition in his capacity as Ningbo Sunny's "authorized signatory" (representing, falsely, that there was no relationship between Ningbo Sunny and the Settling Coconspirators).  Lupica then became Meade's CEO.

h.      Less than a month earlier, Lupica had been the decades' long top executive at the Settling Distributor.

i.      At the same time, Ningbo Sunny also made the Settling Distributor's Vice President of Sales, Victor Aniceto, the Vice President of Sales for Meade.[2]  Subsequently, Aniceto was promoted to President of Meade when Lupica retired.

75.      In its Order, the Court held that Plaintiff had not sufficiently alleged an antitrust injury arising from the Meade acquisition.  (Dkt. No. 38 at 11.)  As shown in the added allegations above, Ningbo Sunny and the Settling Coconspirators worked together to prevent a party not under their control (JOC) from entering into the distribution market.

76.      The acquisition of Meade integrated Ningbo Sunny into the sphere of distribution for the first time.

77.      Further, if JOC did legitimately withdraw its bid, and absent the illegal Ningbo Sunny bid, Orion very likely would have prevailed with its bid and acquired the important Meade assets including critical IP, products and manufacturing capabilities that would have allowed Orion to become a larger, independent competitive threat to Ningbo Sunny's and the Settling Coconspirators' businesses.

---

[2] Aniceto learned of Ningbo Sunny's acquisition of Meade before the acquisition was publicly announced and while he was still employed by the Settling Distributor.

78.     Furthermore, this injured Orion by having to compete against Meade, which after the Ningbo Sunny acquisition could pay transfer pricing for the same telescopes Orion distributed, while Ningbo Sunny fixed Orion's prices however it chose.

79.     This conduct also prevented an additional market entrant who could have competed against Defendants and the Settling Coconspirators, eliminating competition and increasing consumer prices. Such injuries are precisely the type of injury to competition that the antitrust laws were designed to prevent. *E.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (market division agreements and concerted acquisition of competitors were an "unlawful and exclusionary" practice under the Sherman Act).

### 4.     Ningbo Sunny Manufactures Products for its Purported Competitor

80.     On information and belief, Ningbo Sunny now manufactures low-end products for at least one of the Settling Distributors, which could have such products made by its parent company, the Settling Manufacturer, rather than buying them from a competitor. This is further evidence that they are cooperating and allocating the market, rather than competing with one another.

### 5.     Ningbo Sunny and its Purported Competitor Share Non-Public, Sensitive Information about Their Business Operations

81.     Competitors typically go to great lengths to prevent competitors from knowing non-public information regarding their business operations. Such secrecy can offer a competitive advantage in the marketplace. Ningbo Sunny and the Settling Manufacturer, however, share confidential information that competitors would not share. For example, they share information about the pricing of products, as well as credit arrangement and order forecasts, which again is the type of information competitors seek to keep secret from one another.

82.     Ningbo Sunny also shares confidential information about its most basic business capabilities with its purported competitor, the Settling Manufacturer. Indeed, Ningbo Sunny's Chairman, Peter Ni, took Orion's President and the Settling Manufacturer's President on a tour of Ningbo Sunny's factory, where they viewed Ningbo Sunny's production capabilities and floor plan, which are precisely the type of information manufacturers vigorously protect from competitor scrutiny.

83.     The Settling Manufacturer's President also claimed to have a co-ownership stake in one or more of Defendants.

84.     At an October 17, 2015 meeting between Orion's President and the Settling Manufacturer's President in San Jose, California, Orion learned that Ningbo Sunny had invested $10 to $14 million in Meade since acquiring it.  Upon information and belief, Ningbo Sunny provided this information to the Settling Manufacturer because of their close business relationship and co-ownership structure.

### 6.     Ningbo Sunny Conspired with its Purported Competitor to Interfere with Orion's Purchase of the Hayneedle Assets

85.     As detailed further below, Ningbo Sunny coordinated with its competitor to retaliate against Orion for trying to compete for the Hayneedle Assets.  That Ningbo Sunny conspired with its purported competitor to frustrate Orion's purchase efforts evidences their agreement to assist one another and monopolize the market.

### C.     Ningbo Sunny Is Engaged in Market Division, Monopoly Pricing, and Price Maintenance

86.     As noted above, Ningbo Sunny and its would-be competitor, the Settling Manufacturer, divided telescope supply by agreeing which products each would sell to Orion.  As a result of this agreement, Orion has no way to negotiate a better price with either company – and they are the only available sources of supply.

87.     On information and belief, each company's prices have been fixed, dictated and/or approved of by the other.

88.     As a result of having no competition and by virtue of their unlawful agreements, both manufacturers have the ability to unilaterally set supracompetitive prices far above what they could command in a competitive market.  By way of example, they have both maintained the same prices for their goods, notwithstanding the massive devaluation of Chinese currency.  Absent an agreement to fix prices, the devaluation of a China's Renminbi would have made Defendants' exports much cheaper in U.S dollars.

89.     On information and belief, Defendants have also conspired with one another to set prices at the distribution level.

90.     In addition to price maintenance, Ningbo Sunny has conspired with the Settling Manufacturer to eliminate competition in various product channels to ensure products are not competing "head to head."  This is reinforced by the actual structure of the market, which Defendants have orchestrated to eliminate competition by stopping "head to head" competition between the two manufacturers and their respective distributors.  For example, as noted above, Ningbo Sunny manufactures a beginner telescope, which it sells to its competitor's subsidiary.  Yet Meade, which is owned by Ningbo Sunny, does not sell any competitive product in this space.

**D.     Ningbo Sunny Acquired Meade after the FTC Prohibited Its Competitor from Acquiring Meade**

91.     In 2002, the FTC formally blocked Meade's efforts to merge with Ningbo Sunny's ostensible competitor's subsidiary (one of the Settling Distributors) because it found "the potential combination … would raise significant competitive concerns and would violate the FTC Act and Section 7 of the Clayton Act."  The FTC contended that "the two companies together would monopolize the market for Schmidt-Cassegrain telescopes and would eliminate substantial actual competition … in the market for performance telescopes."  The FTC further found that the proposed merger "would likely result in anticompetitive activity in the two markets at issue" and "that entry into the relevant telescope markets sufficient to deter or counteract the anticompetitive effects of the proposed acquisition is unlikely to occur."

92.     Notwithstanding the FTC's position, Ningbo Sunny purchased Meade without disclosing to U.S. regulators the Settling Manufacturer's interest in Ningbo Sunny, or any of the other affiliations between the companies noted above, e.g., that the two companies were sharing operations, banking, employees, and pricing information.

93.     The existence of Ningbo Sunny's collusion with the Settling Manufacturer over the Meade acquisition is now made clear by the evidence recently produced in this case, discussed *infra*.  Nor is there any question that Ningbo Sunny made the acquisition in order to "vertically integrate" Meade to create a unified market presence.  Peter Ni admitted as much in his press release announcing the acquisition:

> Peter Ni, CEO of Sunny Optics, Inc. states, "I am extremely pleased
> to be involved in the future of Meade Instruments. This is a

> tremendous opportunity for both companies. It is my desire that Meade will be managed by Joe Lupica and that Meade continue to maintain its North American sales, marketing, and manufacturing facilities. **Where possible, Sunny Optics will offer its support to optimize the vertical integration of both companies.**

Astronomy Magazine, "Meade Instruments Corp. completes merger agreement with affiliates of Ningbo Sunny Electronic Co., Ltd." (10-15-2013 by Meade Instruments Corp.) (accessible as of October 27, 2017 at http://www.astronomy.com/news/2013/10/meade-instruments-corp-completes-merger-agreement-with-affiliates-of-ningbo-sunny-electronic-co-ltd).

94.     In addition to the antitrust injuries alleged above, Ningbo Sunny's acquisition of Meade has further harmed competition because it transferred valuable intellectual property and manufacturing capabilities that competitors such as Orion or JOC, a low-end telescope manufacturer with little market share (both of whom bid on purchasing Meade), could have used to compete against Ningbo Sunny and the Settling Coconspirators.  It further transferred market share to Ningbo Sunny, which is working with the Settling Coconspirators to control both supply and distribution.

95.     Moreover, since it was acquired by Ningbo Sunny, Meade has avoided competing with the Settling Coconspirators – yet further evidence that Ningbo Sunny is colluding to illegally divide the market.

**E.     Defendants' Tortious and Anticompetitive Acts to Undermine Orion's Acquisition of the Hayneedle Assets**

96.     Orion makes a significant percentage of its sales in the U.S. market via the internet. In 2014, Orion sought to purchase competing website URL addresses to bolster its sales.

97.     Defendants acted to retaliate against Orion and fix prices for credit after they discovered Orion's opportunity to purchase these URLs.

98.     Hayneedle.com is an e-commerce company where users can buy household goods, home décor and other items, including telescopes.  In 2014, Hayneedle decided to sell several of its URLs, including telescopes.com and binoculars.com, along with other assets (the "Hayneedle Assets").  Orion was interested in buying the URLs because it already owned the URL telescope.com, wanted to avoid confusion among internet users searching for Orion products, and wanted to keep its foothold in e-commerce.

99.     Before Orion bid on the Hayneedle Assets, the Settling Manufacturer's President told Orion's President that it was "very nervous" about Orion bidding on the Hayneedle Assets and tried to pressure Orion not to do so.

100.    Orion bid on the Hayneedle Assets anyway and had the highest bid.  Orion then executed a letter of intent with Hayneedle, giving Orion an exclusivity period to do due diligence on the purchase.  During the exclusivity period, nobody else could buy the Hayneedle Assets but Orion.

101.    Thereafter, the Settling Manufacturer sent Orion an email immediately revoking Orion's credit line and cutting off its supply until Orion paid off all its outstanding invoices.  The email stated that "if Orion really buys Hayneedle, this will be the beginning of a hazard," and further warned that Orion's credit line would not be reinstated if Orion continued to pursue the Hayneedle acquisition.

102.    The same day, Orion received an identical email from Wen Jun (Peter) Ni at Ningbo Sunny, immediately cutting off Orion's line of credit and supply.  The email used the same exact phrasing as the one from Ningbo Sunny's competitor, *e.g.*, "if Orion really buys Hayneedle, this will be the beginning of a hazard."  The email even included the same typographical errors.

103.    Shortly thereafter, when Orion tried to order telescopes from Ningbo Sunny, Joyce Huang, an employee of the Settling Manufacturer, confirmed that Ningbo Sunny had cut off Orion's credit.  Huang did so by forwarding Orion an email that Ningbo Sunny had separately sent to its competitor two days earlier, explaining that Ningbo Sunny was cutting off all credit and would only ship telescopes "after the corresponding payment is received."

104.    Even though Ningbo Sunny conspired with its competitor to simultaneously cut off Orion's credit and supply to try to prevent Orion from consummating the Hayneedle deal, Orion continued to do its due diligence during the exclusivity period so that it could make the acquisition. At that point, all material terms of the deal had been agreed to by both parties, including that Hayneedle would no longer sell telescope products through the URLs it was retaining.

105.    However, right before the deal was set to close, Hayneedle suddenly asserted that it had never agreed to the previously uncontroversial non-compete term.  Hayneedle's bizarre about

1    face on this term occurred because, on information and belief, Ningbo Sunny's competitors and/or

2    their agents were communicating with Hayneedle and threatening Hayneedle to not go through

3    with the sale.

4         106.    After the exclusivity period expired, Hayneedle insisted Orion would have to pay

5    the higher original bid price, and refused to agree to a non-compete notwithstanding the deal the

6    parties already had agreed upon.  Orion had no additional funds to offer Hayneedle because of the

7    conspiracy to cut off Orion's lines of credit.  As a result, Orion was unable to close.

8         107.    During Orion's continued negotiations with Hayneedle, the Settling Coconspirators

9    acquired the Hayneedle Assets.  Almost immediately thereafter, both companies restored Orion's

10   lines of credit.

11        108.    In fact, the restoration of Ningbo Sunny's line of credit and the terms were

12   communicated to Orion by the Settling Manufacturer.

13        109.    The timing of these events – threatening to remove and then removing Orion's line

14   of credit to starve it of the capital needed to close its acquisition of the Hayneedle's assets,

15   interfering with that acquisition and subsequently purchasing the assets for themselves, and then

16   immediately restoring Orion's line of credit via single email applicable to both Ningbo Sunny and

17   the Settling Manufacturer – make clear that (a) Ningbo Sunny and its purported competitor

18   colluded together and used their monopoly power to gain further market share and (b) that they

19   would work together to punish Orion for trying to compete against either one.

20        110.    Defendants' actions further show that these nominal "competitors" actively

21   conspired with one another to fix the price of credit terms relating to Orion's purchase of

22   telescopes.

23        **F.    Ningbo Sunny's Retaliation against Orion**

24        111.    Shortly before this complaint was filed (and after the settlement with Ningbo

25   Sunny's coconspirators), Ningbo Sunny began abruptly refusing to do business with Orion.

26        112.    On October 6, 2016, Orion sent purchase orders for Ningbo Sunny telescopes to

27   Junwen ("James") Chu, Vice President of Marketing of Ningbo Sunny.  In response, Chu refused to

28   accept the purchase orders and directed Orion to send them instead to one of the Settling

1    Coconspirators' employees.

2         113.   Orion thereafter sent several more purchase orders to Ningbo Sunny.  Each one has

3    been ignored for no rational business purpose other than to retaliate against Orion for asserting its

4    rights.  Such conduct is illegal.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585,

5    608 (1985) (defendant violated Sherman Act where its refusal to continue to deal with competitor

6    "was not justified by any normal business purpose" but "because [defendant] was more interested

7    in reducing competition ... over the long run by harming its smaller competitor").

8         114.   Ningbo Sunny's conduct has caused economic injury, loss of revenue and loss of

9    goodwill to Orion and has injured competition by reducing consumer choice, eliminating

10   telescopes sold by Orion from the market, and causing higher prices.

11        **G.    Defendants' Conduct Has Harmed Orion and Competition in the Relevant
         Market**

12        115.   As a result of Defendants' conduct, there is only one significant remaining

13   independent U.S. telescope brand, Orion.

14        116.   Defendants' conduct has caused injury to both Orion and the relevant market.  Orion

15   has been injured because it is paying supra-competitive, arbitrarily inflated prices for telescopes.  It

16   has further been injured because it cannot compete against Defendants' below cost pricing.  Orion

17   is also damaged by not having the Hayneedle Assets, which would rightfully belong to Orion

18   absent Defendants' conspiracy to suppress competition and tortiously interfere with Orion's

19   exclusive negotiations with Hayneedle.  As a direct result of such conduct, Orion is losing sales,

20   goodwill and market share.

21        117.   In telescope manufacturing, price competition has been restrained or eliminated,

22   particularly, as alleged above, for products where Ningbo Sunny and the Settling Coconspirators

23   have agreed to divide the market between them.  As a result, output has been restricted, and the

24   prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels,

25   and purchasers of telescopes, including Orion and downstream consumers, have been deprived of

26   free and open competition.  This is an antitrust injury of the type that the antitrust laws were meant

27   to punish and prevent.

28

118.    Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the lack of emergence of any replacement suppliers, demonstrates that the barriers to entry into the supply market, combined with Defendants' anticompetitive conduct, have and will effectively foreclose competition at the supply level.

119.    At the telescope distribution level, price competition has been restrained or eliminated, particularly, as alleged above, for products where Ningbo Sunny and the Settling Manufacturer, through their wholly-owned distributor subsidiaries, have agreed to divide the market between them.  Competition and consumer choice have also been restrained where Defendants unlawfully combined to prevent Orion from using distribution channels, such as the Hayneedle URLs, to compete against Defendants.

120.    Competition and consumer choice have also been restrained due to Ningbo Sunny's acquisition of Meade.  Since Ningbo Sunny acquired Meade, Meade has not significantly competed with its formerly largest competitor, because the two brands are now subject to an unlawful agreement not to compete.  Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, including Orion, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

121.    As a result of the conduct alleged herein, Defendants have stifled competition, fixed, raised, stabilized, or maintained at artificially inflated levels, and deprived consumers of free and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

122.    Through their domination of the supply chain and unlawful agreements with the Settling Coconspirators, Defendants (acting in concert with the Settling Coconspirators) have effectively prevented new market entrants at the distribution level, thereby continuing to inhibit and restrict competition.  On information and belief, Defendants intend to raise prices and recoup their losses if they succeed in eliminating Orion through their below-cost sales, as they will have eliminated their last healthy competitor at the distribution level.

**H.     Defendants' Conduct Has Substantially Impacted Commerce**

123.     Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and have a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for telescopes and diminishing competition throughout the United States.

**CAUSES OF ACTION**

**First Cause of Action**
**Against All Defendants**
**Price Fixing and Collusion Between Competitors**
**(Violation of the Sherman Act Section 1, 15 U.S.C. § 1)**

124.     Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

125.     Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

126.     By engaging in the conduct described above, Defendants and the Settling Coconspirators have knowingly and intentionally combined and conspired with each other with the specific intent to unreasonably restrain trade in the market for beginner to high-end consumer telescopes in the U.S.

127.     Defendants Ningbo Sunny and Sunny Optics, Inc. entered into a continuing combination or conspiracy with the Settling Coconspirators to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of telescopes directly sold to United States purchasers, including Orion; combining and conspiring to raise, fix, maintain or stabilize the prices of telescopes sold to United States purchasers; fixing credit prices and terms as to Orion; agreeing to divide the market between themselves to eliminate competition; selling telescopes to distributors in the United States, including Orion, at noncompetitive and artificial prices; and combining and conspiring to eliminate competition by depriving Orion of the Hayneedle Assets to prevent competition and solidify their monopoly power.

128.     Defendants Ningbo Sunny and Meade further combined and conspired with the Settling Coconspirators to unreasonably restrain trade and commerce in violation of § 1 of the

Sherman Act by dividing distribution so as to eliminate competition among themselves; selling and distributing telescopes in the United States at prices below cost to eliminate competitors, including Orion; and by completing the merger between Ningbo Sunny and Meade with the intent and effect to lessen competition, control potentially competitive manufacturing capability and create a monopoly.  The effect of that merger has already lessened competition, raised barriers to entry and tended to create a monopoly in the market for beginner and intermediate telescopes in the U.S.

129.    Defendants' conduct has harmed competition in the U.S. for recreational telescopes by increasing the prices paid by telescope distributors such as Orion, increasing the prices paid by U.S. consumers, reducing consumer choice, increasing barriers to entry, and stifling innovation. Orion was and continues to be injured in fact by the conspiracies of Defendants and the Settling Coconspirators.

130.    Orion and U.S. consumers have suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants and the Settling Coconspirators, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial under Section 15 of the Clayton Act, 15 U.S.C. § 15.

**Second Cause of Action**
**Against All Defendants**
**Attempted Monopolization and Conspiracy to Monopolize**
**(Violation of Sherman Act § 2, 15 U.S.C. § 2 and Clayton Act § 7, 15 U.S.C. § 18)**

131.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

132.    Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

133.    Defendants and the Settling Coconspirators have monopolized, attempted to monopolize, and/or conspired to monopolize the supply and distribution markets for telescopes in the United States.  By engaging in the conduct above, Defendants are willfully maintaining and abusing a monopoly; leveraging their supply monopoly to control distribution and price; preventing

other market participants, including Orion, from acquiring competitive manufacturing potential by acquiring Meade; blocking Orion from competing at the distribution level by taking the Hayneedle Assets to eliminate that channel of competition; and allocating the supply and distribution markets among themselves.

134. Defendants' willful conduct as described above has given them the ability to control prices and exclude competition.

135. Defendants' willful conduct as described above has a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power.

136. Defendants' conduct described above has caused Orion antitrust injury.

137. As a result of Defendants' actions in violation of 15 U.S.C. § 2, Orion has been injured and continues to be injured in its business and property in an amount to be determined at trial, which amount is to be trebled in accordance with 15 U.S.C. § 15.

138. Because Orion has suffered injury to its business as a result of Defendants' sales and promotions selling telescopes below cost, Defendants are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial pursuant to California Business and Professional Code section 17082.

**Third Cause of Action**
**Against All Defendants**
**Unfair Competition**
**(Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

139. Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

140. The Defendants' conduct violates state law as described above and constitutes unfair, unlawful, and fraudulent competition against Orion.

141. As a result of Defendants' unfair, unlawful and fraudulent competition, Orion has lost money and customers, and continues to do so.

FIRST AMENDED COMPLAINT

1
2

**Fourth Cause of Action**
**Against All Defendants**
**Collusion to Restrain Trade**
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*)**

3

142.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set

4

forth herein.

5

143.    California's Cartwright Act prohibits any "combination of capital, skill or acts by

6

two or more persons for" the purpose of restraining trade, including price maintenance.

7

144.    Defendants knowingly and intentionally conspired with each other with the specific

8

intent to sell Defendants' telescopes below-cost at predatory levels in the U.S. market, and for the

9

purposes of destroying fair competition.

10

145.    In furtherance of Defendants' conspiracy, together with the Settling Coconspirators,

11

they collectively agreed to price, offer for sale, and did sell telescopes below cost in the U.S.

12

146.    Defendants have erected effective barriers to entry into the U.S. consumer telescope

13

market.

14

147.    The Defendants' conspiracy to sell telescopes below cost in the United States

15

violates California's Cartwright Act.

16

148.    Orion has suffered an antitrust injury as a direct and proximate result of the

17

conspiracy between Defendants and the Settling Coconspirators, and Defendants are therefore

18

liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial.

19

**PRAYER FOR RELIEF**

20

WHEREFORE, Plaintiff prays that the Court issue the following relief:

21

A.      Equitable relief, including without limitation, divestiture and an injunction

22

prohibiting Defendants' illegal practices;

23

B.      Compensatory damages in the amount of at least $10,000,000;

24

C.      Treble damages of at least $30,000,000;

25

D.      Restitution;

26

E.      Disgorgement of ill-gotten assets and property;

27

F.      Punitive Damages;

28

**FIRST AMENDED COMPLAINT**

G.      Attorneys' fees and costs; and

H.      All such other and further relief as the Court may deem just, proper, and equitable.

Dated:  November 3, 2017                              BRAUNHAGEY & BORDEN LLP


                                                     By:    /s/ *J. Noah Hagey*
                                                            J. Noah Hagey

                                                     Attorneys for Plaintiff OPTRONIC
                                                     TECHNOLOGIES, INC. d/b/a Orion
                                                     Telescopes & Binoculars

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.

3

4  Dated:  November 3, 2017                          Respectfully submitted,

5                                                                 BRAUNHAGEY & BORDEN LLP

6
                                                                 By:   /s/ *J. Noah Hagey*
7                                                                            J. Noah Hagey

8                                                                 Attorneys for Plaintiff OPTRONIC
                                                                 TECHNOLOGIES, INC. d/b/a Orion
9                                                                 Telescopes & Binoculars

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT