1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5  OPTRONIC TECHNOLOGIES, INC.,  )
                                 )
6           Plaintiff,           )
                                 )
7  vs.                           )   No. C 16-06370-EJD
                                 )
8  NINGBO SUNNY ELECTRONIC CO.,  )
   LTD., et al.,                 )
9                                )
            Defendants.          )
10 _____)

11                               San Jose, California
                                 Tuesday, September 11, 2018
12

13   <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING  10:00 - 10:50 = 50 MINUTES</u>
14

15 <u>APPEARANCES</u>:

16 For Plaintiff:
                             Ronald James Fisher
17                           BraunHagey & Borden, LLP
                             220 Sansome Street, 2nd Floor
18                           San Francisco, California
                               94123
19                     BY:   RONALD JAMES FISHER, ESQ.
                       BY:   TAYLOR JILLIAN ALTMAN, ESQ.
20

21 For Defendants:
                             Sheppard Mullin Richter &
22                             Hampton, LLP
                             333 South Hope Street
23                           43rd Floor
                             Los Angeles, California 90071
24                     BY:   LEO DAVID CASERIA, ESQ.

25            (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Defendants:              Sheppard, Mullin, Richter &
                                   Hampton, LLP
 3                               Four Embarcadero Center
                                 17th Floor
 4                               San Francisco, California
                                   94111
 5                          BY:  DYLAN IAN BALLARD, ESQ.

 6
     Transcribed by:             Echo Reporting, Inc.
 7                               Contracted Court Reporter/
                                 Transcriber
 8                               echoreporting@yahoo.com

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  <u>Tuesday, September 11, 2018</u>                    <u>10:00 a.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4          THE CLERK:  Calling the matter of Optronic

5  Technologies versus Lingbo Sunny Electric, Case Number

6  16-cv-06370.

7          THE COURT:  May I have your appearances, please.

8          MR. FISHER:  Ronald Fisher for Optronic

9  Technologies, plaintiff.

10         THE COURT:  Good morning.

11         MR. CASERIA:  Leo Caseria and my partner Dylan

12  Ballard from Sheppard Mullin on behalf of defendants Lingbo

13  Sunny and Meade Instruments Corporation.

14         THE COURT:  Good morning.

15      So today we're addressing two matters.  The one is the

16  alleged waiver of privilege by defendants and whether the

17  waiver extends to all communications involving the Sheppard

18  Mullin firm.  That's docket number 141.

19      And then the other matter is whether certain

20  communications between Ningbo Sunny and Sunny Mould are

21  privileged and/or responsive.  And that's the docket number

22  138 matter.

23      My first question for you all is whether we need to

24  conduct this hearing under seal, given the questions of

25  privilege that are likely part of the discussion.  I'm not

4

1 sure it matters, but we do have one person in the back of

2 the courtroom.

3          MR. CASERIA:  Your Honor, that probably depends on

4 what direction the conversation takes.

5          THE COURT:  Well, I would like for us to be free

6 to talk about matters that are known to you all.  But where

7 the matter might bear on some kind of privilege issue, I

8 want to make sure we're not publicly disclosing that.

9     Had you given some thought to whether you wanted the

10 proceeding under seal?

11          MR. FISHER:  We had not, your Honor.  To the

12 extent the Court goes on to rule that the privilege doesn't

13 apply to the matters discussed in this hearing, then we of

14 course would hope that those would be unsealed at that time.

15 But beyond that, we have not given that any thought.

16          THE COURT:  Okay.  Well, why don't we just be

17 careful, and I won't seal the courtroom at this time.

18          MR. CASERIA:  That sounds fine.

19          THE COURT:  Okay.  So I have a number of questions

20 for each of you, and I will let you also address the Court

21 in terms of whatever else you would like to add to your

22 papers and what we discuss here.

23     Let me start with Orion since it's Orion's motion.

24     And you're welcome to stay seated to argue.  It's

25 important that we have the audio system pick up what you

5

1 say.  So if you can just make sure you move the microphone

2 in front of you, that would be appreciated.  Thank you.

3    So on the question about waiver, I understand Orion to

4 argue that because in it Ningbo Sunny did not intend its

5 communications with Sheppard Mullin would be confidential,

6 none of them are.  And that thesis arises from your reading

7 of the engagement agreement.

8    Am I correct in characterizing your argument?

9      MR. FISHER:  That's correct in part, your Honor.

10    There's really two arguments here being advanced by

11 Orion.  And they relate to two separate elements of the

12 eight-part test for the attorney-client privilege.

13    The argument you just referred to relates to the fourth

14 element, which goes to the confidentiality of the

15 communications.

16    And Orion contends that under USB Rule (phonetic), the

17 fact that Ningbo Sunny by virtue of inclusion in the

18 engagement letter that Sunny's trade competitors -- Joe

19 Lupica, Dave Anderson, Lawrence Nguyen (phonetic), David

20 Shen -- would give direction to and communicate with the

21 firm.  That's itself evidence that Ningbo Sunny did not

22 intend this representation to remain confidential.

23    Had Mr. Anderson or Mr. Nguyen directed the firm

24 Sheppard Mullin to provide information, they would have done

25 so pursuant to that engagement letter.  And so we contend

6

1   that that fourth element of the eight-part test has not been

2   met.

3       Separately, one can also view this case as a subject

4   matter waiver case under the eighth element of the test,

5   whether there's been a waiver.

6       The result in the end is the same because the documents

7   that we lodged with the Court pursuant to your Honor's

8   order, and additional documents produced by defendants in

9   response to your Honor's recent order granting discovery

10  directly from Sheppard Mullin, make clear that the

11  involvement of Mr. Nguyen and Mr. Anderson in the

12  transaction extended to all parts of that representation.

13          THE COURT:  Okay.  So thank you for clarifying

14  your position.  Let's focus on the first part, which you

15  call the fourth element of the eight-part test.

16      So it seems to me that under Rule, the Court got rid of

17  this question of what did the person claiming privilege

18  intend or not intend and really focused on what's actually

19  disclosed and was it voluntarily disclosed.

20      So my question for you is, don't we have to look at

21  here what was actually disclosed with people or entities

22  outside of the attorney-client relationship and then whether

23  that disclosure was voluntary?

24      I assume Orion would argue, well, certainly it was

25  voluntary.  But then that causes us to focus on what was

7

1  actually disclosed.  I think that dovetails with your "Let's

2  look at the subject matter that's part of the disclosure and

3  compare that to what's being withheld."

4      Is that a fair characterization?

5          MR. FISHER:  I think there's some slight nuances

6  that we would amend there, your Honor.  Specifically USB

7  Rule held that -- and I'm quoting here page 609 of that

8  opinion -- "that the party asserting the privilege" -- oh,

9  excuse me.

10     612 I'm quoting.  "That a party's admitted awareness

11  that anything related to the matter claimed as privileged,"

12  in brackets, "would not be held in confidence but rather

13  shared with at least one third party destroys the

14  confidentiality essential to establishing the privilege."

15     Here, where at the outset of the representation, the

16  engagement letter expressly directs Sheppard Mullin to make

17  any aspect of the representation available to third parties,

18  there simply can't be any expectation of confidentiality

19  with any part of the representation.  So we don't think we

20  reached that question of scope under the fourth element.

21          THE COURT:  I think you're reading the engagement

22  agreement too broadly.  It clearly says that there is an

23  expectation that there will be communications with these

24  non-client entities.  But it's by no means self-evident that

25  the text "You have instructed us to take direction from and

8

1  communicate directly with your advisors," is meant to say

2  that the law firm will only take instruction from and will

3  only take direction from advisors and will communicate with

4  those advisors about everything.  It doesn't say that.

5      So it's not evident from what's been submitted to the

6  Court or from just a reading of that text that the

7  characterization you're giving it is correct.

8          MR. FISHER:  Well, I -- sorry.

9          THE COURT:  So I think -- my sense is that we're

10 still back to what did those third parties see and then

11 we're sort of in the subject matter waiver bucket.

12     You're nodding your head.  Do you agree?

13         MR. FISHER:  No, I'm nodding my head in

14 understanding, your Honor.

15         THE COURT:  Okay.

16         MR. FISHER:  I would just point out on that last

17 point that it's Orion's view that the "take direction" part

18 of the portion of the engagement letter you just read makes

19 clear that had Mr. Nguyen or had Mr. Anderson asked to see

20 some documents relating to the representation, they

21 certainly could have.  And that destroys the

22 confidentiality.

23     But moving to the subject matter waiver point that your

24 Honor is raising, your Honor asked Orion to lodge documents

25 with the Court, which we've done so.  And those documents

9

1  show that Mr. Nguyen and Mr. Anderson were intimately

2  involved with managing Sheppard Mullin's work on the

3  transaction, including -- and here I'm going to go at a high

4  level into the subject of those documents.

5          THE COURT:  Okay.  You're talking about the

6  documents that have already been produced.

7          MR. FISHER:  Those that have already --

8          THE COURT:  The 22 documents that have already

9  been produced.

10          MR. FISHER:  I'm talking about the documents, yes,

11  that we recently lodged with the Court, the translations.

12          THE COURT:  Not the ones that have been selected

13  by the parties for -- let me just be clear.

14          MR. FISHER:  That's correct, your Honor.

15          THE COURT:  There's the 22 documents that were

16  originally listed in the privilege log and that were

17  subsequently produced.  Those have been shared with the

18  Court.

19      Then each of you selected 10 from the privilege log.

20  Those were submitted to the Court in camera.  You haven't

21  seen any of those.

22          MR. FISHER:  That's correct.

23          THE COURT:  You've just seen the privilege log

24  entry and you've made your selections.  So you're referring

25  to the 22 documents that have already been produced?

10

1          MR. FISHER:  That's correct.

2          THE COURT:  Okay.

3          MR. FISHER:  Thank you for clarifying.

4      But as for those documents that we've seen -- and I'm

5  going to go into those documents at a high level here, your

6  Honor -- they include tax and merger strategy, including

7  whether a Hong Kong or a U.S. entity should ultimately

8  acquire.  I'm sorry, these are the most recent documents

9  that were just produced by defendants.

10          THE COURT:  Okay.  So those aren't before the

11  Court.

12          MR. FISHER:  I understand.

13          THE COURT:  Right.  So --

14          MR. FISHER:  Those were produced on September 4th,

15  pursuant to your Honor's recent order.  And we think that

16  they are extremely relevant to this question.

17      Defendants represented to you at the June 11th hearing

18  that documents held by Sheppard Mullin couldn't have any

19  bearing on the merits of this case.  And what we're seeing

20  is that that's just not the case.  We have documents here

21  that we would like to lodge with the Court --

22          THE COURT:  Okay.

23          MR. FISHER:  -- relating to this.  They are

24  documents that are between Mr. Nguyen and Mr. Anderson and

25  Sheppard Mullin, not cc'ing Peter Ni, that cover tax and

11

1  merger strategy, antitrust issues, and an FTC investigation

2  into the involvement of David Shen, Synta and Celestron in

3  the transaction.

4          THE COURT:  Okay.  So let me just pause you there,

5  because you're referring to matters that aren't before me

6  and I haven't seen, which seem to be -- a recurring problem

7  with this case is that we have a dispute, we find that

8  there's still some more work to be done, either between the

9  parties or some further submission that needs to be made to

10 the Court and then I'm not in a position to resolve your

11 concerns.

12      Let me just tell you what I currently think about what

13 is before me, and then we'll decide whether we need some

14 further proceeding.

15      So I have reviewed all the 22 documents.  I've also

16 looked at -- and, where necessary, their English

17 translations.  And I've also looked at the documents that

18 were selected by each party from the privilege log.  I've

19 looked those in camera as well.

20      And my first observation is that some but not all of

21 the documents that are among the 22 involve communications

22 with the Sheppard Mullin firm.  Many fewer, among the 20

23 that were selected for in camera review, involve

24 communications with the Sheppard Mullin firm.

25      So my first question.  If your premise is

12

1  communications with the Sheppard Mullin firm with third

2  parties waives privilege as to certain subject matter,

3  there's some category of documents out there that don't

4  involve Sheppard Mullin.  Are those part of your motion

5  about waiver or not at this point?

6         MR. FISHER:  Yes, your Honor.  I would say that to

7  the extent that documents are claimed as privileged as a

8  result of Sheppard Mullin's representation of defendants

9  relating to the Meade transaction, that privilege has been

10  waived by virtue of the engagement letter and the

11  communications that we're discussing here today.

12         THE COURT:  Okay.  So there's very little -- in my

13  view, very little subject matter overlap between the 22

14  documents that have already been produced and the 20 that

15  I've reviewed in camera.

16    And I'm construing subject matter as I think <u>Chevron</u>

17  requires me to construe subject matter, which is, for

18  example, communications with an auditor about certain

19  questions about tax deferral don't waive communications

20  about any tax deferral question.

21    So <u>Chevron</u> I think construes the subject matter waiver

22  question quite precisely.

23    So if I apply that rubric, which I think I am bound to

24  apply here and not more broadly anything having to do with

25  the Meade transaction, there is very little, if any, overlap

1  in the documents that are before me.

2      I have some specific questions about some of the

3  documents that I'm not confident were accurately

4  characterized or that maybe aren't privileged.  I'm not

5  sure.  I can't tell whether they're privileged or not

6  because of lack of information about the parties that are

7  copied.  And I intend to address Sunny's counsel on those

8  points.

9      But if we're just focusing on subject matter overlap,

10  there really isn't any.  There isn't any that on this set of

11  material, I would say yes, you're entitled to production of

12  additional matters.

13      So I realize that half of that equation is material

14  that you can't see and you can see the other half, but I

15  don't know what's in your binder of recently produced

16  documents from the Sheppard Mullin firm.  We need to have

17  another round on that basis.  You'll have to make a separate

18  submission.

19      But at least on the matters before the Court right now,

20  I'm inclined to not find any waiver that extends to further

21  production using the 20 documents as a representative

22  example.

23      I do have a couple of follow-up questions for you, and

24  then I'm going to turn to Sunny's counsel on this question.

25      A number of the documents that are among the ones that

14

1 were selected involve -- and I think this is apparent from

2 the description in the privilege log.  But they're

3 pre-merger communications by counsel, not Sheppard Mullin,

4 with Meade.  How could those possibly fall into the category

5 of the subject matter waiver that you describe?

6         MR. FISHER:  Well, your Honor, as I explained

7 earlier, our view is that the subject matter waiver extends

8 to the transaction and that representation because of USB

9 Rule.  And so to the extent that defendants now claim, after

10 the closing of the merger, claim attorney-client privilege

11 over those documents, we believe that privilege has been

12 waived.

13         THE COURT:  So your view, just to be precise, is

14 that if Meade's counsel before the merger had communications

15 with Meade and those documents are showing up on the

16 privilege log, those would be waived by virtue of the fact

17 that Sheppard Mullin communicated with third parties about

18 some aspects of its advice to its client on its half of that

19 transaction.  That's your view?

20         MR. FISHER:  Our view is that once the acquisition

21 is fully completed and Sheppard Mullin -- or, excuse me,

22 Ningbo Sunny has full ownership through Sunny Optics of

23 Meade, that the waiver of materials relating to the Meade

24 transaction extends to all -- they now own that privilege

25 and that has now been waived.  That is our view.

1        THE COURT:  Analytically, is there any difference

2   in how the Court treats this question if we talk about the

3   documents -- the 22 documents that have already been

4   produced -- as documents that were never privileged in the

5   first place.  They were simply documents that were out there

6   versus documents that were privileged but there's been a

7   waiver of privilege.

8        Analytically, in the case law is there any difference

9   in how the Court assesses how the disclosure of that

10  information to third parties -- whether by waiver or just in

11  the first instance it's not a privileged document -- impacts

12  other documents in the production that are being withheld?

13       MR. FISHER:  So taking your question in the

14  context of these Meade documents -- I think that's what your

15  Honor is driving at -- as I said, our primary argument is

16  that these documents between -- communications with Sheppard

17  Mullin and its clients regarding the Meade transaction were

18  never privileged.

19       Under that view, there would not have been a waiver.

20  It simply would have never been privileged.  And I think

21  under that view, it would analytically have been narrower.

22  In other words, it would not have extended to other

23  documents that ultimately came under defendants' control as

24  a result of the closure of the merger.

25           THE COURT:  Okay.  So if that's what happened,

16

1  then isn't that against -- doesn't that cut against your

2  argument?

3          MR. FISHER:  Well, it would cut against our first

4  argument but not our second, not our subject matter waiver

5  argument.

6          THE COURT:  But if there's no waiver, how is there

7  a subject matter waiver?

8          MR. FISHER:  Well, if -- I'm not totally sure I'm

9  following your Honor.

10     I think -- our position is that if we're under element

11 four in USB Rule, then everything that relates to the Meade

12 transaction that is in the possession of the Sheppard Mullin

13 firm is not privileged and should be produced.

14     So that might be a narrower set than under the subject

15 matter waiver theory, but I don't think it's contrary to our

16 position that additional documents need to be disclosed.

17          THE COURT:  Okay.  So let me ask Sunny's counsel a

18 few questions.

19     So just on the question of the intent and the structure

20 of the attorney-client relationship here, you argued in your

21 papers that the engagement letter was not intended to

22 suggest that all communications to or from the firm and all

23 direction given to the firm would be with these third

24 parties' involvement.

25     All I have is the engagement agreement, your say-so and

1 Mr. Fisher's say-so about how that document should be
2 interpreted.  Is there any other evidence that suggests --
3 or that shows how that arrangement was structured, that
4 attorney-client relationship was structured?

5          MR. CASERIA:  Sure, your Honor.

6          THE COURT:  And you can sit down.

7          MR. CASERIA:  Sure.

8          THE COURT:  It's probably easier to be picked up
9 by the microphone.

10          MR. CASERIA:  Sure.  Yeah, I think your Honor
11 reads the engagement letter the same way we do which is the
12 engagement letter was intended to create an attorney-client
13 relationship between defendants and Sheppard Mullin relating
14 to advice to Lingbo with respect to its acquisition of
15 Meade.

16      And, yes, there's a provision in there that says that
17 four individuals are going to act as advisors and Sheppard
18 Mullin can take direction from them and communicate with
19 them.

20      As your Honor pointed out, it doesn't say we must share
21 100 percent of information about the acquisition with them,
22 100 percent of strategy, copy them on every single document.
23 And, in fact, that's not what happened.  Only certain
24 documents are sent to these individuals.  And there's no
25 dispute as to those documents.  We are producing those.  We

18

1 produced 22 of them.

2      When Orion flagged that some of these were in our

3 privilege log, we looked at them and we produced them.

4 There's no dispute about those.  The only dispute is as to

5 things that have not been shared with these individuals.

6      But to your Honor's question about whether there's

7 evidence that in fact there were some limits on what was

8 shared with these people, there are.  If you look at the 22

9 documents that were submitted, document 8, which is PL-1502,

10 refers to Dave Anderson.

11      Dave Anderson is one of the four advisors that's listed

12 in the engagement letter.  And he sends an email about a

13 week after the engagement letter is signed, basically saying

14 "My role here is done."

15      He essentially facilitated Joe Lupica getting set up as

16 a consultant for Ningbo with respect to the acquisition of

17 Meade.  And there's a document where he says "Okay.  I've

18 set you guys up.  Please stop looping me in on things."

19      So his role ended, or should have ended at that point.

20 If there were documents that were shared with him after that

21 date, we're going to produce them -- or we have produced

22 them.  We're not holding those back.  We have no dispute

23 about that.

24      Separately, Joe Lupica has been deposed in this case.

25 He testified that there were certain due diligence meetings

19

1  where Sheppard Mullin was there with Ningbo, the client, and

2  said "We don't want David Shen at these meetings."

3      So there were certain meetings where certain things

4  were to be discussed between Sheppard Mullin and Ningbo

5  Sunny, and David Shen was not allowed at those meetings.  So

6  there were limits on what was shared.

7      Now, that's going to be different for each individual.

8  It's not something that I can cleanly say was limited to

9  certain things and not others.  But there were limits.  And

10 so what we've done is whatever was shared with those

11 individuals, we're saying we're not disputing that those

12 need to be produced.

13     Now, with respect to whether that waives everything

14 that we've ever discussed -- whether it waives everything

15 that Sheppard Mullin has discussed with Ningbo Sunny

16 relating to the transaction, we just don't think that's the

17 case.  And we don't think the case law requires that.

18     Orion seems to suggest that there's an intentional

19 waiver plus it's the same subject matter, you've got to

20 produce everything on that subject matter.

21     One thing we haven't discussed is, as we laid out in

22 our briefs, is we think fairness is a required third element

23 of subject matter waiver.

24     And Orion does not acknowledge that as an element, does

25 not address it, does not say that there's a fairness

1 consideration that applies here.  But I think if you look at

2 Chevron, Rule 502, the Wyland case, fairness is a

3 requirement.  If you're going to say that there's been a

4 subject matter waiver, it applies to both extrajudicial and

5 in-court waivers.  And there is no fairness concern here.

6      We're not trying to use any of these documents.

7 There's no sword and shield concern.  We're not asserting an

8 advice-of-counsel defense.

9      There's an example in one of their cases, Eisenhower

10 (phonetic) where a party attached communications with

11 counsel in response to a motion for summary judgment.  We're

12 not doing anything like that.

13      These are just -- frankly, these are documents that we

14 largely think are not particularly relevant or responsive,

15 not really proportional to the needs of the case.  But to

16 the extent they aren't privileged, we don't have any problem

17 producing them.

18           THE COURT:  I think one of the problems here is

19 that the privilege log is not particularly detailed when it

20 comes to the content of what's being withheld.  And so I

21 think it's created a lot of suspicion, if nothing else.  And

22 the fact that there were documents on the list that were

23 subsequently produced, naturally creates suspicion as well.

24      So while I do think that you don't have to have the

25 sword and shield problem in order to find that a document is

21

1  not privileged -- that's clearly the case and if there are

2  responsive documents that are not privileged because they've

3  been disclosed with third parties, then I do think we have

4  to look at the question of whether there is some part of the

5  story being withheld or not withheld by keeping some

6  documents privileged and others disclosed.

7      But as I said before, my review of what's been provided

8  to the Court so far doesn't show a subject matter overlap.

9  So I'm not inclined to order that there's been a broad

10  waiver.  In the first place, I don't think the engagement

11  agreement supports that.

12      I also am not finding subject matter overlap of any

13  kind.  But I do have some concerns about what's on the

14  privilege log.  And let me do this carefully.

15      So there are two documents that appear to be related.

16  They're PL-818 and PL-820.  And these are described on the

17  log as "Email chain containing legal advice/opinion of

18  counsel re fairness letter and proxy statement."  And

19  Marshall and Stevens, Inc. is identified as a sender or

20  recipient depending on the context.

21      So my first question is:  What is Marshall and Stevens,

22  Inc.?

23          MR. CASERIA:  Marshall and Stevens.  So Marshall

24  Stevens is a firm that has both financial advisors and

25  attorneys, and they were involved for Meade.

1          THE COURT:  Yes, they were clearly involved in

2     Meade and appear to have been -- yes.

3          MR. CASERIA:  And worked on a variety of things,

4     including a fairness letter, proxy statements, and valuation

5     issues.

6          THE COURT:  Are they lawyers?

7          MR. CASERIA:  The firm has both lawyers and

8     non-lawyers.

9          THE COURT:  Are the people who are identified as

10     the senders or recipients of the email chain --

11          MR. CASERIA:  So I think --

12          THE COURT:  -- non-lawyers or lawyers?

13          MR. CASERIA:  If I recall correctly -- this is in

14     the documents that are in the 10 plus 10 submission?

15          THE COURT:  Yes.  This is in the selected

16     documents.

17          MR. CASERIA:  So Stephanie Coo (phonetic) and

18     Luciana Cabral (phonetic) are not lawyers.  But, if I recall

19     correctly, in those email strings, they refer to someone

20     else who is a lawyer at Marshall Stevens, and that person

21     looking at the things that they were looking at.

22          THE COURT:  So I am not -- let's see.

23          MR. CASERIA:  If we're going to get into the

24     specifics, we may want --

25          THE COURT:  Yes.  So I'm not confident that these

23

1 two entities have been described accurately and that the

2 matters are related to privilege.  I think they're not

3 relevant.  However, I think you maybe need to take a closer

4 look at those entries --

5          MR. CASERIA:  Okay.

6          THE COURT:  -- because I can't tell from the

7 information that's been provided whether they are or are not

8 privileged.

9     The other one I have -- the next one I have a concern

10 about is PL-969 and, again, this is the description in the

11 log.  I'm not reading something else.  "Email containing

12 legal advice opinion of counsel re drafting of proxy

13 statement."

14     Clearly, at least one of the people on this string is

15 counsel to Meade, but there are other people on here who are

16 identified and I can't tell who they are and whether the

17 communication is really privileged.  There's like seven or

18 eight people that are listed.

19          MR. CASERIA:  This is just off of the privilege

20 log?  This is not --

21          THE COURT:  I'm reading off of the privilege log.

22          MR. CASERIA:  969.

23          THE COURT:  This is entry 969.

24     You give me all this stuff in detail, and I went

25 through it in detail.

24

1          MR. CASERIA:  969.  Okay.  So --

2          THE COURT:  So Tim McQuay doesn't appear to be a

3 lawyer.

4          MR. CASERIA:  Yes.  He is a former member of

5 Meade's board.

6          THE COURT:  Okay.  Fred Schneider, Arrowhead

7 Brass.

8          MR. CASERIA:  So this -- right.  The recipients

9 are all other board members or their representatives.

10          THE COURT:  Okay.  All right.  So they're board

11 members.

12          MR. CASERIA:  Or -- yes.

13          THE COURT:  All right.  Or employees of Meade or

14 counsel to Meade?

15          MR. CASERIA:  Right.  These are all relating to

16 Meade, correct.

17          THE COURT:  Mr. Peterson?  I don't know of any --

18          MR. CASERIA:  I think he's a representative of a

19 board member.

20          THE COURT:  Okay.  So that -- I think that's fine.

21     Okay.  I have two more that I have questions about.

22          MR. CASERIA:  Okay.

23          THE COURT:  And these are ones where I'm concerned

24 that the privilege log does not contain an accurate

25 description of the document.  That's PL-1320.

1    The description in the log says "Email containing legal

2 advice opinion of counsel re attorney services agreement."

3 That's not how it was described in the in camera submission

4 to me, and I don't think that's what it is.

5    I also think it shouldn't be disclosed, but I don't

6 think it's an accurate description.  If you could maybe take

7 a look and let me know if you agree with that.

8         MR. CASERIA:  Attorney service agreement.  Yeah,

9 this --

10        THE COURT:  Not quite right.

11        MR. CASERIA:  It --

12        THE COURT:  And there's no reason why you can't

13 tell them what it actually is.

14        MR. CASERIA:  Yes.

15        THE COURT:  And I think doing that is going to

16 just dispel the suspicion.

17    Okay.  So one more.  PL-406, the description in the log

18 says "Email chain providing information necessary to obtain

19 legal advice re Hayneedle acquisition."

20    Again, I don't really think that's an accurate

21 description, and I have some additional concerns about this

22 document.  But I'll let you find it first.

23        MR. CASERIA:  Which one -- I'm sorry.

24        THE COURT:  406.

25        MR. CASERIA:  406.

1          THE COURT:  Yes.

2          MR. CASERIA:  With respect to the attorney service

3  agreement, I think the person who logged it was actually

4  intending that these are services an attorney will be

5  providing.

6          THE COURT:  I know, and I know there are many

7  entries on this privilege log.

8          MR. CASERIA:  Yes.

9          THE COURT:  And you didn't do them personally.

10          MR. CASERIA:  I -- yeah.

11          THE COURT:  However, as -- this is going to become

12  more of an issue when we get to the next discovery dispute,

13  because I feel like a lot of -- a lot of the problem here

14  might be avoided by being a little bit more specific about

15  what some of these things are.  But we'll get to that.

16          MR. CASERIA:  Okay.

17          THE COURT:  So 406, I don't think that's an

18  accurate characterization in the log of what the document

19  is.  And then I have some questions for you about it.

20          MR. CASERIA:  406.

21          THE COURT:  And if you compare it to the

22  description you provided to me in camera, you'll see what I

23  mean.

24          MR. CASERIA:  So -- right.  It is -- it's advice

25  about the Hayneedle acquisition but in the context of this

27

1  case.

2          THE COURT:  Right.  So here's my view on this.

3      This document is privileged, but the email exchanges

4  that are referenced in it are not.  And the people who are

5  the authors or recipients of those emails should be -- so

6  those emails that are referenced and excerpted in this

7  document should be produced and they very well may have

8  been.

9      And the people who are the authors of those emails

10 should be deposed if -- they are subject to being deposed,

11 not that they should be deposed.  But they are subject to

12 being deposed.

13          MR. CASERIA:  You're talking about in the

14 actual -- I'm trying to be careful here --

15          THE COURT:  Yes, the excerpts.

16          MR. CASERIA:  -- in the actual document itself.

17 The image.

18          THE COURT:  Yes.

19          MR. CASERIA:  So that image comes out of a

20 pleading that Orion filed.

21          THE COURT:  But it's obviously an image of an

22 underlying email as well.

23          MR. CASERIA:  Right, which Orion has.

24          THE COURT:  Good.  This was my only concern --

25          MR. CASERIA:  Okay, okay, okay.

1          THE COURT:  -- that we were not withholding the

2  underlying stuff --

3          MR. CASERIA:  No, no.

4          THE COURT:  -- that's being the subject of what is

5  clearly attorney advice and communication in aid of legal

6  advice.

7          MR. CASERIA:  Right.  Just to be clear, so if you

8  look at that document, Peter Moreo is Orion's CEO, so that

9  is a document they have.

10          THE COURT:  Okay.  Very good.  Those were my

11  concerns --

12          MR. CASERIA:  Okay.

13          THE COURT:  -- about the documents that were

14  submitted to me in camera.  And as I said at the outset, I'm

15  inclined to find that there has not -- to the extent there's

16  been a waiver, it doesn't extend to these 20 representative

17  documents.

18       So I don't know what else is out there that hasn't been

19  produced that should be.  But there is a mismatch between

20  the ones that have already been produced and the ones that

21  are being withheld, which means you did your job correctly.

22  It means that there isn't anything missing, at least from

23  that subset as far as Orion is concerned, nothing being

24  withheld that should be produced.

25       I think I am -- I am concerned about some of the

29

1  descriptions and whether the right decision was made for

2  other reasons, but I will elaborate on that in the order and

3  give some further guidance.

4      So anything more on this issue from Orion before we

5  move to the other issue?

6          MR. FISHER:  Yes, your Honor, just some final

7  points.

8          THE COURT:  Sure.

9          MR. FISHER:  Your Honor referenced making a

10  separate submission of documents that have come to Orion

11  since this briefing has been completed that relate to this

12  issue.  We would ask that your Honor keep the record open to

13  consider those here just for purposes of efficiency.  I just

14  think that that would be the quickest and most -- simplest

15  way for this issue to be definitively resolved --

16          THE COURT:  How do you imagine that happening?

17  Because I need to rule on this motion, which has had a long

18  life already.

19          MR. FISHER:  Indeed it has, your Honor.  And we

20  would love to have a ruling on it.  One option is for us

21  simply to provide you and defendants with some of the

22  documents we've identified from that production here today.

23      Another option would be for us to provide those to you

24  under seal or lodgment with the Court by close of business

25  tomorrow.

1     We can get these documents to you very quickly.  They

2  relate --

3          THE COURT:  Without argument, is what you're

4  proposing?  Just like here's the pile of documents, but I'm

5  not going to brief what I think the significance of them

6  are?

7          MR. FISHER:  We think these documents -- we think

8  our prior briefing makes clear, and I also can tell you here

9  today that Mr. Nguyen, Mr. Anderson and others, David Shen,

10 were involved intimately with the strategy and

11 implementation of the Meade acquisition, including well into

12 it -- deep into it -- including relating to antitrust issues

13 relating to government inquiries regarding Mr. Shen's and

14 Synta's and Celestron's involvement in the merger.

15     Those -- that's made clear in the latest production

16 from defendants pursuant to your Honor's recent order.  And

17 we think that's significant to this motion because it

18 affects what the scope of the subject matter waiver might

19 be.

20          THE COURT:  So you're suggesting that if I see

21 these documents, I will then appreciate that the 20 selected

22 documents are now within the scope of a waiver; is that what

23 your prediction is?

24          MR. FISHER:  Your Honor, I don't know what's in

25 those 20 documents.  The documents on the privilege log are

1 communications between Sheppard Mullin and their client, in

2 other words, Peter Ni.

3     What they are not is communications between Sheppard

4 Mullin and Mr. Anderson who is not a client of the firm, Mr.

5 Nguyen who is not a client of the firm, or Mr. Shen who is

6 not a client of the firm.

7     None of those documents would show up on a privilege

8 log because they're not communications with a client.  Yet

9 we know that there are significant numbers of communications

10 between Sheppard Mullin and these individuals that relate to

11 other documents that Sheppard Mullin may be holding

12 internally relating to the transaction such as --

13         THE COURT:  Okay.  Wait a minute.  So you're

14 saying the documents that you now have cause you to believe

15 that there are other documents not on a privilege log that

16 are being withheld?

17         MR. FISHER:  What I'm saying, your Honor, is that

18 these documents reference responses to the Federal Trade

19 Commission's investigation of the merger, among other

20 things, and that we don't see -- including on the privilege

21 log -- communications between Mr. Ni and Sheppard Mullin --

22         THE COURT:  Okay.

23         MR. FISHER:  -- on that point.

24         THE COURT:  So that sounds to me like a different

25 issue.

1      What I'm being asked to do is assess right now in this

2  motion whether there are documents that are listed on the

3  privilege log defendants have provided that shouldn't be

4  privileged and should be produced to you.

5      It sounds like what you're saying is that your concern,

6  based on this more recent production from the Sheppard

7  Mullin firm, is that there are more documents in someone's

8  possession, custody or control that haven't been produced

9  and haven't been logged and that you're concerned that there

10  is an incomplete production.  Is that really what you're

11  saying?

12          MR. FISHER:  I just want to be thoughtful before I

13  respond.

14          THE COURT:  Sure.

15          MR. FISHER:  I believe what we're saying, your

16  Honor, is that there are documents in Sheppard Mullin's

17  possession, specifically communications with the government

18  that the subject of which were disclosed to third parties

19  and which we have not received, and we think we should be

20  receiving those.

21          THE COURT:  And are you seeing those show up on a

22  privilege log?

23          MR. FISHER:  No, your Honor.

24          THE COURT:  Okay.  So that to me sounds like a

25  separate dispute from the one I have in front of me, because

1   I'm not going to be able to make any judgment about it based

2   on this sort of privilege log analysis that we've been

3   doing.  And I have the 1,769 entry that I could assess, but

4   you sound like you have a different problem.

5       I think you need to brief that separately, I'm sorry to

6   say.  As much as I would love to have another discovery

7   dispute from you all, I think that's the only way that it is

8   going to get teed up for my decision.

9       So with respect to the motion that we have in front of

10  us, docket number 141, is there anything else that you wish

11  to add to your papers or the argument you've already made?

12          MR. FISHER:  We would merely say, your Honor, that

13  Federal Rule 502 certainly doesn't apply here by its own

14  terms.  It applies to disclosures made in the state or

15  federal proceedings, not disclosures made in the course of a

16  private transaction and that we believe the two paragraphs

17  of the Chevron decision, which was issued in 1992, do not

18  add additional elements to the attorney-client privilege as

19  stated by the Ninth Circuit in 2009.

20      And that with that, we would submit.

21          THE COURT:  Okay.  All right.  Thank you.

22      And, Mr. Caseria, do you have anything you would like

23  to add?

24          MR. CASERIA:  No, your Honor.  I'll just address

25  those last two points on the FTC documents.  We're not

34

1   withholding anything that was produced to the FTC as

2   privileged.  It wouldn't be privileged.  There just aren't

3   that many, so they have what we have.

4           THE COURT:  I'm sorry, you're talking about --

5           MR. CASERIA:  A separate dispute.

6           THE COURT:  -- Mr. Fisher's argument about there

7   is some other dispute --

8           MR. CASERIA:  Right.

9           THE COURT:  -- based on a recent production.

10          MR. CASERIA:  Right.

11          THE COURT:  Okay.  So anything on docket 141 and

12  then -- yes.

13          MR. CASERIA:  On the fairness point, we still

14  think that's an element, as Chevron and Wyland make clear,

15  and there's no reason that's been expressed by Orion for why

16  that would not be an element in the case of an extrajudicial

17  waiver.  I'll just stop there.

18          THE COURT:  Okay.  All right.  So let's move on to

19  the second dispute that's reflected in the docket 138

20  submission.

21      So on this one, it seems like, again, the crux of the

22  problem, at least at the outset, is a disagreement about

23  what it means to use search terms to identify responsive

24  documents.

25      And based on what's before me, it seems to me that

35

search terms are a vehicle for identifying responsive

documents, and both of you would be justified in saying:   I

don't have to do anything else to identify responsive

documents so long as I run the search terms that we all

agree should be run.

But -- and the result may be that you have over-

inclusive or an under-inclusive productions as a result.

But you've decided to live with that.

It usually doesn't mean that search terms define what

is or is not actually responsive to a document request.   I

don't see that you all have agreed to that specifically,

that search terms define what is responsive and what is not.

It's a vehicle for getting through a huge volume of ESI,

that's what search terms are.   And you could have stopped

there, but you don't have to.

And Orion still bears the burden of proving that the

discovery it seeks is relevant and proportional to the case.

I mean that doesn't disappear because you all have agreed on

search terms.   So that's just sort of how I approach this

dispute.

So then we get to the question of, okay, there are

documents on the privilege log that Sunny says they're

either not responsive or they're not privileged -- or

they're privileged or both.

So, frankly, it's difficult for me to tell from the

1 privilege log whether -- with respect to the people

2 participating in the email, whether they are within or

3 without privilege, whether it's the Sunny Mould folks and

4 their own privilege and even what the subject matter is.

5 It's very difficult for me to tell just from the privilege

6 log, which I think is an underlying problem, as I alluded to

7 in our prior discussion.

8      The privilege log is not particularly detailed.

9 There's a balance there, but I think some of the

10 descriptions are too high level to really be useful.

11     I am not going to review, whatever it is, 40 additional

12 documents in Chinese off the privilege log that relate to

13 communications between Sunny and Sunny Mould.  At least I'm

14 not going to do that at this point.

15     My inclination is that the parties really need to do a

16 better job, and the burden really falls to Sunny in the

17 first instance to do a better job of communicating about

18 this dispute.  And what that would mean is that there needs

19 to be a complete explanation of the names of the people who

20 are identified as senders or recipients, copies, whatever

21 and their roles.

22     What search terms were hit with respect to the

23 document.  That may be self-evident, but I think you need to

24 identify what search terms were hit.  Why it's not

25 responsive, if that's your contention.  And why it's

1   privileged, if that's your contention.

2       The discussion in the brief -- or the joint discovery

3   dispute from Sunny was way more helpful than any of the

4   privilege log entries.  And it may be that you all in your

5   conferences between counsel, you've already shared all of

6   that information.  I suspect that you had since that's part

7   of the way that you get to a discovery dispute before me.

8   But my inclination at this point is to start with the

9   documents that are referenced in footnote seven of the

10  brief.

11      There's a little bit of disagreement I think between

12  the two of you about which is the universe of documents at

13  issue.  There's footnote seven, which is in Orion's part of

14  the brief, and then there's a later footnote that has a

15  smaller subset.  So -- footnote 11.

16      So I was thinking -- and I'm going to hear from both of

17  you on this proposal, but I think that -- I intend to order

18  that the parties -- that Sunny in the first instance provide

19  more information about the documents identified in footnote

20  seven, because I do think that that will go a long way to

21  resolving the dispute.

22      If it's really the case, as you describe in your

23  papers, that these relate to things totally non-responsive

24  and unrelated to the dispute in this case, privileged for

25  some other reason, you should just make that clear and then

38

1 talk about it.

2     And maybe there is some subset of those that really do
3 need to be brought before me, and I'm happy to address it on
4 an expedited basis, given your discovery schedule.  But I
5 think there needs to be some further work done.

6     I'm a little bit puzzled how -- and I'd like maybe for
7 Mr. Caseria to address this.  Orion contends that responsive
8 documents have been found and have been produced from Sunny
9 Mould custodians.  I'm not really sure how that could be,
10 given what you describe as the separateness of the
11 businesses.

12          MR. CASERIA:  Sure.  I think that -- well, part of
13 the underlying issue here is that certain Sunny Mould
14 employees are using Sunny Optics email addresses for Sunny
15 Mould work.

16     So taking a step back to what your Honor started with,
17 you can -- in a world with search terms, you can make life
18 easier on yourself and just produce everything that comes up
19 in a search term.

20     One of the things we did was we pulled up Peter Ni's
21 emails.  For an email address, there's the Sunny Optics
22 email address for -- but it's an email address that he uses
23 to do business for Sunny Mould.  We pulled up those emails.
24 To the extent anything wasn't privileged and hit on a search
25 term, we produced it.

1    The only things that are in dispute are the things on

2  the privilege log that were talked about here, so I think

3  that's what they're referring to.  We have produced a number

4  of emails from Peter Ni that relate to this email address

5  that was a Sunny Optics email address but that he used for

6  Sunny Mould work because we didn't bother to go through and

7  try and figure out which ones were responsive and which ones

8  weren't.

9         THE COURT:  Okay.  Well, yes, it may be that Peter

10  Ni is the only example.

11    I don't know.  Mr. Fisher, are there other examples

12  where Sunny Mould custodians are in possession of responsive

13  documents for the case?

14         MR. FISHER:  Your Honor, it's too difficult to

15  tell because of the nature of the email addresses involved

16  here, which often are a series of consonants followed by an

17  email domain or a series of numbers followed by an email

18  domain.

19    It's just simply very difficult to tell who's whom, who

20  is receiving this and how it relates to the structure of the

21  privilege and whether it's within or without it.  And it's

22  defendants' burden to provide that information.

23         THE COURT:  Okay.  So let me just ask you both to

24  respond to the proposal that I put out there about how I

25  intend to resolve this particular dispute.

1     Mr. Fisher?

2          MR. FISHER:  Certainly, we would welcome more

3  information.  You know, there's aspects of -- we're deep in

4  discovery in this case.  We are hard-pressed with upcoming

5  deadlines and we still are having these issues where we're

6  trying to sort out things that hopefully in a perfect world

7  would have been sorted out quite some time ago.  And it's

8  prejudicing us.

9     And so at some point, we can't keep finding issues and

10 playing blindman's bluff with discovery.  And we think that

11 defendants had ample opportunity to provide a privilege log

12 that complied with the rules and their burden to establish

13 the privilege over the documents.  That hasn't happened

14 here.  And the analysis can end there.

15    Of course, we would comply with any order that your

16 Honor issues.

17         THE COURT:  Okay.  And Mr. Caseria?

18         MR. CASERIA:  Your Honor, we're fine with that

19 proposal.  I will say that we tried to make it very clear in

20 our meet and confers with Orion that these documents are

21 totally non-responsive and relate to a totally different

22 industry from telescopes and that's what -- if your Honor

23 orders us to do a more detailed log on these documents,

24 that's what they're going to hear again, which is that these

25 primarily relate to a venture or it relates to automotive

41

1   applications and doesn't relate to telescopes at all.

2          THE COURT:  Well, it's one thing to sort of say

3   it's not responsive because it's different and it's another

4   thing to show them that.  I don't mean by showing them the

5   document.  I mean by having a description that is

6   sufficiently detailed for them to know that that's a correct

7   assessment.

8          MR. CASERIA:  No, I understand.

9          THE COURT:  So that would be what I would order.

10          MR. CASERIA:  That's -- and we're fine with that.

11   I think all I would say is that my sense from the meet and

12   confers is that that would not alleviate any concerns

13   because the view from Orion was if they hit the search term,

14   we get it.

15      We hear what you're saying, that it's not responsive.

16   We don't care.

17      But we're happy to do the exercise.

18          THE COURT:  Well, on this record, I can't decide.

19   I can't decide for you or for you.  I mean you're telling me

20   what's in the documents.  They haven't seen the documents.

21      I'm looking at the privilege log.  I can see what it

22   says.  It doesn't seem like it's responsive on its face, but

23   I can't tell.

24      So how quickly could you get the additional

25   information?  Say I issued the order today, how quickly

1  could you get the additional information from the privilege

2  log provided?

3         MR. CASERIA:  And just specifically what would be

4  the --

5         THE COURT:  It's the documents listed in footnote

6  seven.

7         MR. CASERIA:  Okay.

8         THE COURT:  So I didn't count them, but it looks

9  to me like maybe there's 30 to 40.

10         MR. CASERIA:  I think we could probably do that

11  within a week.

12         THE COURT:  Okay.  All right.  And then I don't

13  think I need a further hearing.  I think I will just need to

14  be able to -- what I would like for you to do is after you

15  get that additional information, you talk to each other,

16  like seriously talk to each other.

17     And then if there are any remaining disputes, I want to

18  see those documents in camera with their English

19  translations of their Chinese so that I can make a decision

20  without having to have another cycle with a hearing and

21  everything.  Okay?

22         MR. FISHER:  Yes, your Honor.

23         THE COURT:  Okay.  That's what I plan to order.

24     There is one last document which is this PL-1528, which

25  was submitted to me in camera.  That is described as "Email

43

1  prepared at the request of counsel in anticipation of

2  litigation re Orion."

3      Okay.  So that may be a high level accurate description

4  of this document.  I'm not totally sure.  But I think you

5  should just tell them what it is and it will be self-evident

6  that it is not responsive.

7          MR. CASERIA:  Again, we did in the meet and

8  confers, whatever we --

9          THE COURT:  No, like really what it is.  Right?

10         MR. CASERIA:  It's a chart of attorneys' fees.

11         THE COURT:  Yes.

12         MR. CASERIA:  We've told them that.  They want it.

13         THE COURT:  Mr. Fisher, how is that possibly

14  relevant to anything in the case?

15         MR. FISHER:  That wouldn't be, your Honor.

16         THE COURT:  Good.  All right.  So that one is not

17  going to be produced.

18      Okay.  So that was easy.  This is the kind of

19  conversation I would expect you to have.

20         MR. CASERIA:  We've had these kind of

21  conversations.

22         THE COURT:  All right.  Well, once you do the

23  detailed privilege log, then I will be able to see what it

24  is as well.  Okay?

25         MR. CASERIA:  Okay.

44

1          THE COURT:  All right.  So anything further on

2   either -- well, on docket number 138 before we adjourn?

3          MR. CASERIA:  No, your Honor.

4          THE COURT:  Mr. Fisher?

5          MR. FISHER:  Nothing, your Honor.

6          THE COURT:  Okay.  All right.  Thank you very

7   much.

8          MR. CASERIA:  Thank you.

9       (Proceedings adjourned at 10:50 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

<u>CERTIFICATE OF TRANSCRIBER</u>

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, September 11, 2018

*Echo Reporting, Inc.*