# EXHIBIT C

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/260191827

# Structural approaches to estimating overcharges in price-fixing cases

**Article** *in* Antitrust Law Journal · January 2010

CITATIONS
4

READS
106

1 author:

John Douglas Zona
Square Z Research LLC

**17** PUBLICATIONS  **964** CITATIONS

SEE PROFILE

All content following this page was uploaded by John Douglas Zona on 16 February 2014.

The user has requested enhancement of the downloaded file.



EXHIBIT
357
Zona



# STRUCTURAL APPROACHES TO ESTIMATING OVERCHARGES IN PRICE-FIXING CASES

J. Douglas Zona*

Computing damages in a price-fixing case typically involves estimating (1) the volume of business affected by the alleged conspiracy and (2) the difference between the observed prices and the prices that would have prevailed but-for the conspiracy (i.e., the overcharge).[2] Typically, damages are then estimated by taking the product of these two parts.[3]

The overcharge is typically estimated by comparing observed conspiracy prices to some appropriate competitive benchmark.[4] the benchmark may be

---

*Director, Berkeley Research Group. I would like to thank the following people for helpful comments and suggestions: Mike Akemann, Chris Pleatsikas, Azucena Monroy, Greg Werden, Serge Moresi, Valerie Suslow, three referees, and the editors of this *Journal*.

[1] In this article, I use the term "conspiracy" to mean an explicit agreement with direct communication among conspirators with the intent of limiting competition among the conspirators and harming consumers (in general, the kind of conspiracies we consider would be proscribed under the antitrust laws). I also use the words "conspiracy" and "collusion" interchangeably. In economics, the term "collusion" can have a broader interpretation (incorporating tacit cooperation where agreement is only implicit), but I am working with this more narrow definition here. *See e.g.*, Robert H. Porter & J. Douglas Zona, *Collusion, in* 2 Issues in Competition Law and Policy 1069 (Wayne Dale Collins ed., 2008) [hereinafter Porter & Zona (2008) [. In this article, I also use the word "cartel to refer to the group of conspirators engaged in an explicit agreement with direct communication.

[2] As early as 1906 we see this issue arise in *Chattanooga Foundry & Pipeworks v. City of Atlanta*, 203 U.S. 390, 396 (1906). More recent examples of this type of damages computation include *In re Polypropylene Carpet Antitrust Litigation*, 996 F. Supp. 18 (N.D. Ga. 1997).

[3] While this approach is typical, other methods may more accurately measure the total economic damages associated with a conspiracy in some circumstances. For example, the simple overcharge-times-quantity method fails to account for potential volume effects, deadweight loss, and other adverse economic effects throughout the distribution chain. Other methods of computing damages, including the structural approaches discussed here, may be able to incorporate these effects.

[4] In this article, I use the term "competitive" to describe a process where firms choose their own actions (which may involve pricing above cost) without an explicit agreement or direct communication with other suppliers on what their actions will be. In general, this kind of behavior will not be proscribed by the antitrust laws. What I refer to here as "competitive" would typically be called "non-cooperative" in an oligopoly setting.

77 Antitrust Law Journal No. 2 (2011). Copyright 2011 American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or downloaded or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

based on observed prices for the products at issue before or after the conspiracy period.[5] Or the benchmark may instead be based on prices from a related or similar market that is unaffected by the conspiracy.[6] Such benchmarks are typically adjusted to account for differences in economic circumstances (aside from collusion) between the market in which the conspiracy took place and the benchmark. For example, benchmark prices may be adjusted for changes in underlying costs using regression analysis.

There are a number of challenges in applying the benchmark method. In many circumstances it can be difficult to collect sufficient information to formulate an appropriate benchmark. For example, price data may only be available during the conspiracy period. Or the cost data used to adjust prices may be unavailable. Or the start (or end) date of the conspiracy period may coincide with some other economically relevant event, such as the arrival of a new entrant into the market. In such circumstances, there may not be sufficient data available to use a benchmark approach to separately identify the effect of the conspiracy (if any) from the other economic factors affecting prices. There are a number of other potential issues in estimating damages using this method, which I will elaborate on subsequently.

In this article I propose a simple method for estimating overcharges based on a structural representation of the market process in two circumstances. In the first representation, the outcomes are assumed to be subject to the conspiracy. In the second representation, I model how competition in the market would have impacted prices but for the conspiracy. Overcharge is then estimated by the difference in outcomes between the two market models. This simple method, which is related to the analytic techniques developed in the context of merger simulation, is less data-intensive than the typical benchmark approaches described above, and has certain other advantages too, though it also has limitations, some of which I describe below.

## I. STRUCTURAL MODELING

Structural modeling can be a powerful economic tool to address important competition policy questions. A structural model is a representation of the underlying fundamental economic processes that determine observable outcomes in the marketplace. Structural modeling is a well-established analytical approach in economics—building models and using those models to predict

---

[5] *See, e.g.*, Luke M. Froeb, Robert A. Koyak & Gregory J. Werden, *What Is the Effect of Bid-Rigging on Prices?*, 42 ECON. LETTERS 419 (1993).

[6] *See, e.g.*, Robert H. Porter & J. Douglas Zona, *Ohio School Milk Markets: An Analysis of Bidding*, 30 RAND J. ECON. 263 (1999) [hereinafter Porter & Zona (1999)].

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

the effects of changes in policy or other exogenous variables has long been a fundamental technique in the economist's toolkit.[7]

Structural modeling is routinely applied to evaluate mergers, where it is often referred to as merger simulation. A structural model of a merger might include components that describe firm behavior (i.e., firms' objectives, such as short-run profit-maximization), production technology (i.e., the nature of costs), and consumer response (i.e., the system of demand for the products at issue).[8] With a structural model, the economist can predict the effects on marketplace outcomes of changes in the economic environment. For example, some of the competitive effects of a merger can be predicted if the economist is able to model accurately the key economic processes of the expected postmerger world to compare to the premerger situation.

In a merger simulation, the "competitive" regime is the premerger market interaction.[9] Outcomes from this interaction are observed. The "collusive" regime is the predicted postmerger market interaction. Joint profit-maximization for the merged firms, with non-merging firms continuing to set prices unilaterally, is the usual behavioral assumption.[10] In a merger simulation, differences in prices between the premerger competitive regime and the postmerger collusive regime are the estimated unilateral effect of the merger. Fundamen-

---

[7] Models are designed to capture the key economic elements of the real world, abstracting from those elements that are not crucial. It is precisely by focusing on the key elements that a model becomes useful for economic analysis. The question then becomes which real world elements are central to the analysis at hand and which are not. The choice as to which elements of the real world to incorporate into the model is part of model specification.

[8] One of the first applications of this approach in a merger context was Jerry A. Hausman, Gregory K. Leonard & J. Douglas Zona, *Competitive Analysis with Differentiated Products*, 34 ANNALES D'ECONOMIE ET DE STATISTIQUE 159 (1994) [hereinafter HLZ]. HLZ proposed a method for simulating the post-merger world that allows for explicit quantification of the merger's effects on the prices of the products of the merged firm, incorporating any marginal cost reductions the merger was expected to generate.

[9] The usual assumption about competitive/premerger behavior has assumed independent choice of price by each supplier treating the prices of others as fixed. In the merger simulation context, this assumption has not been particularly controversial. But mischaracterizing the premerger behavior will generally result in bias in the estimates of structural parameters and of price increases due to the merger. As a result of these concerns about potential bias, this assumption has been tested in some merger simulations. *See, e.g.*, Jerry A. Hausman & Gregory K. Leonard, *Economic Analysis of Differentiated Products Mergers Using Real World Data*, 5 GEO. MASON L. REV. 321 (1997).

[10] In the merger context, this assumption has not been particularly controversial. In merger simulation, however, it is worth emphasizing that the model is used to predict future behavior and outcomes. As with any forecasting exercise, there tends to be significant uncertainty with respect to such predictions, in part because it can be difficult or impossible to predict all relevant structural and other changes that might occur in a marketplace. Such changes can relate to new technologies or products, regulatory or legislative shifts, or significant entry or exit. By contrast, using simulation techniques to estimate overcharges is usually a purely backward-looking exercise. Thus, at the time the analysis is conducted, the relevant shifts in the marketplace will be known and can (at least in principle) be accounted for in the analysis.

tally, the differences in prices arise because of the differences in the nature of competitive interaction. In the modeling effort, typically all other structural elements are held fixed. However, to the extent that marginal costs change pre- and postmerger due to merger-specific efficiencies, these can be incorporated into the model in a straightforward manner. Other changes, such as new product entry or product repositioning, are more difficult, albeit conceptually possible, to handle.

Here I demonstrate how structural modeling can be applied to estimate but-for prices and overcharges in a price-fixing damages context. There are some limited references to this idea in the economics literature. Daniel Rubinfeld uses structural modeling to compute the damages by randomly drawing competitive bids for a benchmark.[11] Gregory Leonard and J. Douglas Zona discuss how structural modeling can be employed to measure the effects of collusion on prices.[12] John Connor suggests that there are a few academic studies that may point to the potential for forensic applications.[13] Theon Van Dijk and Frank Verboven discuss the possibility of a structural approach to estimating damages,[14] while John Asker[15] uses a structural model to estimate damages in the context of a bid-rigging scheme.[16]

In this article I propose a method to estimate overcharges based on the difference in two outcomes from a structural economic model. This method raises a number of issues, some of which may also relate to the benchmark approaches for estimating overcharges in price-fixing cases. Structural modeling in a price-fixing context confronts certain issues that are not confronted (at least not explicitly) in merger simulation or when using a traditional benchmark approach. The principal issues to address first involve characterizing the nature of the competitive and collusive interactions.

---

[11] Daniel L. Rubinfeld, *Econometrics in the Courtroom*, 85 Colum. L. Rev. 1048, 1092–94 (1985).

[12] Gregory K. Leonard & J. Douglas Zona, *Simulation in Competitive Analysis*, *in* 3 Issues in Competition Law and Policy, *supra* note 1, at 1405 [hereinafter Leonard & Zona (2008)].

[13] John M. Connor, *Forensic Economics: An Introduction with Special Emphasis on Price Fixing*, 4 J. Competition L. & Econ. 31 (2007).

[14] Theon van Dijk & Frank Verboven, *Quantification of Damages*, *in* 3 Issues in Competition Law and Policy, *supra* note 1, at 2331.

[15] John Asker, *A Study of the Internal Organization of a Bidding Cartel*, 100 Am. Econ. Rev. 724 (2010).

[16] There is also an extensive literature on computing expected outcomes in bidding situations, which can be used to analyze some forms of bid rigging. *See, e.g.*, Emmanuel Guerre, Isabelle Perrigne & Quang Vuong, *Optimal Nonparametric Estimation of First-Price Auctions*, 68 Econometrica 525 (2000); Harry J. Paarsch & Han Hong with M. Ryan Haley, An Introduction to the Structural Econometrics of Auction Data (2006); Patrick Bajari & Lixin Ye, *Deciding Between Competition and Collusion*, 85 Rev. Econ. Stat. 971 (2003) [hereinafter Bajari & Ye (2003)].

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

### A. Characterizing Behavior in the Competitive Regime

In a traditional benchmark analysis of price fixing, outcomes from a competitive (benchmark) regime are observed. The competitive outcomes (i.e., prices) are compared to the outcomes during the presumed collusive regime. There is often controversy as to whether the observed outcomes are a realistic indication of what the market would have produced but for the collusion. For example, defendants may claim that the period before the start of the conspiracy was an unsustainable price war and using it would overstate damages. On the other hand, plaintiffs might argue that prices after the conspiracy are still higher than the competitive level because of the lingering effects of the conspiracy or for some other reason.[17]

In a structural analysis of price fixing, the competitive outcomes are not observed, and the nature of competitive interaction must be specified as part of the model. Economic theory allows a wide range of "competitive" outcomes. Indeed, as a matter of economic theory, almost any outcome could be supported as a competitive equilibrium in an oligopoly (where most cartel behavior occurs).[18] For example, marginal cost pricing can lead to situations where all firms have no incentive to deviate, at least under some circumstances. Pricing at marginal cost will generally imply a lower bound on the sustainable competitive prices and, therefore, the highest estimated overcharges, all else equal. Similarly, other pricing behavior based on unilateral action can also be supported as competitive equilibria, with higher competitive prices and lower estimated overcharges.

However, typically, not all assumptions about competitive behavior are equally reasonable from an economic point of view, given the facts and circumstances of a particular industry at a particular period in time. The courts generally require that once a plaintiff establishes liability, the jury may "make a just and reasonable estimate of the damages based on relevant data."[19] Under the *Daubert* ruling and its progeny,[20] expert testimony must be "relevant" and "reliable"—where "relevant" means connected to the facts and circumstances of the case and assisting the trier of fact, while "reliable" relates to the principles and methods used—and can be established in several ways.[21] Applying *Daubert* criteria specifically to a structural model of damages, the *Concord*

---

[17] *See, e.g.*, Joseph E. Harrington, Jr., *Post-Cartel Pricing During Litigation*, 52 J. Indus. Econ. 517 (2004).

[18] This is the so-called Folk Theorem in game theory. *See, e.g.*, Mamoru Kaneko, *Some Remarks on the Folk Theorem in Game Theory*, 3 Math. Soc. Sci. 281 (1982).

[19] Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 264 (1946).

[20] Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993).

[21] *See, e.g.*, Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 Wash. L. Rev. 423 (1995).

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

*Boat* decision demonstrates the importance of connecting any structural model to the facts and circumstances of the case.[22]

A review of the facts and circumstances, combined with economic theory, may suggest that certain behavior is unlikely and constitutes an unreasonable behavioral assumption in a particular situation. But facts will generally trump theory. The assumptions of any structural model should, therefore, be consistent with the key economic facts. For example, if transactions have historically been organized by auctions, then a competitive scenario that assumes otherwise might be unreasonable. As another example, if leader-follower pricing behavior is observed outside the conspiracy in otherwise similar circumstances, then that kind of behavioral assumption might be reasonable in the but-for world.

Reasonableness (and unreasonableness) can also be informed by economic theory. For example, in the kinds of oligopoly settings typically encountered in price-fixing cases, marginal cost pricing is unlikely to be a reasonable assumption but for the conspiracy. In oligopoly settings, each firm has measurable impact on the profits of others, and so it is in a firm's interest to set prices to reflect that interdependence; marginal cost pricing does not achieve this.[23] Similarly, some tacitly collusive (and legal) schemes may require such high costs of monitoring and policing that (tacit) coordination is unreasonable to assume but for a conspiracy.[24]

As in the merger simulation context, an oligopoly model where firms choose prices to maximize profits assuming other firms' prices are given can be a reasonable starting point in characterizing competitive behavior.[25] In this type of competitive model, firms choose their own profit-maximizing point given the actions of others and no firm has an economic incentive to deviate from their choices, given the behavior of others. Other assumptions, such as quantity setting, may also be reasonable.[26]

---

[22] Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000). In that decision, testimony of one expert, including damages-related testimony, was excluded in part because the structural economic model developed was not consistent with the economic realities of the case.

[23] Lawrence J. White, *Lysine and Price Fixing: How Long? How Severe?*, 18 REV. INDUS. ORG. 23 (2001).

[24] Tacit coordination might be assumed in those instances in which it is unlikely the challenged behavior would have resulted from chance, independent responses without monitoring, or express coordination among the parties.

[25] This kind of assumption may be reasonable even in industries where products seem homogeneous, as many firms differentiate their products (and charge different prices) with different payment terms, delivery options, customer service, and a variety of other devices. Here I am *not* assuming products are perfectly homogeneous, but rather am assuming something more general.

[26] The assumption of price- or quantity-setting behavior may make little difference in terms of outcomes. *See, e.g.*, Paul Klemperer & Margaret Meyer, *Price Competition vs. Quantity Competition: The Role of Uncertainty*, 17 RAND J. ECON. 618 (1986). Other types of competition, for example, in location, timing of entry, or other strategic variables, may also be considered.

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

### B. Characterizing Behavior in the Collusive Regime

In a benchmark analysis of price fixing, outcomes from a collusive regime are also observed (as was the case for the "competitive" regime) and assumed to be outcomes of collusive behavior.[27]

In a structural analysis of price fixing, the observed outcomes are also assumed to be the result of the collusive behavior, and the structural parameters of the model are derived from these observations. As in the merger simulation context, an error in specifying the model may bias the computed structural parameters, which in turn could lead to bias in the estimated overcharge. For example, assuming joint profit maximization may be unreasonable if firms had colluded by agreeing to add 50 percent to whatever their competitive bids would have been. The firms may have decided to collude in this fashion because it was easier to monitor and enforce that collusive arrangement than another collusive arrangement.[28] Joint profit maximization may have implied a 30 percent increase in bids over the competitive bids, but the collusive agreement required a 50 percent increase. If demand is not too elastic, then conspirators may be better off colluding in this way (in the sense of higher profits), relative to not colluding at all.

As a general matter, collusion can take many forms, but the allegations in a particular case may be a good starting point for characterizing collusive behavior for purposes of structural modeling. For example, plaintiffs may allege that conspirators fixed market shares or allocated customers in some particular way. In the case of an effective market allocation (either by customer or by geography) one could tailor the structural model so that each colluding firm faces a distinct demand curve which reflects the unavailability of the but-for substitute products of the other colluder(s).

But allegations often lack specificity[29] and provide limited guidance. Nevertheless, the assumption of joint profit maximization for the colluding firms

---

[27] Note that the "collusive" regime may not be a single period but occur over a longer period, perhaps off and on, with varied success.

[28] As a general matter, conspiracies can be difficult to monitor and enforce and firms that engage in cartel behavior may face a number of practical constraints on their ability to raise prices. Because colluders are not able to enter into legally enforceable contracts, collusive arrangements need to be self-enforcing. Thus, the arrangements must be compatible with the individual incentives of each firm, so that it pays for each firm to stick to the collusive agreement net of whatever costs they bear in order to participate. *See, e.g.*, Porter & Zona (2008), *supra* note 1.

[29] Of course, the allegations must have some specificity; under *Twombly*, a price-fixing claim under Sherman Act Section 1 must be dismissed when the complaint fails to allege facts sufficient to make an inference of a conspiracy plausible. Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); *see also In re* Travel Agent Comm'n Antitrust Litig., 583 F.3d 896 (6th Cir. 2009), *cert. denied*, 2011 WL 55388 (2011) (affirming dismissal of complaint even though plaintiffs alleged parallel conduct, behavior against defendants' self-interest, knowledge of each others' actions, opportunities to conspire at trade association meetings, and a history of collusive behavior in the

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

and unilateral pricing for non-colluders may be a reasonable starting point to measuring damages in many such situations.[30] For example, allegations of customer allocation are consistent with an assumption of joint profit maximization assuming customers have been allocated efficiently.

Obviously, joint profit maximization yields the highest level of profit that the group of colluders can achieve, given the behavior of others.[31] The assumption of joint profit maximization does *not* imply that the estimated overcharge (rate) is at a maximum. As the example above illustrates, in some cases the assumption of joint profit maximization will underestimate the impact of the collusion on prices. Similarly, the assumption of joint profit maximization does not necessarily imply a ceiling or upper bound on the overcharge due to the collusion.

## C. Causality and Changes in Overcharge

In a benchmark analysis of price fixing, the differences in outcomes between the "competitive" and "collusive" regimes are interpreted as *caused* by differences in behavior. In other words, such analyses, when done properly, are designed to conclude that the overcharge is caused by the collusive behavior. For this causal inference to be valid, however, the analysis must identify and control for all important economic factors that may explain the observed differences, other than collusion. This can be, and usually is, quite contentious.

In a structural analysis of price fixing, like merger simulation, the model provides an estimate of the difference attributable to (or caused by) changes in behavior. Again, because a structural model is used, the difference is attributable (only) to the difference in competitive and collusive behavior, given the data. In order to compute an overcharge for another point in time, other factors which might be expected to change may need to be controlled for. For example, if costs change over time, then the estimate of marginal costs from

industry); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008) (affirming dismissal of complaint where plaintiffs failed to allege "who what when where" facts of the conspiracy).

[30] While the theoretical assumption may not describe the actual behavioral process, it may nevertheless lead to predictions that reasonably reflect outcomes in the reality of the marketplace. This particular assumption has precedent in the economics literature. For example, Bajari and Ye use a statistical test to classify outcomes as more like a competitive benchmark or a perfectly collusive benchmark. Bajari & Ye (2003), *supra* note 16. Similarly, Porter and Zona specify a model which relates price to market structure measured by the Herfindahl-Hirschman Index (HHI) and use the difference between the HHIs assuming competitive and perfectly coordinated behavior to compute damages. Porter & Zona (1999), *supra* note 6.

[31] Short of merger, achieving this level of profit may require substantial coordination and monitoring (and perhaps side payments) that may be both costly and perhaps risky. Evidence of frequent conspirator communication and effective monitoring are consistent with active cartel management. It may therefore be reasonable to expect such active management to tend to find the profit-maximizing level of prices, subject to whatever constraints may be binding.

the model could be adjusted to give an estimate of marginal costs, but-for price, and overcharge computed over time.

## II. THE STRUCTURAL APPROACH

A structural model of a market could involve econometric estimation of various relationships. For example, demand may be estimated using a variety of modern methods developed in the marketing and economics literature.[32] Cost functions could also be estimated using an econometric analysis of cost and production data. A full-blown structural model would likely require a large effort, which may be possible and justified in some circumstances.[33]

In the merger context a number of short-cut approaches to structural modeling have been proposed that allow one to make inferences based on limited data and without econometric analysis.[34] A major element of such simplified approaches take a restricted version of some more general (demand) model and calibrate the model to the particular competitive situation using limited data.[35]

### A. THE BASE MODEL

In order to develop and demonstrate a practical application of the structural approach, I use publically available data from the Vitamin A cartel operating in the 1990s.[36] The Vitamin A cartel example illustrates that a structural approach can be applied using limited data, of the type typically available at the early stages of a price-fixing investigation.[37] I use this example to develop the

---

[32] Many of these methods have become standard in the economics and marketing literature and the tools to estimate them are well known to economists. *See, e.g.*, Steven Berry, *Estimating Discrete-Choice Models of Product Differentiation*, 25 RAND J. ECON. 242 (1994); Steven Berry, James Levinsohn & Ariel Pakes, *Automobile Prices in Market Equilibrium*, 63 ECONOMETRICA 841 (1995); Peter E. Rossi, Robert E. McCulloch & Greg M. Allenby, *The Value of Purchase History Data in Target Marketing*, 15 MKTG. SCI. 321(1996).

[33] For example, when sufficiently detailed data are available to estimate econometrically the shape and parameters of the demand and cost curves, with substantial effort it would be possible to obtain estimates generally more reliable than the simpler methods discussed here. When it is important to put a finer point on the damage numbers—such as at trial—the additional effort and expense may be justified.

[34] Leonard & Zona (2008), *supra* note 12.

[35] One primary advantage of these approaches is that they can be implemented relatively quickly and inexpensively. One primary disadvantage is that the often strong restrictions and limited connection to actual market data can make the model a relatively poor tool for estimating changes in incentives and outcomes. It is often difficult to weigh the advantages and disadvantages of these simplified approaches without performing additional tests and analysis, some of which may require data that are not readily available.

[36] For a general discussion of the circumstances of the vitamin cartels, see JOHN M. CONNOR, GLOBAL PRICE FIXING: OUR CUSTOMERS ARE THE ENEMY (2001) [hereinafter CONNOR (2001)].

[37] I am not attempting to support the particular assumptions used in the Base Model with the facts and circumstances of the Vitamin A case. In addition to many others who have written

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

basic model (Base Model), and then consider the sensitivity of the various inputs on computed overcharge measures.

I begin by assuming that the observed data are consistent with a particular characterization of (collusive) behavior and solve for the values of the parameters of the model which are implied. Then, the structural model is used to derive competitive outcomes and overcharges.

The basic elements of a structural approach include a characterization of demand and the price-setting behavior of firms with and without the explicit collusive agreement.[38] Specifically, the Base Model is based on the following assumptions:

> 1. **Demand**—For this application I use a version of the Nested Logit Model (NLM) of demand. The NLM specifies a set of equations which give quantities demanded as a function of prices and the parameters of the model. Other short-cut methods from the merger simulation context could generally be applied as well.[39]
>
> 2. **Price-Setting Behavior Under the Collusive Agreement**—In this case, I assume that the alleged conspirators maximize joint profits and non-conspirators price independently to maximize their own profit.[40] I consider alternative assumptions in a subsequent section.

---

about the vitamins cartels, an interested reader can see Connor for details on these conspiracies. *Id.*

[38] For the scenarios I consider, marginal costs are treated as constant, but in general this would be an additional issue to be addressed in a structural model.

[39] For those interested in the mathematical specification, I give a brief summary of the demand model. According to the NLM, the logarithm of demand for a product i, $q_i$, given prices of product j, $P_j$, (where there are N products i and j, and with $\alpha_i$, $\beta$, and $b$ parameters of the model, is

$$\ln q_i = \alpha_i + \beta P_i + (b-1)\ln\left(\sum_j \exp(\alpha_j + \beta P_j)\right)$$

*See, e.g.,* Kenneth E. Train, Discrete Choice Methods with Simulation 82–90 (2003). Other short-cut methods include: Proportionality-Calibrated AIDS (Roy J. Epstein & Daniel L. Rubinfeld, *Merger Simulation: A Simplified Approach with New Applications*, 69 Antitrust L.J. 883 (2001)), and Antitrust Logit Model (Gregory J. Werden & Luke Froeb, *The Antitrust Logit Model for Predicting Unilateral Competitive Effects*, 70 Antitrust L.J. 257 (2002)).

[40] Under the assumptions of the scenario, the conspirators together select the prices for their products that maximize joint profits. If there were non-conspirators, I would assume that they set prices independently, that is, taking the prices of others as given. The individual product demands are given by the NLM. The specific assumptions imply a set of first-order conditions which must be met for the prices to be profit maximizing. Derivation of the conditions is tedious, but straightforward. In general, the first-order condition says that at the profit-maximizing price, the ratio of incremental profit to price will be equal to the inverse of the demand elasticity for the product or group of products in the case of a conspiracy. With the NLM, the first-order conditions imply

$$\frac{P_k - C_k}{P_k} = \frac{-1}{P_k \beta\left(1 + (b-1)s^C\right)}$$

for each conspirator $k$, where $s^C$ is the cartel market share and $C_k$ is the marginal cost for the product of firm $k$. The first order conditions imply that margins are larger when demand is less elastic, or when cartel share is large.

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

3. **Price Setting Behavior Under Competition**—In this case, I assume that each firm sets price to maximize its own profits taking the prices of others as given.[41] I consider alternative assumptions in a subsequent section.

The method requires the simultaneous solution of three different sets of conditions: demand, collusive, and competitive. The demand conditions relate the parameters of the demand system to the observed prices, shares, and industry information. The collusive conditions are derived from the assumed price-setting behavior under collusion and relate marginal costs to the other parameters and observed data. The competitive conditions characterize behavior under competition, given the other data of the model. These types of equations are typically solved using numerical methods since a closed-form (algebraic) solution need not exist.[42]

Returning to the Vitamin A example, according to Connor, Roche, BASF, and Rhone-Poulenc (RP) conspired to raise the price of Vitamin A used as a feed additive by setting the prices to be charged and agreeing on market share targets for the conspirators.[43] According to Connor, there were other suppliers not party to the agreement, which I treat as a single non-conspirator here. According to Connor, the Vitamin A cartel spanned the period from 1990 to 1999—I focus on the year 1995, which was arguably the height of the cartel activity.[44] I observe some basic industry data, which are summarized in Table 1 below. Those data, along with the assumption of joint profit maximization under collusion, are used to derive the model parameters.

The results of the calculations are also displayed in Table 1. Notice that the calculated marginal cost for the non-conspirator is much higher than the others. The implied logic of the model is that the non-conspirator would have such a small share only if it were substantially cost-disadvantaged—the calculated number is a result of that logic. The high cost number for the non-conspirator is consistent with the high costs of controlling production and having technical know-how and/or other barriers to entry. In reality, the non-conspirator firms sold Vitamin A, but did not produce it. Also note that the derived

---

[41] The specific competititve assumptions (and the other assumptions of the Base Model) imply another set of conditions which must be met for the prices to be profit maximizing. The first order conditions imply

$$\frac{P_k - C_k}{P_k} = \frac{-1}{P_k \beta \left(1 + (b-1)s_k\right)}$$

for each firm $k$, where $s_k$ is the firm's market share and $C_k$ is the marginal cost for the product of firm $k$.

[42] These kinds of methods are straightforward and implemented in many spreadsheet programs, such as Microsoft Excel. This example is intended to give an overview of the methodology, but the discussion is not meant to be a technical roadmap.

[43] CONNOR (2001), *supra* note 36, at 305–07.

[44] *Id.* at 306.

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

conspirator margins match; this is also a consequence of the NLM and the joint profit-maximization assumption.

TABLE 1: INPUTS AND DERIVED MODEL PARAMETERS FOR
VITAMIN A CARTEL USING BASE MODEL

| | | Company | | | |
|---|---|---|---|---|---|
| | Industry | Roche | BASF | Rhone-Poulenc | Other |
| **Model Inputs:** | | | | | |
| Price ($/kg)[i] | | 55.00 | 55.00 | 55.00 | 55.00 |
| Quantity (Million kg)[ii] | | 0.713 | 0.570 | 0.410 | 0.089 |
| Cartel Member[iii] | | Yes | Yes | Yes | No |
| Margin[iv] | | 60.00% | | | |
| Industry Demand Elasticity[v] | −1.5 | | | | |
| **Derived Model Parameters:** | | | | | |
| Demand Intercept ($\alpha_k$) | | 5.778 | 5.555 | 5.225 | 3.699 |
| Marginal Cost ($/kg) ($C_k$) | | 22.000 | 22.000 | 22.000 | 43.214 |
| Within Group Price ($\beta$) | −0.09 | | | | |
| Group Price (b) | 0.310 | | | | |

Notes: [i]  JOHN M. CONNOR, GLOBAL PRICE FIXING: OUR CUSTOMERS ARE THE ENEMY 321 (2001) (using 1995 value).
[ii]  *Id.* at 291 (for market shares); *id.* at 295 (for U.S. sales in 1995 divided by $55).
[iii]  *Id.* at 305–06.
[iv]  *Id.* at 331 (using lower end of percent range for Vitamin A margin for Roche). *See also id.* at 332.
[v]  Baseline assumption.

The model can be used to solve for outcomes under various behavioral assumptions. The derived parameters of the model are used to compute the but-for prices under the assumed but-for behavior. Prices, quantities, shares, margins, and profits for the assumed competitive behavior are displayed in Table 2. Because the computed costs for the non-conspirator are relatively high, even under competition, it cannot lower price much below the price it was charging when it priced under the cartel umbrella. The computed outcomes under cartel behavior are also presented in Table 2. Of course, at these parameter values, the observed quantities numerically match those predicted by the NLM and the observed prices are the values which maximize the joint profit of the conspirators, given the calculated costs.

There is a dramatic reduction in output associated with collusion among the three conspirators. For example, Roche output decreases from about 1.1 million kg to 0.7 million kg, under collusion. The output of the non-conspirator *increases* to partially fill the void left by the reduction from collusion. For

12

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

Roche, price increases from the individually set profit-maximizing price of about $37.59 to $55.00.

Overcharges are expressed as the percent change in price from collusion. In the example, the share weighted average overcharge is about 31.3 percent. Damages, estimated as overcharge times total revenue, are about $30 million in 1995. The percent overcharge is comparable to the high end of the ranges presented in Connor of 25–30 percent, or the Government's estimate of 15–25 percent.[45] Other measures of changes in welfare, such as change in profits or consumer surplus, can be computed using the model. The computed effect of the conspiracy was to increase Roche's profits by about $6 million for 1995 (Table 2). Total profits (across all firms) increased about $14 million for 1995. Computed profits from the cartel might be compared to the estimated costs of setting up and running the cartel. If incremental profits are too low relative to costs, then there are limited economic incentives to enter into an agreement.

TABLE 2: ESTIMATED OVERCHARGES AND PROFITS FROM
COLLUSION IN 1995 FOR VITAMIN A CARTEL
USING BASE MODEL

|  | Company | | | |
|  | Roche | BASF | Rhone-Poulenc | Other |
|---|---|---|---|---|
| **Outcomes under Assumed Competitive Behavior:** | | | | |
| Price ($/kg) | 37.59 | 36.81 | 35.89 | 54.68 |
| Quantity (Million kg) | 1.129 | 0.968 | 0.754 | 0.031 |
| Share | 39.2% | 33.6% | 26.2% | 1.1% |
| Margin | 41.5% | 40.2% | 38.7% | 21.0% |
| Profit (Million $) | 17.61 | 14.33 | 10.48 | 0.36 |
| **Outcomes under Assumed Collusive Behavior:** | | | | |
| Price ($/kg) | 55.00 | 55.00 | 55.00 | 55.00 |
| Quantity (Million kg) | 0.713 | 0.570 | 0.410 | 0.089 |
| Share | 40.0% | 32.0% | 23.0% | 5.0% |
| Margin | 60.0% | 60.0% | 60.0% | 21.4% |
| Profit (Million $) | 23.52 | 18.82 | 13.52 | 1.05 |
| **Estimated Effects:** | | | | |
| Overcharge | 31.7% | 33.1% | 34.8% | 0.6% |
| Change in Profits From Collusion (Million $) | 5.91 | 4.48 | 3.05 | 0.69 |

The effects of changes in some of the key data on the overcharge estimates are displayed in Table 3. There is an inherent tension among three critical numbers in the structural model: conspirator price-cost mark-up, aggregate conspirator shares, and industry elasticity. From basic microeconomic models,

---

[45] *Id.* at 333–36.

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

when a group of firms together price as a monopolist (either through merger or perfect collusion), the cost-price margin at the short-run profit-maximizing price will be equal to the inverse of the (negative) industry demand elasticity. In our base scenario the elasticity is −1.5, so if a monopoly had been setting prices and produced at the observed value of the industry elasticity then the monopoly margin would be about 66.6 percent. If the conspiring group of firms faces competition from within the industry (i.e., there are some non-conspiring firms in the industry), then the residual demand that the group faces is more elastic than for the whole industry and the collusive margin will be generally lower that the pure monopoly value. The more competition the colluders face, the greater the relative difference between the monopoly margin and the margin that conspirators can optimally achieve.

TABLE 3: ESTIMATED OVERCHARGES—SENSITIVITY ANALYSIS

| Scenario | | | | Overcharges | | | | |
|---|---|---|---|---|---|---|---|---|
| Case | Conspirator Margin | Conspirator Share[i] | Elasticity | Roche | BASF | Rhone-Poulenc | Other | Weighted Average |
| Base | 0.600 | 95.0% | −1.50 | 31.7% | 33.1% | 34.8% | 0.6% | 31.3% |
| 1 | 0.525 | 95.0% | −1.50 | 37.0% | 37.9% | 39.0% | 0.4% | 35.9% |
| 2 | 0.550 | 95.0% | −1.50 | 36.4% | 37.5% | 38.7% | 0.5% | 35.5% |
| 3 | 0.575 | 95.0% | −1.50 | 34.8% | 36.1% | 37.5% | 0.6% | 34.1% |
| 4 | 0.600 | 95.0% | −1.50 | 31.7% | 33.1% | 34.8% | 0.6% | 31.3% |
| 5 | 0.625 | 95.0% | −1.50 | 25.7% | 27.2% | 29.1% | 0.5% | 25.7% |
| 6 | 0.650 | 95.0% | −1.50 | 14.1% | 15.5% | 17.0% | 0.2% | 14.5% |
| 7 | 0.600 | 80.0% | −1.50 | 11.1% | 12.3% | 13.7% | 0.7% | 9.8% |
| 8 | 0.600 | 90.0% | −1.50 | 20.6% | 22.1% | 23.9% | 0.8% | 19.8% |
| 9 | 0.600 | 97.5% | −1.50 | 42.0% | 43.0% | 44.2% | 0.2% | 41.8% |
| 10 | 0.600 | 99.0% | −1.50 | 51.2% | 51.8% | 52.4% | 0.1% | 51.2% |
| 11 | 0.600 | 95.0% | −0.75 | 51.7% | 52.2% | 52.9% | 0.3% | 49.6% |
| 12 | 0.600 | 95.0% | −1.00 | 49.1% | 49.8% | 50.6% | 0.3% | 47.2% |
| 13 | 0.600 | 95.0% | −1.25 | 44.3% | 45.2% | 46.3% | 0.5% | 42.8% |
| 14 | 0.600 | 95.0% | −1.50 | 31.7% | 33.1% | 34.8% | 0.6% | 31.3% |

Note: [i] Conspirator Share is allocated to conspiring firms using base case share ratio.

From Table 3, we observe that the estimated weighted average overcharge is rather sensitive to the particular values of margin, non-conspirator share, and industry elasticity. For example, Case 1 shows the effect of a reduction in the presumed conspirator margin from 60 percent in the base case to 52.5 percent. The computed weighted average overcharge increases from 31.3 percent to 35.9 percent. In this case, the cartel margin is lower, consistent with more substitution in the marketplace, and therefore the competitive margin is lower still. The presumed conspirator margin also has a substantial impact on the computed overcharge. Cases 7–10 show the effect of changes in conspirator share on the computed overcharge. In this particular example, overcharges

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

(and profits from collusion) are substantially affected by the share of supply outside the conspiracy, all else equal.

### B. ALTERNATIVE MODELS WITH OTHER BEHAVIORAL SCENARIOS

Specific derivation of overcharges using the structural method depends on the presumed nature of the price-setting behavior (under competitive and collusive scenarios). For present purposes, I will develop alternative assumptions to illustrate the types of issues that may be encountered, but still other scenarios could be developed consistent with the facts and circumstances of a particular case. Other assumptions about behavior may produce very different outcomes and estimates of overcharges.

#### 1. *Alternative Competitive Behavior*

Using the model derived above, I computed estimated overcharges in Vitamin A as about 30 percent, based on an assumed specific form of competitive interaction. I now consider the effect on the overcharge estimate of an alternative form of competitive interaction. The first step in computing the overcharge, derivation of the structural parameters, is the same as before. In the second step, I use the derived parameters to compute a different competitive outcome.

For this alternative case, I assume that the other firms in the market only entered because of the profit opportunity created by the cartel. Or, but for the cartel prices, profits to the other firms would not be sufficient to cover their fixed costs and they would exit the market. With NLM for demand, removing a product is easily handled and demand is reallocated proportional to market shares.[46] Outcomes from these calculations are presented in Table 4 along with the outcomes and overcharges from the base case. The presence of the other firms is not of competitive significance as their absence causes a small increase in prices but no larger than $0.06 per kg. Overcharges are marginally different from the base case. In this case, this is due in large part to the fact that "other" firms were a trivial share of global vitamin A production in the 1990s.

As a second alternative, I assume Roche behaved as a "market leader" and all the other producers are "followers."[47] Here, Roche is able to raise price

---

[46] This kind of alternative competitive assumption would be very difficult to handle using a benchmark method since the set of competitors for the benchmark transactions may not be the same as the but-for set of competitors. Using the structural method and the NLM, demand is adjusted to account only for the pricing of available products—i.e., the sum in demand function in footnote 39 is only computed over available products.

[47] Followers take the actions of all others as given, while the Stackelberg leader incorporates the response of followers into its decision. In the present context, Roche has a modified first-order condition for profit maximization, while followers have first-order conditions identical to

15

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

above the base competitive model because it "knows" that the other firms will follow its lead. Table 4 displays the outcomes for these calculations: competitive prices increase slightly with these behavioral assumptions and overcharges are also affected slightly. Overcharge for Roche is computed to be somewhat smaller because of its presumed leadership position.

TABLE 4: ESTIMATED OVERCHARGES FOR 1995 VITAMIN A CARTEL USING ALTERNATIVE COMPETITIVE ASSUMPTIONS

| | Company | | | |
| --- | --- | --- | --- | --- |
| | Roche | BASF | Rhone-Poulenc | Other |
| **Outcomes under Base Competitive Behavior** | | | | |
| Price ($/kg) | 37.59 | 36.81 | 35.89 | 54.68 |
| Overcharge | 31.7% | 33.1% | 34.8% | 0.6% |
| **Outcomes With "Others" Exiting the Industry** | | | | |
| Price ($/kg) | 37.65 | 36.85 | 35.92 | NA |
| Overcharge | 31.5% | 33.0% | 34.7% | NA |
| **Outcomes With Roche as "Stackelberg Leader"** | | | | |
| Price ($/kg) | 38.44 | 36.91 | 35.96 | 54.68 |
| Overcharge | 30.1% | 32.9% | 34.6% | 0.6% |
| **Outcomes With Roche as Price Setter** | | | | |
| Price ($/kg) | 38.03 | 38.03 | 38.03 | NA |
| Overcharge | 30.9% | 30.9% | 30.9% | NA |

Finally, I have calculated "competitive" prices assuming other firms follow Roche prices. In this context, other firms do not optimize; rather, they just follow Roche's lead. If Roche does not act as if it knows the others will follow, then Roche's first-order condition is the same as the base competitive case, and outcomes will be very near the base competitive prices (computed values are $37.71 with overcharge of 31.4 percent).[48] At these prices "Other"

---

the base competitive circumstances. Equilibrium is determined by simultaneous solution of all the first-order conditions.

Roche's first-order condition is modified so that

$$P_{Roche} - C_{Roche} = \frac{-1}{\beta\left(1 + (b-1)\left(s_{Roche} + \sum_j \frac{\partial P_j}{\partial P_{Roche}} s_j\right)\right)}$$

Here, the way the followers' prices respond to changes in Roche prices are reflected by the derivatives in the equation. These derivatives are computed using the implicit function theorem applied to the followers' first-order conditions.

[48] If Roche knows that others will follow, then it can charge higher prices since competition will not erode its market share. Because Roche is effectively setting the industry price under this alternative, the price is near the collusive outcome. It is different from the base collusive outcome because there joint profits are maximized, while under this alternative, it is Roche's individual profits that are maximized. Computed price is $58.67 and, since prices are higher than the collusive prices, overcharges are negative (−6.7 percent). Obviously, a defendant might like to

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

would no longer produce, so outcomes are recomputed with that firm exiting the market.

A variety of other sets of assumptions about competitive behavior could be considered, including assumptions that do not require profit maximization or optimization.

### 2. *Alternative Collusive Behavior*

In the examples given, marginal costs are derived as a consequence of optimizing behavior under the collusive assumption. These simple methods may be inapplicable when the collusive behavior is not based on optimization (such as a "double-your-price" rule of thumb). There are alternatives to joint profit maximization to consider using the structural method even within the set of behaviors based on optimization. Although it is beyond the scope of this article to go into details, I outline two examples here:

(1) *Colluding by agreeing to allocate the market.* Consider an agreement to split the market geographically between two colluding firms, so that each firm does not offer its products in the other's allocated area. The two colluders are then left to compete only with the other supplier and not with each other for the allocated customers.[49] Each of the colluding firms acts unilaterally in its assigned territory and maximizes profit assuming the price of the non-cartel competitor in its region is fixed and that the conspirator will not enter.[50] The non-colluding firm recognizes that it competes against both firms, but in different regions, and sets a single price.[51]

(2) *Colluding by agreeing to match prices.* For example, suppose Firms 1 and 2 agree that Firm 2 will match Firm 1's price increase above the competitive level. Firm 2 will charge its competitive price plus "delta" ($\Delta$) percent. Firm 1 will also charge its competitive price plus $\Delta$ percent, but will set $\Delta$ so as to maximize its own profits, given that Firm 2 will follow. In this scenario the three conditions which define the collusive behavior are (i) the pricing relationship for Firm 1 as above; (ii) the matching behavior for Firm 2; and

---

argue that absent the explicitly collusive behavior, a tacitly collusive outcome like this would have resulted.

[49] This presumes that there are distinct customers in separate areas to be allocated. If customers have locations in many different areas, a customer allocation scheme could be handled similarly.

[50] The first-order conditions for profit maximization are straightforward but tedious to derive. Effectively, the conspirators are competitive in each of their assigned territories, but consumers do not benefit from the excluded competitor.

[51] This first-order condition is also straightforward to derive. If the non-conspirator is able to set two different prices, the conditions and outcomes become very straightforward since they would be independent competitive duopolies in the two areas.

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

(iii) the unilateral action of the non-conspirator, Firm 3, as in the previous scenarios.

Even if I maintain the base assumption of joint profit maximization by the cartel members, different assumptions about the set of firms party to the collusive agreement can be considered in the context of the structural method. In Table 5 I display the estimated overcharges using the Base Model with various assumptions about which firms producing Vitamin A were conspiring.

TABLE 5: ESTIMATED OVERCHARGES FOR 1995 VITAMIN A CARTEL USING ALTERNATIVE CONSPIRACY ASSUMPTIONS

| | Company | | | |
|---|---|---|---|---|
| Conspiring Companies | Roche | BASF | Rhone-Poulenc | Other |
| Roche/BASF/RP | 31.7% | 33.1% | 34.8% | 0.6% |
| BASF/RP | 0.2% | 2.8% | 3.9% | 0.0% |
| Roche/RP | 3.4% | 0.2% | 5.7% | 0.0% |
| Roche/BASF | 6.0% | 7.2% | 0.3% | 0.1% |

Each set of assumptions requires new calculations of costs and other parameters of the model, so the results in the exhibit do not show the incremental effect of particular firms joining/leaving the cartel (I discuss that in the next section). However, it is clear from the table that a conspiracy among two firms is not nearly as effective in elevating price above competitive levels as a conspiracy of three firms. For example, consider the second row in the table, where BASF and RP conspire. BASF and RP together have a share in the range of 50 to 60 percent. Results in Table 3 show that such a small conspirator share would result in a small overcharge. Under this scenario, assuming the observed values are a result of conspiracy among only BASF and RP, the computed cost for Roche is higher than the base case, so its overcharge is somewhat lower than the conspirators' overcharges.

## C. Conditions on Collusive Scenarios

Because participants in a collusive scheme can unilaterally enter into, cheat on, and exit from an agreement, the agreements themselves must be self-enforcing such that it is in the participants' interest to collude, if the agreement is to effectively increase payoffs. These conditions impose some constraints on feasible agreements and collusive assumptions for simulation.[52] Collusive allegations that do not satisfy these constraints are not economically rational

---

[52] *See, e.g.*, Porter & Zona (2008), *supra* note 1.

18

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

(in the language of the Supreme Court).[53] Thus, structural modeling may be used to show that certain allegations are not economically rational because the models indicate that there are limited economic incentives to enter into and stay with a particular collusive scheme.[54] I give some examples of the types of constraints which may be at issue.

Obviously, a first constraint is that profits must be higher for each participant under the collusive scheme. For example, when too little of the market is allocated under an agreement to an otherwise strong competitor, that firm has limited incentive to enter into and stay with such an agreement. Similarly, even a joint profit-maximizing level of prices may divert sales from a relatively high cost firm to a low cost firm so that profits to the high cost firm are lower than the competitive level. These kinds of conditions can be checked using structural modeling.

Similarly, collusive profits must be sufficient to cover the costs of establishing, operating, and participating in the cartel for each participant. Not only do these costs include the out-of-pocket costs of meeting attendance and monitoring, they also include the risks associated with fines, penalties, and devaluation of the participants' customer relationships, when and if the cartel behavior is publically detected. The structural modeling will give an estimate of the size of the increase in profits associated with the different scenarios, and may provide some guidance as to whether participation under the collusive scenario would be economically rational for each participant.

For example, consider the position of RP in the Vitamin A cartel. Assuming the observed prices and shares are the result of a cartel, I derive the profit to RP under the conspiracy as $13.52 million in 1995 (see Table 2). Using the model parameters estimated under those assumptions, I recomputed an equilibrium assuming RP is not part of the conspiracy and rather sets price independently but under the price umbrella established by a Roche/BASF conspiracy. In this case, RP makes $13.05 million. Thus, the benefit to RP from joining an ongoing conspiracy between Roche and BASF is computed as $0.47 million. If this were the only benefit to RP from the conspiracy, it seems unlikely that this amount would cover the expected costs associated with being involved in the cartel. In some sense, it is surprising they (RP) would agree to participate.[55] If all conspiracy ends, the results from Table 2

---

[53] Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574 (1986).

[54] Of course, economic incentives and economic rationality may not guide behavior perfectly and theory cannot overcome demonstrated facts to the contrary. *See, e.g.*, Eastman Kodak Co. v. Image Technical Servs., 504 U. S. 451 (1992).

[55] This kind of situation has been examined in the theoretical literature. For example, D'Aspremont et al. consider incentives to collude versus participate as a competitive fringe. Claude D'Aspremont, Alexis Jacquemin, Jean Jaskold Gabszewicz & John A. Weymark, *On the Stability of Collusive Price Leadership*, 16 CAN. J. ECON. 17 (1983). Alternatively, Rotemberg

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

show RP profits would be about $3 million lower. Perhaps these kinds of figures were part of the calculation RP made when it requested admission in 1999 to the DOJ's corporate leniency program for its participation in the vitamin cartel.[56]

### III. RELATIONSHIP TO BENCHMARK METHODOLOGY AND MERGER SIMULATION

We have seen that the structural approach can be applied in many circumstances using limited data with strong assumptions. The benchmark methodology also may require strong or restrictive assumptions, even in situations where data are available. For example:

(1) *The benchmark methodology may not be sufficiently rich to capture interaction between firms in an oligopoly setting.* A structural model makes explicit the connection between firm behavior and marketplace outcomes. The model reflects the interdependent, non-linear, logically consistent nature of oligopoly, while the benchmark methodology can only do so in the crudest way.

(2) *The benchmark methodology requires the identification of factors affecting demand or cost.* The benchmark methodology (generally) uses the difference between two levels of price to infer overcharge. However, the model must account for and rule out other possible explanations for the difference, such as cost or demand shifts. This can be contentious.

(3) *The assumption that relationships between costs and demand drivers and prices are stable may be unreasonable.* Even if one were able to identify all the factors which determine price levels (or account for differences in price levels), the relationship may not be stable.[57] For example, with changing technology, the way a cost factor affects price can be different, and assuming no technological change between the benchmark and collusive period may be unreasonable.

(4) *The benchmark methodology does not depend on the nature of the conspiracy.* The benchmark methodology would produce the same estimate of overcharge irrespective of the characteristics of the conspiracy. In the Vitamin

and Saloner drop the assumption of a competitive fringe and consider the strategic incentives to participate in leader-follower behavior. Julio J. Rotemberg & Garth Saloner, *Collusive Price Leadership*, 39 J. INDUS. ECON. 93 (1990).

[56] *See, e.g.*, CONNOR (2001), *supra* note 36, at 315.

[57] This is a version of the so-called Lucas Critique. Lucas argued that reduced-form models, such as those often used in the benchmark methodology, do not estimate structural parameters. Also, these models may change with changes in policy. Robert Lucas, Jr., *Econometric Policy Evaluation: A Critique, in* 1 CARNEGIE-ROCHESTER CONFERENCE SERIES ON PUBLIC POLICY 19–46 (1976).

ESTIMATING OVERCHARGES IN PRICE FIXING CASES

A example, a cartel of Roche and BASF and a cartel of Roche, BASF, and RP would both produce the same estimate of overcharge with the benchmark methodology. The implicit assumption is that the cartel activity is causing the difference in prices and that the presumed cartel is correctly identified.

There have been a number of recent articles that endorse the merger simulation approach, while others have been critical (of the short-cut methods in particular).[58] Many of these issues are relevant in the price-fixing context. I will not address all the points here, but highlight a few of them.

(1) *The Base Model is highly restrictive.* The demand system in the Base Model is very restrictive, and in some circumstances these restrictions can drive the results. For example, the Base Model implies that conspirators with small shares will not be able to impose large overcharges because substitution to other products constrains their ability to do so. A more general model of substitution would not necessarily produce this result and could serve as the basis for analogous structural modeling, but such an approach may require additional data and modeling.

(2) *Some elements of the Base Model can (and should) be tested.* Various elements of the Base Model can be tested. The tests may be econometric or they may be deductive. For example, one implication of the Base Model is identical markups (difference between prices and marginal costs) across all the products produced by the conspirators. The optimal markups are not necessarily equal when the demand system is not as specified in the Base Model or if behavior is not joint-profit-maximizing (which is assumed by the Base Model). Data on prices and marginal costs across products can therefore be used to test for equal markups. If the test cannot reject equal markups, this would support the use of the Base Model; if the markups are not equal, this would suggest that the use of the Base Model is not appropriate.

(3) *The sensitivity of the results to changes in assumptions can be assessed.* The Base Model requires, for example, an estimate of the industry price elasticity of demand. In some cases, an estimate of this parameter will be available in the literature. In other cases, one can be estimated from simple aggregate data.[59] In any event, a sensitivity analysis would look at the changes in the results associated with various reasonable values of the key parameters in the model, such as industry elasticity. Often a range of parameter values will produce similar results.

(4) *The Base Model can be based on limited data.* The principal advantage of the Base Model is that it does not require detailed data, or sophisticated

---

[58] *See, e.g.*, Leonard & Zona (2008), *supra* note 12 (providing a brief summary).

[59] For example, in HLZ, an industry demand elasticity is estimated using information from the Bureau of Labor Statistics. HLZ, *supra* note 8.

econometric modeling, to estimate the overcharge.[60] Price data from outside the conspiracy period are not necessary. Cost changes and other factors, which must be controlled for in the standard benchmark approach, are not necessary. However, if the structural elements of the model are estimated econometrically, detailed data would be required, but it still would not be necessary to estimate the demand model using pre-period data, post-period data, or other yardsticks. Thus, a structural approach can be an especially useful tool in a limited data environment. And from a policy perspective, in cases where there are limited (or no) benchmark data available, conspiring firms should not get the benefit of uncertainty in proving damages.[61] In such instances, where hardcore cartel behavior has been proven and damages must be estimated, the deductive approach I propose in this article may be both reasonable and sufficiently reliable.

## IV. CONCLUSION

I have presented a structural approach to estimating overcharges in price-fixing cases. The approach has some strong advantages over typical benchmark methods, especially when data for a control or benchmark group are limited or unavailable. In particular, the structural methodology does not require elimination of all the other causal factors that could explain a difference in price. The structural approach shares many of the strengths and weaknesses of merger simulation. It also has some advantages over merger simulation (in particular, it is not an attempt to forecast the future).

This structural approach may complement other approaches to estimating damages in price-fixing cases. Even if these techniques have not (yet) been presented and fully accepted by U.S. courts, they can be useful for settlement purposes, alternative dispute resolution proceedings, or "evaluation of the case" purposes. These methods require little data and can be done quickly and cheaply. Thus, they could serve an important role in informing decisions even at the earliest stages of the process.

---

[60] The necessary data can often be assembled without too much cost or difficulty, though in some cases one must proceed by using assumed values for certain parameters. For example, an estimate of price-cost margin often can be obtained from company accounting data. While obtaining an estimate of the own-price demand elasticity is often more problematic, the Basic Model can be computed using a range of reasonable values for industry elasticity if a specific estimate cannot be obtained from marketing studies, the academic literature, or direct estimation using econometric techniques.

[61] As has been argued elsewhere, "[T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential, as well as direct and positive proof. . . . Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.'" Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946) (quoting Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 564 (1931)).