**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1   J. Noah Hagey, Esq. (SBN: 262331)
      hagey@braunhagey.com
2   Matthew Borden, Esq. (SBN: 214323)
      borden@braunhagey.com
3   Jeffrey M. Theodore, Esq. (SBN: 324823)
      theodore@braunhagey.com
4   Ronald J. Fisher, Esq. (SBN: 298660)
      fisher@braunhagey.com
5   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
6   San Francisco, CA 94104
    Telephone:  (415) 599-0210
7   Facsimile:  (415) 276-1808

8   ATTORNEYS FOR PLAINTIFF
    OPTRONIC TECHNOLOGIES, INC.
9

10                      **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12

13
    OPTRONIC TECHNOLOGIES, INC., d/b/a          Case No: 5:16-cv-06370-EJD-VKD
14  Orion Telescopes & Binoculars ®, a California
    corporation,                               **PLAINTIFF OPTRONIC**
15                                             **TECHNOLOGIES, INC.'S NOTICE OF**
                 Plaintiff,                     **MOTION AND MOTION FOR**
16                                             **SUMMARY JUDGMENT**
           v.
17                                             **Date:**      Sept. 12, 2019
    NINGBO SUNNY ELECTRONIC CO., LTD.,         **Time:**      9:00 am
18  SUNNY OPTICS, INC., MEADE                  **Judge:**     Hon. Edward J. Davila
    INSTRUMENTS CORP., and DOES 1 - 25,        **Location:**  Courtroom 1 – 5th Floor
19
                 Defendants.
20

21

22

23

24

25

26

27

28

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................ 1

TABLE OF AUTHORITIES ................................................................................. 1

NOTICE OF MOTION AND MOTION ............................................................... 3

INTRODUCTION ................................................................................................. 1

FACTS .................................................................................................................. 3

      A.     Parties ................................................................................................ 3

      B.     Market ................................................................................................ 3

      C.     Defendants' Collusive and Anticompetitive Activities ..................... 3

ARGUMENT ........................................................................................................ 4

I.     ORION IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS UNDER SECTION ONE OF THE SHERMAN ACT ................................................ 4

      A.     Sunny Conspired with Synta to Suppress Competition by Acquiring Meade ........ 5

             1.     Sunny Planned the Acquisition with Synta ................................. 5

             2.     Synta and Celestron Assisted in the Acquisition ....................... 6

             3.     Sunny and Sheppard Mullin Lied to the FTC about Synta ........ 7

             4.     Synta and Celestron Financed Sunny's Acquisition of Meade and Took Equity in Meade ........ 8

             5.     Sunny Ran Meade "for the Benefit of the Entire Group of Companies (Sunny, Synta, Meade and Celestron)" ........ 10

      B.     Sunny Conspired with Synta to Allocate the Market ........ 11

      C.     Sunny Conspired with Synta to Fix Prices ........ 13

             1.     Sunny Agreed to Hand Over Its Pricing Information to Synta and Allow Synta to Conduct Sunny's Sales to Orion ........ 14

             2.     Sunny and Synta Fixed Prices and Withdrew Credit from Orion to Coerce Orion Into Withdrawing a Bid to Purchase Assets Synta Wanted ........ 16

      D.     Orion Has Established Harm Resulting from Sunny's Misconduct ........ 17

II.    ORION IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM UNDER SECTION 7 OF THE CLAYTON ACT ........ 17

      A.     The Relevant Market Is the Global Market for Telescope Manufacturing ........ 19

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

B.      Orion Has Met Its Burden of Establishing a *Prima Facie* Case of
        Presumptive Anticompetitive Effects in the Relevant Market ............................ 19

        1.    The HHI Numbers Alone Establish Orion's *Prima Facie* Case............... 20

        2.    Other Anticompetitive Factors in the Telescope Manufacturing
              Market Independently Establish Orion's *Prima Facie* Case .................... 21

        3.    Defendants Cannot Rebut Orion's *Prima Facie* Section 7 Case ............. 23

III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ORION'S
        STATE LAW CLAIMS ................................................................................... 23

CONCLUSION ...................................................................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1

## TABLE OF AUTHORITIES

2

Cases

3  *AlliedSignal, Inc. v. B.F. Goodrich Co.*,
4     183 F.3d 568 (7th Cir. 1999) ........................................................................ 18

   *Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
5     182 F.3d 1096 (9th Cir. 1999) ...................................................................... 17

6  *Boardman v. Pacific Seafood Group*,
      822 F.3d 1011 (9th Cir. 2016) ......................................................... 20, 21, 23

7  *California v. Am. Stores Co.*,
      495 U.S. 271 (1990) ...................................................................................... 18

8  *Cardizem CD Antitr. Litig.*,
9     332 F.3d 896 (6th Cir. 2003) .................................................................... 4, 13

   *Catalano, Inc. v. Target Sales, Inc.*,
10    446 U.S. 643 (1980) ...................................................................................... 16

11 *Chicago Bridge & Iron Co. v. FTC*,
      534 F.3d 410 (5th Cir. 2008) .................................................... 18, 21, 22, 23

12 *Citizen Pub. Co. v. U.S.*,
      394 U.S. 131 (1969) ........................................................................................ 4

13 *Copperweld Corp. v. Indep. Tube Corp.*,
      467 U.S. 752 (1984) .................................................................................. 4, 11

14 *Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
      236 F.3d 1148 (9th Cir. 2001) ...................................................................... 23

15 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
      509 U.S. 579 (1993) ..................................................................................... 4, 3

16 *FTC v. Arch Coal, Inc.*,
      329 F.Supp.2d 109 (D.D.C. 2004) ............................................................... 19

`17 *FTC v. Penn State Hershey Med. Ctr.*,
      838 F.3d 327 (3d Cir. 2016) ............................................................. 18, 19, 20

18 *FTC v. H.J. Heinz Co.*,
      246 F.3d ...................................................................................... 20, 21, 22

19 *Helix Milling Co. v. Terminal Flour Mills Co.*,
      523 F.2d 1317 (9th Cir. 1975) ................................................................... 5, 8

20 *Knevelbaard Dairies v. Kraft Foods, Inc.*,
      232 F.3d 979 (9th Cir. 2000) ........................................................................ 13

21 *Local 36 of Int'l Fisherman & Allied Workers of Am. v. U.S.*,
22    177 F.2d 320 (9th Cir. 1949) ........................................................................ 13

   *Marin Cty. Bd. of Realtors, Inc. v. Palsson*,
23    16 Cal.3d 920 (1976) .................................................................................... 23

24 *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*,
      475 U.S. 574 (1986) ........................................................................................ 4

25 *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
      924 F.2d 1484 (9th Cir. 1991) ...................................................................... 19

26 *Nova Designs, Inc. v. Scuba Retailer's Ass'n*,
      202 F.3d 1088 (9th Cir. 2000) ...................................................................... 23

27 *Palmer v. BRG of Ga., Inc.*,
28    498 U.S. 46 (1990) (reversing ...................................................................... 11

1                                                                  5:16-cv-06370-EJD

*ProMedica Health Sys., Inc. v. FTC*,
 749 F.3d 559 (6th Cir. 2014) ........................................................................... 19, 20, 21
*Solyndra Residual Tr., ex. rel. Neilson v. Suntech Power Holdings Co, Ltd.*,
 62 F.Supp.3d 1027 (N.D. Cal. 2014) ........................................................................... 4
*St. Alphonsus Med. Center-Nampa Inc. v. St. Luke's Health Syst., Ltd.*,
 778 F.3d 775 (9th Cir. 2015) ........................................................................... passim
*Static Random Access Memory (SRAM) Antitr. Litig.*,
 580 F. Supp. 2d 896 (N.D. Cal. 2008) ........................................................................... 15
*Stevens v. Sup. Ct.*,
 75 Cal.App.4th 594 (1999) ........................................................................... 24
*Tanaka v. Univ. of S. Cal.*,
 252 F.3d 1059 (9th Cir. 2001) ........................................................................... 4
*United States v. Anthem, Inc.*,
 855 F.3d 345 (D.C. Cir. 2017) ........................................................................... 18, 21, 23
*United States v. Brown*,
 936 F.2d 1042 (9th Cir. 1991) ........................................................................... 11, 13
*United States v. Container Corp. of America*,
 393 U.S. 333 (1969) ........................................................................... 15
*United States v. Socony-Vacuum Oil Co.*,
 310 U.S. 150 (1940) ........................................................................... 13, 14

Statutes

15 U.S.C. § 18 ........................................................................... 17
Cal. Bus. & Prof. Code §§ 16700 ........................................................................... 23
Cal. Bus. & Prof. Code §§ 17200 ........................................................................... 24

Rules

Fed. R. Civ. P. 56(c) ........................................................................... 4

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

## **NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 12, 2019, in Courtroom 1, 5th Floor, 280 South 1st Street, San Jose, California, before the Honorable Edward J. Davila. Plaintiff Optronic Technologies, Inc. ("Orion") does and hereby moves the Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in favor of Orion and against Defendants Ningbo Sunny Electornic Co. Ltd., Sunny Optics, Inc., and Meade Instruments Corp.

This motion is made on the grounds that there is no genuine issue as to any material fact regarding Defendants' liability for Orion's claims arising under Section 1 of the Sherman Act and Section 7 of the Clayton Act, and that Orion is accordingly entitled to judgment as a matter of law in its favor.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the declaration of Matthew Borden, the complete files and records in this action, oral argument of counsel, authorities that may be presented at or before the hearing, and such other and further matters as this Court may consider.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1    Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars ("Orion")

2  respectfully submits this Motion for Summary Judgment.

3                                    **INTRODUCTION**

4    Orion is the last independent U.S. telescope brand and distributor.  Defendants Ningbo

5  Sunny Electronic Co., Ltd., Sunny Optics, Inc. (collectively "Sunny") and Meade Instruments

6  Corp. ("Meade") are the largest telescope manufacturer and importer of telescopes into the U.S.

7  and its wholly-owned subsidiary.  For years, Sunny has conspired with the other principal telescope

8  manufacturer, Synta, to divide the market, fix prices, throttle competition and stifle Orion's efforts

9  to grow its business.  The evidence of guilt is so overwhelming that summary judgment is

10  warranted on Orion's Sherman Act Section 1 and Clayton Act Section 7 claims.

11    **Section 1 claims**.  Section 1 prohibits any agreement to restrain trade.  Documents

12  Defendants withheld for years and deposition testimony from Defendants' officers show that

13  Sunny's principal Peter Ni, and Synta's principal David Shen – horizontal competitors – made

14  unwritten agreements to help each other restrain trade, rather than compete.  For example:

15    **A.    Synta lent Sunny millions of dollars to help Sunny purchase Meade**.  Meade's

16  former CEO testified: "█████████████████████████████████████████

`17  ██████████████████████████████████████████████████████████

18  ███████████████████████████████████████████ (Orion's

19  Separate Statement of Undisputed Facts & Supporting Evidence ("SS") ¶ 25.)

20    **B.    Sunny and Synta agreed to fix prices**.  Ni and Shen exchanged emails explaining

21  classic monopoly tactics about ███████████ (SS ¶ 51 ███████████████

22  ████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████

24  ████████████████████████).)

25    **C.    Sunny and Synta agreed to divide the market**.  Sunny's Vice-President emailed

26  Shen re ███████████████ offering to take ████████████████

27  ████████████████████████████████████████ (SS ¶¶ 61-62;

28  SS ¶¶ 57–58.)

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1    **D.    Sunny and Synta agreed to fix Orion's credit terms**.  Sunny's Vice-President

2    testified that Synta ████████████████████████████████████████████████

3    (SS ¶¶ 48-50 ████████████████████████████████████████████████████.)

4        These are *per se* violations of Section 1 of the Sherman Act.  There are no disputed facts to

5    try because these admissions come directly from Defendants' highest officers themselves and, as

6    detailed below, they are just examples of the overwhelming evidence in this case.

7        **Section 7 claims**.  Section 7 prohibits acquisitions that substantially lessen competition.

8    Courts analyze Section 7 cases under a burden-shifting framework.  If the plaintiff establishes a

9    *prima facie* case that the acquisition is anticompetitive, *i.e.*, that it will "significantly increase

10   market concentration," then the burden shifts to the defendant to rebut the *prima facie* case.  Before

11   the Meade acquisition, the Herfindahl-Hirschman Index ("HHI") for the relevant market showed

12   that it was already highly concentrated under DOJ guidelines.  In addition to the undisputed

13   evidence of Defendants' anticompetitive purpose for the acquisition noted above, after Sunny's

14   acquisition of Meade, the HHI jumped from 3,284.80 to 4,375.69, an increase of 1,090.89.

15   (SS ¶ 78.)  This is more than five times the legal threshold for a presumption of anticompetitive

16   effects.  Defendants cannot rebut this presumption because they refused to disclose any experts,

`17  opting instead to only offer rebuttal experts.  Neither of their rebuttal experts sought to calculate the

18   HHI, opine on the market concentration , or even attempt to define the relevant market.

19   Accordingly, they cannot rebut Orion's *prima facie* case, and summary judgment should be

20   granted.

21       Defendants' anticompetitive conduct has harmed Orion, distorted the market, suppressed

22   competition and ultimately injured telescope hobbyists, who have been forced to pay inflated prices

23   for reduced choices.  Summary judgment will significantly narrow the issues for trial, which should

24   be limited to Orion's claims under Sherman Act Section 2 and damages, and simplify the

25   presentation to the jury.  Because Defendants cannot dispute the material facts giving rise to

26   Orion's Section 1 and Section 7 claims (and state law analogs), the Court should enter summary

27   judgment in favor of Orion on those claims.

28

1

2                                                **FACTS**

3        **A.      Parties**

4             Orion is the last significant independent brand and distributor of telescopes in the U.S.

5    Orion selects or creates the design for a telescope it wants to sell and then works with a contract-

6    manufacturer to build the telescope and its relevant components.

7             Defendant Ningbo Sunny is one of the two major manufacturers for telescopes sold in the

8    U.S. The other major manufacturer ("Synta"), and Synta's wholly-owned distributor ("Celestron"),

9    both settled with Orion pre-suit.

10       **B.      Market**

11            Sunny and Synta are horizontal competitors. (SS ¶ 3.) Both Sunny and Synta have been

12   capable of manufacturing the same types of telescopes since at least 2013. (SS ¶ 60.) Yet, other

13   than a single isolated incident, there has never been any overlap in the products offered to Orion by

14   Sunny and Synta. (SS ¶ 64.)

15            Since at least 2014, the telescope manufacturing market has far exceeded the threshold for

16   what is considered highly concentrated by U.S. antitrust enforcement agencies. (SS ¶¶ 80-81.)

`17   Sunny and Synta together account for up to 80% of telescope imports into the United States.

18   (SS ¶ 82.) The remaining market share is scattered among smaller players that cannot supply the

19   volume of quality of telescopes needed by Orion. (*Id*.) Sunny and Synta undisputedly have market

20   power. (*Id*.)

21            There are three major distributors of telescopes in the U.S.: Celestron, Meade and Orion.

22   By far the largest is Celestron, which is owned by Synta. (SS ¶ 25.) Meade is owned by Sunny.

23   (SS ¶ 79.)

24       **C.      Defendants' Collusive and Anticompetitive Activities**

25            Despite being horizontal competitors, Sunny and Synta have cooperated in their business

26   activities to dominate the market. The antitrust violations in this motion fall into three categories.

27   First, Synta and Celestron helped Sunny acquire Meade by giving guidance to Sunny's deal

28   counsel, Sheppard Mullin, and by providing capital and loans. Second, Sunny and Synta have

                    PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1  conspired to divide the manufacturing market between them by not competing against one another

2  and by fixing the prices Orion paid for telescopes.  Third, Sunny and Synta conspired to retaliate

3  against Orion when Orion tried to buy key URLs (the "Hayneedle Assets").  Many undisputed facts

4  substantiating this conduct are discussed further in the analysis of Orion's Section 1 claims below.

5  

**ARGUMENT**

6  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

7  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

8  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine

9  issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for

10  the nonmoving party."  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

11  **I.      ORION IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS UNDER
         SECTION ONE OF THE SHERMAN ACT**

12

13  To establish a Sherman Act Section 1 claim, a plaintiff must show "(1) that there was a

    contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under

14  either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected

15  interstate commerce."  *Solyndra Residual Tr., ex. rel. Neilson v. Suntech Power Holdings Co, Ltd.*,

16  62 F.Supp.3d 1027, 1039 (N.D. Cal. 2014) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059,

`17  1062 (9th Cir. 2001)).  "Certain agreements, such as horizontal price fixing and market allocation,

18  are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it

19  has actually caused."  *Solyndra*, 62 F.Supp.3d at 1041 n.7 (quoting *Copperweld Corp. v. Indep.

20  Tube Corp.*, 467 U.S. 752, 780 (1984)).

21  When the evidence unambiguously shows an agreement to restrain trade that constitutes a

22  *per se* violation of Section 1, a court may grant summary judgment to the plaintiff.  *See*, *e.g.*,

23  *Citizen Pub. Co. v. U.S.*, 394 U.S. 131, 135 (1969) (affirming summary judgment where

24  defendants' *per se* Section 1 violations, including price fixing and market allocation, were "plain

25  beyond peradventure"); *In re Cardizem CD Antitr. Litig.*, 332 F.3d 896, 900, 908 (6th Cir. 2003)

26  (affirming summary judgment for plaintiffs where undisputed evidence showed agreement not to

27  compete).

28

1    Here, as in *Citizen* and *Cardizem*, unambiguous evidence establishes an unlawful agreement

2  between Sunny and Synta to restrain competition, fix prices, and allocate the market, including

3  through concerted actions that constitute *per se* violations.  Documents and testimony show that

4  Sunny and Synta conspired (1) to prevent a competitor from acquiring Meade in order to cement

5  and increase the co-conspirators' market power; (2) to divide the market between themselves, and

6  (3) to fix Orion's prices and credit terms.  Each of these concerted actions on its own is a *per se*

7  violation of Section 1; taken together, they show an extensive *per se* unlawful conspiracy that is

8  "plain beyond peradventure."  Orion is therefore entitled to summary judgment on these claims

9  under Section 1 of the Sherman Act.

10    **A.    Sunny Conspired with Synta to Suppress Competition by Acquiring Meade**

11    Sunny conspired with its horizontal competitor Synta to ensure that Sunny acquired Meade.

12  The purpose of this conspiracy was to protect the conspirator's market share and to ensure that their

13  emerging competitor JOC would not acquire Meade.  *See Helix Milling Co. v. Terminal Flour Mills*

14  *Co.*, 523 F.2d 1317, 1322 (9th Cir. 1975) (conspiring to sell flour mill to co-defendant instead of to

15  competitor "would violate the Sherman Act, no additional showing of 'public injury' is necessary

16  to support a private action for damages").  Here, the evidence shows that Sunny and Synta

`17  combined their extensive efforts, employees, finances, and even their legal counsel Sheppard

18  Mullin to jointly ensure that Sunny, rather than JOC or Orion, would acquire Meade.

19    An email from Sunny's Vice-President states that ███████████████████

20  ████████████████████████████████████ and that ██████████

21  ████████████████████████████████████████████████

22  (SS ¶ 14.)  At the time, JOC was the largest telescope manufacturer aside from Sunny and Synta.

23  (SS ¶ 11.)  That Sunny and Synta acted out their illegal plan is substantiated by numerous

24  documents and admissions by Defendants' officers.

25    **1.    Sunny Planned the Acquisition with Synta**

26    As the Court noted in its Order Denying Defendants' Motion to Dismiss, government

27  documents show that Sunny told Synta's CEO David Shen, Celestron's CEO Joseph Lupica,

28  Celestron's COO David Anderson, and all the members of Celestron's Executive Committee,

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1  Sylvia Shen (David Shen's sister), Jack Chen (David Shen's brother-in-law) and Laurence Huen,

2  about its intent to purchase Meade on ***May 23, 2013***, two weeks before Sunny even submitted its

3  bid.  (Dkt. No. 230 at 4; Borden Decl. Ex. 13.; SS ¶ 10.)  In its Order Denying Motion to Dismiss,

4  the Court found that this evidence "bolsters" Orion's allegation of a conspiracy.  Dkt. No. 230 at 4.

5  The Court also held that this allegation, together with Orion's allegations that (1) Sunny shared

6  sensitive information with Synta, (2) Synta's president and his family had an ownership interest in

7  Sunny, and (3) Celestron officers replaced Meade management after the acquisition, "support an

8  inference that the leadership of [Sunny] and [Synta], despite being competitors, sought to prevent a

9  competing manufacturer from expanding." *Id.* at 4-5.  Internal documents and deposition

10  testimony reveal that Synta and Celestron actively helped manage the acquisition through Sunny's

11  lawyers, Sheppard Mullin, and helped finance the acquisition through a combination of loans and

12  equity before and after the deal closed.

13          **2.**      **Synta and Celestron Assisted in the Acquisition**

14      The initial phase of Sunny's due diligence was handled by ███████████████

15  ████████████  After Peter Ni ███████████████████████████████████

16  ████████████████████████████████████████████████.  (SS ¶ 15.)

`17  Laurence Huen was a █████████████████████████████████████

18  ███████  (SS ¶¶ 4, 26.)  Together, Huen and Lupica███████████████.  (SS ¶¶ 15,

19  26.)  Lupica████████████████████████████████████████████

20  ████████████  (Borden Decl. Ex. 5, Lupica Dep. 368:17-22.)

21      Because Sunny had ████████████████████████████████

22  ████████████████████████████████████████.  (Borden Decl. Ex. 6,

23  Anderson Dep. 341:20-342:10.)  Anderson initially testified that ███████████████

24  ████████████████████████████████████████████████████

25  ██████████████████████████████(SS ¶ 17.)  But after Judge DeMarchi

26  reopened his deposition because Sunny had misrepresented that it had complied with the Court's

27  Order to produce documents, Anderson admitted that ███████████████████

28  ████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████.

3 (SS ¶¶ 17-20.)

4     Sheppard Mullin's June 7, 2013 engagement letter with Sunny confirmed in writing its

5 obligation to take instructions about the acquisition from Sunny's horizontal competitors.  It stated:

6 "You have instructed us to take direction from and communicate directly with your advisors, Dave

7 Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica."

8 (SS ¶ 18.)

9 ██████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████████

11 (SS ¶ 21.)  In light of the FTC's antitrust concerns, ██████████████████████████

12 ██████████████████.  (SS ¶ 21 (citing Borden Decl. Ex. 5, Lupica Dep. 317:6-9).)

13 ███████████████████████████████████████

14 ████████████

15     Sheppard Mullin expressly advised Sunny that even after the acquisition, Shen and

16 Celestron should avoid taking any stake in Meade.  (Borden Decl. Ex. 5, Lupica Dep. 319:9-24;

`17 Borden Decl. Ex. 12, ("Any tie up between Celestron and Meade post-closing would raise the same

18 antitrust issues that exist today.").)  As shown in Section b below, however, ██████████████

19 ████████████████████████████████

20     **3.    Sunny and Sheppard Mullin Lied to the FTC about Synta**

21 ██████████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████

24 ████████████████████████  (SS ¶¶ 29-30.)  These statements were misleading

25 for many reasons.  First, ██████████████████████████████████████████

26 ██████████████████.  (SS ¶ 18.)  Second, ████████████████████

27 ████████ SS ¶¶ 19, 26), ████████████████████████████████████

28 ████████████ (e.g., Dkt. No. 171-4), and ████████████████████████

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**



1  ████████████████████████████ (Borden Decl. Ex. 5, Lupica Dep. 329:3-331:4, 338:7-

2  339:5.)  Third, as detailed in Section b below.████████████████████████████████████

3  ██████████████████████████████████████████████████████████████████████████████

4  ██████████████████████████ SS ¶¶ 14, 27.)  Fourth, after the transaction was

5  completed, ██████████████████████████████████████████████████████

6  ████ SS ¶ 31.)

7       **4.    Synta and Celestron Financed Sunny's Acquisition of Meade and Took**
          **Equity in Meade**

8       In addition to ████████████████████████████████████████████████

9  ████████████████████████ Part of the money to close the Meade transaction

10  came from ████████████████████████████████████████████████████

11  ██████████████████████████ (SS ¶ 24.) ████████████████████████

12  ██████████████████████████████████████████████████████████████████████

13  ████████████████████ (SS ¶ 24.)

14       Synta, through Celestron, ████████████████████████████████████████

15  ██████████████████████████████ At least part of the money to close the

16  transaction, in fact, ██████████████████████ (SS ¶ 25 (citing Borden Decl. Ex. 54 (" ████

`17  ██████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████ ; *id*. Ex. 55

20  ████████████████████████████████████████████.)  The resulting debt/equity structure

21  was ██████████████████████████████████████████████████████████████

22  ██████. (SS ¶ 27.)  Mr. Anecito testified as follows about ████████████████████

23  ██████████████████████████████████████████████

24        ████████████████████████████████████████████

25        ████████████

26        ████████████████████████████████████████

27        ████████████████████████

28  ――――――――――――――――――
   [1] Ni Wen Jun is Peter Ni's given name in Chinese.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**



. (SS ¶ 25 (citing Borden Decl. Ex. 56.)

. (SS ¶ 25 (citing Borden Decl. Ex. 58).)

Defendants understood that

As Meade's CEO explained:

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1 (SS ¶ 25 (citing Borden Decl. Ex. 5 (Lupica Dep. 372:12-18))).)  As with ███████████

2 █████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ██████

5 ████████████████████████████████

6 ███████

7 ████████████████████████████████████████████████████

8 ██████

9 ████████████████████████████████████████████████████

10 ████████

11 ██████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ██████

14 ████████████████████████████████████

15 ██████

16 █████████████████████████████████████████████████████

`17 ████████████████

18 (SS ¶ 25 (citing Borden Decl. Ex. 5 (Lupica Dep. 372:23-373:25); Borden Decl. Ex. 52.)

19        All in all, to help "prevent JOC to buy MEADE," and to assist the Meade acquisition,

20 Celestron advanced $10 million in "prepayments" to Sunny. (SS ¶ 14 (citing Borden Decl. Ex. 14.)

21 Celestron was concerned that it would have to report these prepayments to its lenders because there

22 was "no discernable benefit to Celestron (ie no early payment discount)" in making them.  (*Id.*)

23        **5.    Sunny Ran Meade "for the Benefit of the Entire Group of Companies**
              **(Sunny, Synta, Meade and Celestron)"**
24        After the acquisition, Sunny and Synta immediately ██████████████████████

25 ████████████████████████████████. Shen ████████████████████████████████

26 ███████████████████ *See* Borden. Decl. Ex. 57 [Exs. 1-2]; *Id.* Ex. 85; Chiu 66:17-67:19.

27 Internal documents also show that Sunny's and Synta's principals met for two days **to discuss**

28



REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1   "**how the four companies are to cooperate for the benefit of the entire group of companies**

2   **(Sunny, Synta, Meade, and Celestron**)."  SS ¶¶ 35–36. ████████████████████

3   ████████████████████████████████████████████████████████████

4   ████████████ (SS ¶ 39.)

5         In sum, while the evidence Orion submitted with its FAC "impl[ied] . . . a conspiracy to

6   unlawfully select or limit" Sunny's and Synta's competition by acquiring Meade, Dkt. No. 230 at

7   5, the evidence adduced through discovery – including admissions from Meade's and Celestron's

8   executives and documents from Sunny and its lawyers – precludes any possibility that █████████

9   ████████████████████████████  As explained in Section II.A.1 below, the merger harmed

10  competition by greatly increasing market concentration in an already highly concentrated market.

11  This evidence, together with the examples of *per se* violations set forth below, entitles Orion to

12  summary judgment on its Section 1 claim.

13      **B.**     **Sunny Conspired with Synta to Allocate the Market**

14        An agreement between two competitors to allocate the market is *per se* illegal.

15  *Copperweld*, 467 U.S. at 780; *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("A

16  market allocation agreement between competitors at the same market level is a classic *per se*

`17  antitrust violation.").  "Such agreements are anticompetitive regardless of whether the parties split

18  a market within which both do business or whether they merely reserve one market for one and

19  another for the other."  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (reversing summary

20  judgment for defendants where companies previously competed in same territorial market but then

21  agreed to divide markets).

22        Sunny and Synta had the capacity to manufacture similar telescopes.  (SS ¶ 60.)  Despite

23  having the capacity to do so, Sunny and Synta ████████████████████████████████

24  ████████████████████     █████████████████████████████████████

25  ████████████████████████████████ (SS ¶ 59.)  Sunny's 30(b)(6)

26  ───────────────────────────

27  [2] Sunny's 30(b)(6) witness admitted that █████████████████████████████████████

28  ████████████████████

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  witness admitted that ███████████████████████████████████████
2  ██████████████████████████████████████████████
3  ██████████████████████████
4  ████████████████████████████████████
5  ███
6  ████████████████████████
7  ████████████████████.
8  (SS ¶ 64 (citing Ex. 2, Chiu 30(b)(6) Dep. 53:4-10.)
9  ████████████████████████████████████████████████████
10  ██████████████████.  (SS ¶¶ 61, 62 (citing Borden Decl. Ex. 80 (emails from Sunny's
11  Vice-President to Synta re "██████████████," offering to ████████████████
12  ████████████████████████████
13  ████  Per this agreement, Sunny and Synta also ████████████████████████
14  ████  SS ¶¶ 57-65.)  In December 2013, David Shen wrote Peter Ni directly to discuss ██
15  ████████████████████████████████████████████
16  ████████████████████
`17  ████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████████████████████████████████
20  (SS ¶ 57.)
21  Peter Ni ██████████████████████████████
22  ████████████████  (SS ¶ 62.)  Correspondence between David Shen and Peter Ni
23  ████████████████████████████████████████████████
24  ████████████████████████████████████████
25  ██████████████████████).)  And Peter Ni told his employees that
26  his vision was for "the four companies . . . to cooperate for the benefit of the entire group of
27  companies (Sunny, Synta, Meade and Celestron)."  (SS ¶ 37.)
28

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**



1   The collaboration between Sunny and Synta was so extensive that ███████

2   ████████████████████████████████████  For example, ███

3   ████████████████████████████████████

4   ████████████████████████████████████

5   ████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████  (SS ¶¶ 67, 69-70.)

12      In sum, Sunny and Synta's concerted efforts to carve up the market, avoid competing,

13  accomplish an unlawful merger, fix prices, and generally conduct itself as two branches of a single

14  company rather as competitors is exactly what the antitrust law forbids, and is a *per se* violation of

15  Section 1.  *Brown*, 936 F.2d at 1045.  This serial pattern of *per se* unlawful acts establishes a

16  violation of Section 1 "plain beyond peradventure."  The Court should therefore grant summary

`17  judgment to Orion.  *See Cardizem*, 332 F.3d at 908.

18      **C.     Sunny Conspired with Synta to Fix Prices**

19      "Foremost in the category of *per se* violations is horizontal price-fixing among

20  competitors."  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000).  When

21  horizontal competitors have agreed to fix prices, "[n]o inquiry as to substantiality, directness,

22  effectiveness, or reasonableness of restraint is permitted."  *Local 36 of Int'l Fisherman & Allied

23  Workers of Am. v. U.S.*, 177 F.2d 320, 331 (9th Cir. 1949); *United States v. Socony-Vacuum Oil

24  Co.*, 310 U.S. 150, 218 (1940) ("price-fixing agreements are unlawful per se").  Here, the evidence

25  shows that Sunny conspired with Synta in two distinct ways to set the prices it would charge to

26  Orion.  Both types of conduct constitute *per se* violations of Section 1.

27      In addition to ██████████████████████████████, Sunny and

28  Synta also ████████████████████████████

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT



1    ████████████████████████████████    Sunny's 30(b)(6) witness admitted that    ████████████

2    ████████████████████████████████

3        ████████████████████████████████████████████████████

4        ████████████████████████████████████

5    (SS ¶ 42 (citing Borden Decl. Ex. 2 (Chiu 30(b)(6) Dep. 53:22-25).)  Huang's business card and

6    email show that she was employed by Synta with an email address of synta@ms61@hinet.net.

7    (Borden Decl. Ex. 86.)  And Huang █████████████████████████████y.  (SS ¶ 50.)

8        Because    ████████████████████████████████████████

9    ████████████████████████████████    In emails to Orion,█████████████

10   ██████████████████████████████████████████████████████

11      ████  (SS ¶ 43.)  Thus,██████████████████████████████

12   ████████████████    Because ████████████████████████████████

13   ████████████████████████████████████████████████████

14   ██████████████████████████████████.  (SS ¶ 46 (citing Borden Decl. Ex.

15   72; *id*. Ex. 3 (Chiu Dep. 92:10-95:6 (testifying that ████████████████████████████

16   ███, 50:19-51:9 ████████████████████████████████████

`17  ███.)

18      Synta also ████████████████████████████████████

19      ████  (SS ¶ 41.)  Internal documents show that ████████████████████████

20   ██████████████████████████████████████████████████.

21   (SS ¶ 41 (citing Borden Decl. Ex. 17 [Exs. 19-20]; *id*. Ex. 68.)  Synta also ████████████

22   ████████████████████.  (SS ¶ 44, (citing Borden Decl. Ex. 71; *Id*. Ex. 3 (Chiu Dep. 280:11-19).)

23   Sunny and Synta also ████████████████████████████████████

24   ████  (SS ¶¶ 48-50.)

25        **1.     Sunny Agreed to Hand Over Its Pricing Information to Synta and Allow
26               Synta to Conduct Sunny's Sales to Orion**

27      A company's provision of sensitive price information to a competitor can, on its own,

28   establish a violation of Section 1 if done pursuant to an agreement to share such information.  *In re*

1   *Static Random Access Memory (SRAM) Antitr. Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008)

2   ("the exchange of price information alone can be 'sufficient to establish the combination or

3   conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act'") (quoting *United States*

4   *v. Container Corp. of America*, 393 U.S. 333, 335 (1969)).

5       Here, the evidence shows that



15    SS ¶ 46.)

16       Working in concert to make the sales paid off for both Sunny and Synta.  Synta

23    (SS ¶ 45.)  An analogous situation would be if

24   Huawei sent Samsung its price list and order statistics and allowed Samsung's employees to

25   negotiate and process sales of Huawei phones to Huawei dealerships.  This unthinkable situation –

26   exactly what happened here – constitutes a crystal-clear *per se* violation of Section 1.

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1        **2.**     **Sunny and Synta Fixed Prices and Withdrew Credit from Orion to**
                   **Coerce Orion Into Withdrawing a Bid to Purchase Assets Synta Wanted**

2        Sunny and Synta not only conspired to impose a surcharge on Orion; they also jointly used

3 their market power and ability to fix prices and credit terms as a cudgel against anyone who sought

4 to break their hold on the market.

5        Antitrust law understands credit terms offered to a customer to be an inseparable

6 component of price, because "extending interest-free credit for a period of time is equivalent to

7 giving a discount equal to the value of the use of the purchase price for that period of time."

8 *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (per curiam). Accordingly, "credit

9 terms must be characterized as an inseparable part of the price," and an "agreement to terminate the

10 practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls

11 squarely within the traditional *per se* rule against price fixing." *Id.*

12        Here, the evidence indisputably shows that Sunny and Synta agreed ██████████████

13 ████████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████████

15 (SS ¶ 47.) Former Celestron's former Senior Vice President of Sales Victor Aniceto testified that

16 ████████████████████████████████████████████████████████████████████████████

`17 ██████████████ (SS ¶ 55.)

18        After Synta learned that ████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████████████████

20 ████████████████████. (SS ¶ 48.) The email stated: ███████████████████████████

21 ████████████████████████ (*Id.*) That very same day, ███████████████████████████

22 ████████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24 (SS ¶ 49.) ████████████████████████████████████████████. (SS ¶¶ 48-49.) ████████

25 ████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████. (SS ¶¶ 49-50.)

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

When Orion did not back down, 

(SS ¶ 51 (emphasis added).)

Sunny and Synta's collusion achieved its purpose.  Orion was ultimately forced

SS ¶¶ 52-54.)

One could not imagine a more clear-cut example of unlawful collusion to fix prices in order to achieve anticompetitive ends.  Defendants' fixing of price and credit terms are *per se* Section 1 violations, and summary judgment in Orion's favor is warranted.

**D.    Orion Has Established Harm Resulting from Sunny's Misconduct**

As a purchaser of Sunny's products, Orion is presumed injured by Sunny's unlawful price-fixing.  *See Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (noting at n.4 that "purchasers are preferred plaintiffs in price-fixing cases" (citing Areeda & Hovenkamp, Antitrust Law ¶ 370 (1995))).  In his report, Dr. Zona analyzed the effects of Sunny's misconduct and concluded that Orion has sustained significant damages – the amount of which should be the focus of the jury's efforts at trial.

**II.    ORION IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM UNDER SECTION 7 OF THE CLAYTON ACT**

Section 7 of the Clayton Act prohibits mergers and acquisitions whose effects "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18; *St. Alphonsus*

1   *Med. Center-Nampa Inc. v. St. Luke's Health Syst., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).  This is

2   an "expansive definition of antitrust liability."  *See California v. Am. Stores Co.*, 495 U.S. 271, 284

3   (1990).  The Act "does not require proof that a merger or other acquisition has caused higher prices

4   in the affected market.  All that is necessary is that the merger create an appreciable danger of such

5   consequences in the future."  *St. Alphonsus*, 778 F.3d at 788.

6       Courts analyze Section 7 cases under a three-step burden-shifting framework.  *Id.* (citing

7   *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).  First, the plaintiff must

8   establish a *prima facie* case that the acquisition is anticompetitive, *i.e.*, that the transaction will

9   "significantly increase market concentration, thereby creating a presumption that [it] is likely to

10  substantially lessen competition."  *Chicago Bridge*, 534 F.3d at 423.  If the plaintiff makes this

11  showing, then the transaction is presumed anticompetitive, and the burden shifts to the defendant to

12  rebut the *prima facie* case by casting "doubt on the accuracy of the [plaintiff's] evidence as

13  predictive of future anticompetitive effects."  *Id*.  The strength of this presumption increases with

14  the strength of plaintiff's evidence.  *See United States v. Anthem, Inc.*, 855 F.3d 345, 350-51 (D.C.

15  Cir. 2017) ("The more compelling the *prima facie* case, the more evidence the defendant must

16  present to rebut it successfully.").  If the defendant rebuts the *prima facie* case, then "the burden of

`17  producing additional evidence of anticompetitive effect shifts" back to the plaintiff "and merges

18  with the ultimate burden of persuasion."  *Anthem*, 855 F.3d at 350.[3]

19      To make its *prima facie* showing, the plaintiff must "(1) propose the proper relevant market

20  and (2) show that the effect of the merger in that market is likely to be anticompetitive."  *FTC v.*

21  *Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337-38 (3d Cir. 2016).  Orion has conclusively

22  established these elements.  This case is well in line with numerous decisions in which courts found

23  that plaintiffs easily met their burden to establish a *prima facie* case.  Moreover, there is no

24  evidence in the record through which Defendants could rebut Orion's *prima facie* case.

25  Accordingly, Orion is entitled to summary judgment on its Clayton Act claim.

26

27  [3] The burden-shifting applies equally to mergers that have already been consummated.  *See, e.g.*,
    *St. Alphonsus*, 778 F.3d at 783 (consummated merger).  It similarly applies where the Section 7
28  challenge is brought by a private party (rather than the government).  *See, e.g.*, *AlliedSignal, Inc. v.*
    *B.F. Goodrich Co.*, 183 F.3d 568, 574 (7th Cir. 1999).

### A.  The Relevant Market Is the Global Market for Telescope Manufacturing

A relevant market for antitrust analysis has two components: the product market and the geographic market.  *Penn State*, 838 F.3d at 338.

A relevant product market must "identify a set of products that are reasonably interchangeable."  *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014) (citing U.S. Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines*, § 4.1 (Aug. 19, 2010)).  "The general question is whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other."  *Id.* (quoting *FTC v. Arch Coal, Inc.*, 329 F.Supp.2d 109, 119 (D.D.C. 2004)).  Here, the relevant product market "is the market for telescope manufacturing services.  The narrow product market definition is consistent with the specialized nature of the product[.]"  (SS ¶ 72.)  As discussed below, the scale, technical expertise, and intellectual property required to make consumer telescopes in volume renders other kinds of manufacturing services "not reasonable substitutes for telescope manufacturing services."  (SS ¶ 72.)  This is substantiated by correspondence between Synta and Sunny discussing their ability to withstand price wars by *reducing the volume of their production*, confirming that providers of other manufacturing services cannot easily substitute for the telescope manufacturing services provided by Synta and Sunny.  SS ¶

The relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply."  *St. Alphonsus*, 778 F.3d at 784 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)).  Here, the relevant geographic market is global, because customers "look all over the world for manufacturers and procure services at great distances relative to the point of sales (namely, Asian supply sources with U.S. and European points of sale)."  (SS ¶ 76.)

### B.  Orion Has Met Its Burden of Establishing a *Prima Facie* Case of Presumptive Anticompetitive Effects in the Relevant Market

Once the relevant market is determined, a plaintiff can establish a *prima facie* case by showing that the merger "will probably lead to anticompetitive effects in that market."  *St. Alphonsus*, 778 F.3d at 785.  Plaintiffs typically accomplish this by calculating the Herfindahl-Hirschman Index ("HHI"), which measures concentration in the market, *see Penn State*, 838 F.3d

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1   at 346, and which courts and government agencies rely on as an authoritative guide for analyzing

2   mergers and acquisitions. *See, e.g., St. Alphonsus*, 778 F.3d at 787; *Boardman v. Pacific Seafood*

3   *Group*, 822 F.3d 1011, 1021 (9th Cir. 2016); *Penn State*, 838 F.3d at 347; Merger Guidelines, §

4   5.3. Where, as here, the HHI shows a significant increase in concentration in an already highly

5   concentrated market, this evidence alone establishes a *prima facie* case and satisfies Orion's

6   burden. St. Alphonsus, 778 F.3d at 788. In addition, the particular structure of the telescope

7   manufacturing market and the evidence of high barriers to entry establish a second, independent

8   *prima face* case here.

9            **1.**       **The HHI Numbers Alone Establish Orion's *Prima Facie* Case**

10     "The HHI is calculated by totaling the squares of the market shares of every firm in the

11  relevant market," which gives proportionately greater weight to firms with larger market shares.

12  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 n.9 (D.C. Cir. 2001).[4] This is because an HHI increase is

13  more likely to have anticompetitive effects in a concentrated market than in an unconcentrated one.

14  *See Merger Guidelines* § 5.3.

15     In determining whether the HHI demonstrates a sufficiently high market concentration to

16  establish a *prima facie* showing of a threat to competition, courts consider both (1) the post-merger

`17  HHI, and (2) the increase in HHI resulting from the merger. *Penn State*, 838 F.3d at 346; *Merger*

18  *Guidelines*, § 5.3. A post-merger market with an HHI **above 2,500** is classified as "**highly**

19  **concentrated**," and a merger that **increases the HHI by more than 200 points** in a highly

20  concentrated market is **"presumed to be likely to enhance market power."** *St. Alphonsus*, 778

21  F.3d at 786 (citing *Merger Guidelines*, § 5.3) (emphasis added).

22     A sufficiently high HHI figure resulting from a merger is enough to establish a plaintiff's

23  *prima facie* case and shift the burden to the defendant. *St. Alphonsus*, 778 F.3d at 778 ("The

24  extremely high HHI on its own establishes the *prima facie* case."). For example, in *ProMedica*, the

25  evidence showed that the merger would raise the HHI by 1,078, to a total number of 4,391. 749

26  F.3d at 568. The court noted that this increase was "more than five times the increase [of 200]

27

28

---

[4] For example, in a market with two firms in which one has an 80% market share and the other has a 20% market share, the HHI is 6,800 ($80^4 + 20^4$). By contrast, in a market with two firms who each control 50% of the market, the HHI is 5,000 ($50^4 + 50^4$). Merger Guidelines § 5.3 & n.9.

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1  necessary to trigger the presumption of illegality," and that the total number was "almost double

2  the 2,500 threshold for a highly concentrated market." It found that the merger therefore "blew

3  through [the HHI thresholds] in a spectacular fashion" and justified a presumption of illegality. *Id*.

4  Similarly, in *Heinz*, the court found that an increase in HHI of 510 in a market where the HHI pre-

5  merger was already 4,775 created a presumption of harm to competition "by a wide margin." 246

6  F.3d at 716. And in *Anthem*, the court found that a post-merger HHI increase of 1,511, to a total of

7  4,350, raised an "overwhelming presumption of anticompetitive effect." 855 F.3d at 367.

8       Here, Dr. Zona calculated that the 2012 HHI in the telescope manufacturing market – the

9  year before Sunny acquired Meade – was 3,284.80. (SS ¶ 78.) This was already more than 700

10  points higher than the threshold for a "highly concentrated" market. *Merger Guidelines* § 5.3.

11  After the merger, in 2013, the HHI was **<u>4,375.69</u>**, or **<u>more than 1,800 above the highly</u>**

12  **<u>concentrated threshold</u>**. (SS ¶ 80.) This showed **<u>an increase of 1,090.89, which is more than</u>**

13  **<u>*five times* the threshold for a presumption of likely anticompetitive effects</u>**. The HHI in this

14  case is very similar to those in *ProMedica*, *Heinz*, and *Anthem*. As in those cases, this is not a close

15  call. Orion more than met its burden to establish a *prima face* case.[5] *See Boardman v. Pac.*

16  *Seafood Grp.* 822 F.3d 1011, 1021 (9th Cir. 2016) (affirming preliminary injunction enjoining a

`17  merger pursuant to Section 7 where the plaintiff employed an HHI analysis and adduced expert

18  opinion showing barriers to entry existed).

19        **2.**    **Other Anticompetitive Factors in the Telescope Manufacturing Market**

20              **Independently Establish Orion's *Prima Facie* Case**

21       In addition to high HHI, other undisputed evidence of anticompetitive factors in the relevant

    market independently establishes Orion's *prima face* case. In *Chicago Bridge*, in a Section 7

22  challenge to a merger in the market for cryogenic storage tanks, the FTC showed that (1) the

23  merging entities were the only firms with market power; (2) the market had high barriers to entry

24  due to the highly technical nature of the products, which required sophisticated engineering,

25  specialized procedures, and proprietary techniques; and (3) new entrants lacked the experience to

26

27

28

---

[5] Dr. Zona's calculations further show that since Sunny's 2013 acquisition of Meade, the HHI has never dropped below the 2,500 "highly concentrated" threshold. (SS ¶ 81.) The most recent HHI figure available, for 2018, was 3,478.62 – nearly 1,000 points *above* that threshold. (*Id*.)

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  compete effectively.  The court found this evidence "independently suffice[d]" to establish the

2  FTC's *prima facie* case that the merger was likely to have an anticompetitive effect.  534 F.3d at

3  421-22, 433; *see also Heinz*, 246 F.3d at 717 (high barriers to entry in baby food market, where

4  new entry was "difficult and improbable," further demonstrated anticompetitive effect of merger);

5  *St. Alphonsus*, 778 F.3d at 788 (high barriers to entry "further strengthens the FTC's case.").

6       The evidence shows that the factors that established an independent *prima facie* Section 7

7  case in *Chicago Bridge* are also present in the telescope manufacturing market.  First, Sunny and its

8  co-conspirator Synta are the only firms with market power in the relevant market.  (SS ¶ 82 (Dr.

9  Zona finding that Sunny and Synta "together account for the lion's share of the market," with "up

10  to 80 percent of telescope imports to the United States since 2012.").  Dr. Zona also concluded that

11  this already extremely high market share *underestimates* the firms' market power, because "the

12  remaining market share is scattered among smaller manufacturers that cannot supply the quality or

13  quantity of telescopes required by a distributor such as Orion."  (SS ¶ 82.)

14       Second, there is undisputed evidence of high barriers to entry.  Dr. Zona opined that the

15  "substantial portfolios of intellectual property" that Sunny and Synta control, including multiple

16  patents covering the popular "Goto technology," not only present a "substantial barrier to entry,"

`17  but also prevent even existing market participants from competing for sales of certain products.

18  SS ¶ 83.[6]  In addition, because of the technologically-intensive nature of the industry, a potential

19  competitor opening a new factory would need "substantial lead times for efficient production."

20  SS ¶ 84.  Further, the fact that Sunny and Synta are vertically integrated with their own distribution

21  channels creates an additional substantial barrier in that any new manufacturer who might attempt

22  to enter the market would have "only a small segment of the distribution market to compete for."

23  (SS ¶ 85 (citing Zona Decl. Ex. 1 ¶ 67).)  Indeed, the Court held that these factors demonstrated

24  barriers to entry in its Order Denying Defendants' Motion to Dismiss.  Dkt. No. 230 at 6.

25       Finally, the evidence shows not only that new entrants would lack experience to compete,

26  but that existing competitors cannot compete effectively with Sunny and Synta.  Dr. Zona opined:

27

28  ―――――――――――――――――
[6] Goto technology is a popular telescope feature that enables users to automatically direct their telescopes to objects of interest using GPS.  SS ¶ 83.

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1  "At the volumes Orion requires, Sunny and Synta are the only real option.  Demands of product

2  consistency and quality prevent amalgamating shipments from smaller suppliers."  (*Id.* ¶ 68).)  The

3  few smaller manufacturers that currently exist are "unable to do assembly efficiently" and "lack[]

4  IP and the sophistication, quality, and reliability of Sunny and Synta[.]"  (*Id.* ¶¶ 70-71.)

5  **3.    Defendants Cannot Rebut Orion's *Prima Facie* Section 7 Case**

6  As shown above, overwhelming evidence shows the anticompetitive effects caused by

7  Ningbo Sunny's acquisition of Meade.  Defendants burden to avoid summary judgment is

8  accordingly heavy.  *Anthem, Inc.*, 855 F.3d at 350-51 (D.C. Cir. 2017) ("The more compelling the

9  *prima facie* case, the more evidence the defendant must present to rebut it successfully.").

10  Defendants' experts have failed to offer competing HHI or market power analyses, or

11  indeed any affirmative opinion *at all*.  (SS ¶ 86.)  Defendants accordingly cannot rebut Orion's

12  *prima facie* case – and even if they could, the sky-high HHIs and the specific threat to competition

13  in this particular market entitles Orion to summary judgment on its *prima facie* case alone.  *See*,

14  *e.g.*, *Chicago Bridge*, 534 F.3d at 424 (government's strong evidence not only established *prima*

15  *facie* case but also "served as a redoubt" against defendant's showing, allowing ruling for the

16  government on its *prima facie* case).  Accordingly, the Court should enter summary judgment in

`17  favor of Orion on its § 7 claim.[7]

18  **III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ORION'S STATE
       LAW CLAIMS**

19

20  The same evidence that establishes Orion's right to summary judgment under the Sherman

   Act also establishes its right to summary judgment on claim under the Cartwright Act, Cal. Bus. &

21

22  Prof. Code §§ 16700 *et seq.  See, e.g.*, *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,

   1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under

23

24  federal law because the Cartwright Act was modeled after the Sherman Act"); *Nova Designs, Inc.*

   *v. Scuba Retailer's Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000) ("federal cases interpreting the

25

26

27  [7] The Court should, at minimum, grant Orion partial summary judgment and shift the burden of
   persuasion to Defendants to rebut Orion's prima facie case at trial.  *See St. Alphonsus*, 778 F.3d at
28  783 (9th  Cir. 2015) (setting forth burden-shifting analysis); *Boardman*, 822 F.3d at 1021 (9th Cir.
   2016) (applying same in § 7 action by private plaintiff).

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1   Sherman Act are applicable to problems arising under the Cartwright Act") (quoting *Marin Cty.*

2   *Bd. of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 925 (1976)).

3          Similarly, this evidence also establishes Orion's right to summary judgment on its claim

4   under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*

5   "The UC[L] works by 'borrowing' violations of other laws and treating those transgressions, when

6   committed as a business activity, as 'unlawful business practices.'" *Stevens v. Sup. Ct.*, 75

7   Cal.App.4th 594, 602 (1999).  These "unlawful business practices" are "independently actionable

8   under section 17200 *et seq.* and subject to the distinct remedies provided thereunder." *Id.*  Because,

9   as shown above, Sunny's conduct violates the federal and state antitrust laws, it also violates the

10  UCL and entitles Orion to relief under that statute.

11                                    <u>**CONCLUSION**</u>

12         For the foregoing reasons, Orion respectfully requests that the Court grant its Motion for

13  Summary Judgment.

14

15  Dated:  July 25, 2019                          BRAUNHAGEY & BORDEN LLP

16

`17                                               By:   <u>/s/ *Matthew Borden*</u>
                                                         Matthew Borden

18                                               Attorneys for Plaintiff OPTRONIC
                                                 TECHNOLOGIES, INC. d/b/a Orion
19                                               Telescopes & Binoculars ®

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT