J. Noah Hagey, Esq. (SBN: 262331)
     hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
     borden@braunhagey.com
Jeffrey M. Theodore, Esq. (SBN: 324823)
     theodore@braunhagey.com
Ronald J. Fisher, Esq. (SBN: 298660)
     fisher@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone:  (415) 599-0210
Facsimile:  (415) 276-1808

ATTORNEYS FOR PLAINTIFF
OPTRONIC TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPTRONIC TECHNOLOGIES, INC., d/b/a Orion Telescopes & Binoculars ®, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>NINGBO SUNNY ELECTRONIC CO., LTD., SUNNY OPTICS, INC., MEADE INSTRUMENTS CORP., and DOES 1 - 25,<br><br>Defendants. | Case No: 5:16-cv-06370-EJD-VKD<br><br>**PLAINTIFF OPTRONIC TECHNOLOGIES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF ORION'S ECONOMIC EXPERT DR. ZONA**<br><br>**Date:** September 12, 2019<br>**Time:** 9:00 a.m.<br>**Judge:** Hon. Edward J. Davila<br>**Ctrm:** 4, 5th Floor<br><br>**Compl. Filed:** Nov. 1, 2016<br>**First Am. Compl.:** Nov. 3, 2017<br>**Trial Date:** October 15, 2019 |

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

ARGUMENT................................................................................................................................... 1

I.    DR. ZONA'S ANALYSIS OF PRICE-FIXING AND MARKET ALLOCATION
      DAMAGES IS CLEARLY ADMISSIBLE UNDER RULE 702 ..................................... 3

      A.    Defendants' Own Economist Admits that Dr. Zona's Methodology Is Sound ...... 3

      B.    Defendants' Challenges to Dr. Zona's Models Are Meritless................................ 4

            1.    Defendants Misrepresent the Facts Regarding the Elasticity Input............ 5

            2.    Defendants' Challenge to Dr. Zona's Use of Overcharge Data Is Not
                  Grounds for Exclusion................................................................................. 8

            3.    Defendants' Challenge to the Structural Method Fails............................ 12

      C.    Dr. Zona's Models Easily Satisfy the Standard for Establishing Antitrust
            Damages, Particularly Where Defendants' Own Misconduct Makes an Exact
            Calculation Nearly Impossible .............................................................................. 13

II.   DR. ZONA'S USE OF VALIDATED CLIENT DATA REGARDING THE
      MEADE AND HAYNEEDLE ASSETS WAS ENTIRELY PROPER .......................... 15

III.  THE COURT SHOULD REJECT DEFENDANTS' ATTEMPT TO DICTATE
      WHAT DATA DR. ZONA CAN USE IN HIS CALCULATIONS ............................... 18

CONCLUSION............................................................................................................................. 20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Apotex, Inc. v. Cephalon, Inc.*,
321 F.R.D. 220 (E.D. Pa. 2017) ................................................................................... 16, 18

*Apple iPod iTunes Antitrust Litig*,
No.: 05-CV-0037 YGR, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) ..................................... 2

*Aventis Environmental Science USA LP v. Scotts Co.*,
383 F.Supp.2d 488 (S.D.N.Y. 2005) .................................................................................... 10

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)................................................................................................... 11, 14

*Clear-View Technologies, Inc. v. Rasnick*,
No. 13-cv-02744, 2015 WL 3505003 (N.D. Cal. Jun. 2, 2015) ............................................... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................................... 3, 7

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) ................................................................................................ 2

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...................................................................................................... 1, 2

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.*,
273 U.S. (1927)....................................................................................................... passim

*Edwards v. National Milk Producers Fed.*,
No. C,11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014)...................... 11, 14, 15, 16

*Fail-Safe, LLC v. A.O. Smith Corp.*,
74 F.Supp.2d 870 (E.D. Wis. 2010) .................................................................................... 18

*Fontana Pipe & Fabrication v. Ameron, Inc.*,
993 F.2d 882 (9th Cir. 1993) ....................................................................................... 11, 14

*GPNE Corp. v. Apple, Inc.*,
No. 12-cv-02885-LHK (N.D. Cal Apr. 16, 2014), 2014 WL 1494247 ..................................... 17

*Hynix Semiconductor Inc. v. Rambus Inc.*,
No. C-00-20905 RMW, 2008 WL 73686 (N.D. Cal. Jan. 5, 2008)............................................. 9

*IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*,
2014 WL 12577404 (N.D. Cal. Oct. 3, 2014) .............................................................. 5, 6, 8, 13

*In re Air Cargo Shipping Services Antitrust Litig.*,
2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)............................................................................ 2

*In re Korean Ramen Antitrust Litig.*,
No. 13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017).................................. 2, 10

*In re Qualcomm Antitrust Litig*,
328 F.R.D. 280 (N.D. Cal. 2018)......................................................................................... 10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-MD-01819-CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010)...................................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2013 WL 12311008 (N.D. Cal. Jun. 14, 2013) ................................... passim

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) ........................................................................................... 11

Case No. 5:16-cv-06370-EJD-VKD

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

*Knutson v. Daily Review, Inc.*,
    548 F.2d 795 (9th Cir. 1976) ................................................................................ 11
*Laumann v. National Hockey League*,
    117 F. Supp. 3d 299 (S.D.N.Y. 2015) ............................................................ 12, 13
*Manpower, Inc. v. Ins. Co. of Pennsylvania*,
    732 F.3d 796 (7th Cir. 2013) ............................................................................ 4, 18
*Moore v. James H. Matthews & Co.*,
    682 F.2d 830 (9th Cir. 1982) ................................................................................ 11
*Pacific Shores Properties, LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) ........................................................................ 11, 14
*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .................................................................................. 2
*Scentsational Tech., LLC v. Pepsi, Inc.*,
    No. 13-cv-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ................. 17
*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) .............................................................................. 3, 11, 14
*The Scoular Co. v. Ceres Global AG Corp.*,
    No. 14-1881 (JRT/HB), 2017 WL 3535210 (D. Minn. Aug. 16, 2017) ................. 16
*The Smart Marketing Grp., Inc. v. Publications Int'l., Ltd.*,
    No. 04 C 146, 2014 WL 624933 (N.D. Ill. Feb. 18, 2014) ................................... 16
*United Energy Trading, LLC v. Pacific Gas & Elec. Co.*,
    No. 15-cv-02383-RS, 2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) ..................... 17
*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ........................................................................................... 3, 4
*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ................................................................................ 17

## RULES

Federal Rule of Evidence 703 .................................................................................... 9
Federal Rule of Evidence 702 .............................................................................. 1, 3, 9

## OTHER AUTHORITIES

A.P. Lerner, *The Concept of Monopoly and the Measurement of Monopoly Power*,
    1 Rev. Econ. Studies 157-75 (1934) ........................................................................ 5
John M. Connor & Robert H. Lande, *Cartel overcharges and optimal cartel fines*,
    3 Issues in Competition Law & Policy 2203-18 (S.W. Waller, Ed.) (2008) ................. 9
John M. Connor & Robert H. Lande, *How High Do Cartels Raise Prices? Implications for Optimal
Cartel Fines*,
    80 Tul. L. Rev. 513 (2005) ..................................................................................... 9
John M. Connor & Yuliya Bolotova, *Cartel Overcharges: Survey & Meta-analysis*,
    24 Int'l J. Ind. Org. 1109-37 (2006) ....................................................................... 9

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars ("Orion") respectfully submits this Opposition to Defendants' Motion to Strike Certain Testimony of Orion's Economic Expert Dr. Zona.

## INTRODUCTION

Orion's economic expert, J. Douglas Zona, Ph.D., is an economist with over 30 years of experience. He has written and presented numerous papers and book chapters on antitrust, unfair competition, and damages calculation issues, and his work has been cited in the leading antitrust law treatise, Areeda & Hovenkamp's *Antitrust Law*. He has also provided expert reports and/or testimony in numerous antitrust lawsuits and investigations on behalf of both private parties and government entities since 1991.

Here, Dr. Zona prepared a meticulous analysis of Orion's overcharge damages using the standard econometric tool known as an empirical model, which he then confirmed with a structural model analysis that has been published in the *Antitrust Law Journal* and approved by this Court in other cases. Dr. Zona set forth his calculations and damages estimates in a clear and succinct report that will enable the jury to understand and consider his inputs and methodology, as well as his conclusions.

In the present Motion, Defendants Ningbo Sunny Electronic Co., Ltd., Sunny Optics, Inc., and Meade Instruments Corp. seek to exclude large portions of the Zona Report based on a number of false or misleading arguments. They misstate the facts regarding the basis for Dr. Zona's elasticity calculation; fail to cite apposite authority regarding Dr. Zona's overcharge inputs; falsely state that Dr. Zona "blindly reli[ed]" on Orion's internal projections (even though he testified at deposition about how he validated those projections); and argue that Dr. Zona's calculations are improper because they would have preferred that Dr. Zona use Defendants' data, rather than Orion's, to assess Orion's damages. Defendants are wrong – factually and legally – on each one of these arguments. Their Motion should therefore be denied.

## ARGUMENT

Expert testimony is admissible under Federal Rule of Evidence 702 if it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Testimony is

relevant if it will "assist the trier of fact to understand or determine a fact in issue," *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007), and it is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Ultimately, the inquiry into the admissibility of expert testimony is "a flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 596). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017), at *9 (citation omitted).

"Deference to experts is particularly appropriate when expert testimony concerns 'soft sciences' like economics. Because these disciplines 'require the use of professional judgment,' expert testimony is less likely to be excluded because 'challenges may ultimately be viewed as matters in which reasonable experts may differ.'" *In re Air Cargo Shipping Services Antitrust Litig.*, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) *8, *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015); *see also Apple iPod iTunes Antitrust Litig*, No.: 05-CV-0037 YGR, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014), *6 (discussing disagreements between parties' economics experts and noting that "econometrics is in the family of social sciences and therefore necessarily contains certain value judgment and hypotheses that are tested and used in conjunction with statistics. Unless beyond the realms of reason and reliability, these issues are fully within the province of experts to debate and a jury to resolve").

The deference accorded to econometric analysis is even more pronounced in antitrust cases. As discussed in more detail in Section I.C. below, courts have long recognized that antitrust plaintiffs do not need to prove damages with exact mathematical precision. In *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 369 (1927), the Supreme Court held that for antitrust damages, "[i]t is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." *Id*. at 379. This is because "a defendant whose wrongful conduct

has rendered difficult the ascertainment of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." *Id.*; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("Calculations need not be exact") (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969) ("[D]amages issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts").

Under these standards and guiding principles, there is no question that Dr. Zona's testimony, providing economic expert opinion on antitrust damages, is admissible under Rule 702.

## I.    DR. ZONA'S ANALYSIS OF PRICE-FIXING AND MARKET ALLOCATION DAMAGES IS CLEARLY ADMISSIBLE UNDER RULE 702

### A.    Defendants' Own Economist Admits that Dr. Zona's Methodology Is Sound

To understand Defendants' challenges to the Zona Report, it is necessary to first understand Dr. Zona's methodology.  As explained in the Report, damages analysis in antitrust cases involves comparing "actual economic results to those in a 'but-for world,' which is a reference to the counterfactual situation in which the defendants did not engage in the alleged misconduct but instead pursued their next-best (*i.e.*, profit maximizing) legal course of action."  (Borden Declaration in Support of Oppo. to Motion to Strike ("Borden Decl."), Ex. 1, Zona Report ¶ 73.) To determine the effect of Defendants' collusion on Orion's profits, Dr. Zona sought to express damages as a function of actual profits by using empirical evidence to algebraically determine the applicable "damages rate." (*Id.* ¶ 79.)  That enabled him to quantify damages as the actual, observed level of profits multiplied by the damages rate.  (*Id.* ¶ 80.)

Dr. Zona calculated Orion's damages from Defendants' conspiracy to fix prices and allocate the market through an empirical method that used four inputs: margin, passthrough, elasticity, and overcharge.  (*Id.* ¶¶ 82-84.)  Dr. Zona derived these inputs from Orion's sales and cost data, as well as other pertinent information.  For example, Dr. Zona calculated the margin input by "look[ing] to Orion's income statements" to "obtain a measure of Orion's gross margin for the relevant products." (*Id.* ¶ 85.)  The income statements included actual monthly sales and costs figures, and

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

a summary line included calculated earnings before income tax, depreciation, and amortization ("EBITDA"). (*Id.*) Dr. Zona used the standard Ordinary Least Squares ("OLS") regression analysis to determine Orion's incremental margin from that data. (*Id.* ¶¶ 85-88.)

Dr. Zona used his margin calculation, together with the passthrough, elasticity, and overcharge inputs, to calculate the damages rate. (*Id.* ¶¶ 89-104). Once he had determined the damages rate, Dr. Zona multiplied it by Orion's incremental profit on the relevant products to obtain the full measure of damages. (*Id.* ¶ 105.)

Finally, as "an alternative and as a check" to ensure the reliability of the damages rate calculated in his empirical method, Dr. Zona also "considered an economic model based on the underlying structural elements of the market" and recalculated damages based on that structural model. (*Id.* ¶¶ 106-118.)

Defendants do not challenge Dr. Zona's methodology in the empirical model for calculating either the damages rate or the overall damages. On the contrary, their economic expert, Dr. Saravia, agreed that her methodology was economically sound. (Borden Decl., Ex. 2, Saravia Dep. 182:14-183:7 ("Q. So your objections to Dr. Zona's empirical method is with parameters, but you would agree that if you have the right values for his parameters, what he's doing would be an acceptable way to calculate damages in this case? A. . . . [E]conomically, it's fine. . . . in terms of the economic math, I have no problem.").) **Crucially, this admission alone makes clear that Defendants' motion should be denied.** *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis.").

## B.    Defendants' Challenges to Dr. Zona's Models Are Meritless

Because they admittedly have no basis on which to challenge the methodology in Dr. Zona's empirical model, Defendants instead argue that two of his input parameters, elasticity and overcharge, are unreliable. Defendants claim that these inputs are "divorced from the facts of the case" and constitute "guesswork," because "[i]nstead of relying on actual facts and data from this

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

case, Dr. Zona substitutes theoretical economic and mathematical assumptions[.]" (Mot. at 6.) Defendants' attacks misstate the facts and the law.

First, Defendants misstate the basis for Dr. Zona's elasticity input by falsely claiming that he is "relying entirely" on an FTC working paper. Dr. Zona calculated elasticity by using Orion's margin (which he calculated based on Orion's sales data, a fact that Defendants' economic expert Dr. Saravia concedes) and the Lerner relationship, a widely accepted economic concept.[1]  He used the FTC's analysis *in addition* to his work with Orion's sales data.

Second, Defendants' attack on Dr. Zona's overcharge parameter – that his use of cartel overcharge data compiled and published by Professor John M. Connor of Purdue University was impermissible – is equally unavailing.  Defendants fail to disclose that their exact theory for precluding this testimony was rejected by Judge Illston in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 12311008, *2 (N.D. Cal. Jun. 14, 2013), where she permitted use of the exact same cartel dataset that Dr. Zona makes use of in his calculations in this matter.

Finally, Defendants also attack Dr. Zona's use of the structural model that he pioneered, and which has been subjected to peer-review and publication in the *Antitrust Law Journal*.  But Defendants again fail to advise the Court that courts in this district have specifically denied *Daubert* motions seeking to exclude expert antitrust overcharge analysis that utilize "the 'Zona base model.'"  *IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, 2014 WL 12577404, at *2 (N.D. Cal. Oct. 3, 2014) (Alsup, J.).  In stark contrast, the sole case Defendants rely on in support of their challenge to the structural model is entirely inapposite because it involved an expert's attempt to estimate demand for *a product that was never made*.  Unlike the analysis in that case, Defendants' critiques of Dr. Zona—such as they are—are subjects for cross-examination, not exclusion.

### 1.    Defendants Misrepresent the Facts Regarding the Elasticity Input

Defendants devote nearly twenty percent of their motion to arguing that the elasticity input in Dr. Zona's empirical model is improper and should be excluded because he "rel[ied] entirely on

---

[1] *See* Borden Decl., Ex. 3, Zona Dep. at 89:7-13 ("I have done an analysis based on a relationship in economics, the Lerner relationship, price minus cost over price equals the inverse of the negative demand elasticity."); *see also* A.P. Lerner, *The Concept of Monopoly and the Measurement of Monopoly Power*, 1 Rev. Econ. Studies 157-75 (1934).

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

an FTC 'working paper' to estimate a price elasticity of demand instead of actually doing the work to analyze the consumer telescope industry and/or Orion's telescope sales to estimate the elasticity[.]" (Mot. at 6.)  Defendants are misleading the Court.

As Dr. Zona clearly explained in his Report and at his deposition, he *did* use Orion's data to calculate elasticity.  First, he calculated Orion's margin based on (1) the company's income statements, which included "actual monthly sales figures and actual monthly costs figures for various categories of costs," (Borden Decl., Ex. 1, Zona Report ¶ 85); and (2) OLS regression analysis that measured how much cost changed with sales.  (*Id.* ¶ 86.)  This yielded a margin of 26.4%.  (*Id.* ¶ 88.)[2]  Next, in accordance with the inverse elasticity rule of economic theory, Dr. Zona estimated elasticity of demand as the inverse of Orion's margin calculation, which yielded an estimate of -3.8.  (*Id.* ¶ 95.)  Dr. Zona then used the FTC working paper, which sets forth the elasticity range that the FTC calculated when it blocked a proposed merger of Meade and Celestron, as a *check* to confirm the accuracy of his margin calculation, as well as to provide an additional reasonable range of damages.  (*Id.* ¶ 96.)  Dr. Zona explained that because the FTC had estimated the elasticities at a range from -4.8 to -10.0, those calculations support his data-based estimate of -3.8 in the present case "as conservative."  (*Id.*).

It is therefore not true, as Defendants argue at length, that Dr. Zona "rel[ied] entirely" on the FTC estimates; "did *no* independent analysis"; "ma[d]e sweeping generalized conclusions about the price elasticity of all Orion products … based only on three telescopes picked by the FTC"; or "substitute[d] a dated FTC working paper for his own analysis[.]" (Mot. 6-8 (emphasis in the original).)  On the contrary, Dr. Zona *did* "actually do[] the work to analyze … Orion's telescope sales to estimate the elasticity" that Defendants claim he failed to do.  (*Id.* at 6.)

Defendants' misrepresentation of this critical fact is not a misunderstanding or error.  On the contrary, Defendants questioned Dr. Zona about it at length at his deposition.  In response, Dr. Zona repeatedly explained how he used Orion's price and cost data to estimate price elasticity

---

[2] Defendants' Motion does not challenge the methodology or results of Dr. Zona's margin calculation.

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

using econometrics.  (Borden Decl., Ex. 3, Zona Dep. at 89:3-91:5; 166:21-169:15.)  In particular, Defendants asked:

> Q. So how does your elasticity estimate constitute an econometric analysis of the telescope market? [Objection.]
>
> A. So I have done an analysis based on a relationship in economics, the Lerner relationship, price minus cost over price equals the inverse of the negative demand elasticity. So I have used econometrics to measure the price minus cost over price and the Lerner relationship to estimate the elasticity. And the elasticity is a way to identify the scope of the relevant market.
>
> Q. But you haven't estimated a formal econometric model to measure price elasticity and demand for Orion telescopes, have you? [Objection.]
>
> A. I think I just described an econometric analysis to get margin, and then a relationship from economic theory that relates margin to the inverse of the demand elasticity.  So I have used econometric analysis to estimate a demand elasticity for Orion telescopes.
>
> Q. But not a price elasticity?
>
> A. *Exactly a price elasticity.*

(*Id.* at 89:15-90:3 (emphasis added).)  Dr. Zona further testified that his elasticity estimate was "specific to Orion's telescopes because it is based on Orion's price and cost data." (*Id.* at 90:22-91:5.)

Defendants' own economist Dr. Saravia concedes that this methodology is an economically acceptable means to calculate a reasonable estimate of elasticity:

> Q. Would you agree that an elasticity estimate can be obtained using price, the price and cost margin? [Objection.]
>
> A. Yes. . . . There are instances under which one can use the inverse elasticity to come up with the -- could -- there are instances or circumstances under which one could use the inverse elasticity rule to come up with a reasonable estimate of elasticity and that rule would use the price and cost data or the margin.

(Borden Decl., Ex. 2, Saravia Dep. at 178:1-12.)[3]

It is improper for Defendants to represent otherwise in their Motion.

_____

[3] Dr. Saravia does contest whether the application of this methodology was appropriate under the particular circumstances presented here; while she is wrong, that issue goes to weight rather than admissibility.

## 2. Defendants' Challenge to Dr. Zona's Use of Overcharge Data Is Not Grounds for Exclusion

Defendants also seek to exclude the overcharge element of Dr. Zona's empirical model, *i.e.*, the amount by which Defendants' unlawful conduct enabled them to raise prices above what they would have charged in a competitive market. (Mot. at 5.) Defendants contend that the Court should exclude Dr. Zona's overcharge input because he utilized cartel data compiled by Professor John Connor to assess the overcharge rate. *Id.* As Judge Illston held when admitting the Connor data in the *Flat Panel* case, however, this argument is not grounds for exclusion because it goes to the weight, not admissibility, of the evidence. 2013 WL 12311008 *2.

As Dr. Zona explains in his Report, the overcharge element is different from the other three elements of the model in that it is "not directly observable." (Borden Decl., Ex. 1, Zona Report ¶ 97.) This is because, as discussed in Section I.C. below, the extraordinary length of Defendants' ongoing conspiracy makes it impossible to use the standard method of calculating overcharge, *i.e.*, comparing the prices Defendants charged during the conspiracy period with the prices they charged in a "clean" period before or after the conspiracy. Notably, Defendants have not proposed *any* other method of calculating the overcharge in this case.[4]

To determine the overcharge, then, Dr. Zona "reviewed the literature on measured cartel overcharges from other conspiracies to inform the present case." (*Id.* ¶ 98.) Specifically, he analyzed "a data set related to international private cartels, covering the period 1990 to 2012," developed by Professor John M. Connor, a senior fellow at the American Antitrust Institute, a fellow of the Agricultural and Applied Economics Association, and Professor Emeritus of industrial-organization economics at Purdue University. (*Id.*) Dr. Zona then analyzed a subset of that data for cartels comparable to the one at issue in this case, *i.e.*, two- and three-member cartels with market share greater than 70%. (*Id.*) From that subset, Dr. Zona calculated a conservative overcharge estimate of 27-35%, which he confirmed by comparing it to a benchmark derived from

---

[4] As Orion explained in its *Daubert* motion, Mr. Redman's proposal to calculate an overcharge by comparing prices charged by colluding and non-colluding firms contradicts widely-accepted economic principles. Dkt. 238 at 13. Defendants make no attempt to defend Mr. Redman's proposed calculation in their response. *See* Dkt. 273.

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

a standard theoretical model of oligopoly competition known as Cournot Equilibrium.  (*Id.* ¶¶ 98-101.)

By selecting a subset of data applicable to cartels with features comparable to the conspiracy at issue here, Dr. Zona properly tied his analysis to the facts of this case.  And Dr. Zona's use of Professor Connor's data is an accepted method for estimating overcharge where that data is not directly observable.  Rule 702 requires that reliable testimony be based on "sufficient facts or data," which "may include other experts' reliable opinions or hypothetical facts that are supported by the evidence." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-00-20905 RMW, 2008 WL 73686 (N.D. Cal. Jan. 5, 2008), at * 1 (citing Fed. R. Evid. 702, Adv. Committee Note (2000)).  Further, it is well settled that an expert may base an opinion on facts or data that the expert has been made aware of if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.  Fed. R. Evid. 703.  Professor Connor's dataset has been updated and published multiple times, and subjected to peer review in articles of the sort regularly and reasonably relied upon by experts in Dr. Zona's field.  *See, e.g.*, John M. Connor & Yuliya Bolotova, *Cartel Overcharges: Survey & Meta-analysis*, 24 Int'l J. Ind. Org. 1109-37 (2006); John M. Connor & Robert H. Lande, *Cartel overcharges and optimal cartel fines*, in 3 Issues in Competition Law & Policy 2203-18 (S.W. Waller, Ed.) (2008); *see also* John M. Connor & Robert H. Lande, *How High Do Cartels Raise Prices? Implications for Optimal Cartel Fines*, 80 Tul. L. Rev. 513 (2005).

Indeed, Defendants neglect to inform the Court that Judge Illston rejected the precise argument they advance and denied a motion to exclude expert testimony on overcharge based upon the very same analysis and data developed by Professor Connor.  *Flat Panel*, 2013 WL 12311008.

In *Flat Panel*, the defendants sought to exclude testimony from the plaintiff's damages expert regarding "typical cartel overcharges" that the expert had derived from Professor Connor's data compilation on cartels.[5]  The expert in *Flat Panel*, as here, used "the performance of other

---

[5] The expert in *Flat Panel* relied on an earlier scholarly paper by Professor Connor that also analyzed overcharges by cartels worldwide, as does his scholarly paper that Dr. Zona relied on here. (*Flat Panel*, Case No. M 07-1827 SI (N.D. Cal.), Dkt. No. 7844, at 9 n.3 and 10 n.5.)  The *Flat Panel* court erroneously referred to it as the "O'Connor study," 2013 WL 12311008 at *2.

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

cartels" as shown in Professor Connor's data as a "useful benchmark" in estimating overcharge in that case.  (*Flat Panel*, Dkt. No. 7844, Ex. 1 at 4, Case No. M 07-1827 SI (N.D. Cal.).)  As Defendants argue here, the defendants in *Flat Panel* also argued that the opinion was inadmissible because the expert had failed to tie the information about other cartels to the circumstances of that particular case.  The court rejected that argument, explaining:

> [T]he Court denies Defendants' challenges to Dr. Bernheim's testimony regarding 'typical' cartel overcharges as they go to the weight rather than the admissibility of the testimony.  Defendants take issue with the []Connor study on which Dr. Bernheim relies and cite newer scholarship addressing the issue of cartel overcharges; Defendants may address such challenges, among others, through cross-examination."

*Id.* at *2.

Judge Illston's ruling accords with the long-accepted principle that it is for the jury, not the court, to resolve disagreement between experts about the propriety of a damages model or the data used to construct it.

For example, in an earlier opinion in the *Flat Panel* case, No. M 07-1827 SI, 2013 WL 124347 (N.D. Cal. Jan. 8, 2013), the Court reviewed a motion to exclude an expert opinion about the effects of the cartel on sales of monitor panels.  The expert "stated that an overcharge could not be reliably measured for monitors for a variety of reasons." *Id.* at 1.  He therefore constructed an econometric model for a different product and used it as a proxy for the monitor panels.  *Id*.  The court denied the motion to exclude, stating that the defendant could "challenge these determinations through cross-examination and through the testimony of [its own expert], who has prepared his own econometric models." *Id*.[6]

---

[6] *See also In re Qualcomm Antitrust Litig*, 328 F.R.D. 280, 305 (N.D. Cal. 2018) (denying *Daubert* motion where defendant argued that plaintiffs' expert built his regression results on unreliable data because "district courts within and outside this district have often concluded that "experts' decisions about what data to use" in their analysis bear on the weight, not the admissibility, of expert testimony"); *Korean Ramen*, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) at *2, *17 (denying *Daubert* motion because, despite defendants' "reasonable criticisms" of expert's price inputs and use of a limited dataset, expert's "inputs and resulting estimated overcharge may be ripe for attack on summary judgment or trial, but they are not too inherently unreliable or untenable to be excludable"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-01819-CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010), at *6 (denying motion to exclude expert's testimony because limitations in the data on which he relied "may impact the weight of Dr. Dwyer's evidence, but they do not clearly indicate that his analysis is unreliable"); *Aventis*

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

This is axiomatic where, as here, it is Defendants' misconduct that has made it more difficult to assess damages because there is no "clean period" against which to compare prices.  As the Supreme Court explained in *Story Parchment*:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts…. The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

282 U.S. at 563 (citing *Eastman Kodak*, 273 U.S. at 379).  This is because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *see also Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1171 (9th Cir. 2013) (where defendant's actions prevented precise calculation of damages, jury was entitled to determine damages by drawing just and reasonable inferences from the evidence).[7]

Dr. Zona's analysis far exceeds this standard and is therefore admissible to prove Orion's damages.  Defendants will have their opportunity to challenge Dr. Zona's analysis before the jury via cross-examination, but they are not entitled to exclude it altogether.

---

*Environmental Science USA LP v. Scotts Co.*, 383 F.Supp.2d 488, 514 (S.D.N.Y. 2005) (denying motion to exclude plaintiff's damages expert because "Defendants are free to challenge the basis and source for Dr. Martin's numbers, but a challenge to the facts or data relied upon by Dr. Martin does not go to the admissibility of his testimony, but only to the weight of his testimony" (citation omitted)); *see also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (reversing summary judgment based on exclusion of expert's testimony as to cause of plaintiff's injury because opposing opinions do not "preclude the admission of the expert's testimony—they go to the *weight*, not the admissibility" (emphasis in the original)).

[7] *Accord Fontana Pipe & Fabrication v. Ameron, Inc.*, 993 F.2d 882 (9th Cir. 1993) (holding that "[w]hatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced."); *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) ("an antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations") (citation omitted); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) (proof of antitrust damages is sufficient "if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate") (citation omitted); *Edwards v. National Milk Producers Fed.*, No. C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014), at *6 ("damages in antitrust cases need not be proven with exact certainty").

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

### 3.   Defendants' Challenge to the Structural Method Fails

Next, Defendants argue that the Court should exclude Dr. Zona's structural model. Defendants ignore that Dr. Zona is properly using his structural method as a *check* on his empirical model, not as a free-standing method for calculating damages.  Instead, citing *Laumann v. National Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015), Defendants claim that the model is "too far removed from actual facts and data in this case to be presented to a jury."  (Mot. at 5-6.)  That case, however, has no application here.

Crucially, the expert in *Laumann* was attempting to predict consumer demand for <u>a product that did not exist</u>, *i.e.*, an option to subscribe to televised sports games for a single team (instead of what the defendants offered, a subscription to a bundled package for all of the games in an entire league).  The court noted that because there was "no observable data about consumer behavior in the [but for world], utilizing real-world information is paramount in estimating otherwise unknown consumer preferences."  *Id.* at 306.  The expert, however, did not conduct any surveys or obtain any data regarding consumer preferences for a new product; instead, he based his model on data regarding what current subscribers presently watched given what was already available.  *See id.* at 307.  The court noted that while none of the defendants' technical criticisms of the model would "be independently sufficient to win a *Daubert* challenge," the expert's failure to obtain information about "consumer tastes and preferences" while attempting to model demand of a hypothetical product based on those consumer tastes and preferences made his model unreliable.  *Id*. at 315.

The structural model Dr. Zona constructed here is nothing like the model that was at issue in *Laumann*.  Rather than attempting to predict demand for a non-existent product based on consumers' specific tastes and preferences, Dr. Zona's model predicts the behavior of profit-maximizing firms behaving efficiently pursuant to basic and widely accepted economic theory.  (Borden Decl., Ex. 1, Zona Report ¶¶ 110-113.)  As Dr. Zona testified, his model used a linear demand relationship, which is "probably the most prevalent assumption about demand curves that economists make" and "very conventional."  (Borden Decl., Ex. 3, Zona Dep. at 144:11-21.)  He further explained that his model employed "sort of a textbook type of analysis for an industrial organization and tuned to this specific circumstance. . . .  I'll give you that it is a theoretical model,

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

absolutely, but it is applied to the facts and circumstances here." (*Id.* at 146:15-147:5.)  He also rejected Defendants' counsel's assertion that his model did not use data.  (*See id.* at 145:20-147:19; 150:18-151:8.)  Defendants' reliance on *Laumann* is therefore misplaced.

Finally, Defendants observe that Dr. Zona described structural models in an article he authored as "useful for settlement purposes, alternative dispute resolution proceedings, or evaluation of the case purposes." (Mot. at 6.)  According to Defendants, this means that structural models cannot also be used for "actual merits damage calculation."  (*Id.*)  Nothing in Dr. Zona's article provides support for that leap of logic, and courts in this district have disagreed with Defendants and held that Dr. Zona's article sets forth a permissible structural damages analysis.  Indeed, Judge Alsup approved an expert's use of "the 'Zona base model' published in the *Antitrust Law Journal*" to create "a 'simulated structural approach' to estimate damages by comparing actual prices with prices predicted by a structural representation of the market absent the allegedly conspiratorial conduct." *IL Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*, 2014 WL 12577404, at *2 (N.D. Cal. Oct. 3, 2014) (Alsup, J.).

But even if Defendants were correct, Dr. Zona did not use the structural model for his primary damages calculation here.  Rather, he used it as "an alternative and as a check to the direct method" set forth in his empirical method.  (Borden Decl., Ex. 1, Zona Report ¶ 106; *id.*, Ex. 3, Zona Dep. at 151:22-152:8.)  In other words, it provides mathematical corroboration for his empirical model, which, as discussed above, relied on copious amounts of data.  Defendants cite no authority to show that in order to cross-check and confirm the accuracy of his or her primary calculation, an expert must also construct a second empirical model.  And again, as in the many cases set forth above, their argument goes to the weight to be afforded to Dr. Zona's testimony, not its admissibility.

**C.    Dr. Zona's Models Easily Satisfy the Standard for Establishing Antitrust Damages, Particularly Where Defendants' Own Misconduct Makes an Exact Calculation Nearly Impossible**

As noted at p. 2 above, an antitrust plaintiff is entitled to recover its damages if it provides evidence showing a "reasonable basis of computation." *Eastman Kodak*, 273 U.S. 379.  This is particularly true where, as here, the defendant's own misconduct makes it difficult to calculate

damages with precision. "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (citing *Eastman Kodak*, 273 U.S. at 379). "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *see also Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1171 (9th Cir. 2013) (where defendant's actions prevented precise calculation of damages, jury was entitled to determine damages by drawing just and reasonable inferences from the evidence); *Fontana Pipe & Fabrication v. Ameron, Inc.*, 993 F.2d 882 (9th Cir. 1993) ("[w]hatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced.") (quoting *Story*, 282 U.S. at 563); *Edwards v. National Milk Producers Fed.*, No. C 11-04766 JSW, 2014 WL 4643639 (N.D. Cal. Sept. 16, 2014), at *6 ("damages in antitrust cases need not be proven with exact certainty").

In the present case, Dr. Zona's careful econometric analysis far exceeds the "reasonable basis" standard. Further, the fact that Defendants engaged in their conspiracy for such an extraordinary length of time – stretching back at least seven years – created added complexity in assessing damages here. In many antitrust cases, damages can be calculated by comparing the period in which the conspiracy existed with a "clean" period, *i.e.*, a period before the conspiracy began or after it ended. Here, however, there was no such clean period for Dr. Zona to use because no such clean period exists. It is therefore not possible to obtain a measure of what prices existed in a competitive market pre-conspiracy. Further, as alleged in the First Amended Complaint, the conspiracy is ongoing, which precludes a comparison based on post-conspiracy prices. (Dkt. No. 41 ¶¶ 127, 129, 137.)

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

Given these circumstances, which Defendants' own misconduct caused, Dr. Zona's analysis is far more than sufficient under *Eastman Kodak*, *Story Parchment*, and the long, unbroken line of cases that followed them.  His testimony is therefore admissible to prove Orion's damages.

## II.    DR. ZONA'S USE OF VALIDATED CLIENT DATA REGARDING THE MEADE AND HAYNEEDLE ASSETS WAS ENTIRELY PROPER

Defendants also challenge Dr. Zona's opinion regarding the damages they caused Orion by conspiring to prevent it from acquiring the Meade and Hayneedle assets.  Defendants argue (1) that Dr. Zona's "only basis" for his testimony is "oral speculation by Orion's Chief Executive in a telephone interview" regarding the expected synergies and increased profits that Orion would gain from those acquisitions, and (2) that his "blind reliance on this 'self-serving' speculation … must be excluded." (Mot. at 8-9.)  Defendants again misstate the facts.

As an initial matter, Defendants' aspersion of Mr. Moreo's analysis of Orion's potential acquisitions of the Meade and Hayneedle assets as "oral speculation" ignores the facts of the case.  Orion engaged in substantial due diligence regarding these potential acquisitions, as part of which it created internal projections.  Orion was, however, compelled to destroy all documents related to that diligence after the deals collapsed—as is exceedingly common in unconsummated mergers.  Mr. Moreo testified to these facts at his 30(b)(6) deposition.  (Borden Decl., Ex. 4, P. Moreo 30(b)(6) Dep. at 205:20-206:19 (Hayneedle); 240:15-241:2 (Meade).)  Thus, Dr. Zona's multiple interviews with Mr. Moreo—the only person remaining at Orion who worked on the Hayneedle and Meade acquisition attempts—was not "oral speculation," but rather the best possible evidence available regarding Orion's projections relating to expected increase in sales, reduction in inbound and outbound shipping costs, and reduction in product costs from scale economies and improved bargaining position arising from the completion.  (Borden Decl., Ex. 3, Zona Dep. at 193:17-195:10; 205:5-206:8; *see also id.,* Ex. 1, Zona Report at ¶ 122.)   Indeed, that is why Orion designated Mr. Moreo as its 30(b)(6) witness on the subject of Defendants' "interfer[ence] with Plaintiff's acquisitions of Hayneedle assets or Meade." (Borden Decl., Ex. 5, Fourth Am. 30(b)(6) Dep. Notice to Orion ¶ 22.)

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

But Dr. Zona did not merely take Mr. Moreo's word as gospel. Instead, after he obtained Orion's ranges on expected savings in product and shipping costs, Dr. Zona "validated them, cross-checked them to see if they were consistent with my understanding of the costs and the nature of the production in here." (*Id.*, Ex. 3, Zona Dep. at 194:6-195:10; 197:19-198:1; 205:18-206:13; 226:13-227:16.) Dr. Zona then detailed how he validated the numbers provided by Orion. (*See id.*, Ex. 3, Zona Dep. at 206:19-209:12 (describing his analysis).) Nor did Dr. Zona solely rely on Mr. Moreo; where contemporaneous documents existed, he used them to derive Orion's expected purchase price and valuation of the Meade assets. (*Id.*, Ex. 3, Zona Dep. at 189:5-24; 201:25-203:8.) And with respect to Hayneedle, Dr. Zona agreed with Orion's assessment that those assets would generate an increase in sales of at least 10 percent, based on his experience that a 10 percent increase in sales would be consistent with the increased exposure provided by the Hayneedle assets and search engine optimization. (*Id.*, Ex. 3, Zona Dep. at 209:15-210:18.)

Courts readily find that experts may rely on client data and projections where, as Dr. Zona did here, the expert provides a basis for his or her reliance—especially when those projections were made for business purposes rather than litigation. *See*, *e.g.*, *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 232-34 (E.D. Pa. 2017) (expert's reliance on market share projections from client did not render his opinion unreliable because expert explained why he found figure appropriate); *The Scoular Co. v. Ceres Global AG Corp.*, No. 14-1881 (JRT/HB), 2017 WL 3535210 (D. Minn. Aug. 16, 2017) at *14-15 (denying motion to exclude where expert did not independently test client projections and estimates but ensured reliability by discussing them with client); *The Smart Marketing Grp., Inc. v. Publications Int'l., Ltd.*, No. 04 C 146, 2014 WL 624933 (N.D. Ill. Feb. 18, 2014), at *3 (denying motion to exclude on the grounds that damages expert based testimony on, among other things, plaintiff's pro forma sales projections, because "where an expert has provided support for his reliance on a party's internal projections, the opinion need not be excluded, and the opposing party may instead test the expert's reliance on the internal projections through cross-examination").

The cases Defendants cite do not help them. In two of their cases, the courts noted that exclusion may be appropriate if the expert had no basis for relying on the client's projections *but*

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

*then went on to admit the experts' testimony*, finding that the experts had satisfied their obligations under Rule 702.  In *Clear-View Technologies, Inc. v. Rasnick*, No. 13-cv-02744, 2015 WL 3505003 (N.D. Cal. Jun. 2, 2015), which Defendants cite at pages 4 and 9 of their Motion, a court in this District *denied* a motion to exclude over the defendant's argument that the assumptions underlying the expert's testimony were "wildly speculative" and "pie-in-the-sky." *Id.* at *2.  The court noted that there was a "high bar to exclude expert testimony based on faulty assumptions." *Id*.  It then noted that the expert had independently analyzed the data and concluded that the defendant's arguments therefore did not meet the "high bar" for exclusion.  *Id*. at *2-3.  And in *United Energy Trading, LLC v. Pacific Gas & Elec. Co.*, No. 15-cv-02383-RS, 2018 WL 5013580 (N.D. Cal. Oct. 16, 2018) *2, which Defendants cite at page 4 of their Motion, another court in this District *denied* a motion to exclude the defense expert on the grounds that he was "parroting" the defendant's position without independently verifying the data it provided him.  The court explained that the expert had done his own analysis of the data, and while the plaintiff may have grounds to challenge the data's validity, it could do so through cross-examination, not exclusion.  *Id*.

In the remainder of the cases on which Defendants rely, the courts excluded the experts' testimony, not simply because the experts used client projections, but because the *projections themselves* were unreliable and/or the expert failed to explain why he or she relied on them.  *See Scentsational Tech., LLC v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018), at *16 (excluding expert's testimony where his model relied on "revenue projections made by ST executives in an email regarding what they <u>hoped</u> to make" on the product, with "no sales data or independent market report indicating that the business venture could make sales and be profitable" (emphasis in the original)); *GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK (N.D. Cal Apr. 16, 2014), 2014 WL 1494247, at *4-5 (excluding expert's testimony that defendant would have paid $1 per unit to license plaintiff's technology where expert admitted that he had used "no specific math" or "mathematical calculation" to obtain that figure and relied instead on "all the evidence in the record and my years of licensing and doing this"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (affirming exclusion of testimony where expert relied on estimates in a company business plan without knowing either the qualifications of the persons who

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

prepared it or the assumptions upon which the estimates were based, and explaining that to rely on estimates of others, an expert "must explain why he believed the estimates were reliable"); *Fail-Safe, LLC v. A.O. Smith Corp.*, 74 F.Supp.2d 870, 887-88 (E.D. Wis. 2010) (excluding testimony in unjust enrichment case where both the data it was based on and the expert's scrutiny of it were "extremely suspect"; the *plaintiff's* expert, who was asked to estimate damages based on the *defendant's* projected sales, relied entirely on a single undated PowerPoint slide from defendants showing how many units it "hoped" to have on the market and did no verification of that figure).

Because Dr. Zona "validated and cross-checked" the data and projections he received from Orion (Borden Decl., Ex. 3, Zona Dep. at 206:9-13), and testified as to why he felt that information was reliable, his use of Orion's data and projections was proper under all of the cases Defendants cite (as well as Orion's cited authorities).  The Court should therefore deny Defendants' Motion.

## III.  THE COURT SHOULD REJECT DEFENDANTS' ATTEMPT TO DICTATE WHAT DATA DR. ZONA CAN USE IN HIS CALCULATIONS

Defendants' final attempt to exclude Dr. Zona's testimony is to argue that he should have used the data they produced in discovery as the basis for his calculations, rather than the Orion data he found more reliable and appropriate.  (Mot. at 10.)  Defendants do not cite a single case for their breathtaking assertion that *they* can dictate what inputs *Orion's* expert must use in his models and calculations.  Indeed, there is none, because, as the many cases cited above hold, the proper method for them to challenge Dr. Zona's selection of data is through cross-examination.  *See*, *e.g.*, *Flat Panel*, 2013 WL 124347, *1 (denying motion to exclude where plaintiff's expert constructed an econometric model for a different product than the one at issue on the theory that it was a "reasonable proxy," and holding that the defendant could challenge that opinion through cross-examination and through its own expert's models); *Apotex*, 321 F.R.D. at 233 ("Whether Dr. Singer relied on the best data in forming his opinions is a question for the jury."); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury.").

Defendants' Motion also conspicuously omits the reason that Dr. Zona opted to use Orion's data rather than Defendants, which was that Sunny's data production did not include costs necessary to directly calculate Sunny's margins, and, by extension, Sunny's overcharge.  Indeed, Defendants have taken the remarkable position that they do not track their cost data at the product level.  (Dkt. No. 242 at 7 ("There is no product or SKU-level labor cost data.").)  In other words, Defendants contend that Ningbo Sunny—a telescope manufacturer—does not track how much it pays to manufacture a given telescope model, even though such cost information is essential to understanding whether a given telescope model is profitable or not.  Defendants also withheld – and continue to withhold – substantial detail from their financial statements in violation of the Parties' agreed scope of production.  *See* Dkt. 242.

This is why Dr. Zona was unable to use Defendants' data, a fact that Dr. Zona explained at length in his deposition:

> Q. And you had monthly financial statements that included cost data, right, for the defendants?
>
> A. They included a certain kind of cost, yes, I believe. That's my understanding. I didn't use any of it because it wasn't relevant to what I was doing.
>
> Q. What were you doing?
>
> A. I told you, I was trying to match or identify the costs that were associated with the products that were being supplied to Orion in order to determine the margin that Sunny was making on those particular products.
>
> Q. So did you attempt to determine margins on the basis of the available information that you had on the products that were sold to Orion?
>
> A. I attempted to do that, but I wasn't able to because there's a large - - expected large component missing, like the costs of putting all the parts together, if I am interpreting those sheets correctly.

(Borden Decl., Ex. 3, Zona Dep. at 75-76:13.)

Unsurprisingly, Defendants' insistence that Dr. Zona should have used their incomplete data rather than Orion's to calculate damages is devoid of any explanation as to why their data might be useful, much less usable in the first place.  Defendants' own experts make no use of the data that Defendants now insist is so important that it justifies excluding Dr. Zona entirely.  To the

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA

extent Defendants truly believe this is a persuasive critique of Dr. Zona's analysis, they are free to challenge Dr. Zona on that point via cross-examination.

## **CONCLUSION**

For the foregoing reasons, Orion respectfully requests that the Court deny Defendants' Motion to Strike Certain Testimony of Orion's Economic Expert Dr. Zona.

Dated:  August 8, 2019                                          BRAUNHAGEY & BORDEN LLP


By:     /s/ *Matthew Borden*
                Matthew Borden

Attorneys for Plaintiff OPTRONIC
TECHNOLOGIES, INC. d/b/a Orion
Telescopes & Binoculars

ORION'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN TESTIMONY OF DR. ZONA