# EXHIBIT A

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---oOo---

| | |
|---|---|
| OPTRONIC TECHNOLOGIES, INC., d/b/a Orion Telescopes & Binoculars, a California corporation, ) ) ) ) | |
| Plaintiff, ) | Case No. 5:16-cv-6370-EJD |
| vs. ) ) | |
| NINGBO SUNNY ELECTRONIC CO., LTD., SUNNY OPTICS, INC., MEADE INSTRUMENTS CORP., and DOES 1-25 ) ) ) ) | |
| Defendants. ) ) | |

---oOo---

TUESDAY, MAY 14, 2019

VIDEOTAPED DEPOSITION OF JOSE SASIAN, PH.D.

HIGHLY CONFIDENTIAL

---oOo---

REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
451454

SINCE 1972

**BARKLEY**
*Court Reporters*
barkley.com

| | | | |
|---|---|---|---|
| (310) 207-8000 Los Angeles | (415) 433-5777 San Francisco | (949) 955-0400 Irvine | (858) 455-5444 San Diego |
| (310) 207-8000 Century City | (408) 885-0550 San Jose | (760) 322-2240 Palm Springs | (800) 222-1231 Carlsbad |
| (916) 922-5777 Sacramento | (800) 222-1231 Martinez | (702) 366-0500 Las Vegas | (800) 222-1231 Monterey |
| (951) 686-0606 Riverside | (818) 702-0202 Woodland Hills | (702) 366-0500 Henderson | (516) 277-9494 Garden City |
| (212) 808-8500 New York City | (347) 821-4611 Brooklyn | (518) 490-1910 Albany | (914) 510-9110 White Plains |
| (312) 379-5566 Chicago | 00+1+800 222 1231 Paris | 00+1+800 222 1231 Dubai | 001+1+800 222 1231 Hong Kong |

A.   Thank you.

Q.   Approximately how many hours --

MR. FISHER:  Just before you ask your question, Counsel, I just want to place this on the record.  Counsel for defendants now has access to a LiveNote transcript, which has not been provided to plaintiffs.  We strongly object to the inequitable distribution of access to the transcript.  I have used LiveNote at numerous depositions in my career, and I have never been in a situation where it was not provided to both parties.  I just wanted to place that on the record.  So with that, we can proceed for now.

Q.   BY MS. NIKONOVA:  All right.  I will ask my question again.  Are you ready?

A.   Yes.

Q.   Approximately how many hours did you spend working on this case so far?

A.   Maybe 25, 30 hours, something like that.

Q.   How much time did you spend preparing your expert report?

A.   Around 13 hours.

Q.   Thirteen, one three?

A.   Yes.

Q.   About how much time did you spend

47

preparing for this deposition?

A.   Perhaps 15 hours.

Q.   Did you spend -- besides the 13 hours for your expert report and 15 hours for your deposition, did you spend time on this case doing anything else?

A.   No.

Q.   And did you write every single word in your report?

A.   No.

Q.   Approximately how much of the report did you write yourself, not including your exhibits and CV?

A.   Before I answer that question, let me ask Mr. Fisher about --

MR. FISHER:   You can answer to the extent you are not disclosing any privileged communications.

Q.   BY MS. NIKONOVA:   You can't ask your counsel questions.  You have to answer my question unless it impedes on privilege.

A.   Yeah, I was referring to privilege.

Q.   But my question is approximately how much of the report did you write yourself, not including your exhibits and CV?

48

BARKLEY
Court Reporters

A.    Maybe 40 percent, maybe 40 percent of it.

Q.    40 percent, okay.    Did counsel write the remaining 60 percent?

A.    The balance, yes.

Q.    Now I'd like to point you to Exhibit 2 of your report?

A.    Yes.

Q.    What is Exhibit 2 of your report?

A.    It is entitled "Documents Reviewed by Dr. Jose Sasian, Ph.D."

Q.    Does Exhibit 2 list all of the evidence and material that you reviewed in connection with preparing your expert report?

A.    I believe so.

Q.    And what do you mean by "reviewed"?

MR. FISHER:    Object to form.

THE WITNESS:    From reading the documents to just making sure they were documents.

Q.    BY MS. NIKONOVA:    What do you mean "making sure they were documents"?

A.    Well, they are -- over here are some responses that I didn't read, but I just saw that they were present.

Q.    Okay.    So the -- are you referring to the responses listed on Page 3 of Exhibit 2?

49

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

A.    Yes, for example.

Q.    So you didn't read any of those?

A.    Not that I recall.

Q.    Why not?

A.    Because I didn't deem it necessary.

Q.    You didn't deem it necessary to read documents you never read?

MR. FISHER:   Object to form.

THE WITNESS:   I am not sure I understand your question.

Q.    BY MS. NIKONOVA:   Why didn't you read these documents?

MR. FISHER:   Object to form.   Object to form.

THE WITNESS:   I don't know.   I didn't spend the time reading it.

Q.    BY MS. NIKONOVA:   Did you know that the plaintiff also submitted these types of documents that are responses to defendant's requests for production, interrogatories and requests for admissions?

A.    No, I don't know about that.

Q.    You didn't read those either?

A.    No.

Q.    You didn't know they existed?

50

BARKLEY
Court Reporters

A.   I don't recall that.  I don't recall that.

Q.   Why did you list these documents on Page 3 if you didn't read them?

A.   Because those documents were mentioned in my discussions with counsel.

Q.   Did you put on this list all documents that were mentioned in your discussion with counsel?

A.   I believe so.

Q.   So this is the entire universe of documents that you have seen in this case?

A.   I believe so.

Q.   Are all sources of information that you cite in your report included in this exhibit?

A.   Could you please say it again?

Q.   Sure.  Are all sources of information cited in your report included in this exhibit?

MR. FISHER:  Object to form.

THE WITNESS:  I believe so.  I may have missed one, but I believe, yes, they are cited.

Q.   BY MS. NIKONOVA:  Who prepared Exhibit 2?

A.   Counsel for Orion.

Q.   Did you verify that Exhibit 2 was accurate before putting it into your report?

A.   No, I didn't check for accuracy.

BARKLEY
Court Reporters

You don't base any of your expert opinions on your discussions with Mr. Peter Moreo; is that your testimony?

A.    My testimony is that I use information provided by Mr. Peter Moreo to arrive to my conclusions.

Q.    Okay.  This might just be semantics, so I'll rephrase to make sure we are on the same page.

You use information provided by Mr. Peter Moreo as a basis for your conclusions?

A.    In part, yes.

Q.    Why isn't your discussion with Peter Moreo listed on Exhibit 2?

A.    I don't know, but it is listed in the references I provide in the report.

Q.    Just so we get a clear record, I am going to ask you to speak a little bit louder and slower, if that's possible.

A.    Yes.

Q.    We just want to make sure that the court reporter can write down everything that you are saying.

A.    Yes.

Q.    Do you know how many times you cite to your discussions with Mr. Peter Moreo in the

67



report?

A.   Several.

Q.   Several.  Who is Peter Moreo?

A.   My understanding is that he is the head owner of Orion.

Q.   Head owner?

A.   Head or owner.

Q.   Head or owner, sorry.

A.   Of Orion.

Q.   How many discussions have you had with him?

A.   One.

Q.   How long was that discussion?

A.   Maybe 40 minutes, an hour.

Q.   So 40 minutes to an hour; is that fair?

A.   Yes.

Q.   When did this discussion take place?

A.   It may have been in December last year.

Q.   So December of 2018; is that right?

A.   Yes.

Q.   Have you had any follow-up discussions with Mr. Moreo after that?

A.   No, I haven't.

Q.   Have you spoken to anyone else at Orion?

A.   No, I haven't.

68

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

Q.   You tell me, was it a discussion or more like an interview?  I am just trying to understand the nature of your conversation.

A.   As I said before, I asked him to provide information to further the case, and he provide a number of points for this information.

Q.   You said he provides a number of points for this information.  Can you explain what that means?

A.   Yeah, I am quoting him as referring to a number of subjects.

Q.   Did he provide any other points that you didn't quote?

A.   I vaguely recall the conversation.

Q.   Do you say you vaguely or barely?  I'm so sorry.

A.   I'm sorry for the pronunciation.  I vaguely, I barely, barely recall the details of the conversation.

Q.   I guess it happened a while ago, December 2018, right?

A.   Yes.

Q.   Did you take notes during that conversation?

A.   No, I didn't.

69

BARKLEY
Court Reporters

Ph.D.  The time is 10:29 a.m., and we are off the record.

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  Back on the record. This is the beginning of Disc No. 2, Volume I in the deposition of Jose Sasian, Ph.D.  The time is 10:39 a.m. on May 14th, 2019.

Q.   BY MS. NIKONOVA:  Hi, Dr. Sasian.  You understand that you are still under oath?

A.   Yes.

Q.   When we took a break, we were talking about your discussions with -- your discussion with Peter Moreo, correct?

A.   Yes.

Q.   Who else was present during that discussion?

A.   If I am correct, Mr. Fisher was present.

Q.   And you're talking about an attorney that's representing Orion?

A.   Yes.

Q.   Was there anyone else present?

A.   Maybe Mr. Matt Borden.

Q.   Another attorney, correct?

A.   Yes.

Q.   During your discussion with Mr. Moreo,

72

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

Q. Can you elaborate on that?

MR. FISHER: Object to form.

THE WITNESS: For example, I didn't include hi, how are you, introduction-type protocol.

Q. BY MS. NIKONOVA: Okay. Besides introduction-type protocol, did you include everything else that you talked about with Mr. Moreo in your expert report?

A. As I said before, I vaguely recall the conversation and -- yeah, I vaguely recall the conversation.

Q. Okay. Is there any way for somebody to verify or find out what you talked about with Mr. Moreo?

MR. FISHER: Object to form.

THE WITNESS: I don't know about that.

Q. BY MS. NIKONOVA: So even though you barely recall the conversation, you're still relying on Mr. Moreo for numerous facts, correct?

MR. FISHER: Object to form.

THE WITNESS: I am quoting Mr. Moreo on a number of items in my report.

Q. BY MS. NIKONOVA: I don't want this to be an issue of semantics. Are you quoting him or are

74

Q.   And feel free to read the sentences in the body to which the footnotes refer.  Let me know when you're done.

A.   Well, the first sentence says --

Q.   You don't have to read it out loud.  You can read it to yourself and familiarize yourself with it and let me know when you're done.

MS. NIKONOVA:  Do you need --

MR. FISHER:  I am okay for now.

THE WITNESS:  I am saying I am informed. That's what I am saying.  And you mention the discussion with Mr. Moreo.

Q.   BY MS. NIKONOVA:  Again, you are not quoting Mr. Moreo, right?

A.   That's correct.

Q.   Did you write these sentences that relate to footnotes 16 to 17 of your report or did counsel write that?

MR. FISHER:  Object to form.

THE WITNESS:  I think counsel for Orion wrote them.

Q.   BY MS. NIKONOVA:  Did counsel for Orion write all of the portions of your report that cite to your discussion with Mr. Moreo that we have seen so far?

77

BARKLEY
Court Reporters

A.    Yes.

Q.    Okay.  And there's a last reference on Page 19.

Do you see footnotes 25 and 26?

A.    Yes.

Q.    So I'd like you to do the same thing, read to yourself the footnotes that correspond to 25 and 26 and let me know when you're done.

A.    Yes.

Q.    Okay.  Same question, for those footnotes you're not quoting Mr. Moreo's -- what Mr. Moreo said to you during your discussion, right?

A.    That's correct.

Q.    And you barely remember that discussion?

A.    That's correct.

Q.    Did counsel for Orion write these sentences that correspond to these two footnotes?

A.    Yes.

Q.    Are there any other discussions outside -- with counsel that you had that informed your opinions in this case?

A.    Could you please repeat the question?

Q.    Sure.  Outside of discussions with counsel, I am not asking for privileged information, have you had any other discussions

78

BARKLEY
Court Reporters

you giving an opinion about telescopes that are not in the exhibits of your report?

A.   Again, I would have to be specific on the type of telescopes and all the types of telescopes. I would have to be specific.  My report addresses consumer telescopes of this type, of the type showing on these exhibits.

MS. NIKONOVA:  Move to strike.

MR. FISHER:  Opposed.

Q.   BY MS. NIKONOVA:  I'll rephrase my question, or I'll ask it again.

Do you have an expert opinion on telescope products that are not listed in the exhibits of your expert report?

MR. FISHER:  Object to form.

THE WITNESS:  No, my opinion is related, or it is summarized or is specific on Paragraph 4 on my report.

Q.   BY MS. NIKONOVA:  That's not what I asked you.

Do you have an expert opinion on telescope products that are not listed in the exhibits of your expert report?

MR. FISHER:  Object to form.

THE WITNESS:  No, I don't have an opinion

96

BARKLEY
Court Reporters

of that.

Q.   BY MS. NIKONOVA:   What affects the price and quality of a telescope?

MR. FISHER:   Object to form.   Outside the scope.

THE WITNESS:   It depends on many factors.

Q.   BY MS. NIKONOVA:   Can you give me those -- can you list for me those factors?

MR. FISHER:   Outside the scope.

THE WITNESS:   The quality of the telescope.

Q.   BY MS. NIKONOVA:   Okay.   The quality of the telescope affects the price.   Does anything else affect the price of the telescope?

MR. FISHER:   Object to form.   Outside the scope.

THE WITNESS:   I cannot think of anything at this point.

Q.   BY MS. NIKONOVA:   Okay.   Didn't you write in your report in general if a telescope has a larger aperture and higher quality optics, metal components rather than plastic, and the owner of the software that can automatically point the telescope at objects, it will be more expensive?

Similarly, the more components a telescope

97

BARKLEY
Court Reporters

has, the more a telescope will cost.  Didn't you write that?

MR. FISHER:  Where are you coming from?

MS. NIKONOVA:  Paragraph 22.

Q.   BY MS. NIKONOVA:  Did you write that?

A.   Yes.

Q.   Did you write that or did counsel write that for you?

A.   I don't recall who exactly wrote that.

Q.   It could be counsel?

A.   It could be counsel.

Q.   Is Paragraph 22 completely accurate or should we change something there?

A.   And that's, again, paragraph --

Q.   22, 22.

A.   And the question, whether it is complete?

Q.   The question is whether this is completely accurate?

A.   I wouldn't qualify as related to accurate. It is a statement I am making.

Q.   Is this statement accurate?

MR. FISHER:  Object to form.

THE WITNESS:  I would say it is correct.

Q.   BY MS. NIKONOVA:  Is there a difference between "accurate" and "correct"?

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

MR. FISHER:  Object to form.

THE WITNESS:  No.

Q.   BY MS. NIKONOVA:  Why not?

A.   Because a 16-inch telescope will likely be outside -- what we would call the consumer product, the consumer telescope type of range of telescopes.

Q.   Okay.  Can you help set the parameters of what the -- what you would call the consumer product, where the consumer telescope would be in range?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  With what metric?

Q.   BY MS. NIKONOVA:  What metrics would you use?  Would you use lens size?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  It would be less size.

Q.   BY MS. NIKONOVA:  Could it be prices?

A.   Excuse me?

Q.   Could it be price?

MR. FISHER:  Same objections.

THE WITNESS:  I am not sure about price.

Q.   BY MS. NIKONOVA:  What other metric would you use to set a parameter for the consumer

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

product, as you define it?

MR. FISHER:  Same objections.

THE WITNESS:  I would say the diameter of the lens.

Q.    BY MS. NIKONOVA:  Okay.  Could you please define the consumer product or the consumer telescope range of diameters?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  Say for a refracting telescope, anywhere from one-inch to maybe five inches.

Q.    BY MS. NIKONOVA:  What about for a reflecting telescope?

MR. FISHER:  Same objections.

THE WITNESS:  Maybe from three to eight, ten inches.

Q.    BY MS. NIKONOVA:  So you are not providing an expert opinion on a telescope that may have a lens diameter of 14 inches, correct?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  No.

Q.    BY MS. NIKONOVA:  What about 12 inches?

MR. FISHER:  Same objections.

112

BARKLEY
Court Reporters

THE WITNESS:  Perhaps.

Q.   BY MS. NIKONOVA:  Perhaps yes?

MR. FISHER:  Same objections.

THE WITNESS:  Okay.  I will stop at ten inches.

Q.   BY MS. NIKONOVA:  So you are not providing expert testimony on any telescope that exceeds a lens diameter of ten inches, correct?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  Just to be clear, my expert opinion is my report.

Q.   BY MS. NIKONOVA:  Right.  So can you answer the question?

A.   Yes.  But to clarify, your question is when, when, at what time am I providing another expert opinion?

Q.   I'm sorry, what?

A.   Well, your question is, if I recall it, try whether if I am providing an expert opinion, and my answer -- well, to answer, I'd like the question to be read, please.

Q.   BY MS. NIKONOVA:  You're not providing expert testimony on any telescope that exceeds a lens diameter of ten inches in this case, correct?

113

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  No.

Q.   BY MS. NIKONOVA:  That is not correct?

A.   That's correct.

Q.   Why is that not correct?

A.   Because in my opinion, it is written in my report.

Q.   I understand it is written in your report. I am asking you about it.  Can you answer the question?  Are you providing an expert opinion on telescopes containing lens diameters of more than ten inches?

MR. FISHER:  Same objections.

THE WITNESS:  No.

Q.   BY MS. NIKONOVA:  Can you explain why the diameter of a lens is so important in a telescope?

A.   One reason is the bigger the diameter, the larger light-gathering power of the telescope is.

Q.   Are there any other reasons why the diameter of a lens is so important for a telescope?

A.   Another reason is the larger the diameter, the better is the resulting power.

Q.   The what power?

A.   Resulting.

114

BARKLEY
Court Reporters

Q.   Resulting.  So you can see better and further?

A.   Better.

Q.   Better, okay.

Generally the bigger the lens, the more expensive the telescope is; is that right, generally?

MR. FISHER:  Outside the scope.

THE WITNESS:  Not necessarily.

Q.   BY MS. NIKONOVA:  Why not?

A.   Because you can have a bigger telescope with poor optics and a smaller telescope with excellent optics, and that would be more expensive.

Q.   Holding all of those factors constant, as the lens size increases, is it more expensive to make the telescope?

MR. FISHER:  Outside the scope.

THE WITNESS:  Yes.

Q.   BY MS. NIKONOVA:  When you made your own telescope, as you testified earlier today, what was the largest lens size that you used?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  In one instance it was 16 inches.  Let me see.  Maybe 60 centimeters, 24

115

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

inches, 24 inches.

Q.    BY MS. NIKONOVA:    You wouldn't classify that as a consumer telescope, right?

A.    That's right.

MR. FISHER:    Form.    Outside the scope.

Q.    BY MS. NIKONOVA:    In your report you talk about Schmidt-Cassegrain telescopes and Maksutov-Cassegrain telescopes.    Can you explain the difference between them?

A.    Yes.    A Schmidt telescope, there is in addition to a Cassegrain telescope, which has two mirrors, there is either a correcting plate for the image, to improve the image.    And this plate, it is nearly a parallel plate of glass but has an aspheric curve, which is difficult to manufacture.

The Maksutov telescope has instead rather than an aspheric plate, has a meniscus lens with spheric surfaces, which is easier to manufacture.

Q.    Is it fair to say that a Schmidt-Cassegrain telescope is more difficult to manufacture than a Mak-Cassegrain telescope?

A.    Other things equal, yes.

Q.    Do you have knowledge about what share of consumer telescopes are Schmidt-Cassegrain telescopes?

116

BARKLEY
Court Reporters

both capable of manufacturing similar consumer telescopes. If you look at Paragraph 53, if you look at --

Q. I'm sorry, what am I looking at in Paragraph 53?

A. The statement that I made that I see no reason why Sunny could not manufacture refractors 120 millimeters in aperture for Orion on a quarter mount or similar mount.

Q. What is 120 millimeters in inches?

A. About four and a half, four-and-three-quarters.

Q. Okay.

A. If you look at Paragraph 44.

Q. 44?

A. Yes. I mentioned that based upon my review of the StarBlast 4.5 equatorial specifications, I conclude that Sunny is capable of manufacturing reflector telescopes of up to eight inches in diameter or even larger with the investment of Human Resources to ensure proper quality controls.

I also conclude that Sunny is capable of manufacturing telescopes with equatorial mounts.

Q. Are you done?

124

BARKLEY
Court Reporters

telescopes, given Meade's capabilities to include go-to technology, given the products that Meade had already posing to the market support my conclusion that Sunny has -- it includes Meade -- is able to manufacture a large range of consumer telescopes.

Q.   Let me make sure I understand this correctly, and we'll move on, okay?

It is your opinion that Sunny is capable of manufacturing similar consumer telescopes for Orion up to ten inches; is that correct?

MR. FISHER:  Object to form.

THE WITNESS:  Let me clarify a couple of things.  We mentioned about sizes.  I really don't want to put a limit like ten inches, as I said before.  It depends on the product.  It depends upon a number of things.  And I also mentioned that my opinion was on the products for Orion, but it is obvious that if Sunny can make products for Orion, well, Sunny can sell them to anyone else.  That's an obvious thing, right?

Q.   BY MS. NIKONOVA:  Why is that an obvious thing?

A.   Because if somebody requires the same product and the company, Sunny knows how to make it, they can easily sell it to someone else.

126

BARKLEY
Court Reporters

Q.    And are all of those factors important to know whether we are looking at similar telescopes?

A.    Yes, that may be important.

Q.    They may be important or they are important?

A.    They are important, yes.

Q.    Okay.  Where in your report do you discuss focusers?

A.    I don't recall discussing focusers in my report.

Q.    Where in your report do you discuss setting circles?

A.    I don't recall discussing setting circles in my report.

Q.    Right.  Because you don't, right?

A.    Yes.

Q.    Where in your report do you discuss eyepieces?

A.    I don't discuss eyepieces in my report.

Q.    Where do you discuss view finders?

A.    I don't discuss view finders.

Q.    So turning to Page 10 of your report.  Let me know when you get there.

A.    Yes.

Q.    For Part A you pick where there are two

129

BARKLEY
Court Reporters

telescopes that are listed in your report, correct?

A.    Yes.

Q.    One of them is the StarBlast 4.5 EQ?

A.    Yes.

Q.    And the other is the AstroView 90-millimeter EQ?

A.    Yes.

Q.    Who picked those telescopes?

A.    As I said before, I think they may have been suggested by Mr. Moreo.

Q.    What independent expertise did you use to determine whether you should be focusing on these two telescopes?

A.    What do you mean by "independent expertise"?

Q.    Did you do anything else besides take Mr. Moreo's suggestion when you chose to look at these two telescopes?

MR. FISHER:  Objection; form.

THE WITNESS:  No, I didn't.

Q.    BY MS. NIKONOVA:  Do you know what share of Orion's telescope sales are for the StarBlast 4.5 EQ?

MR. FISHER:  Object to form.  Outside the scope.

130

BARKLEY
Court Reporters

THE WITNESS:  No, I don't know.

Q.  BY MS. NIKONOVA:  Is that something you could have found out?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  Could you please repeat the question?

Q.  BY MS. NIKONOVA:  Is that something you could have found out?

MR. FISHER:  Same objections.

THE WITNESS:  The previous question.

Q.  BY MS. NIKONOVA:  The share of Orion's telescope sales for the StarBlast 4.5 EQ?

A.  What do you mean by "share"?

Q.  What percent of Orion's sales the StarBlast 4.5 EQ constitutes?

MR. FISHER:  Object to form.  Outside the scope.

Q.  BY MS. NIKONOVA:  Do you understand what I'm asking?

A.  Yeah, I'm listening to the question.  I didn't pay attention to it.

Q.  Would that have been important?

MR. FISHER:  Object to form.  Outside the scope.

131

BARKLEY
Court Reporters

THE WITNESS:  I know that those products were acquired by Orion in some quantity by somebody.

Q.  BY MS. NIKONOVA:  They were acquired by Orion in some quantities and some volume because Orion sold them, right?

A.  Yes.

Q.  My question is:  Do you know how much of this product Orion sold?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  No, not for a fact.

Q.  BY MS. NIKONOVA:  And your answer applies to both the StarBlast 4.5 EQ and the AstroView 90-millimeter EQ?

MR. FISHER:  Same objections.

THE WITNESS:  Yes.

Q.  BY MS. NIKONOVA:  When Mr. Moreo suggested that you use these two products, what did he tell you?

MR. FISHER:  Object to form.

THE WITNESS:  I want to clarify that it may have been Mr. Moreo who suggested these two telescopes.

Q.  BY MS. NIKONOVA:  Thank you for clarifying

132

BARKLEY
Court Reporters

that.  Do you know what Mr. Moreo's reason was for suggesting these two telescopes?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  I think the reason is these telescopes, because they are basic kinds of telescopes, and these telescopes have been used by both Synta and Sunny.

Q.  BY MS. NIKONOVA:  Is that what Mr. Moreo told you, or do you remember?

A.  No, I don't remember exactly who the suggestion came from.

Q.  Who else could it have come from?

A.  From Mr. Moreo or from counsel or I.

Q.  Did you consider looking at any other products besides these two telescopes?

A.  No.

Q.  Why not?

A.  Well, I have to do an analysis, and this is the analysis I produced.

Q.  This is the analysis you were told to do?

MR. FISHER:  Object to form.

THE WITNESS:  I didn't say that.

Q.  BY MS. NIKONOVA:  Okay.  All right.  So you say in Paragraph 38 under .2 you say --

133

BARKLEY
Court Reporters

obvious.  I think I said it may not be obvious.  It has to be stated.  That's what I said.

Q.  BY MS. NIKONOVA:  Okay.  I'll ask the question again.  If Sunny and Synta both made the same product, doesn't that necessarily -- doesn't that necessarily infer that they had capabilities to make that product?

MR. FISHER:  Object to form.

THE WITNESS:  Yes.  It says they have the capability to make those telescopes.

Q.  BY MS. NIKONOVA:  So if Sunny and Synta made the same product, they were capable of making the product that they made?

A.  Yes.

Q.  Does that require an expert opinion and a Ph.D. in optics to understand?

MR. FISHER:  Object to form.

THE WITNESS:  Yes.

Q.  BY MS. NIKONOVA:  You think so?  Why?

A.  Because sometimes one has to state the simple things, if you will.

Q.  I understand that you are stating the simple thing.  I am asking if the simple thing absolutely requires your expert opinion?

A.  I don't know about that.

135

BARKLEY
Court Reporters

A.   No, I didn't.

Q.   Did you cite any industry publications to support what you're saying?

A.   No, I didn't.

Q.   Okay.  Then go to Paragraph 44 and 45. Because you looked at the StarBlast 4.5 EQ and because Sunny made a telescope with a 4.5-inch diameter and an equatorial mount, are you inferring that it can make other telescopes up to eight inches in diameter?

A.   Yes, that's my opinion.

Q.   What other basis do you have for your opinion other than what you wrote in Paragraph 42?

A.    There are some other bases which comes in Exhibit 6, which it's some information gathered by people from Orion when they visit Sunny and where I believe Mr. James Chiu was mentioned that they were preparing to make larger reflecting telescopes.

Q.   Besides Paragraph 42 and Exhibit 6 of the Chiu deposition, do you have any other basis for your conclusion?

        MR. FISHER:  This is in Paragraph 44?

        MS. NIKONOVA:  Yes.

        THE WITNESS:  Yes.  The type of manufacturing process that Sunny had to make the

144

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

StarBlast 4.5 equatorial mounting telescope, the type of machinery, the type of technology can be easily extended to make bigger parts.  There are no new technological challenges except that making bigger parts for bigger telescopes.

Q.   BY MS. NIKONOVA:  Isn't that basically what you say in Paragraph 42?

A.   Paragraph 42 refers primarily to the optical part, but there are mechanical parts, too.

Q.   Have you seen Sunny's optical part technology?

A.   Sunny's --

Q.   Optical technology?

A.   I am not sure I follow.

Q.   You haven't seen Sunny's -- you haven't seen the place where Sunny manufactures its telescopes, right?

A.   No, I haven't seen it.

Q.   You don't know what equipment Sunny actually has, do you?

A.   Actually, there is some information in that Exhibit 6 where it is mentioned that Sunny was acquiring new optical machinery.

Q.   That Sunny was acquiring in the future new optical machinery?

145

A.    New optical machinery.

Q.    Do you know every single piece of machinery that Sunny has?

A.    Not every piece of machinery.

Q.    Do you know how old Sunny's machinery is?

A.    No, I don't.

Q.    Did you request documents about this?

A.    No, I didn't.

Q.    You haven't looked at any technical documents that Sunny produced, right?

A.    No, I haven't.

Q.    So in Paragraph 44 that sentence we were just reading goes on to say -- I'll start kind of from the beginning.  "I conclude that Sunny is capable of manufacturing reflector telescopes of up to eight inches in diameter, or even larger with the investment of human resources to ensure proper quality control."

Do you see that?

A.    Yes.

Q.    Do you have any knowledge of Sunny's investment in human resources?

A.    No, I don't.

Q.    Do you have any knowledge how much it would cost to invest in human resources to ensure

146

BARKLEY
Court Reporters

proper quality control?

A.   No, I don't.

Q.   You haven't done any modeling to see if it would be profitable for Sunny to invest in human resources to ensure proper quality control to make these larger lenses, right?

MR. FISHER:   Object to form.   Outside the scope.

THE WITNESS:   No, I haven't.

Q.   BY MS. NIKONOVA:   Very quickly, let's go back to footnote 2.

MR. FISHER:   Do you have a page on that?

MS. NIKONOVA:   Page 11.

Q.   At the end of footnote 2, you say, "I am informed this telescope," and that's the StarBlast 4.5 EQ, "was manufactured by Sunny for Orion based upon my discussions with Orion President Peter Moreo"; is that correct?

A.   Yes.

Q.   Okay.   And then in Paragraph 45, so back to Page 13 -- sorry, Page 14 at the very end of Paragraph 45, that very last sentence.   Do you see it on Page 14 at the end of Paragraph 45, the last sentence of that paragraph?   Do you see it?

A.   Yes.

147



Q.   It says, "I am informed that Sunny has never attempted to compete with Synta for Orion's business on the manufacture of these (or similar) SKUs."  And your footnote cites again to discussion with Mr. Moreo; is that correct?

A.   Yes.

Q.   Do you have any independent basis to think that, besides your conversation with Mr. Moreo, to think that Sunny has never attempted to compete with Synta for Orion's business on the manufacture of these SKUs?

A.   No, I don't have any of that information.

Q.   Would it matter to you if you were wrong?

A.   I haven't thought about that, but I am taking this as being true.

Q.   If this isn't true, have you thought about how that would change your expert opinion?

A.   Well, I may reconsider it.

Q.   Is the fact that Sunny has never attempted to compete with Synta for Orion's business on the manufacture of these SKUs important to your opinion?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  No, no.  My expert opinion,

148

BARKLEY
Court Reporters

MR. FISHER:  Counsel, there's a little bit of a language barrier.  You should be respectful of that.

MS. NIKONOVA:  Actually, that was a question for me.

Q.   And you're right, Dr. Sasian, we started with Paragraph 45, and we went to 47.  Do you want to go through it again?

A.   Okay.  I just need a minute to understand this.

Q.   Okay.  Take your time.

Just for the record, and so you know, I read the last paragraph -- the last sentence on Paragraph 45 and the corresponding footnote 10, and then I read all of Paragraph 47 and the corresponding Footnote 12, if that helps.  And take all the time you need to read it.

MR. FISHER:  You should read whatever you need to answer the question.

THE WITNESS:  Thank you.

Here at Paragraph 47 at the end I am saying this information that I received supports my conclusion that both manufacturers can make similar telescopes because that information indicates that both manufacturers have made the same product.  I

A.    I take it as accurate.

MR. FISHER:  Counsel, at some point in the near future I need to use the facilities.

MS. NIKONOVA:  Sure.  One second.  Let me make sure I don't have any more questions on this.

MR. FISHER:  Sure.

Q.    BY MS. NIKONOVA:  Did you write Paragraph 47 or did counsel write that for you?

A.    I think counsel wrote that paragraph.

Q.    And you did nothing to verify that that paragraph was correct?

MR. FISHER:  Object to form.

THE WITNESS:  I don't recall doing anything to verify that.

Q.    BY MS. NIKONOVA:  You assumed it was true because Peter Moreo said it?

A.    Yes.  Well, because the source, I believe, is Peter Moreo.

Q.    You believe the source was Peter Moreo?

A.    Yes.

MS. NIKONOVA:  Okay.  Now is a good time for a break.  Five minutes?

MR. FISHER:  Yes.

THE VIDEOGRAPHER:  Going off the record. The time is 1:41 p.m.

156

BARKLEY
Court Reporters

exact same telescope to Ningbo Sunny and to Synta, right?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  I don't know if each transaction took place, but the quotes here are different.

Q.  BY MS. NIKONOVA:  You have had Orion sales data, right?  You reference it or cite it in your report?

MR. FISHER:  Object to form.

THE WITNESS:  The transactional data, yes.

Q.  BY MS. NIKONOVA:  Is this something that you potentially could have checked in the transactional data?

MR. FISHER:  Object to form.

THE WITNESS:  Probably not.  Because I didn't see a distinction with one or the other.

Q.  BY MS. NIKONOVA:  So when you were writing, or your counsel was writing, those first couple of sentences in Paragraph 47 in your report, you had no idea that that was correct, right?

A.  I have no idea.

Q.  So the first three sentences in Paragraph 47, are these correct based on the purchase orders

169

BARKLEY
Court Reporters

Mr. Lupica's testimony?

A.   No.

Q.   Who decided which portion of Mr. Lupica's testimony you would read?

MR. FISHER:  Object to form.

THE WITNESS:  Myself.

Q.   BY MS. NIKONOVA:  So you were given a full transcript, and then you decided which parts you would read?

MR. FISHER:  You can answer that to the extent you are not disclosing conversations with counsel, if you can.

THE WITNESS:  Actually, I may have had a suggestion of some paragraph, some paragraphs.  I received a request about -- I did request seeing information about manufacturing.

Q.   BY MS. NIKONOVA:  Did you read the portion of Mr. Lupica's testimony where he talked about all of the problems and issues and manufacturing issues in these Mexico plants?

A.   I think I scan very quickly through the whole document, but I don't recall.

Q.   You didn't read it?

MR. FISHER:  Object to form.

THE WITNESS:  I read some parts, but I

179

BARKLEY
Court Reporters

quickly scanned the document.

Q.    BY MS. NIKONOVA:    You didn't read the parts where Mr. Lupica described all of the manufacturing issues that Meade faced in its Mexico plant?

A.    Yeah, I don't recall.

Q.    By "plant," I mean factory?

MR. FISHER:  Object to form.

THE WITNESS:  I don't recall.

Q.    BY MS. NIKONOVA:  Okay.  Do you see in Paragraph 60 in your report, 60, you write --

A.    Yes.

Q.    -- you write, "It would have been easy for Sunny to manufacture the telescopes that Synta made for Orion without significantly modifying its machinery and operations."  By "Sunny" here do you mean through Meade?

MR. FISHER:  Object to form.

THE WITNESS:  Yes.

Q.    BY MS. NIKONOVA:  How do you know it would have been easy for Meade to manufacture the telescopes that Synta made for Orion without significantly modifying its machinery and operations?

A.    Well, Meade was making very complex

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

**BARKLEY**
*Court Reporters*

consumer telescopes, so they have expertise with these telescopes.

Q.    So they would have to make some modifications to its machinery and operations, right, just not significant; is that what you are saying there?

A.    Yeah, they could have made some modifications.

Q.    Do you have any idea how much those modifications would have cost?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  No.

Q.    BY MS. NIKONOVA:  And you are not providing testimony on how much modifications would have cost Meade, right?

A.    No.

Q.    Do you agree that Meade was having financial difficulties in 2008 and 2009 and through the beginning of 2013?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  I don't recall.  As I said before, I don't recall reading about that.

Q.    BY MS. NIKONOVA:  Can you tell me what

181

BARKLEY
Court Reporters

THE WITNESS:  I would be speculating.

Q.  BY MS. NIKONOVA:  You are not providing an expert opinion on that, are you?

A.  No, I am not relaying that's being provided.

Q.  Again, I'll have you look at Page 13, and there's a sentence halfway down through the page that starts with, "Due to the company's declining revenues."

Let me know when you find it.

A.  Yes.

Q.  I'll read it out loud.  It says, "Due to the company's declining revenues, recurring losses and liquidity and weakened financial condition, the company may not be able to execute long enough to execute the planned merger."

Do you see that?

A.  Yes.

Q.  Let's go back to your report.  You see that paragraph we were just talking about, Paragraph 57, where you cited the 10-Q that we were just reading?  Let me know when you get there.  Are you there?

A.  Yes.

Q.  Did you write that paragraph or did

187

BARKLEY
Court Reporters

counsel write that paragraph?

A.   I think counsel for Orion wrote that paragraph.

Q.   What about Paragraph 60, did you write that or did counsel write that?

A.   They may have been counsel for Orion.

Q.   Okay.  And I just want to focus you on the word "easy."  You see where it says, "As discussed above, it would have been easy for Sunny to manufacture the telescopes."

Do you see that?

A.   Yes.

Q.   Is it your opinion that it would have been easy?

A.   What do you mean?  I don't understand the question.

Q.   Is that your expert opinion, it would have been easy for Sunny via Meade to manufacture the telescopes that Synta made for Orion?

MR. FISHER:  Object to form.

THE WITNESS:  Based on the new -- once Sunny acquire Synta and acquire the expertise that Meade had, then Synta positioned itself in order to make more sophisticated telescopes.  It will be easy for Sunny to manufacture more sophisticated

188

BARKLEY
Court Reporters

telescopes.

Q.   BY MS. NIKONOVA:  How do you know how easy or difficult it would have been?

A.   Well, you can make something or you cannot make something, period.  If you can make something, then you have the ability to make it, and it may require less or more resources, but you have the technology to do it.  So in that sense is this use of the word "easy."

Q.   So if you have the technological ability to do something, it is easy to do it?

A.   Yes.  Otherwise you cannot do it.

Q.   You can't do something that is not easy?

A.   No.  You cannot do something you don't have the technology to do it.

Q.   Okay.  Are you just saying the word "easy" you are saying they had the technology to do it, right?

A.   Yes.

Q.   You are not opining on how strenuous or difficult or not difficult it would have been to actually do it, right?

MR. FISHER:  Object to form.

THE WITNESS:  Yes.

Q.   BY MS. NIKONOVA:  Now we are moving to

189

BARKLEY
Court Reporters

No. 3, Volume I in the deposition of Jose Sasian,

Ph.D.  The time is 2:45 p.m., and we are off the

record.

(Whereupon a recess was taken.)

(Reporter marked Exhibit No. 350 for

identification.)

(Reporter marked Exhibit No. 351 for

identification.)

(Reporter marked Exhibit No. 352 for

identification.)

THE VIDEOGRAPHER:  Back on the record.

This is the beginning of Disc No. 4, Volume I in

the deposition of Jose Sasian, Ph.D.  The time is

2:57 p.m. on May 14th, 2019.

Q.   BY MS. NIKONOVA:  Dr. Sasian, before we
went off the record, we were talking about
Paragraph 61 in your report, right?

A.   Yes.

Q.   Do you have that in front of you?

A.   Yes.

Q.   So that paragraph reads:  "I am informed
that documents produced in this lawsuit support my
conclusion that Sunny is capable of making
telescopes that compete with Synta's telescopes,"
right?

191

BARKLEY
Court Reporters

A.    Yes.

MR. FISHER:   Object to form.

Q.    BY MS. NIKONOVA:   Did you write this paragraph or did counsel write this paragraph?

A.    It may have been counsel who wrote the paragraph, and I have mentioned before where there has been some paragraphs which counsel has possibly written them.   But all these paragraphs were reviewed and discussed with me to form my opinion.

Q.    You haven't told me this before, have you, before the break?

MR. FISHER:   Object to form.

THE WITNESS:   No, I haven't.

Q.    BY MS. NIKONOVA:   You're giving me this caveat now that you have taken a break with counsel, aren't you?

MR. FISHER:   Counsel, you just asked the question.   Object to form.

THE WITNESS:   Yes.

Q.    BY MS. NIKONOVA:   Do you know which documents Paragraph 61 is referring to?

A.    Well, one of the documents I am referring to it in Paragraph 62, which it is Exhibit 6.

Q.    The Chiu Exhibit 6?

A.    Excuse me?

192

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters

as to whether Synta is capable of manufacturing telescopes that compete with Sunny's, why are you providing an expert opinion on it?

MR. FISHER:  Object to form.  Outside the scope.

THE WITNESS:  Well, to be complete on my opinion.  I am supporting my opinion.

Q.   BY MS. NIKONOVA:  Did you write Paragraph 64?

A.   It was probably counsel to Orion.  It was probably counsel to Orion.

Q.   Okay.  And in Paragraph 65 you have a citation, footnote 25?

A.   Yes.

Q.   That says -- that lists the source as your discussion with Mr. Moreo, right?

A.   Yes.

Q.   So in Paragraph 65 you write, "I am further informed that at certain points in time, Synta informed Orion that it was moving products that Synta was making to Sunny," right?

A.   Yes.

Q.   And your only basis for that information is Mr. Moreo?

A.   Yes.

199

BARKLEY
Court Reporters

(Whereupon a recess was taken.)

THE VIDEOGRAPHER:  Back on the record. The time is 4:00 p.m.

FURTHER EXAMINATION BY MS. NIKONOVA

Q.  Hi, Dr. Sasian.  I just have a few last questions for you, and then we can head home, okay?

A.  Okay.

Q.  Do you remember you just testified about reviewing and editing your report?

A.  Yes.

Q.  When did you review and edit your report?

A.  Early in January.

Q.  When was your report due?

A.  I think it was due on January 3rd.

Q.  Did you edit and review your report on January 1st, New Year's Day?

A.  During those days it took place.

Q.  So including January 1st, New Year's Day, you edited and reviewed your report?

A.  I don't remember if it was the 1st of the year.  Certainly probably the 2nd or 3rd.

Q.  How much time, approximately, did you spend reviewing and editing your report?

MR. FISHER:  Object to form.  Outside the scope of redirect.  Outside the scope.

221

BARKLEY
Court Reporters

THE WITNESS:  As I said, the process of drafting the report took maybe 13 or 14 hours.  I don't recall exactly.

Q.   BY MS. NIKONOVA:  My question was just pertaining to the time that you testified about reviewing and editing your report?

MR. FISHER:  Same objections.

THE WITNESS:  It may have been -- I don't recall exactly, but it may have been half of that time.  I don't remember.

Q.   BY MS. NIKONOVA:  Would you be able to check your invoices that you submitted to Thomson Reuters to verify?

MR. FISHER:  Object to form.  Outside the scope of redirect.  Outside the scope.

Go ahead.

THE WITNESS:  I don't think there is --

MR. FISHER:  Also, I'll caution you not to reveal privileged information.

Go ahead.

THE WITNESS:  I had a number of discussions with counsel, and it was back-and-forth kind of discussion, and I don't know if I can separate drafting versus editing.  It appear -- I think I recall -- it was happening.  The reality is

222

BARKLEY
Court Reporters

that there was very little time.

Q.   BY MS. NIKONOVA:  Okay.  When you say that you reviewed and edited your report, did you check every citation in your report personally?

MR. FISHER:  Object to form.  Outside the scope of redirect.  Outside the scope.

Again, same caution.

THE WITNESS:  Yeah, probably I did that, yes.

Q.   BY MS. NIKONOVA:  Is it your testimony that you checked every single citation in your expert report?

MR. FISHER:  Object to form.

THE WITNESS:  What do you mean by that?

Q.   BY MS. NIKONOVA:  You know in your expert report you have lots of footnotes?

A.   Yes.

Q.   Did you check each and every one of them?

A.   Probably, yes, I did.

Q.   Do you remember when your counsel asked you whether you looked at -- whether defendant depositions, whether you looked at defendant depositions?

A.   Yes.

Q.   And you mentioned Joe Lupica, right?

223

BARKLEY
Court Reporters

A.    Yes.

Q.    You mentioned Peter Ni?

A.    Yes.

Q.    And you mentioned a few others?

A.    Yes.

Q.    Did you read every single one of those depositions?

A.    No.

Q.    Did you read any of those depositions?

A.    Parts.

Q.    The parts that counsel told you to read?

MR. FISHER:    Object to form.    In fact, I am going to not let him answer that.    I will instruct you not to answer.

THE WITNESS:    Okay.

Q.    BY MS. NIKONOVA:    Did you look at every single document or every single exhibit in those depositions?

A.    No.

Q.    Besides Exhibit C for Mr. Chiu, do you remember reviewing any of the exhibits?

MR. FISHER:    Object to form.

THE WITNESS:    No.

MS. NIKONOVA:    Okay.    That's it for me.

MR. FISHER:    Thank you.

224

BARKLEY
Court Reporters

of the testimony given by the witness.  (Fed. R. Civ. P. 30(f)(1)).

Before completion of the deposition, review of the transcript [XX] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated: MAY 29, 2019

_____

228

JOSE SASIAN, PH.D. - HIGHLY CONFIDENTIAL

BARKLEY
Court Reporters