UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OPTRONIC TECHNOLOGIES, INC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NINGBO SUNNY ELECTRONIC CO., LTD., et al.,<br><br>　　　　　Defendants. | Case No. 5:16-cv-06370-EJD<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 256, 270 |

　　　　This case is about telescopes and antitrust law. Plaintiff Optronic Technologies, Inc. ("Orion") has brought claims under Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, California's Unfair Competition Law ("UCL"), and California's Cartwright Act against Defendants Ningbo Sunny Electronic Co., Ltd. ("Sunny"), Sunny Optics, Inc. and Meade Instruments, Inc. ("Meade") (collectively "Defendants"). The court has federal question jurisdiction over Orion's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Orion's state law claims under the Court's supplemental jurisdiction provided by 28 U.S.C. § 1367. Orion moves for summary judgment on its claims under Section 1 of the Sherman Act, Section 7 of the Clayton Act, and the California laws. Defendants cross move for summary judgment on all of Defendants' claims. The court has considered the parties' papers[1] and their oral argument. The court denies Orion's motion, and grants in part and denies in part Defendants' motion.[2]

---

[1] The court admonishes both parties for violating the court's Standing Order for Civil Cases. The parties are reminded that they are required to read and comply with the Standing Order and the Civil Local Rules. Going forward, the court will strike non-compliant filings.

[2] The court has filed this order under seal because it contains material subject to sealing orders. Within seven days of the filing date of this order, the parties shall provide the court a stipulated

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
1

## I. Factual Background

The constellation of stars in this litigation is as follows: Orion is a brand and distributor of telescopes and other optical products. Orion does not manufacture its products, but largely imports them. Sunny is a Chinese telescope manufacturer. It has two subsidiaries: Meade and Sunny Optics, Inc. Sunny acquired Meade in 2013. Meade manufactures and distributes telescopes. Sunny's principal is Peter Ni. Prior to this case, Orion entered into a settlement agreement with several other entities in the telescope manufacturing and marketing universe. Three of the parties to the "Settlement Agreement" (Caseria Ex. 40) are Suzhou Synta Optical Technology Co. Ltd ("Suzhou Synta"), Synta Technology Corp. ("Synta Tech), and Celestron Acquisition LLC ("Celestron") (collectively, the "Synta Entities"). Celestron, a subsidiary of Suzhou Synta is, by far, the largest distributor of telescopes in the United States. Defendants contend that Suzhou Synta is a Chinese telescope manufacturer and that Synta Tech, another subsidiary, is an importer of Suzhou Synta's telescopes. The nature of the relationship between Suzhou Synta and Synta Tech is disputed by the parties. David Shen is the principal of the Synta Entities. Suzhou Synta and Sunny are the largest manufacturers of telescopes sold in the United States.

In early 2013, Meade became available for acquisition. Orion bid $4.5 million on Meade, but Meade announced that it had entered into a merger agreement with a third-party Jinghua Optics & Electronics ("JOC"). In the weeks following that announcement, Sunny made an unsolicited bid of $5.5 million, which Meade accepted. Sunny and Meade closed their deal in July 2013. In 2014, Orion attempted to acquire various assets, including valuable URLs, from Hayneedle, an online retailer (the "Hayneedle Assets"). The deal fell apart for disputed reasons.

Until 2016, Orion marketed and sold telescopes manufactured by Sunny and by Synta Suzhou. Orion purchased telescopes made by Sunny through an individual named Joyce Huang,

---

redacted version of this order, redacting only those portions of the order containing or referring to material for which the court has granted a motion to seal and for which the parties still request the material be sealed. The court will then issue a redacted version of the order.

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT

2

who works for the Synta Entities.  After the Synta Entities and Orion executed the Settlement Agreement, Orion sent a demand letter to Defendants.  In response, Sunny ceased selling Orion its telescopes.  Orion filed this litigation in November of that year.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" where it would affect the outcome of the case, and a dispute is "genuine" where a reasonable fact finder could decide for either party. *O'Brien as Tr. of Raymond F. O'Brien Revocable Tr. v. XPO CNW, Inc.*, 362 F. Supp. 3d 778, 782 (N.D. Cal. 2018).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations." *Id.* (quotations and citation omitted).  The court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A court may grant summary judgment on an entire claim or defense, or on a "part of each claim or defense." Fed. R. Civ. P. 56(a).  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## III. Discussion

### A. Defendants' Acquisition of Meade

Orion first argues that Sunny violated Section 1 of the Sherman Act by conspiring with the Synta Entities to acquire Meade.  Defendants contend that Orion lacks both the Article III standing and the antitrust standing required for it to bring this claim.  "For Article III purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (citation and quotations omitted).  A private antitrust plaintiff must demonstrate an antitrust injury, which consists of (1) an "injury of the type the antitrust laws were intended to prevent that also (2) flows from that which makes defendants' acts unlawful." *Id.* (quotations

omitted). Once a plaintiff has established standing, the elements of a claim under Section 1 are: (1) a contract, combination, or conspiracy (2) "that unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Solyndra Residual Tr. ex. rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1039 (N.D. Cal. 2014) (citing *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001)).

### 1. Standing and Antitrust Injury

Defendants argue that Orion has not suffered an injury-in-fact nor an antitrust injury because there was no possibility that Orion would have acquired Meade regardless of any alleged misconduct by Defendants. In February 2013, Orion sent Meade a letter indicating its interest in acquiring Meade for $4.5 million. Caseria Ex. 27 at 1. Meade chose to proceed with a different offer from JOC. Eckert Ex. 1; *see* Caseria Ex. 28 ("Meade Europe" was a subsidiary of JOC at the time). In April, JOC attempted to reduce its offer from $5 million to $4 million, prompting Meade to re-open the bidding process. Eckert Ex. 3 at 1. In early May, Meade reached out to Orion and explained that it was "no longer under an agreement to deal with another party [*i.e.*, JOC] exclusively." Eckert Ex. 4. Orion declined to provide another offer. Eckert Ex. 5 at 1. JOC subsequently offered $4.5 million, which Meade accepted, and the proposed merger was announced on May 17, 2013. Caseria Ex. 28 at 1. In June, Sunny made an unsolicited bid of $5.5 million. FAC Ex. 1 at B-2. Meade then terminated the proposed merger with JOC and accepted Sunny's offer on July 16, 2013. *Id*.

This timeline shows that Orion would not have acquired Meade in the absence of Defendants' alleged conduct; JOC would have. JOC and Meade had announced their merger—for the amount that Orion had already offered—when Defendants swooped in. Orion points to the testimony of its CEO, Peter Moreo, that Meade had contacted Orion to say that "JOC attempted to retrade or lower the price" and to ask if Orion would like to rebid. Hagey Ex. 10 at 252:22-253:11. However, this testimony does not create a factual dispute. Peter Moreo admits that he does not remember when this outreach occurred. *Id.* at 252:15-16 ("I don't remember the exact

dates."); 252:24 ("I don't remember one hundred percent."); *see City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1370 (9th Cir. 1992) ("[T]he fact that Mr. Greenwalt could not recall any names, dates or times further indicates that Vernon has not raised a factual dispute sufficient to survive summary judgment."). And his testimony is entirely consistent with the timeline supported by Defendants' evidence. JOC did indeed attempt to lower its price, but that was before JOC and Meade ultimately agreed to and announced their merger. The timeline of Meade's negotiations indicates that Orion was not in a position to acquire Meade, regardless of Defendants' alleged misconduct.

Orion makes another argument that absent the alleged unlawful conduct, it would have had an additional $11.4 to $30.6 million to invest in purchasing Meade. But those figures arise from damages estimated by its damages expert, Dr. Zona, and are based on the period from November 2013 to May 2018. Zona Rep. ¶ 105; *id.* ¶¶ 103-118, 132. Dr. Zona's report does not indicate that Orion could have had more money to spend on Meade in the first half of 2013.

The court finds that there is no genuine dispute that Defendants did not cause Orion's failure to acquire Meade. *See* Fed. R. Civ. P. 56(g); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986) ("Recovery will not be permitted for injuries which have been independently caused by something other than the antitrust violation."). Accordingly, Orion lacks standing to maintain claims and recover damages arising from its failure to acquire Meade for itself.

However, Orion's motion does not state that its failure to acquire Meade is the only harm caused by the alleged conspiracy. Rather, Orion claims that the conspiracy to enact the merger harmed it by increasing market concentration. Pl.'s Mot. at 11; Pl.'s Reply at n.5. Here, Orion's motion relies on Dr. Zona's calculation of the Herfindahl–Hirschman Index ("HHI") for the proposed relevant market. Pl.'s Mot at 11, 17-21. Dr. Zona defines the relevant market as "the market for telescope manufacturing services." Zona Rep. ¶ 45. HHI is a measure of industry concentration that has been widely accepted by courts considering antitrust merger and acquisition actions. *Id.* ¶ 56; *see, e.g., St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778

F.3d 775, 788 (9th Cir. 2015); *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001). A market with an HHI of 2,500 or above is "highly concentrated" by the standards of the federal government. Zona Rep. ¶ 56 (citing U.S. Department of Justice & FTC, Horizontal Merger Guidelines § 5.3 (2010)). "[A] merger that increases HHI by more than 200 points, to a total number exceeding 2500, is presumptively anticompetitive." *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 568 (6th Cir. 2014) (citations omitted); *see also St. Alphonsus*, 778 F.3d at 786 ("Mergers that increase the HHI more than 200 points and result in highly concentrated markets are presumed to be likely to enhance market power."). An antitrust injury can arise from a merger or acquisition that results in "either . . . a lessening of competition due to the acquisitions or from 'anticompetitive acts made possible' by the acquisitions." *McCaw Pers. Commc'ns, Inc. v. Pac. Telesis Grp.*, 645 F. Supp. 1166, 1170 (N.D. Cal. 1986) (citing *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1058-59 (6th Cir. 1984), *cert. denied*, 469 U.S. 1036 (1984)). Here, Dr. Zona calculated that, prior to the Meade acquisition in 2012, the HHI for the proposed market was 3,284.80—already a highly concentrated market. Zone Rep. Tbl. 1 (Dkt. No. 309-1)[3] at p. 5. The year of the acquisition, the HHI rose to 4,375.69. This jump of 1,094.89 in the HHI is more than five times the amount presumed to enhance market power, *St. Alphonsus*, 778 F.3d at 786, and is comparable to the increase of 1,078 to a total market number of 4,391 in *ProMedica Health*, 749 F.3d at 568, where the Sixth Circuit upheld the FTC's ordered divestiture of merged entities. *Id.* at 573.

Defendants do not contest this theory directly, but in their arguments concerning Orion's claim under Section 7 of the Clayton Act, they argue that calculating HHI requires a properly defined market, and that Orion's proposed market is inadequate. They argue that Dr. Zona conducted insufficient analysis to determine this market, and instead relied on conclusory assertions to the point that this court should grant summary judgment in their favor. The Supreme

---

[3] Despite both parties referring to this table in their supporting papers, it appears Orion mistakenly failed to file it with the motion. At the court's request, Orion filed the table at a later date.

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
6

Court has instructed that "[t]he outer boundaries of a product market are [to be] determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  While, "[s]ummary judgment in an antitrust case is appropriate where the plaintiff fails to define a cognizable market," *AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293, 294 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1180 (2018), "[t]he definition of the relevant market – both product and geographic – is generally a question of fact reserved for the jury." *Sidibe v. Sutter Health*, 2019 WL 2078788, at *25 (N.D. Cal. May 9, 2019) (citation and quotations omitted); *see also St. Alphonsus*, 778 F.3d at 783 ("Definition of the relevant market is a factual question . . . .").

Here, the court disagrees with Defendants.  Dr. Zona's report thoroughly analyzes the relevant market.  For example, he notes that telescopes are a specialized product with a very limited number of manufacturers worldwide, he examines U.S. Customs data to calculate market share and establish market power using the HHI index, he analyzes the effect that technical industrial capabilities have on manufacturers to produce at scale, and he identifies barriers to entry and expansion by potential competitors.  Zona Rep. ¶¶ 43-59, 65-71.  Dr. Sasian, Orion's technical telescope expert, boosts Dr. Zona's proposed market by opining that telescope manufacturers can use "similar equipment . . . to manufacture both low- and high-end products. The distinctions between making low- and midrange telescopes are even less significant." Sasian Rep. ¶ 5.

The court finds that whether Orion's proposed market is properly defined is a question for the jury.  Accordingly, whether Orion has suffered an antitrust injury on this theory of liability is not a question to be resolved on summary judgment.

### 2. Conspiracy

Having established that Orion has shown sufficient antitrust injury to withstand summary judgment, the court turns to whether summary judgment is appropriate as to whether Defendants and the Synta Entities unlawfully conspired to carry out the acquisition.  Orion has presented evidence that Sunny and the Synta Entities worked together to engineer the Meade acquisition.  For example, Sunny informed several officers of the Synta Entities of its intention to purchase

Meade weeks before submitting its bid. *See generally* FAC Ex. 1 at A, B-2. Around this time Peter Ni sent Daivd Shen and the President of Celestron Dave Anderson an email stating, "I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON/SYNTA should be provid[ing] the financial support to SUNNY." Borden Ex. 14. Sunny's engagement letter with its legal counsel for the acquisition—attorneys from the same firm providing counsel to Defendants in this case—states that Sunny "ha[s] instructed [the attorneys] to take direction from and communicate directly with your advisors, Dave Anderson, Laurence Huen, David Shen and Joe Lupica [then CEO of Celestron who became CEO of Meade after Sunny's acquisition]." Borden Ex. 16. Defendants offer explanations for this evidence that, they contend, absolve them of any wrongdoing.

The evidence here is subject to multiple interpretations, so summary judgment is not appropriate as to the conspiracy claims. The court grants partial summary judgment in favor of Defendants, finding that Defendants did not stop Orion from acquiring Meade. Orion may not recover damages based on the Meade acquisition. However, the court denies both parties' motions for summary judgment on the theory that the alleged conspiracy to acquire Meade harmed Orion through concentrating the market.

### B. Section 7 of the Clayton Act

Defendants and Orion both move for summary judgment on Orion's claim based on Section 7 of the Clayton Act. Section 7 of the Clayton Act "bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly.'" *St. Alphonsus*, 778 F.3d at 783 (quoting 15 U.S.C. § 18). Claims brought under Section 7 voyage across a multi-step burden-shifting analysis. *Id.* First, the plaintiff must establish a prima facie case that the merger is anticompetitive. *Id.* To do so, the plaintiff must "(1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337-38 (3d Cir. 2016). "Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT

8

merger contravenes the Clayton Act." *St. Alphonsus*, 778 F.3d at 783 (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)). Then the burden shifts to the defendant to rebut the prima facie case. *St. Alphonsus*, 778 F.3d at 783. "If the defendant successfully rebuts the prima facie case, the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion, which is incumbent on the [plaintiff] at all times." *Id.* (citation, quotations, and alterations omitted).

While Orion analyzes the entire burden-shifting framework, Defendants primarily attack Orion's definition of the proper market. Defendants also move for summary judgment on Orion's Section 2 claims based on this same argument. The court has already addressed the parties' arguments on the market and found the issue to be one for the jury. Defendants briefly make one other argument that Orion's theory of harm under the Clayton Act is inconsistent with the court's order denying Defendants' motion to dismiss (Dkt. No. 230 at 7). Defendants' mischaracterize the court's order. The court did not hold that Orion was limited to seeking damages arising from having to pay supracompetitive prices. Rather, the court found that the FAC adequately pled that the Meade "acquisition allowed Defendants to increase their market share, to stifle competition, and to attain monopoly power. Orion alleges that it has been injured by these harms to competition among telescope manufacturers." Dkt. No. 230 at 7. This argument does not warrant summary judgment.

Because the court has found that a triable issue exists as to the relevant market, the court denies both motions for summary judgment on the Clayton Act claim, and Defendants' motion to the extent it sought summary judgment on Orion's Section 2 claims based on market definition.

### C. Market Allocation

Orion claims that the Synta Entities and Defendants conspired to allocate the telescope market. The pillars of this argument are Orion's contentions (1) that the Synta Entities and Defendants have the capacity to manufacture the same telescopes, (2) that they have never competed for Orion's business, and (3) that they cooperate in other facets of their business. Orion largely relies on its telescope expert Dr. Sasian to support the first pillar. He opines that both

Sunny and the Synta Entities have sufficient technical expertise, manufacturing capabilities, and intellectual property to manufacture the same or similar telescopes. Sasian Rep. § II. Orion presents various evidence in support of the second pillar. For example, Sunny's 30(b)(6) witness testified that Sunny only once offered a price quote to Orion for a product that Suzhou Synta also manufactured. Borden Ex. 2 at 53:4-14. Orion refers to a December 12, 2013 email wherein David Shen wrote that Peter "Ni will not be a competitor and is trustworthy when it comes to business" and that if Defendants "[b]id[] with Costco between May and June (compete with Celestron for the price) . . . celestron would not trust sunny any longer." Borden Ex. 57 (internal Ex. 13-14 at 1, 3). And, finally, Orion argue that the Meade acquisition demonstrates market allocation because Defendants and the Synta Entities worked together to prevent JOC from expanding its reach. Defendants counter by presenting their own evidence and offering their own interpretations of Orion's evidence. They argue, for example, that Sunny's factory in China lacked the capabilities to manufacture the high-end telescopes manufactured by Suzhou Synta. Caseria Ex. 14 at 44:6-11. And Defendants contend that with the Meade acquisition, they began manufacturing high-end telescopes. *See* Caseria Ex. 34.

The competing evidence and its different interpretations show that the question of market allocation is not appropriate for resolution at summary judgment. Both parties' motions are denied.

### D. Price Fixing

Orion's next theory of liability under Section 1 is that Defendants and the Synta entities conspired to fix market prices. "Foremost in the category of per se violations is horizontal price-fixing among competitors." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000). Orion contends that Defendants fixed prices in two separate ways. First, Orion contends that Defendants and the Synta Entities engaged in price fixing through an arrangement where Sunny sold its telescopes to Orion through Joyce Huang, an employee of the Synta Entities. The arrangement necessarily required Sunny to provide sensitive pricing information and its trade-secret order statistics to the Synta Entities. Second, Orion argues that Defendants and the Synta

Entities used their market power to fix prices and credit terms to prevent Orion from acquiring the Hayneedle Assets.

### 1. Sunny's Sales to Orion

When competitors share sensitive information, such as pricing information, it can support a finding that the competitors are part of a conspiracy. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969)). Orion argues that it is entitled to summary judgment because Defendants and the Synta Entities engaged in price fixing by exchanging sensitive pricing information and trade-secret sales information, and because the Synta Entities sold Sunny's products on Sunny's behalf. Huang's business card indicates that her employer is "Synta Technology Corporation" and her email address is synta@ms61.hinet.net. Borden Ex. 86. Huang took Orion's orders of Sunny's telescopes and quoted the prices of Sunny's telescopes to Orion. Pl.'s Sep. Stmt. Facts 43, 44. On at least one occasion, Sunny also provided Celestron with data concerning its historic sales to Orion. Pl.'s Sep. Stmt. Fact 46. Sunny considered this sort of sales data to be a trade secret. *Id.*

Defendants counter that Synta Tech is merely a subsidiary distributor for Suzhou Synta and is not a competitor of Sunny. Defendants raise two arguments from here: First, the arrangement is an ordinary one that does not implicate antitrust laws. And second, Orion is an indirect purchaser of Sunny's products, so it is barred from bringing a claim against Sunny in place of the direct purchaser, Synta Tech. As to the first argument, the court notes that the preamble of the Settlement Agreement lists Suzhou Synta and Synta Tech as separate entities. Caseria Ex. 40 at 1. Defendants describe this arrangement as a commonplace one by which a manufacturer (Sunny) works with a distributor (Synta Tech) to sell product to a retailer (Orion). Under such an arrangement, Defendants argue, Sunny's provision of its pricing and sales data to Synta does not raise antitrust concerns. Defendants' next argument is that Orion, as an indirect purchaser, lacks standing to pursue damages for antitrust violations under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1979). *Illinois Brick*, though, does not preclude standing for an indirect

purchaser where a price-fixing conspiracy exists between the manufacturer and the direct purchaser. *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122-23 (9th Cir. 2008).

Here, Orion has presented evidence that Synta Tech is one of several shell companies run by David Shen and is, thusly, part of the alleged conspiracy. For example, during Sunny's corporate deposition, the 30(b)(6) witness was asked, "Do you know what Synta Technology Corporation is?" to which the witness replied, "I don't." Hagey Ex. 6 at 35:15-21. Orion also contends that the Settlement Agreement indicates that David Shen controls Synta Tech. Caseria Ex. 40 at 12. This evidence shows that there are triable issues as to which Synta Entity distributed Sunny's telescopes to Orion and whether that entity was part of the alleged conspiracy. Both parties' motions are denied as to this theory of liability.

### 2. The Hayneedle Assets

Orion claims that Defendants and the Synta Entities engaged in unlawful price fixing by cutting off its credit when they learned that Orion sought to purchase the Hayneedle Assets. Defendants counter that the deal failed to close for other reasons, so Orion cannot show causation. The Hayneedle Assets are a set of web domains, including telescopes.com. Pl.'s Sep. Stmt Fact 47. On May 12, 2014, Orion sent a letter of intent to Hayneedle indicating that Orion sought to purchase the Assets. Borden Ex. 73. On June 14, 2014, the Synta Entities sent Peter Moreo an email that cut off Orion's credit, and stated, "if Orion really buys Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more." Borden Ex. 74 at 2. The Synta Entities then forwarded their email to Sunny and asked Sunny to also withdraw Orion's line of credit. *Id.* Sunny then sent Orion a nearly identical email. Borden Ex. 75. Orion contends that with its supplier credit cut off, it could not move forward with the asset acquisition. Borden Ex. 7 at 187:11-17.

However, Defendants present evidence that the acquisition foundered because of Orion's demand that Hayneedle also enter into a non-compete agreement. In a company-wide email recounting the events, Peter Moreo wrote, "After weeks of moving forward by both companies,

we found a major point of disagreement . . . . [W]e insisted on legal protections in the contract re non-compete provisions that the Seller found unacceptable." Caseria Ex. 35. Peter Moreo explained in deposition that he chose to withhold information about the Synta Entities and Sunny cutting off Orion's credit in his company-wide email because employees may find such information "disconcerting." Hagey Ex. 10 at 216:3-13. He also testified that the non-compete issue was only one of three reasons the deal collapsed. Borden Ex. 7 at 187:3-188:10. The other two reasons involved Defendants and the Synta Entities attempting to sabotage the deal. *Id.*

Defendants argue, as they did with the Meade acquisition, that they did not cause Orion's alleged injury. Therefore, Orion lacks injury-in-fact and antitrust injury for this theory of price fixing, and the court should grant summary judgment in its favor. *See Los Angeles Mem'l Coliseum*, 791 F.2d at 1366; *see also Online DVD-Rental*, 779 F.3d at 922. Orion counters that it is not required to show that Defendants' conduct was the only cause, but only that it was a substantial factor in bringing about the injury. *See Los Angeles Mem'l Coliseum*, 791 F.2d at 1366 ("[A] plaintiff need not prove that the antitrust violation was the only cause of its injury . . . ; proof that the violation was a material cause is sufficient."); *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986) (A plaintiff "need not rule out all possible alternative sources of injury, they must show that the alleged anticompetitive activity was a material cause of the injury." (citation and quotations omitted)).

Faced with competing interpretations of the evidence, the court finds there is a genuine dispute as to whether the alleged conduct of defendants was a material cause of Orion's injury. Both motions are denied as to the Hayneedle Assets.

### E. Below-Cost Pricing

A claim for below-cost pricing must show two things: (1) "the prices complained of are below an appropriate measure of its rival's costs," and (2) "the competitor had a dangerous probability of recouping its investment in below-cost prices." *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1460 (9th Cir. 1993) (citation, quotations, and alterations omitted). Such claims are "rarely tried, and even more rarely successful." *Id.* (quoting *Matsushita*, 475 U.S. at 589). Orion does not

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
13

contest that its claims arising from below-cost pricing are based on conduct by the Synta Entities, and by not Defendants. Pl.'s Reply at 15. But they contend that, because Defendants allegedly have entered into an unlawful conspiracy with the Synta Entities, they are jointly and severally liable for damages caused by the Synta Entities. *Id.* The court need not consider the merits of this legal argument because Orion does not present any evidence that the Synta Entities' prices are below their costs. Defendants' motion is granted as to Orion's claims based on below-cost pricing.

### F. Refusal to Deal

Defendants move for summary judgment on Orion's claims based on Defendants' alleged refusal to deal with Orion. After Orion and the Synta Entities executed the Settlement Agreement in September 2016, Orion raised the possibility of obtaining telescopes from Sunny directly. Caseria Ex. 42 at 3-4. Sunny though refused to supply Orion until Defendants and Orion "solved the unfriendly disputes," *i.e.* the negotiations that preceded this litigation. *Id.* at 3; Defs.' Sep. Stmt. Fact 17. Orion contends that under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985), Defendants' refusal to deal with Orion was anticompetitive because they had no rational economic reason to cease making money from Orion. The Supreme Court has clarified that *Aspen Skiing* is "is at or near the outer boundary" of Sherman Act liability. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). It is a narrow exception to the general rule that "an entirely private business [may] freely . . . exercise his own independent discretion as to parties with whom he will deal." *Id.* at 408 (citation and quotations omitted). The Ninth Circuit has recognized that a company may refuse to deal with an entity that sues the company without contravening antitrust laws. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 890 (9th Cir. 1982). "[T]he bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relation." *Id.* (quoting *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir.1962)).

Here, it is undisputed that Defendants only refused to deal with Orion after Orion began threatening litigation. Caseria Ex. 42 at 2 ("we received the letter with a huge claim from your

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
14

lawyer . . . I hope we can cooperate with each other directly after this issue is settled."). Orion argues that because it had, at least some, direct dealings with Sunny prior to Defendants' refusal, *Aspen Skiing* controls and Defendants are liable. The court disagrees. *Aspen Skiing* did not involve circumstances, such as these, where the purchaser was threatening litigation against the manufacturer. Rather, this case is more similar to *Zoslaw*, where the Ninth Circuit upheld summary judgment in favor of the defendant-supplier who had "ceased selling merchandise" to the plaintiff-retailer after they settled their initial lawsuit. 693 F.2d at 875, 890. Given the narrow scope of *Aspen Skiing*, the court finds that Defendants were justified in their decision to discontinue their business relationship with Orion. Defendants' motion for summary judgment is granted.

### G. Restitution Under the UCL

Defendant makes two arguments as to Orion's claim under the UCL. First, they seek summary judgment precluding Orion from recovering any non-restitutionary award on its UCL claim. "A UCL action is equitable in nature; damages cannot be recovered." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). An order for restitution is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Id.* at 1144-45; s*ee also SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1184 (S.D. Cal. 2012) ("In order to constitute restitution, the victim must have at least an identifiable vested interest in the money he seeks to recover. The interest may not be contingent upon an uncertain future event." (citation omitted)). In a UCL claim, "disgorgement of profits is allowed . . . only to the extent it constitutes restitution, *i.e.*, profits unfairly obtained to the extent they represent money in which the plaintiff has an ownership interest." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1102 (N.D. Cal. 2007).

Defendants argue that Orion's sought-after damages arising from lost profits from price overcharges, economic injury, or last value (*see, e.g.*, Zona Rep. ¶¶ 8(c), 8(d), 124) do not qualify

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
15

as restitution. Orion agrees that the UCL only allows for restitution, and then argues it is entitled for restitution for Defendants' overcharges. Orion contends that it is entitled to "the difference in value between what it paid due to Defendants' unlawful activities and what it actually received." Pl.'s Reply at 15. The court agrees with Orion. To the extent that Orion can show that Defendants overcharged them for specific goods or services, Orion is entitled to recover the difference between the overcharge that Orion actually paid and what Orion would have paid absent Defendants' allegedly unlawful conduct. Orion is not entitled to other monetary awards on its UCL claim. *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d at 1105 (holding that antitrust plaintiffs could recover for overcharges, as restitution, under the UCL). In their reply, Defendants argue, for the first time, that Orion has not presented sufficient evidence to what this amount would be. Defs.' Reply at 15. The court will not consider this argument because it was not raised in Defendants' motion.

Defendants also argue that Orion cannot take restitution from Defendants because Orion has not dealt directly with Defendants to obtain Defendants' products. In other words, Orion is not entitled to restitution because it is an indirect purchaser. This argument has no merit. "In light of the reasoning of *Korea Supply* . . . the Court concludes that as long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d at 1105. Defendants' summary judgment motion is denied as to Orion's UCL claims.

### H. Orion's State Law Claims

Orion's state law claims arise from the Cartwright Act and the UCL. For this motion, these claims rise and fall with Orion's federal claims. *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act" (citation omitted)); *Stevens v. Sup. Ct.*, 75 Cal.App.4th 594, 602 (1999) ("The UCL works by borrowing violations of other laws and treating those transgressions, when committed as a business activity, as unlawful business practices.") (citation, quotations, and alterations omitted).

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
16

Because the court has denied Orion's motion as to its federal claims, it also denies its motion for its state law claims.

### I. Defendant Meade

Defendants ask the court to grant summary judgment as to all claims against Meade because, they argue, no evidence implicates Meade in any unlawful activity. The court interprets the evidence differently. Various documents raise a triable question as to whether Meade was engaged in the alleged conspiracy. *See, e.g.*, Borden Ex. 79 (November 12, 2013 internal Meade email stating "Mr. Ni discussed with me earlier that . . . he doesn't want to disrupt Synta business."). Defendants argue that, in context, these documents are unremarkable, and that may be true. But that is not a question for this court to decide. Defendants motion for summary judgment as to Defendant Meade is denied.

### IV. Conclusion

For the reasons discussed above, the court denies Orion's motion. The court grants Defendants' motion as to Orion's claims based on below-market pricing and refusal to deal. The court also grants Defendants' motion so far as the court finds that Defendants did not prevent Orion from acquiring Meade for itself; Orion may not recover damages based on its inability to acquire Meade. Defendants' motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: September 20, 2019

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 5:16-cv-06370-EJD
ORDER DENYING MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR SUMMARY JUDGMENT
17