1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  |   A Limited Liability Partnership
2 |   Including Professional Corporations
  | LEO D. CASERIA, Cal. Bar No. 240323
3 | THOMAS DILLICKRATH, (admitted pro hac vice)
  | 2099 Pennsylvania Avenue, NW, Suite 100
4 | Washington, D.C. 20006-6801
  | Telephone:    202.747.1900
5 | Facsimile:    202.747.1901
  | E-mail:       lcaseria@sheppardmullin.com
6 |               tdillickrath@sheppardmullin.com

7 | MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
  | DYLAN I. BALLARD, Cal. Bar No. 253929
8 | HELEN C. ECKERT, Cal. Bar No. 240531
  | JOY O. SIU, Cal. Bar No. 307610
9 | Four Embarcadero Center, 17th Floor
  | San Francisco, CA 94111
10 | Telephone:    415.434.9100
   | Facsimile:    415.434.3947
11 | E-mail:mscarborough@sheppardmullin.com
   |              dballard@sheppardmullin.com
12 |              heckert@sheppardmullin.com
   |              jsiu@sheppardmullin.com
13 |
   | Attorneys for Defendants
14 | NINGBO SUNNY ELECTRONIC CO., LTD.,
   | SUNNY OPTICS, INC., and
15 | MEADE INSTRUMENTS CORP.

16 |                    UNITED STATES DISTRICT COURT

17 |          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

OPTRONIC TECHNOLOGIES, INC. d/b/a Orion Telescopes & Binoculars, a California corporation,

        Plaintiff,

      v.

NINGBO SUNNY ELECTRONIC CO., LTD., SUNNY OPTICS, INC., MEADE INSTRUMENTS CORP., and DOES 1-25,,

        Defendant.

Case No. 5:16-cv-06370-EJD-VKD
*Assigned to: Honorable Edward J. Davila*

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Compl. Filed:  November 1, 2016
First Am. Compl. Filed:  November 3, 2017
Trial Date:  October 22, 2019
Hearing Date:  Not set
Time:  Not set

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE THAT pursuant to the Court's November 15, 2019 order on the

3    record, *see* Trial Tr. 2209:6-8, Defendants Ningbo Sunny Electronic Co., Ltd. ("Sunny"), Sunny

4    Optics, Inc. ("Sunny Optics"), and Meade Instruments Corp. ("Meade") (collectively,

5    "Defendants") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 50

6    for judgment as a matter of law on Plaintiff Optronic Technologies, Inc.'s ("Orion" or "Plaintiff")

7    claims against Defendants.  As discussed in the accompanying Memorandum of Points and

8    Authorities, Defendants respectfully request that judgment as a matter of law be granted in their

9    favor as to Orion's claims under the Sherman Act, Sections 1 and 2; Clayton Act, Section 7;

10   California's Cartwright Act; and California's Unfair Competition Law, on the grounds that a

11   reasonable factfinder would not have a legally sufficient evidentiary basis to find for Orion on

12   these claims.

13   This motion for judgment as a matter of law is based on this notice of motion, the

14   accompanying memorandum of points and authorities, the complete files and records in this

15   action, any oral argument of counsel, and such other matters as the Court may consider.

16

17   Dated:  November 18, 2019

18                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

19

20                              By _____
                                    */s/ Michael W. Scarborough*
21                                  MICHAEL W. SCARBOROUGH
                                    Attorneys for Defendants
22                                  NINGBO SUNNY ELECTRONIC CO., LTD.,
                                    SUNNY OPTICS, INC. and
23                                  MEADE INSTRUMENTS CORP.

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................................1

II.     RELEVANT LEGAL STANDARDS ...........................................................................1

III.    ARGUMENT ...................................................................................................................1

        A.      Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's
                Claims Under Section 2 of the Sherman Act. ....................................................1

                1.      To the Extent Plaintiff's Section 2 Claims Are Based on a "Joint
                        Monopoly" or "Shared Monopoly" Theory, Such Claim Is Invalid. .............1

                2.      Plaintiff Has Failed To Introduce Evidence That It Suffered Any
                        Injury As a Result of Any Violation of Section 2 of the Sherman
                        Act. ..........................................................................................................4

                3.      Plaintiff Has Failed To Introduce Evidence That Defendants Had the
                        Specific Intent to Monopolize The Relevant Market. ...................................5

                4.      Plaintiff Has Failed To Introduce Evidence That the Relevant
                        Market Is a Global Market Encompassing All Telescope
                        Manufacturing. .......................................................................................5

                5.      Plaintiff Has Failed To Introduce Evidence That Defendants
                        Engaged In "Predatory Conduct." ............................................................7

                6.      Plaintiff Has Failed to Introduce Evidence That Defendants Had
                        Monopoly Power or A Dangerous Probability of Achieving
                        Monopoly Power. .....................................................................................8

                7.      Plaintiff Has Failed to Introduce Evidence That Defendants Joined
                        A Conspiracy to Monopolize the Relevant Market. ....................................11

        B.      Defendants Are Entitled to Judgment As A Matter of Law as To Plaintiff's
                Section 1 Claims ..................................................................................................11

                1.      Plaintiff Has Failed To Introduce Any Evidence That Defendants
                        Joined a Conspiracy To Fix The Price of Telescopes or To Fix
                        Orion's Credit ........................................................................................13

                        a.      Plaintiff Has Failed to Introduce Evidence of Per Se Price
                                Fixing. .........................................................................................13

                        b.      No Reasonable Jury Could Find Defendants Liable for
                                Orion's Failure to Acquire the Hayneedle Assets. ...........................16

                2.      Plaintiff Has Failed To Introduce Any Evidence That Defendants
                        Joined a Market Allocation Conspiracy. ....................................................18

                        a.      The Evidence Does Not Support a Finding that Defendants
                                Conspired to Divide the Manufacturing Market ..............................19

-i-

b. The Evidence Does Not Support a Finding that Defendants Conspired to Divide the Distribution Market....................................21

3. At a Minimum, There Is No Evidence of Injury—or Any Conspiracy—After September 2016. ............................................21

C. Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Section 7 Claim. ......................................................................................22

D. Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's State Law Claims. ....................................................................................24

IV. CONCLUSION ..................................................................................................25

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW; MEM. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Federal Cases</u>

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*
    141 F.3d 947 (9th Cir. 1998)....................................................................................................19

*Alaska Airlines, Inc. v. United Airlines, Inc.*
    948 F.2d 536 (9th Cir. 1991).................................................................................................7, 9

*Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.*
    408 F. Supp. 1075 (S.D. Miss. 1976).......................................................................................3

*Amarel v. Connell*
    102 F.3d 1494 (9th Cir. 1996)...................................................................................................5

*AT&T Mobility, LLC v. AU Optronics Corp.*
    *(In re TFT-LCD (Flat Panel) Antitrust Litig.),*
    No. M 07-1827 SI, 2012 WL 3727221 (N.D. Cal. Aug. 27, 2012) ...........................................17

*In re Baby Food Antitrust Litig.*
    166 F.3d 112 (3d Cir. 1999)..............................................................................................14, 15

*Bailey v. Allgas, Inc.*
    284 F.3d 1237 (11th Cir. 2002).................................................................................................9

*Broadcom Corp. v. Qualcomm, Inc.*
    501 F.3d 297 (3d Cir. 2007)....................................................................................................18

*Brown Shoe Co. v. United States*
    370 U.S. 294 (1962)..................................................................................................................5

*Cascades Computer Innovation LLC v. RPX Corp.*
    No. 12-CV-01143 YGR, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013)....................................12

*Chartis Specialty Ins. Co. v. Aqua Scis. Engineers, Inc.*
    No. 11-CV-3669, 2014 WL 2730442 (N.D. Cal. June 16, 2014) ..............................................1

*Chisholm Bros. Farm Equip. v. Int'l Harvester Co.*
    498 F.2d 1137 (9th Cir. 1974)...................................................................................................1

*In re Chocolate Confectionary Antitrust Litig.*
    801 F.3d 383 (3d Cir. 2015)....................................................................................................14

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*
    236 F.3d 1148 (9th Cir. 2001).................................................................................................24

*Coalition for ICANN Transparency, Inc. v. Verisign, Inc.*
    611 F.3d 495 (9th Cir. 2010).....................................................................................................7

*Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*
  885 F.2d 683 (10th Cir. 1989)..................................................................................9

*Copperweld Corp. v. Independence Tube Corp.*
  467 U.S. 752 (1984)..................................................................................................8

*Elec. Commc'ns Corp. v. Toshiba Am. Consumer Prod.*
  129 F.3d 240 (2d Cir. 1997)...................................................................................14

*Endsley v. City of Chicago*
  230 F.3d 276 (7th Cir. 2000)....................................................................................8

*Exxon Corp. v. Berwick Bay Real Estates Partners*
  748 F.2d 937 (5th Cir. 1984)....................................................................................9

*First Union Nat. Bank v. Benham*
  423 F.3d 855 (8th Cir. 2005)..................................................................................13

*FLM Collision Parts v. Ford Motor Co.*
  543 F.2d 1019 (2d Cir. 1976)...................................................................................3

*Glenn Holly Entm't, Inc. v. Tektronix, Inc.*
  352 F.3d 367 (9th Cir. 2003)..................................................................................19

*Harkins Amusement Ent. v. General Cinema Corp.*
  850 F.2d 477 (9th Cir. 1988).................................................................................2, 3

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*
  864 F.2d 1409 (7th Cir. 1989)..................................................................................3

*Jones v. City of Oakland*
  No. 11-CV-4725, 2013 WL 1333933 (N.D. Cal. Mar. 29, 2013).............................1

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*
  190 F.3d 775 (7th Cir. 1999)....................................................................................2

*Krechman v. Cnty. of Riverside*
  723 F.3d 1104 (9th Cir. 2013)..................................................................................1

*Krehl v. Baskin-Robbins Ice Cream Co.*
  664 F.2d 1348 (9th Cir. 1982)................................................................................14

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*
  551 U.S. 877 (2007)................................................................................................14

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*
  No. 15-01086, 2015 U.S. Dist. LEXIS 150141 (C.D. Cal. Sept. 18, 2015)..............2

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*
  140 F.3d 1228 (9th Cir. 1998)................................................................................23

-iv-

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER
OF LAW; MEM. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ............................................................................................12, 13

*Midwest Gas Servs., Inc. v. Ind. Gas. Co.*
    317 F.3d 703 (7th Cir. 2003).....................................................................................2

*Monsanto Co. v. Spray-Rite Serv. Corp.*
    465 U.S. 752 (1984) ................................................................................................14

*Name.Space, Inc.*,
    795 F.3d 1124 (9th Cir. 2015) ..................................................................................8

*Nova Designs, Inc. v. Scuba Retailers Ass'n*
    202 F.3d 1088 (9th Cir. 2000) ................................................................................11

*Paladin Assocs., Inc. v. Montana Power Co.*
    328 F.3d 1145 (9th Cir. 2004)...................................................................................5

*PNY Techs., Inc. v. Sandisk Corp.*
    No. 11-cv-04689, 2014 U.S. Dist. LEXIS 58108 (N.D. Cal. Apr. 25, 2014) ...........11

*In re Publ'n Paper Antitrust Litig.*
    690 F.3d 51 (2d Cir. 2012) ......................................................................................12

*Rebel Oil Co. v. Atl. Richfield Co.*
    51 F.3d 1421 (9th Cir. 1995)........................................................................... *passim*

*RxUSA Wholesale v. Alcon Labs.*
    391 Fed. Appx 59 (2d Cir. 2010) ..............................................................................3

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*
    778 F.3d 775 (9th Cir. 2015)....................................................................................21

*Sambreel Holdings LLC v. Facebook, Inc.*
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ....................................................................7

*Senra v. Cunningham*
    9 F.3d 168 (1st Cir. 1993) .......................................................................................18

*Simonelli v. Univ. of Cal.-Berkeley*
    No. 02-CV-1107, 2007 WL 4054914 (N.D. Cal. Nov. 15, 2007) ..............................1

*Space Exploration Techs. Corp. v. Boeing Co.*
    No. 05-07533, 2006 U.S. Dist. LEXIS 96389 (C.D. Cal. May 12, 2006) ................17

*Spectrum Sports v. McQuillan*
    506 U.S. 447 (1993) ..................................................................................................8

*Standfacts Credit Servs.*,
    405 F. Supp. 2d at 1152...........................................................................................3

-v-

*Stanislaus Food Products Co. v. USS-POSCO Industries*
    803 F.3d 1084 (9th Cir. 2015)........................................................................20

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors*
    786 F.2d 1400 (9th Cir. 1986).......................................................................14

*Theatre Enterprises v. Paramount Film Distrib*
    201 F.2d 306 (4th Cir. 1953)........................................................................16

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA Inc.*
    74 F. Supp. 3d 1052 (N.D. Cal. 2014) ...........................................................5

*United States v. Citizens & S. Nat'l Bank*
    422 U.S. 86 (1975) ......................................................................................14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*
    540 U.S. 398 (2004) ......................................................................................7

*Williams v. I.B. Fischer Nevada*
    999 F.2d 445 (9th Cir. 1993).........................................................................7

*Wright v. S. Mono Hosp. Dist.*
    631 F. Supp. 1294 (E.D. Cal. 1986)..............................................................17

<u>State Cases</u>

*Stevens v. Sup. Ct.*
    75 Cal.App.4th 594 (1999)...........................................................................24

<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>

Federal Rules of Civil Procedure
    Rule 26 .........................................................................................................4
    Rule 50 .........................................................................................................1

Title 15 United States Code
    §§ 1-7 (Sherman Act)............................................................................ *passim*
    §§ 12-27 (Clayton Antitrust Act of 1914) ............................................. *passim*

<u>State: Statutes, Rules, Regulations, Constitutional Provisions</u>

California Business & Professions Code
    §§ 16700-16770 (the "Cartwright Act") ......................................................24
    § 17200 (the "Unfair Competition Law") ...................................................24

<u>Other Authorities</u>

Kevin F. O'Malley, et al.,
    3A *Federal Jury Practice and Instructions,* § 150:131 .............................21

I.     **<u>INTRODUCTION</u>**

Defendants Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny"), Sunny Optics, Inc., and Meade Instruments Corp. ("Meade") (collectively, "Defendants") respectfully move for judgment as a matter of law pursuant to Rule 50(a)(2) of the Federal Rules of Civil Procedure as to Orion's claims under Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, California's Cartwright Act, and California's Unfair Competition Law.

II.    **<u>RELEVANT LEGAL STANDARDS</u>**

Judgment as a matter of law is required where a party's evidence at trial fails to provide a "legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (quotations and citation omitted); Fed. R. Civ. Proc. 50(a).  The "standard is whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party." *Chisholm Bros. Farm Equip. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974) (emphasis added).  Judgment as a matter of law should therefore be granted "when the evidence contains no proof beyond speculation to support a verdict." *Jones v. City of Oakland*, No. 11-CV-4725, 2013 WL 1333933, at *2 (N.D. Cal. Mar. 29, 2013).  Where this is true, "a district court has a duty to direct a verdict in favor of the opposing party." *Chisholm Bros.*, 498 F.2d at 1139-40. The standard for granting a motion under Rule 50(a) "mirrors" the "standard for granting summary judgment . . . such that the inquiry under each is the same." *Chartis Specialty Ins. Co. v. Aqua Scis. Engineers, Inc*., No. 11-CV-3669, 2014 WL 2730442, at *2 (N.D. Cal. June 16, 2014) (internal quotation marks omitted); *see also Simonelli v. Univ. of Cal.-Berkeley*, No. 02-CV-1107, 2007 WL 4054914, at *1 (N.D. Cal. Nov. 15, 2007) ("The court applies the same standard when ruling on a JMOL motion as on a motion for summary judgment.").

III.   **<u>ARGUMENT</u>**

    A.     **Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's Claims Under Section 2 of the Sherman Act.**

        1.     <u>To the Extent Plaintiff's Section 2 Claims Are Based on a "Joint Monopoly" or "Shared Monopoly" Theory, Such Claim Is Invalid.</u>

Plaintiff has asserted three claims under Section 2 of the Sherman Act:

-1-

1    (1) monopolization, (2) attempted monopolization, and (3) conspiracy to monopolize.[1]  Plaintiff's

2    First Am. Compl. (Compl.) ¶¶ 131-138, ECF No. 41.  Plaintiff initially requested various shared

3    monopoly jury instructions on these claims.  *See* Joint [Proposed] Jury Instructions & Pl.'s Errata

4    thereto, ECF Nos. 371, 377 (respectively).  However, each of these Section 2 theories requires

5    proof that a ***single firm*** achieved or attempted to achieve monopoly power in a relevant market.

6    Actual monopolization means a ***single firm*** has monopoly power.  Attempted monopolization

7    means a ***single firm*** has a dangerous probability of achieving monopoly power.  And a conspiracy

8    to monopolize requires a conspiracy between multiple firms to concentrate monopoly power in a

9    ***single firm***.  In other words, the "mono" in monopoly means "one."

10              Accordingly, there is no such thing as a "shared monopoly" or "joint monopoly," and

11   courts—including the Ninth Circuit—have routinely rejected Section 2 claims based on such

12   theories.  *See, e.g.*, *Harkins Amusement Ent. v. General Cinema Corp*., 850 F.2d 477, 490 (9th Cir.

13   1988) (internal citation omitted) (rejecting "novel" theory of "shared monopoly":  "Professors

14   Areeda and Turner admit that '***no case has held the § 2 monopolization provision applicable to***

15   ***shared monopoly***.' . . . One court directly addressing the issue stated bluntly, 'an oligopoly, or a

16   shared monopoly, does not in itself violate § 2 of the Sherman Act.'") (emphasis added); *Rebel Oil*

17   *Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1443 (9th Cir. 1995) ("To pose a threat of monopolization,

18   ***one firm alone*** must have the power to control market output and exclude competition.  An

19   oligopolist lacks this unilateral power.") (emphasis added); *Midwest Gas Servs., Inc. v. Ind. Gas.*

20   *Co*., 317 F.3d 703, 713 (7th Cir. 2003) ("a § 2 claim can only accuse ***one firm*** of being a

21   monopolist") (emphasis added); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.,* 190 F.3d 775, 780

22   (7th Cir. 1999) (rejecting "joint monopolization" or "attempted joint monopolization" theory,

23   describing the theory as "audacious," explaining that the Second and Ninth Circuits have

24   "rejected" the theory, the Seventh Circuit has "[thrown] some cold water on it," and no case

25

_____

26   [1] Plaintiff's  original proposed jury instructions were based on a shared monopoly theory and did

27   not address alleged monopolization. Joint [Proposed] Jury Instructions & Pl.'s Errata thereto, ECF

28   Nos. 371, 377 (respectively).

1   "squarely supports the theory."); *Lenhoff Enters., Inc. v. United Talent Agency, Inc.,* No. 15-

2   01086, 2015 U.S. Dist. LEXIS 150141 at *8-11 (C.D. Cal. Sept. 18, 2015) ("Ninth Circuit case

3   law holds that to sufficiently state a claim under § 2 for conspiracy to monopolize, the plaintiff

4   must allege facts indicating that a conspiracy exists to create a monopoly in a single entity. ***The***

5   ***Ninth Circuit does not recognize a 'shared monopoly' or 'joint monopoly' theory***.") (emphasis

6   added); *Standfacts Credit Servs.*, 405 F. Supp. 2d at 1152 ("***[S]ection 2 prohibits only***

7   ***monopolization by a single entity, as opposed to shared monopolization***"); *FLM Collision Parts*

8   *v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir. 1976) (Section 2 shared monopoly theory

9   "amounts to nothing more than" a Section 1 claim "under another name"); *Ind. Grocery, Inc. v.*

10   *Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989) ("Section 2 . . . does not govern

11   single-firm anticompetitive conduct aimed only at creating an oligopoly."); *RxUSA Wholesale v.*

12   *Alcon Labs.*, 391 Fed. Appx 59, 61 (2d Cir. 2010) (rejecting shared monopoly claim as a

13   recapitulation of plaintiff's Section 1 theories).

14          As a matter of law, the joint possession of market power by multiple firms is not a

15   monopoly; it is an oligopoly, and oligopolies do not violate Section 2 of the Sherman Act.  *See,*

16   *e.g., Harkins*, 850 F.2d at 490 ("[A]n oligopoly, or a shared monopoly, does not in itself violate

17   § 2 of the Sherman Act.") (internal quotations omitted); *Rebel Oil*, 51 F.3d at 1443.  Instead,

18   alleged anticompetitive joint conduct is properly addressed under Section 1 of the Sherman Act:

19          The two most important phrases in the Sherman Act are 'monopoly' and 'conspiracy.'
    Section 2 regulates one with monopoly market domination; section 1 reaches two or more
20   who conspire and therefore acquire together an anticompetitive influence.  To hold that an
    oligopoly violates § 2 amends the Act to subject to antitrust regulation businesses which
21   lack the § 2 required market control and the § 1 conspiracy.

22   *Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.*, 408 F. Supp. 1075, 1106 (S.D. Miss. 1976), *aff'd*

23   *per curiam*, 579 F.2d 972 (5th Cir. 1978) ("The Sherman Act neither mentions nor regulates

24   oligopolies. The parties cite no case which has engrafted this term onto the Act.  To do so would

25   be contrary to the basic thrust of the Sherman Act.").

26          Nevertheless, at trial Plaintiff's only attempt to show that the Defendants achieved or

27   attempted to achieve monopoly power in the asserted relevant market for worldwide telescope

28   manufacturing has consisted of assertions that Defendants and ***another firm***, Suzhou Synta, ***jointly***

-3-

1   achieved or attempted to achieve a "monopoly."  *See, e.g.*, Trial Tr. (10/23/19) at 630:5-8 (Direct

2   Examination of Peter Ni) ("Q. ***So together, Sunny and Synta controlled over 80 percent of the***

3   ***astronomical telescope market*** after this acquisition of Meade and its high end facility and its

4   intellectual property that enabled it to make all kinds of telescopes; correct?") (emphasis added);

5   *id.* (10/28/19) at 828:22-24 ("Q. And you knew that by retaliating against small companies like

6   Orion, ***Ningbo Sunny and Synta could dominate the market***; right?") (emphasis added).

7          There is no evidence ***at all*** in the trial record that either Ningbo Sunny or Suzhou Synta

8   ***individually*** monopolized, or attempted to monopolize, the relevant market.  Given the weight of

9   the above authority, including binding Ninth Circuit precedent, the evidence introduced at trial is

10  insufficient as a matter of law to establish any claim under Section 2, and the Court must grant

11  judgment as a matter of law as to each of Plaintiff's Section 2 claims.

12                    2.       Plaintiff Has Failed To Introduce Evidence That It Suffered Any Injury As
                               a Result of Any Violation of Section 2 of the Sherman Act.

13         Plaintiff's only evidence of injury at trial was the testimony of its expert witness, Dr. J.

14  Douglas Zona.  Under Rule 26 of the Federal Rules of Civil Procedure, Dr. Zona's trial testimony

15  was limited to the information set forth in his pretrial expert report.  Consistent with that report,

16  Dr. Zona's only testimony concerning alleged damages asserted that Plaintiff suffered a maximum

17  of $38.5 million in damages due to product overcharges, and $1.8 million as a result of Plaintiff's

18  alleged inability to acquire the Hayneedle Assets, both of which Dr. Zona testified resulted from

19  violations of Section 1 of the Sherman Act, not Section 2.  Trial Tr. (11/14/19) at 1995:18-23

20  ("What I've done is assumed that the allegations are true.  I've assumed that the particular

21  conspiracy as alleged was true . . . . if it [the alleged conspiracy] did [occur], I've calculated

22  overcharges."); *id.* at 1976:3-24 (listing "allegations" important to an economist for calculating

23  price overcharges as "the agreement on pricing" and the "allegations that Sunny and Synta agreed

24  to avoid conflict"); *id.* at 1993:12-1994:20 (an allegation necessary for estimating Hayneedle

25  damages is that "Sunny and Synta were behind" inferring with the transaction, but admitting that

26  "these are allegations.  I don't mean to speak to the facts about them.").  All of Orion's damages

27  stem from the alleged conspiracy, and Dr. Zona quantified only the effects of the alleged

28

-4-

conspiracy.  Trial Tr. (11/14/19) at 1996:14-23 (admitting the overcharge damages quantify "the impact of the conspiracy"); *id.* at 1997:14-16 (Dr. Zona's formulas "allow me to determine what the effect of the conspiracy was, or the damages"); *id.* at 1996:2-11 (Dr. Zona's damages methodology consists of calculating what "Orion [would] have earned if Sunny and Synta had not conspired," in other words, Dr. Zona's but-for world is one in which "a conspiracy never occurred").  Indeed, Dr. Zona did not testify about economic theory or damages relating to monopolization or any single firm conduct.  There is, therefore, no evidence at all in the trial record that Plaintiff suffered any injury as a result of any violation of Section 2.  *See Rebel Oil*, 51 F.3d at 1433 (plaintiff must prove "causal antitrust injury" to recover under Section 2).  For this additional reason, Defendants are entitled to judgment as a matter of law on Plaintiff's Section 2 claims.

          3.    <u>Plaintiff Has Failed To Introduce Evidence That Defendants Had the Specific Intent to Monopolize The Relevant Market.</u>

Each of Plaintiff's Section 2 claims require proof that Defendants had the "specific intent" to monopolize the asserted relevant market of worldwide telescope manufacturing.  *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158, 1163 n.22 (9th Cir. 2004); *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA Inc.*, 74 F. Supp. 3d 1052, 1076 (N.D. Cal. 2014).  There is no such evidence in this case.  No fact witness testified or was even asked any questions regarding monopolization or the intent to monopolize the relevant market, nor did Plaintiff's economic expert, Dr. Zona, discuss any evidence of intent to monopolize.

          4.    <u>Plaintiff Has Failed To Introduce Evidence That the Relevant Market Is a Global Market Encompassing All Telescope Manufacturing.</u>

Each of Plaintiff's Section 2 claims requires Plaintiff to define and prove a relevant market.  *Amarel v. Connell*, 102 F.3d 1494, 1521 (9th Cir. 1996).  Without a relevant market, there is no baseline from which to analyze any alleged market power or anticompetitive effects.

The Supreme Court has instructed that "[t]he outer boundaries of a product market are [to be] determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), which most often is a sophisticated task requiring expert analysis.

1    Orion's economic expert, Dr. Zona, admitted that "market power is a necessary element to

2    an injury in this kind of a case" and that defining a relevant market is the "first step" of the

3    necessary antitrust analysis—something that "only antitrust people do."  Trial Tr. (11/14/19) at

4    1978:15-18, 1983:7-8.  But Dr. Zona failed to conduct any actual relevant market analysis as he

5    assumed the interchangeability of telescope products.  As Dr. Zona admitted at trial, he did not

6    conduct even the most rudimentary analysis of market share, failing to conduct a SSNIP test,

7    calculate cross-price elasticities, or study consumer preferences.  Trial Tr. (11/15/19) at 2082:17-

8    2083:11.  In failing to conduct a relevant market analysis, Dr. Zona missed two critical issues that

9    leave Orion with an unsupported market definition.

10    First, Dr. Zona conducted no independent analysis or research to determine whether the

11    machinery and processes to mass-produce low-end telescopes (e.g., ones that cost less than $200)

12    are reasonably interchangeable the with machinery and know-how to make high-end telescopes

13    (e.g., ones that cost over $4,000 and potentially a lot more).  Instead, Dr. Zona claimed that he

14    "understands" that low-end and high-end telescopes can be manufactured in the same factories

15    using the same machines and processes.  But this assumption is based solely on an interview with

16    Mr. Moreo, who lacks experience with telescope manufacturing.  Indeed, there is no fact evidence

17    in this case that high-end and low-end telescopes were in the same market.  Meade's "production

18    was limited in the U.S. and Mexico of the high-end product."  Trial Tr. (11/5/19) at 1078:12-14.

19    Ningbo Sunny had the "ability to produce low-end telescopes in large quantities."  Trial Tr.

20    (11/5/19) at 905:17-19).  Mr. Chiu testified that Ningbo Sunny "does not have technologies or the

21    technicians who has the proper skills to produce high-end product, and also we do not have the

22    manufacturing capability mainly in equipment to produce any high-end products."  Trial Tr.

23    (11/8/19) at 1504:19-25).  Testimony showed that Ningbo Sunny has a competitive advantage in

24    manufacturing low-end products, and getting into higher-end products "is going to take a long

25    time."  Trial Tr. (11/8/19) at 1506:2-14).  On the other hand, Synta is "in the market for the middle

26    to the high-end product.  Trial Tr. (11/8/19) at 1508:4-12.

27    Second, Dr. Zona ignored and failed to analyze possible substitutes in the alleged telescope

28    manufacturing market.  Specifically, Dr. Zona did not determine whether telescopes and

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER
OF LAW; MEM. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    binoculars should be in the same relevant product market. Trial Tr. (11/15/19) at 2083:16-

2    2084:13.  Dr. Zona admitted that Ningbo Sunny makes binoculars and rifle scopes, among other

3    products, but did not independent analysis to rule out those manufactured products from the

4    relevant market.  Trial Tr. (11/15/19) at 2083:16-24 (Dr. Zona did not study whether telescopes

5    and binoculars should be in the same relevant market).

6                    5.    Plaintiff Has Failed To Introduce Evidence That Defendants Engaged In
                          "Predatory Conduct."

7          An actual monopolization or attempted monopolization claim under Sherman Act § 2 must

8    also show "predatory" conduct.  *See Coalition for ICANN Transparency, Inc. v. Verisign, Inc.*, 611

9    F.3d 495, 506 (9th Cir. 2010); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th

10   Cir. 1991).  Plaintiff has failed here to produce any evidence of predatory conduct.

11         To the extent Plaintiff has rested its Section 2 claim on the conspiratorial conduct

12   complained of under its Section 1 claim, the Court should find such a reliance insufficient to

13   withstand a motion for judgment as a matter of law.  *See, e.g.*, *Williams v. I.B. Fischer Nevada*,

14   999 F.2d 445, 448 (9th Cir. 1993) ("[A] § 1 claim insufficient to withstand summary judgment

15   cannot be used as the sole basis for a § 2 claim.") (quoting *Thomsen v. Western Elec. Co., Inc.*,

16   680 F. 2d 1263, 1267 (9th Cir. 1982)); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d

17   1070, 1082 (S.D. Cal. 2012) (dismissing Section 2 claim based on alleged Section 1 violations

18   because the "alleged actions do not constitute exclusionary conduct under Sherman Act §2.

19   Indeed, the Court has already found that the Complaint fails to state a [Sherman Act § 1] claim.").

20         Beyond these allegations, the only proof put forth by Plaintiff supports generic arguments

21   about Defendants' alleged high prices, low output, or other business decisions that Plaintiff simply

22   did not like.  None of this conduct can constitute the "predatory" conduct required to support a

23   Section 2 claim, even assuming that Defendants possess monopoly power.  As the Supreme Court

24   has explained:

25              The mere possession of monopoly power, and the concomitant charging of
                monopoly prices, is not only not unlawful; it is an important element of the free-
26              market system. The opportunity to charge monopoly prices--at least for a short
                period--is what attracts "business acumen" in the first place; it induces risk taking
27              that produces innovation and economic growth. To safeguard the incentive to
                innovate, the possession of monopoly power will not be found unlawful unless it is
28

-7-

accompanied by an element of anticompetitive conduct.

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Courts have dismissed Section 2 claims based on similar allegations. *See, e.g.*, *Name.Space, Inc.*, 795 F.3d 1124, 1132 (9th Cir. 2015) (affirming dismissal of Section 2 claim, holding that "whether [defendant's] choices were wise or fair is an issue outside the purview of § 2." "Barring predatory behavior, [defendant] is 'free to choose the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing.'") (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)); *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) ("[T]he Sherman Act does not prohibit an entity possessing market power from simply raising prices in order to increase revenues. For a § 2 violation, more is needed.").

> ### 6. Plaintiff Has Failed to Introduce Evidence That Defendants Had Monopoly Power or A Dangerous Probability of Achieving Monopoly Power.

Finally, for an attempted monopolization claim Plaintiff must show there existed a dangerous probability of monopolization. *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993). Like the element of monopoly power for a monopolization claim, the element of dangerous probability of monopolization is based in large part on the market power of the defendant. *See id.* at 459 ("[D]emonstrating the dangerous probability of monopolization . . . requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."). Importantly though, "[i]t is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984). Instead, Section 2 is only implicated when conduct "pose[s] a danger of monopolization." *Id.* at 768.

Dr. Zona never analyzed whether Ningbo Sunny or Synta possessed monopoly power. Instead, Dr. Zona's analysis was limited to whether either firm had "market power"—an entirely different construct. Even so, Dr. Zona's own market share calculations demonstrate that neither Ningbo Sunny nor Synta individually had monopoly power. There are other non-defendant telescope makers and shippers in Orion's alleged relevant market, comprising about 20 to 30 percent of the market. Trial Tr. (11/14/19) 1989:9-18. According to Dr. Zona's own reported

market shares, Ningbo Sunny and Synta individually face substantial competition.  Trial Tr.

(11/14/19) at 1984:16-18 (Dr. Zona "investigate[d] the market shares of the defendants and

Synta"); *id.* at 1986:4-14 (Dr. Zona calculated market shares "from 2012 to 2018" which reveal

individual company shares for Ningbo Sunny and Synta, including, for example, "46 percent

would be Sunny's share of shipments" in 2012); Trial Tr. (11/15/19) at 2181:7-2182:15 (Dr.

Saravia summarizing Dr. Zona's reported market shares showing that there are "other telescope

manufacturers" and that Sunny and Synta "face competition").

As Dr. Zona admitted, the standard for market power (albeit the wrong standard to be

assessing in the first instance) is 50 percent if there is to be any anticompetitive impact is to be

found.  Trial Tr. (11/14/19) 1987:2-4, 1987:25-1988:2.  In fact, courts have found market shares

below 50 percent to be insufficient to conclude that a defendant possesses monopoly power, and

often find monopoly power where a firm's market share is above 70 or 80 percent.  *Rebel Oil*, 51

F.3d at 1438 ("numerous cases hold that a market share of less than 50 percent is presumptively

insufficient to establish market power" in a claim of monopolization); *see also Bailey v. Allgas,

Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) ("market share at or less than 50% is inadequate as a

matter of law to constitute monopoly power"); *Exxon Corp. v. Berwick Bay Real Estates Partners*,

748 F.2d 937, 940 (5th Cir. 1984) ("monopolization is rarely found when the defendant's share of

the relevant market is below 70%"); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*,

885 F.2d 683, 694 n.18 (10th Cir. 1989) (to establish "monopoly power, lower courts generally

require a minimum market share of between 70% and 80%").

Market share evidence alone is insufficient to establish monopoly power or a dangerous

probability of achieving it.  *See Alaska Airlines, Inc.*, 948 F.2d at 541-542, 549 (both

monopolization and attempted monopolization require an allegation of monopoly power or a

dangerous probability of achieving it).  Plaintiff must also show that there exists significant

barriers to entry by new competitors and significant barriers to expansion by existing competitors;

otherwise, competitors can simply compete and take market share and market power away from

dominant firms. *See Rebel Oil Co., Inc.*, 51 F.3d at 1439 ("A mere showing of substantial or even

dominant market share alone cannot establish market power sufficient to carry out a predatory

1   scheme. The plaintiff must show that new rivals are barred from entering the market and existing

2   competitors lack the capacity to expand their output to challenge the predator's high price.").

3         Orion failed to provide evidence of barriers to entry.  First, there is competition in the

4   purported upstream telescope market.  As explained above, Dr. Zona's own market shares show

5   that 20 to 30 percent of the market was comprised of other competing telescope manufacturers,

6   including JOC, a company that Ningbo Sunny and Synta saw as a competitive threat because it has

7   three telescope brands that manufacture and sell high-end, low-end, and mass-market telescope

8   products.  Trial Tr. (11/5/19) at 1049:4-10).  The other competitors are companies that are already

9   manufacturing telescope products for whom barriers to entry would be significantly lower than a

10   completely new entrant.  As explained above, "other competitors" account for up to 30 percent of

11   the market, which means they can expand their production to take market share from Ningbo

12   Sunny and Suzhou Synta.  The mere presence of 200 other competitors is also proof that firms can

13   enter the market.  The only fact witnesses plaintiff called that have personal knowledge of the

14   telescope manufacturing process confirmed that defendants and alleged co-conspirators face

15   competition.  *See*, *e.g.*, Trial Tr. (11/8/19) at 1507:15-25 (Mr. Chiu listing firms such as Bosma,

16   Chang Jiang, Idun, and JOC as direct competitors to Ningbo Sunny during the relevant period);

17   Trial Tr. (11/6/19) at 1214:19 (Meade has a lot of competitors).

18         Second, competitors in related industries can readily expand and take market share from

19   Ningbo Sunny and/or Synta.  For instance, manufacturers of binoculars, spotting scopes, and rifle

20   scopes could have lower barriers to entering the telescope manufacturing market, especially for

21   lower-end telescopes.  Indeed, Ningbo Sunny makes low-end telescopes in the same factory as

22   binoculars and spotting scopes.  Trial Tr. (11/15/19) at 2103:14-18; Trial Tr. (11/14/19) at

23   1952:17-21.  Mr. Chiu testified that only 40 percent of Ningbo Sunny's business is manufacturing

24   telescopes, while the remainder is other optical products.  Trial Tr. (11/8/19), 1415:18-23, 1417:4-

25   6.  Mr. Lupica testified that Meade had "three different rifle scope brands" and manufactured

26   binoculars.  Trial Tr. (11/5/19) at 908:19-909:8, 909:20-23.  Orion also sells binoculars, spotting

27   scopes, and microscopes.  None of Orion's fact witnesses or expert witnesses address or contradict

28   this.  Dr. Zona's report and trial testimony contain no analysis of binocular manufacturers as

1    potential entrants, even though he admitted that Ningbo Sunny manufactured both types of

2    products in its factories.  Trial Tr. (11/15/19) at 2083:16-24 (Dr. Zona admitting that he did not

3    study whether telescopes and binoculars should be in the same relevant market).

4        Of course, barriers to entry and barriers to expansion are different -- barriers to entry by

5    new competitors may not be obstacles to expansion by competitors who are already in the market.

6    *See Rebel Oil Co.*, 51 F.3d at 1441 ("Market power cannot be inferred solely from the existence of

7    entry barriers and a dominant market share. The ability to control output and prices - the essence

8    of market power - depends largely on the ability of existing firms to quickly increase their own

9    output in response to a contraction by the defendant.").  Plaintiff has throughout this case

10   consistently referred to other competitors that are currently in the market, and nothing during its

11   case at trial contradicts this reality.  Compl. ¶ 45 ("There are three or four major telescope

12   distributors in the U.S."); *id.* ¶ 48 (referring to a "handful" of other telescope brands in the market,

13   "including Explore Scientific, Bresser and others"); *id.* ¶ 74a (referring to competing telescope

14   manufacturer named "JOC").  In the absence of barriers to expansion, the presence of these

15   competitors in the market would act as a check on any alleged abuse of market power.

16       Without sufficient allegations of barriers to entry or expansion, Plaintiff's Section 2 claims

17   fail as a matter of law.  *See PNY Techs., Inc. v. Sandisk Corp.*, No. 11- cv-04689, 2014 U.S. Dist.

18   LEXIS 58108, *39 (N.D. Cal. Apr. 25, 2014) (dismissing attempted monopolization claim that did

19   not "plausibly allege . . . high barriers to entry or expansion.").

20            7.    Plaintiff Has Failed to Introduce Evidence That Defendants Joined a
                    Conspiracy to Monopolize the Relevant Market.

21

22       The requisite proof for existence of a conspiracy for a Section 2 claim mirrors that required

23   for a Section 1 claim.  *See Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th

     Cir. 2000) ("Because Performance's claim under § 1 fails, its claim of a conspiracy to monopolize
24
     under § 2 based on the same conduct necessarily fails as well.").  As detailed herein, Plaintiff has
25
     failed to carry its burden in establishing a conspiracy.
26
         **B.    Defendants Are Entitled to Judgment as a Matter of Law as to Plaintiff's
27            Section 1 Claims.**

28       For a Section 1 plaintiff to survive a motion for a directed verdict, it must present

                                        -11-

evidence:

> "[T]hat tends to exclude the possibility" that the alleged conspirators acted independently.  Respondents in this case, in other words, must show that the inference of conspiracy is ***reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents***.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal citations omitted and emphasis added).  The absence of any plausible motive to engage in the conduct charged is highly relevant to, and bears on, the range of permissible conclusions that might be drawn from ambiguous evidence:  "if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  *Id.* at 596-97; *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) ("[W]here a plaintiff's theory of recovery is implausible, it takes 'strong direct or circumstantial evidence' to satisfy *Matsushita*'s 'tends to exclude' standard.").

Pursuant to the Court's Summary Judgment Order, Orion's theories of liability under Section 1 are that Defendants along with some amorphous group of "Synta entities" fixed the prices of telescopes and allocated the market for telescope manufacturing and customers.[2] Defendants' witnesses affirmed that no such agreements, or any agreements at all, existed.  *See, e.g.*, Trial Tr. (10/28/19) at 816:10-817:5 (Mr. Ni: "no truth at all" to Orion's allegations that

---

[2] Orion argued during the course of trial that Defendants worked with Suzhou Synta and Celestron to acquire Meade.  Even assuming *arguendo* such conspiracy existed, it would not constitute a per se violation of the Sherman Act—the only type of Section 1 violation asserted in Orion's operative complaint.  *See, e.g.*, Compl. ¶¶ 4, 55, 124-130.  Orion has not, and cannot, shown that such alleged conspiracy merits per se treatment.  *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143 YGR, 2013 WL 316023, at *8 (N.D. Cal. Jan. 24, 2013) ("To succeed on a, per se claim, a plaintiff must establish that the defendant entered into an agreement amounting to a hardcore offense, such as naked horizontal price-fixing or market-sharing, and that the plaintiff has suffered "antitrust injury" as a result.").

1  Defendants entered agreement to fix prices or allocate the market); *see also id.* (11/05/19) at

2  1101:17-1102:5 (Mr. Lupica was not aware of any agreements between Mr. Ni and Mr. Shen

3  about the pricing of products to Orion or which products should be sold to Orion); *id.* (11/08/19)

4  at 1555:6-1556:3 (Mr. Chiu did not discuss sales to Orion with Suzhou Synta or David Shen and

5  was not aware of any agreement between Ningbo Sunny or Suzhou Synta regarding prices or types

6  of telescopes to sell).  Orion has failed to adduce any evidence at trial beyond mere speculation to

7  the contrary.[3]  *See First Union Nat. Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005) (judgment

8  as a matter of law appropriate when the record contains no proof beyond speculation to support

9  verdict).

10      1.    <u>Plaintiff Has Failed To Introduce Any Evidence That Defendants Joined a Conspiracy To Fix The Price of Telescopes or To Fix Orion's Credit.</u>

11

12      As the Court observed previously in this case, "Orion contends that Defendants fixed

13  prices in two separate ways": (1) by engaging in price fixing through an arrangement where

14  Ningbo Sunny sold its telescopes to Orion through Joyce Huang, an employee of the "Synta

15  Entities," and (2) by fixing the credit terms to prevent Orion from acquiring the Hayneedle Assets.

16  Order re Mot. for Summ. J. 10:22-11:2.  Plaintiff has failed to adduce evidence at trial to support

17  either of these claims.

18      a.    *Plaintiff Has Failed to Introduce Evidence of Per Se Price Fixing.*

19      Orion has not adduced any direct evidence of an agreement among Defendants and the so-

20  called Synta entities to fix prices.  Instead, Orion has introduced various communications between

21  James Chiu and Joyce Huang regarding product pricing, arguing that Ms. Huang was an agent of

22  Ningbo Sunny's horizontal competitor, Suzhou Synta.  *See* TX 1367, 1795, 1832, 1864, 1873.

23  However, Orion's own witness and internal documents demonstrate that Good Advance, the

24

25  [3] Orion's substantial reliance on "[e]vidence that tends to support" only "collateral conspiracies"

26  such as emails about JOC, "say[] little, if anything" about the conspiracies actually at issue in this

27  litigation.  *See Matsushita*, 475 U.S. at 596-97 (evidence of "*other* combinations," did "not tend to

28  show" the predatory pricing conspiracy alleged).

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER
OF LAW; MEM. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

trading company for which Ms. Huang worked, was a separate and distinct entity from Suzhou Synta.  Trial Tr. (11/08/19) at 1578:1-12, 1579:3-20 (Espinosa saying he had heard that Ms. Huang did not work for Suzhou Synta); Trial Tr. (11/06/19) at 1331:25-1335:19 (Orion negotiated separately with Good Advance and Suzhou Synta and Espinosa believed them to be different companies); TX 2106 (showing Joyce was the contact for Ningbo Sunny/Good Advance, while Nancy was the contact for Suzhou Synta).  This testimony is consistent with Mr. Chiu's explanation that Good Advance is a trading company that operates as a middleman that connects manufacturers with customers for a commission.  Trial Tr. (11/08/19) at 1513:5-1514:20.

This vertical relationship prevents a finding of per se liability—the only type of liability asserted in Orion's complaint—even assuming the existence of an agreement.  *See, e.g.*, Compl. ¶¶ 4, 55; *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 898 (2007) (rule of reason applies to vertical price restraints).  And assuming that Good Advance were controlled by Suzhou Synta (which is not supported by the evidence), Orion still has not connected the dots to show that providing Ms. Huang with pricing information resulted in a conspiracy between Defendants and any of the alleged Synta entities to fix prices.  Exchanges of price information alone do not support a finding of price fixing.  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124-26 (3d Cir. 1999) (holding that the occasional exchange of price information between sales representatives of rival baby food manufacturers is not sufficient to establish a conspiracy to fix prices); *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir. 1986) ("Price information published without 'plus factors,' which indicate an agreement, is judged under the rule of reason."); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act."); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015) ("[G]athering the price information of competitors can be just as consistent with lawful interdependence as with a price-fixing conspiracy.").

In light of all the evidence, Ningbo Sunny's communications with Ms. Huang reveal nothing more than the type of legitimate exchanges between a manufacturer and its distributor that the antitrust laws permit.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984) ("A

-14-

1    manufacturer and its distributors have legitimate reasons to exchange information about the prices

2    and the reception of their products in the market."); *Elec. Commc'ns Corp. v. Toshiba Am.*

3    *Consumer Prod.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (collecting cases holding that dual

4    distribution arrangements are vertical relationships not subject to *per se* liability); *see also Krehl v.*

5    *Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1356-7 (9th Cir. 1982) (courts give manufacturers

6    wide latitude in choosing their particular method of distribution and distributors).[4]

7           Nor does the chart Mr. Moreo assembled comparing the prices Orion and Celestron paid

8    for Ningbo Sunny telescopes show that Defendants were engaged in a per se conspiracy to fix

9    prices.  TX 1935 (citing TX 1577 (Orion Capella data) & 1771 (Ningbo Sunny price list to

10   Celestron March 2014-February 2015)).  As Mr. Chiu explained, Ningbo Sunny's sales to

11   Celestron account for 35 percent of Ningbo Sunny's overall sales, and that Celestron bought

12   approximately 25 times more than Orion of certain popular telescope products.  Trial Tr.

13   (11/08/19) at 1509:15-1511:21.  Mr. Chiu also clarified that larger orders allow it to achieve

14   economies of scale:  "If we needed to produce a larger quantity for a client, then we would, of

15   course, have savings passed on to us from purchasing materials and parts.  Then we are able to

16   pass on that savings to our client."  *Id.* at 1511:22-1512:7.  Assuming *arguendo* that the data in

17   Mr. Moreo's chart are correct, both of these market facts explain the price disparity between

18

19   [4] Orion also introduced a few other one-off emails from 2013 with price and sales information.

20   *See* TX 1180 (Sept. 23, 2013 email between Corey Lee and Celestron and Chiu discussing

21   obtaining pricing and quantity information for Bushnell's AmScope), 1286 (Nov. 19, 2013 email

22   from Ryan Chen to Ni and Shen attaching list of parts Meade purchased from Chinese vendors; Ni

23   explained that this list was sent to Shen so that he could see if Suzhou Synta could supply Meade

24   with materials (Trial Tr. (10/25/19) at 677:20-678:6)), 1660 (Oct. 6, 2013 email from Ni to Shen

25   attaching another parts list; as with TX 1286, Ni sent this to Shen to see if Suzhou Synta could

26   supply parts to Meade (Trial Tr. (10/25/19) at 679:23-681:7)).  As discussed above, that the

27   occasional exchange of price information between sales representatives is not sufficient to

28   establish a conspiracy to fix prices.  *In re Baby Food Antitrust Litig.*, 166 F.3d at 124-26.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER
OF LAW; MEM. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   Celestron and Orion—which cannot support the inference of a conspiracy standing alone.  Finally,

2   the inference of a price fixing conspiracy is also inconsistent with the facts, which show that

3   Ningbo Sunny and Suzhou Synta charged different prices for the comparable products they sold,

4   and that Ningbo Sunny was consistently undercutting Suzhou Synta's prices.  *See, e.g.*, TX 2041,

5   2096, 2098 (showing Suzhou Synta sold the StarBlast telescope to Orion for $99, while Orion paid

6   Good Advance $90 for the same SKU, and Good Advance paid Ningbo Sunny $88); TX 2404,

7   2405, 2406 (for the Astroview:  Suzhou Synta: $114; Good Advance: $108; Ningbo Sunny:

8   $99.20); TX 2399, 2041, 2096 (for the FunScope:  Suzhou Synta: $34; Good Advance: $29;

9   Ningbo Sunny: $27).  The evidence, even when viewed in the light most favorable to Orion,

10   simply does not support a finding that Defendants engaged in a per se price fixing agreement.

11                 b.   *No Reasonable Jury Could Find Defendants Liable for Orion's Failure to Acquire the Hayneedle Assets.*

12

13          Orion has also failed to provide sufficient evidence at trial for a jury to find Section 1

14   liability based on its failure to acquire the Hayneedle assets for three primary reasons.

15          **First**, there is no evidence demonstrating that Defendants reached an agreement with their

16   horizontal competitor—Suzhou Synta—to withdraw Orion's credit.  Indeed, because Ningbo

17   Sunny never extended Orion any credit, there was no credit for it to withdraw.  *See* Trial Tr.

18   (11/08/19) at 1539:24-1540:1.  Instead, the evidence shows that on June 4, 2014, Suzhou Synta

19   sent an email to Orion requiring it to pay its outstanding invoices before Suzhou Synta would ship

20   Orion any more products because it "could not trust Orion's credit any more [sic]" in light of

21   Orion's over-expansion in acquiring the Hayneedle assets.  TX 1034.  The email was forwarded to

22   James Chiu, who discussed the matter with Ningbo Sunny's broker, Joyce Huang of Good

23   Advance, who informed him that Good Advance would not be able to pay for its order from

24   Ningbo Sunny if Orion defaulted on its payments to Good Advance.  *Id.* (11/08/19) at 1538:12-

25   1539:10.  Concerned for Ningbo Sunny's ability to collect on its accounts receivable, and given

26   his limited English, Mr. Chiu followed Ms. Huang's advice to write to Orion and just used the

27   same email sent by Suzhou Synta.  *Id.* at 1540:4-24; *see also id.* 1470:4-15; TX 1773.  Mr. Chiu

28   confirmed that he did not discuss such action with anyone at Suzhou Synta, and that his actions

-16-

were solely designed to protect Ningbo Sunny's ability to collect payments for the products it had

already shipped.  *Id.* at 1540:4-24; *see also id.* (10/25/19) at 739:19-740:14, 744:19-22 (Ni

confirming only concern was to protect Ningbo Sunny's AR).  At most, the evidence merely

shows consciously parallel behavior, which alone does not support a finding of conspiracy.[5]

*Theatre Enterprises v. Paramount Film Distrib*, 201 F.2d 306, 313 (4th Cir. 1953) ("mere

consciously parallel business practices" are insufficient); *Wright v. S. Mono Hosp. Dist.*, 631 F.

Supp. 1294, 1320 (E.D. Cal. 1986) ("In the Ninth Circuit, 'conscious parallelism alone is

insufficient to establish an inference of conspiracy.'").

    ***Second***, there is no evidence Defendants' conduct actually caused the Hayneedle deal to

fall through.  On the contrary, the evidence shows Orion's deal with Hayneedle ultimately fell

apart because Orion insisted that Hayneedle acquiesce to a non-compete clause.  Trial Tr.

(11/13/19) at 1810:23-1820:5; TX 2161 (Sept. 9, 2014 email from Moreo stating:  "Essentially, we

could not agree on the final terms of the transaction–from Orion's perspective we insisted on legal

protection in the contract re non-compete provisions that the Seller found unacceptable."); TX

2218 (Sept. 13, 2014 board presentation explaining deal fell apart because Hayneedle intended to

continue to compete).  Although Mr. Moreo testified that the deal "blew up" in part because of

cash flow constraints placed on Orion by Ningbo Sunny and Suzhou Synta, Trial Tr. at 1814:14-

18, Mr. Moreo's self-serving and speculative testimony on this issue is insufficient to create an

issue of fact for a jury.  *See AT&T Mobility, LLC v. AU Optronics Corp.* (*In re TFT-LCD (Flat

Panel) Antitrust Litig.*), No. M 07-1827 SI, 2012 WL 3727221, at *2 (N.D. Cal. Aug. 27, 2012)

---

[5] In connection with their examination of defense witnesses regarding the Hayneedle transaction, Orion's counsel cited two emails from David Shen, TX 1193 and 1194, dated June 13, 2014 and June 14, 2014 respectively, to which Defendants did not respond.  These emails were sent after Ningbo Sunny had already requested that Orion pay its outstanding invoices, *see* TX 1773; 1247, and therefore shed no light on whether there was an agreement between Mr. Shen and anyone at Ningbo Sunny to jointly withdraw Orion's credit.

1   (no genuine issue of fact "where the only evidence presented is uncorroborated and self-serving

2   testimony") (internal quotation marks and citation omitted).  In any event, it is inconsistent with

3   the evidence, which shows that Orion experienced no issues with its financing.  Trial Tr.

4   (11/13/19) at 1810:9-22 (Orion had money to complete acquisition); TX 2212 at 5 (Sept. 2014

5   presentation to Imaginova's Board of Directors stating financing to complete acquisition in place

6   despite Ningbo Sunny's June 4 email).[6]

7          ***Third***, even assuming Orion was harmed because it failed to acquire the Hayneedle assets,

8   Orion has not adduced a scintilla of evidence to show how its failure to acquire the Hayneedle

9   assets has resulted in harm to competition.  *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297,

10  308 (3d Cir. 2007) ("Conduct that merely harms competitors, however, while not harming the

11  competitive process itself, is not anticompetitive.").  For all of these reasons, judgment as a matter

12  of law should be granted as to Orion's Section 1 claim stemming from the Hayneedle acquisition.

13                 2.      Plaintiff Has Failed To Introduce Any Evidence That Defendants Joined a
                           Market Allocation Conspiracy.

14

15         Orion claims that Defendants divided the telescope manufacturing and distribution

16  markets.  *See* FAC ¶ 133.[7]  Neither of Orion's market allocation theories has merit.

17  _____

18  [6] Because Orion has failed to show Ningbo Sunny's alleged misconduct caused the injury Orion

19  claims, it has also failed to establish antitrust injury.  *Space Exploration Techs. Corp. v. Boeing*
    *Co.*, No. 05-07533, 2006 U.S. Dist. LEXIS 96389, at *14-15 (C.D. Cal. May 12, 2006), *aff'd*, 281

20  Fed. App'x 769 (9th Cir. 2008) (no antitrust standing where plaintiff's injury did not flow from

21  defendants' allegedly anticompetitive conduct).

22  [7] Orion's initial proposed jury Section 1 instructions focused solely on market allocation and price

23  fixing, ECF Nos. 371 & 377 (despite passing references to "customer allocation" in instruction

24  titles), and nowhere in Orion's operative complaint does it assert a customer allocation agreement,

25  *see generally* ECF No. 41.  Defendants object to Orion's untimely and unjustified request for an

26  explicit instruction on such claim after the close of evidence.  *See Senra v. Cunningham*, 9 F.3d

27  168, 171 (1st Cir. 1993) (court did not err in refusing to consider jury instructions plaintiffs

28

-18-

1

   a.   *The Evidence Does Not Support a Finding that Defendants Conspired to Divide the Manufacturing Market*

2

3
        As a threshold issue, Orion adduced absolutely no evidence at trial to show that Meade or

4
Sunny Optics were part of any agreement to divide the market for telescope manufacturing.

5
Instead, Orion has argued and attempted to prove that Ningbo Sunny and Suzhou Synta could

6
manufacture competing, consumer telescopes, and the fact that they did not must mean they

7
entered into an agreement under which they chose not to do so.  *See* Trial Tr. at 1856:5-10

8
(Professor Sasian explaining that his assignment was to analyze whether Suzhou Synta and

9
Ningbo Sunny could manufacture the same telescopes).  As such, this claim fails as a matter of

10
law.

11
        It fares no better with respect to Suzhou Synta and Ningbo Sunny.  As Mr. Ni, Mr. Lupica,

12
Mr. Chiu, and Mr. Anderson explained, Ningbo Sunny "had different capacities[,]" and lacked the

13
machinery and skilled workforce to produce high-end telescopes.  Anderson Dep. Tr. 43:7-44:4;

14
Trial Tr. (10/25/19) at 771:22-777:9 (Ni explaining equipment and personnel required to make

15
advanced products, which Ningbo did not have; indeed, Ningbo Sunny has only one in-house

16
designer who only has a high school degree); *id.* at 1044, 1089 (Lupica stating that Suzhou Synta

17
focused on larger aperture, higher quality products that had higher margins, but Ningbo Sunny's

18
expertise was in low-end, high volume products); *id.* at 1504-07 (Chiu explaining that Ningbo

19
Sunny lacks people, equipment, and capabilities to make high-end products and ISO 9001

20
certification has no bearing on what type of telescopes—or any products—a company can

21
produce).  The evidence simply shows that Ningbo Sunny has continuously manufactured lower-

22
end, high volume products, while Suzhou Synta decided to sell high-end products which have

23
better profit margins after acquiring Celestron, with its machinery, technical expertise, and

24
intellectual property.  Trial Tr. (11/05/19) at 1088:15-1089:15 (Lupica discussing relocation of

25
_____

26
offered shortly before the close of evidence where the court had requested the instructions 20 days

27
in advance of trial and plaintiffs had not shown that the tardily filed jury instructions pertained to a

28
matter that was not foreseeable at the time set by the court).

-19-

1  Celestron's machinery to China, and margins on various telescope products).  The antitrust laws

2  expressly permit companies to make such unilateral decisions about the products that they make

3  and sell.  *Glenn Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 372 (9th Cir. 2003).

4       Orion's witnesses have asserted that because Ningbo Sunny's factory is "large" and

5  "impressive," it must have been able to manufacture all of the same products as Suzhou Synta.

6  *E.g.*, Trial Tr. (11/06/19) at 1313:1-17 (Espinosa stating Ningbo Sunny's factory was better than

7  Suzhou Synta's because it was "a lot larger, a lot cleaner, and it looked like they were really

8  efficient with their product building"); *id.* 1950:1-1953:20 (Sasian stating Ningbo Sunny's factory

9  on Google Maps is large and he "believe[s]" that the machines that were used to make Ningbo

10 Sunny telescopes were capable of mass production).  But the size of a factory says nothing about

11 the manufacturing equipment contained inside or whether the employees possess the requisite skill

12 to manufacture any particular type of product.  In any event, the mere fact that Suzhou Synta and

13 Ningbo Sunny manufactured different products does not "tend to show" conspiracy.

14      Moreover, the evidence at trial has shown that it would make no sense for Ningbo Sunny

15 to enter into a market allocation agreement that prohibited it from selling high-end telescopes

16 while simultaneously investing $15 million dollars in a company that manufactures and sells high-

17 end telescopes that compete with its alleged coconspirators' products.  Trial Tr. (11/05/19) at

18 1078:3-1079:11.  "Antitrust claims must make economic sense."  *Adaptive Power Solutions,*

19 *LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).  Orion's claim fails this test as

20 the evidence at trial confirms that one of the main reasons that Sunny acquired Meade was to take

21 advantage of its ***full line of telescopes***, ***including high-end models***.  Trial Tr. (10/25/19) at 728:5-

22 24 (Ni:  "The decision of acquiring Meade came as an overall strategy for Ningbo Sunny because

23 Ningbo Sunny had always been in the low product market and having Meade would give us

24 more"; "Ningbo Sunny wanted to become a great brand, the largest brand in the world by having

25 Meade because it expands its production life [sic] also to high-end products"); *see also* Trial Tr.

26 (10/28/19) at 804:21-805:4 (Ni:  "After [it] successfully acquired Meade, Ningbo Sunny was able

27 to tap into that high-end product market and Ningbo Sunny then had the manufacturing capability

28 and intellectual properties . . . . I believe in the future this is going to impact Ningbo Sunny in a

-20-

1   more positive way").  This claim makes even less sense in light of the economic realities, which

2   show that Ningbo Sunny in fact competed with Suzhou Synta for sales of the overlapping products

3   that they did manufacture.  *E.g.*, TX 2171 (Nov. 11, 2014 email from Moreo discussing Chiu's

4   quote on three SKUs that were being manufactured by Suzhou Synta for Orion at the time), 2148

5   (2013 quote showing Ningbo Sunny undercutting Suzhou Synta's prices).

            b.    *The Evidence Does Not Support a Finding that Defendants Conspired to*
6                 *Divide the Distribution Market.*

7            Nor does the evidence support a finding that Defendants conspired to divide the

8   distribution market.  To the contrary, the evidence shows that Meade is aggressively competing

9   with Celestron to distribute telescopes at all levels to an array of different customers.  Trial Tr.

10  (11/06/19) 1222:24-1252:8 & TX 2014, 2036, 2038 (Aniceto describing using former sales

11  contacts from Celestron to increase Meade's sales and reducing Meade's product prices to be

12  competitive with Celestron); Trial Tr. at 1258:25-1267:14 & TX 2061 (Aniceto describing

13  Meade's goal to "definitely be a competitor to Celestron"); Trial Tr. at 1176:5-22 (Meade was

14  focused on selling all products and gaining customers at all levels).  And indeed, given the number

15  of competitors in the distribution market, a conspiracy to allocate the market between only two

16  distributors would provide no apparent benefit, rendering this claim economically implausible.

17  *Stanislaus Food Products Co. v. USS-POSCO Industries*, 803 F.3d 1084, 1090-91 (9th Cir. 2015)

18  (market allocation scheme not rational unless there is little competition or where payoff is likely to

19  be significant); Trial Tr. at 1214:1-19 (listing several distributors that compete with Meade).

20          In sum, there is no direct evidence of an agreement to allocate the market for telescope

21  manufacturing or distribution services and the facts contradict such a finding.  Judgment as a

22  matter of law should be granted as to Orion's market allocation claim.

            3.    <u>At a Minimum, There Is No Evidence of Injury—or Any Conspiracy—</u>
23                <u>After September 2016.</u>

24          The only damages claimed by Orion as a result of Defendants' alleged Section 1 violations

25  are price overcharges.  Zona Report ¶ 132; Trial Tr. (11/14/19) at 1974:5-22 (Zona).  However,

26  the undisputed evidence shows that Ningbo Sunny ended its sales relationship with Orion in

27  September of 2016, after Orion filed this lawsuit.  Trial Tr. (11/13/19) at 1642:3-5 (Moreo stating

28

-21-

1    Ningbo Sunny stopped supplying in September 2016).  At around the same time, Orion entered

2    into a Supply Agreement with Suzhou Synta, which guaranteed it most favored customer status—

3    i.e. that Orion would receive the best price for goods that Suzhou Synta was offering to any of its

4    customers.  TX 2420 ¶ 4.2.1 ("Seller will make and sell Products to Buyer on a 'Most Favored

5    Customer' or 'MFC' status" with audit rights).  And indeed, there has been no evidence admitted

6    at trial that shows that there were any communications between Defendants and Suzhou Synta or

7    Celestron (or any other "Synta entity") at any point after December 2015 to the present.  *See* TX

8    1208 (last email even referencing Shen).  Even assuming a conspiracy existed, there is no

9    evidence that it continued into or beyond 2016, or that Orion experienced any overcharge damages

10   as a result.

    **C.    Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's**
           **Section 7 Claim.**

11

12           To establish a violation of Section 7, Orion was required to prove that the effect of Ningbo

13   Sunny's acquisition of Meade "may be substantially to lessen competition, or to tend to create a

14   monopoly" in a particular relevant market.  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's*

15   *Health Sys., Ltd.*, 778 F.3d 775, 783-84 (9th Cir. 2015); *see also* Kevin F. O'Malley, et al., 3A

16   Federal Jury Practice and Instructions, § 150:131.  As discussed above with regard to Orion's

17   Section 2 claims, Orion has failed to establish a relevant market, which is fatal to its Section 7

18   claim as well.  *See supra*, Section III.A.4.  Nor has Orion shown that (1) the acquisition of Meade

19   has substantially lessened competition or tended to create a monopoly, or (2) Orion has suffered

20   antitrust injury as a result of Defendants' alleged Section 7 violation.  *See* Order Granting Mot. to

21   Dismiss 11:8-13, ECF No. 38 ("Moreover, '[i]f the injury flows from aspects of the defendant's

22   conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the

23   defendant's conduct is illegal per se"; "loss incurred because of an unlawful acquisition that would

24   also have been incurred had the acquisition been lawful is not antitrust injury because it does not

25   flow from that which makes the defendant's conduct unlawful.").

26           Orion has failed to adduce any evidence showing that Ningbo Sunny's acquisition of

27   Meade tended to create a monopoly or has reduced competition.  While Dr. Zona testified that the

28

1  market for telescope manufacturing is highly concentrated, his analysis stops there; he does not

2  consider at all the effects of the Meade acquisition on the market (even assuming it were properly

3  defined).  Trial Tr. (11/14/19) at 1987:20-1989:4; Zona Rep. ¶¶ 56-57.  At best, Orion's counsel

4  speculated that Orion would have "self-determination" if Orion or another company had acquired

5  Meade.  The evidence tells a different story.  Orion never purchased telescopes from Meade prior

6  to the acquisition.  Trial Tr. (11/05/19) at 1104:1-1107:15 (Lupica).  Despite subsequent

7  discussions between Orion and Meade for Meade to produce private-label telescopes for Orion,

8  there were never any follow up discussions, even though Meade "welcomed" the additional

9  business.  Trial Tr. (11/06/19) at 1209:8-1210:10 (Aniceto).  And at the time Orion was

10  considering a "strategic relationship[]" with Meade in January 2013, Mr. Moreo stated that Orion

11  was "not going to manufacture" telescopes and agreed that Orion would "shut that part of the

12  [Meade] operation down."  Trial Tr. (11/13/19) at 1827:6-1830:21, TX 2183.  On the whole, the

13  record reveals no facts about what the world would have looked like if JOC, MITC, or any other

14  company had acquired Meade instead—or if those companies would have made the financial

15  investment or had the industry understanding to bring Meade back from the verge of bankruptcy.

16  *See* Trial Tr. (11/05/19) at 1049:4-21, 1057:6-1058:6 (Lupica).

17      The evidence does show however that Ningbo Sunny's acquisition of Meade ***increased***

18  competition.  When Ningbo Sunny purchased Meade, Meade was a failing business, on the brink

19  of bankruptcy, losing millions of dollars every year, and it had secured high-interest loans to fund

20  the business by using its intellectual property as collateral.  Trial Tr. (10/28/19) at 806:22-809:24-

21  810:12 (Ni believes Meade would not exist today without acquisition; loaned Meade millions on

22  top of purchase price to stabilize Meade); *id.* (11/13/19) at 1824:22-1825:4 & TX 2183 (Moreo

23  believed in January 2013 that "BK could happen in the next 90 days" unless someone tried to buy

24  Meade).  It was in such poor financial condition it required a capital investment of roughly $15

25  million dollars.  Trial Tr. (11/05/19) 1077:7-1079:22 (Lupica).  Ningbo Sunny made that

26  investment.  As a result, Meade has once again become a viable player in the industry, vigorously

27  competing in the high-end telescope manufacturing market and the telescope distribution

28  market—against Suzhou Synta and Celestron.  *See also* Trial Tr. (10/28/19) at 799:13-801:22

-23-

1  (Ningbo Sunny's relationship with Meade has provided Meade with full product line so it can

2  compete in the low-, medium-, and high-end markets); *id.* (11/06/19) at 1222:24-1252:8 & TX

3  2014, 2036, 2038 (Aniceto describing using former sales contacts from Celestron to increase

4  Meade's sales and reducing Meade's product prices to be competitive with Celestron); *id.* at

5  1258:25-1267:14 & TX 2061 (Aniceto describing Meade's goal to "definitely be a competitor to

6  Celestron").  And Meade has been able to compete even though *it did not raise its prices* after the

7  acquisition, and in fact, made strategic decisions to *lower* its prices to better challenge Celestron.

8  *E.g.*, Trial Tr. (11/05/19) at 1084:15-1085:19 (Lupica does not believe Meade "changed pricing on

9  any of the product" after acquisition other than to offer promotions); *id.* (11/06/19) at 1225:10-21

10  (Aniceto noting he lowered retail price and wholesale costs to be "more competitive with the

11  products that Celestron had").

12       At bottom, Orion has not carried its burden to show that competition has been lessened or a

13  monopoly created in a properly defined relevant market.  In fact, given the procompetitive effects

14  of the acquisition and the fact that it had no impact on Orion—which did not purchase Orion-

15  branded telescopes from Meade prior to the acquisition, abandoned discussions to do so after, and

16  intended to shut Meade down if it acquired Meade for itself—Orion also has failed to show

17  antitrust injury.  *See Rebel Oil*, 51 F.3d at 1433 ("If the injury flows from aspects of the

18  defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even

19  if the defendant's conduct is illegal *per se*."); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone,

20  Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) ("[L]oss incurred because of an unlawful acquisition

21  that would also have been incurred had the acquisition been lawful is not antitrust injury because it

22  does not flow from that which makes the defendant's conduct unlawful.").  The evidence does not

23  support a finding of liability under Section 7.

24       **D.    Defendants Are Entitled to Judgment as a Matter of Law on Plaintiff's State
             Law Claims.**

25       Plaintiff's remaining claims are asserted under California's Unfair Competition Law

26  ("UCL") and Cartwright Act.  FAC at 28-29.  Claims bought under both California's Cartwright

27  Act and the Unfair Competition Laws are analyzed alongside federal antitrust claims.  *Cnty. of*

28

*Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act") (citation omitted); *Stevens v. Sup. Ct.*, 75 Cal.App.4th 594, 602 (1999) ("The UCL works by borrowing violations of other laws and treating those transgressions, when committed as a business activity, as unlawful business practices.") (citation, quotations, and alterations omitted).  Accordingly, because Plaintiff's state law claims are based on the same conduct and legal theories as its federal claims, its state law claims fail for all of the reasons set forth above.  *See id.*

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant judgment as a matter of law in favor of Defendants as to each of Plaintiff's claims.

Dated:  November 18, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By    _____
*/s/ Michael W. Scarborough*
MICHAEL W. SCARBOROUGH

Attorneys for Defendants
NINGBO SUNNY ELECTRONIC CO., LTD.,
SUNNY OPTICS, INC. and
MEADE INSTRUMENTS CORP.