**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
Jeffrey M. Theodore, Esq. (SBN: 324823)
  theodore@braunhagey.com
Ronald J. Fisher, Esq. (SBN: 298660)
  fisher@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, Tenth Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

ATTORNEYS FOR PLAINTIFF
OPTRONIC TECHNOLOGIES, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OPTRONIC TECHNOLOGIES, INC., d/b/a Orion Telescopes & Binoculars ®, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>NINGBO SUNNY ELECTRONIC CO., LTD., SUNNY OPTICS, INC., MEADE INSTRUMENTS CORP., and DOES 1 - 25,<br><br>Defendant. | Case No: 5:16-cv-06370-EJD-VKD<br><br>**PLAINTIFF OPTRONIC TECHNOLOGIES, INC.'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM**<br><br>**Date:** April 2, 2020<br>**Time:** 9:00 A.M.<br>**Judge:** Hon. Edward J. Davila<br>**Location:** Courtroom 4 – 5th Fl.<br><br>**Compl. Filed:** Nov. 1, 2016<br>**First Am. Compl.:** Nov. 3, 2017<br>**Final Pretrial Conf.:** Oct. 10, 2019<br>**Trial Date:** Oct. 15, 2019<br><br>**Judgment:** Dec. 5, 2019 |

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 2

THE FACTUAL RECORD ......................................................................................... 3

    A.    Defendant Conspired to Acquire Meade to Consolidate Its Nascent Monopoly.... 3

    B.    Defendant Unlawfully Colluded with Synta to Fix Prices and Divide Markets..... 7

    C.    Defendant's Unlawful Acts Injured Orion .............................................. 9

ARGUMENT .............................................................................................................. 10

I.     ORION'S REQUESTED INJUNCTION .......................................................... 10

II.    THE PREREQUISITES TO INJUNCTIVE RELIEF ARE SATISFIED ........ 10

    A.    Orion is Entitled to Injunctive Relief Under the Clayton Act ............................ 10

         1.    Legal Standard ......................................................................... 11

         2.    Defendant's Continuing Violations of the Antitrust Laws Warrant Injunctive Relief  .......................................................................... 11

         3.    Orion Will Suffer Irreparable Injury that Money Damages Cannot Remedy Absent Relief ............................................................ 12

         4.    The Balance of Hardships and the Public Interest Favor Injunctive Relief13

    B.    Orion is Entitled to Judgment and Injunctive Relief Under Its UCL Claim ........ 14

III.   THE REQUESTED INJUNCTION APPROPRIATELY REMEDIES DEFENDANT'S ANTICOMPETITIVE CONDUCT .................................... 15

    A.    Defendant Should Be Ordered to Supply Meade and Orion on Nondiscriminatory Terms for Five Years ................................................................. 16

         1.    The Court Is Empowered to Order Defendant to Supply Meade and Orion Under the Clayton Act ............................................ 16

         2.    The UCL Independently Empowers the Court to Order Defendant to Supply Meade and Orion on Non-Discriminatory Terms.................... 18

         3.    Requiring Defendant to Supply Meade is Critical to Restoring Competition and Ending Defendant's Conspiracy .................... 19

         4.    Requiring Defendant to Supply Orion is Also Critical to Restoring Competition ........................................................... 20

    B.    Defendant Should Be Enjoined from Continuing To Collude............................. 20

CONCLUSION........................................................................................................... 22

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Alvarez v. Chevron Corp.*,
    656 F.3d 925 (9th Cir. 2011) ........................................................................................ 14

*Bergen Drug Co. v. Parke, Davis & Co.*,
    307 F.2d 725 (3rd Cir. 1962) ........................................................................................ 18

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir.1987) ....................................................................................... 17

*Cel-Tech Communs., Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal.4th 163, (1999) ........................................................................................... 14, 19

*City of S. Pasadena v. Dep't of Transp.*,
    29 Cal. App. 4th 1280 (1994) ................................................................................. 14, 15

*Cortez v. Purolator Air Filtration Prod. Co.*,
    23 Cal. 4th 163 (2000) ................................................................................... 14, 19, 20

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................................... 11, 12

*Feesers, Inc. v. Michael Foods, Inc.*,
    No. 1:CV-04-576, 2009 WL 1475270 (M.D. Pa. May 26, 2009) ............................... 18

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ............................................................................................... 15, 16

*Haas Automation, Inc. v. Denny*,
    No. 2:12-CV-4779 (CBM) (PLAx), 2014 WL 2966989 (C.D. Cal. Jul. 1, 2014) ................ 14, 15

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1971) ....................................................................................................... 17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ........................................................................................ 12

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ........................................................................... 2, 17, 20

*In re Estate of Ferdinand Marcos, Human Rights Litig.*,
    25 F.3d 1467 (9th Cir. 1994) ........................................................................................ 12

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947) ............................................................................................... 16, 18

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ........................................................................................ 21

*Lakeview Tech., Inc. v. Robinson*,
    446 F.3d 655 (7th Cir. 2006) ........................................................................................ 12

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.*,
    214 Cal. App. 4th 544 (2013) ................................................................................. 18, 19

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ....................................................................................................... 18

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ........................................................................ 13

*Monster Energy Co. v. Integrated Supply Network, LLC*,
    No. ED CV 17-548-CBM-RAOX, 2019 WL 2781402 (C.D. Cal. July 2, 2019) .................. 14, 19

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

*Nat'l Soc. of Prof'l Engineers v. United States*,
    435 U.S. 679 (1978).............................................................................................. 16
*Palmer v. City of Chicago*,
    806 F.2d 1316 (7th Cir. 1986) ........................................................................... 13
*Paschall v. Kansas City Star Co.*,
    695 F.2d 322 (8th Cir. 1982) ............................................................................. 18
*Phillips v. Crown Central Petro. Corp.*,
    602 F.2d 616 (4th Cir. 1979) ............................................................................. 18
*Sanders v. City of Newport*,
    657 F.3d 772 (9th Cir. 2011) ....................................................................... 15, 21
*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    345 F. Supp. 3d 614 (E.D. Va. 2018) .......................................................... 10, 11
*Todhunter-Mitchell &Co., Ltd. v. Anheuser-Busch, Inc.*,
    375 F.Supp. 610 (E.D. Pa. 1974) ...................................................................... 18
*Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*,
    633 F.2d 477 (7th Cir. 1980) ....................................................................... 17, 18
*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ........................................................................... 21
*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).......................................................................................... 16
*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968)................................................................................... passim
*Zenith Radio Corp. v Hazeltine Research, Inc.*,
    395 U.S. 100 (1969).......................................................................................... 11

**STATUTES**

15 U.S.C. § 26................................................................................................... 1, 11
Cal. Bus. & Prof. Code Section 17203 .................................................................. 14
Cal Bus. and Prof. Code § 17200 ...................................................................... 1, 3

**RULES**

Federal Rules of Civil Procedure 54(b) and 58(b)(2)(B)..................................... 1, 14

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1                                     **NOTICE OF MOTION AND MOTION**

2      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that on April 2, 2020, at 9:00 a.m., in Courtroom 4, 5th Floor,

4  280 South 1st Street, San Jose, California, before the Honorable Edward J. Davila, Plaintiff

5  Optronic Technologies, Inc. ("Orion") will and hereby does respectfully bring this Motion for

6  Equitable Relief and Judgment on UCL Claim under 15 U.S.C. § 26, Cal Bus. and Prof. Code

7  § 17200, and Federal Rules of Civil Procedure 54(b) and 58(b)(2)(B).

8      This Motion is based upon this Notice of Motion and Motion, the points and authorities in

9  the accompanying Memorandum of Points and Authorities, the Declaration of Matthew Borden

10  filed concurrently herewith, the complete files and records in this action, oral argument of counsel,

11  authorities that may be presented at or before the hearing, and such other and further matters as this

12  Court may consider.

13

14  Dated:  February 20, 2020               Respectfully submitted,

15                                 BRAUNHAGEY & BORDEN LLP

16

17                                 By:   */s/ Matthew Borden*
                                        Matthew Borden

18                                 Attorneys for Plaintiff OPTRONIC
                                TECHNOLOGIES, INC. d/b/a Orion

19                                 Telescopes & Binoculars ®

20

21

22

23

24

25

26

27

28

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

1        Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars ("Orion")

2  respectfully submits this post-trial motion for equitable relief.

3  **INTRODUCTION**

4        On November 26, 2019, the jury found in favor of Orion and against Defendant Ningbo

5  Sunny Electronic, Co. on all of Orion's antitrust claims under Section 1 and Section 2 of the

6  Sherman Act and Section 7 of the Clayton Act.  Orion now seeks equitable relief to ensure that

7  Defendant's antitrust violations permanently cease and to remedy the harm Defendant has inflicted

8  and continues to inflict on the U.S. telescope market.

9        The main form of equitable relief necessary to ameliorate Defendant's antitrust violations is

10  an order requiring Defendant to continue supplying Meade on non-discriminatory terms for at least

11  five years, to give Meade time to regain financial independence.  The jury found that Defendant's

12  acquisition of Meade illegally overconcentrated the market by eliminating a potential source of

13  supply and an outlet for telescope sales.  Since trial, Defendant has done everything in its power to

14  frustrate the Court's Judgment and to continue its unlawful activities.  These activities include

15  submitting false pleadings and a false declaration to the Court, smuggling assets out of the country,

16  and cutting off Meade's supply to ensure that no competitor can make use of the asset.  Similar to

17  Defendant's acquisition of Meade, destroying the company eliminates a potential alternative source

18  of supply, and destroys an option for telescope sales not controlled by Defendant and its co-

19  conspirators.  While temporarily stopping sales to Meade immediately hurts Defendant's business,

20  doing so is essential to continue Defendant's plan to maintain its unlawful control over telescope

21  manufacturing.

22        Defendant also should be ordered to supply Orion on non-discriminatory terms for five

23  years.  The Ninth Circuit has held that an injunction requiring an antitrust defendant to sell

24  products to particular parties on nondiscriminatory terms is an appropriate remedy for

25  anticompetitive conduct.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir.

26  1997).

27        Equitable relief is also warranted to redress the jury's finding that Defendant engaged in

28  price fixing and market allocation with its competitor Synta and Synta's wholly-owned subsidiary

Celestron.  To prevent such conduct from recurring, the Court should enjoin Defendant from:
(1) communicating with Synta about the prices of telescopes and accessories; (2) sharing customer
information with Synta or Celestron, including but not limited to statistics about which products
Defendant's customers are buying, how much Defendant is charging for those products, and the
volume of purchases from Defendant; (3) communicating with Synta about which products
Defendant and Synta will manufacture; and (4) participating in any internal meetings or strategy
sessions in which any representative from a competitor, including David Shen or any employee of
Synta, is in attendance.

Orion has prevailed on the merits.  The requested relief is authorized under the Court's wide
equitable powers and broad mandate under the Sherman Act and Clayton Act to "ensure that there
remain no practices likely to result in monopolization in the future."  *United States v. United Shoe
Mach. Corp.*, 391 U.S. 244, 250 (1968) (citations omitted).  It is especially warranted under the
Court's broad remedial powers under Business & Professions Code §§ 17200 *et seq.*

## THE FACTUAL RECORD

Orion briefly summarizes the factual record presented at trial for the Court's benefit.

### A.    Defendant Conspired to Acquire Meade to Consolidate Its Nascent Monopoly

The jury found and the evidence at trial proved that Defendant Ningbo Sunny is the
dominant firm in the highly concentrated telescope and accessories manufacturing market,
possessing a market share as high as 63% between 2013 and 2018.  (TX 1938 (Zona market share
analysis); TX 1939 (Zona HHI calculation showing that the market has been highly concentrated
per DOJ/FTC Merger Guidelines from 2012 to 2018).)  The relevant market is a global market for
telescope and accessory manufacturing.  (Trial Tr. 1978:11-1982:9.[1])  Other than Defendant's co-
conspirator Synta,[2] Defendant has no serious challengers in that market: the remaining 20-30% of
market share is spread among *200 other entities*.  (*Id.*)

---

[1] The trial transcript excerpts cited in this Motion are filed herewith as **Exhibit 1** to the Declaration
of Matthew Borden ("Borden Decl.").

[2] "Synta" includes the entities encompassed in the Court's instruction regarding the settling Synta
entities: Suzhou Schmidt Optical Technology Co. Ltd., Nantong Schmidt Opto-Electrical
Technology Co., Ltd; Good Advance Industries, Ltd.; Celestron Acquisition, LLC; Synta

1    In 1991 and again in 2002, the FTC took action to block proposed combinations between

2  the leading American telescope manufacturers, Celestron and Meade, on antitrust grounds.  (TX

3  1400 (1991); TX 1078 (2002).)  Then-Celestron CFO and CEO, and subsequent agent for

4  Defendants and CEO of Meade, Joe Lupica, was aware of these FTC actions barring any

5  combination of Meade and Celestron.  (Trial Tr. 840:19-841:1; 876:4-877:16.)  Despite this

6  knowledge, Mr. Lupica would actively seek to achieve such a combination during Defendants'

7  acquisition of Meade—at least until the Federal Trade Commission investigated.  (TX 1301.004.)

8    Synta bought Celestron in 2005.  (Trial Tr. 835:20-25.)

9    Synta's Chairman David Shen had been involved in Defendant Ningbo Sunny and its

10  Chairman Peter Ni since at least 2004/2005.  Mr. Shen once owned 26% percent of Ningbo Sunny,

11  which is now held by his sister-in-law.  (TX 1301.)  He was also a director of Ningbo Sunny.  (TX

12  1204.)  He resigned from Ningbo Sunny when Synta acquired Celestron due to what Defendant

13  called "conflicts of interest," *i.e.*, the inherent problem of being an executive and an owner of two

14  horizonal competitors.  (*Id.*)

15    On May 17, 2013, JOC's agreement to purchase Meade was announced.  (TX 1076.011.)

16  On May 23, 2013, executives and board members of Synta and its wholly-owned subsidiary

17  Celestron (including David Shen, Laurence Huen, Joe Lupica, and Dave Anderson) discussed

18  Defendant's potential acquisition of Meade and its manufacturing facility with Defendant,

19  including Peter Ni and James Chiu.  (TX 1076 Ex. A.)  During that meeting, Defendant and

20  Synta—horizontal competitors—agreed to a conspiracy whereby "[t]o prevent JOC to buy

21  MEADE," Sunny would purchase Meade with "the financial support to SUNNY" from

22  "CELESTRON / SYNTA."  (TX 1378.)  The object of the conspiracy was to prevent JOC from

23  acquiring Meade's manufacturing facility and thereby threaten Defendant's and Synta's

24  dominance.  (*Id.*)

25    At Synta's recommendation, Defendant engaged Synta's lawyers to handle the Meade

26  transaction, and expressly directed them in the engagement letter to take direction from the Synta's

27  ───────────────

28  Technology Corp.; Atlas E-Commerce, LLC; SW Technology Corp.; and David Shen. (Trial Tr.
407:13-22.)

1   and Celestron's executives, including David Shen, Laurence Huen, Dave Anderson, and Joe

2   Lupica.  (TX 1787; TX 1209.)  David Shen utilized this authority to ensure that there was no "loss

3   of control."  (TX 1172.)  Celestron CEO Dave Anderson shepherded through Defendant's letter of

4   intent to purchase Meade (TX 1172), which Defendant's Chairman Ni claimed he never read before

5   signing.  Mr. Anderson also helped Defendant's lawyers design the deal structure.  (TX 1341.004.)

6   Mr. Anderson's sworn testimony was that he had nothing to do with the Meade acquisition.

7   (Borden Decl. **Ex. 2** (Anderson Dep. Excerpts) played at Trial Tr. at 1960:15-1962:16.)  Mr. Ni

8   offered similar sworn testimony.  He testified:  "Celestron did not participate in any forms in the

9   acquisition of Meade."  (Borden Decl. **Ex. 3** (P. Ni 30(b)(6) Dep. at 33; *see also id.* ["Q. And when

10  you say did not participate in any form, you mean that they did not offer any assistance related to

11  the Meade acquisition; correct?  THE WITNESS: They did not participate in the process of work of

12  acquiring Meade."]) read into record at Trial Tr. 535:16-17.)  This testimony was obviously false.

13          Because they knew that the FTC would eventually begin scrutinizing the transaction, Synta

14  and Defendant agreed that Celestron CEO Joe Lupica (who was already working to help Ningbo

15  Sunny purchase Meade) would quit his role at Celestron on June 18, 2013, and "officially begin" as

16  Peter Ni's agent for the transaction on June 19, 2013.  (TX 1303.002.)

17          Funds to purchase Meade were sent from Sky Rainbow, a company jointly owned by David

18  Shen and Peter Ni.  (TX 1779.007; Trial Tr. 581:23-582:4.)  Mr. Ni bought Meade in his personal

19  capacity to avoid FTC inquiry.  (Trial Tr. 613:16-614:2.)  After avoiding U.S. regulatory inquiry,

20  he transferred Meade to Defendant for a dollar.  (Trial Tr. 410:2-20.)

21          David Shen's company, Celestron, made $7.2 million in "prepayments" to Ningbo Sunny

22  for telescopes before they were shipped, if ever.  Mr. Ni denied that this ever occurred under oath,

23  even though he was sent an accounting from Celestron's CFO, entitled "Summary of Pre-Payments

24  to Ningbo Sunny," which documented the $7.2 million in prepayments.  (TX 1157.)  A payment

25  from Celestron for supposed telescopes was used to make up the final amount of money Ningbo

26  Sunny needed to fund the acquisition.  (Trial Tr. at 8:18:4-821:15.)  After the payment was made,

27  Ningbo Sunny's Vice Chairman, James Chiu, wrote to Celestron to request "invoices" from its

28

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

1    customers to document the supposed purchases.  (TX 1428.)  Defendant's business records reflect

2    that Celestron was given equity in Meade for this payment.  (TX 1323.)

3         Celestron also provided interest-free loans to Defendant to fund Meade's operations and to

4    finance the acquisition.  (TX 1305.015; (Borden Decl. **Ex. 4** (Lupica Dep. 378:18-379:13) (played

5    at Trial Tr. 997:3.))  Because Defendant knew it would be wrong to have Synta, a horizontal

6    competitor, lend money to Ningbo Sunny, Celestron would advance the money to Ningbo Sunny,

7    and then Synta would delay collecting from Celestron for telescopes that Celestron bought from

8    Synta.  (TX 1181.)  These loans totaled over $10 million. (TX 1378.)  Celestron CEO Dave

9    Anderson admitted in writing that "the majority of [these] payments . . . were made in anticipation

10   with no discernable benefit to Celestron (i.e. no early payment discount)," and were raising red

11   flags with Celestron's auditors.  (TX 1378.)

12        Former Celestron CEO Joe Lupica admitted in his emails and on the witness stand that

13   Defendant could not have acquired Meade but for the collusive assistance Defendant received from

14   its horizontal competitor Synta.  (TX 1317; Trial Tr. 956:23-958:2.)  Defendant's books show that

15   Celestron received debt and equity interests in Defendant's subsidiary Sunny Optics in exchange

16   for this financing.  (TX 1323.14.)  The entries reflected in Defendant's books correspond, to the

17   cent, to payments Celestron was making to Defendant.  (*Compare* TX 1323.14 *with* TX 1428.003

18   (reflecting $301,505.88 payment).)

19        The Federal Trade Commission opened an inquiry into the Meade transaction after

20   receiving a tip that David Shen and Celestron may be involved with Defendant's acquisition of

21   Meade.  (TX 1301.002.)  Defendant and its lawyers understood that "the FTC is trying to see

22   whether Celestron is behind the acquisition and are looking for any ties between Sunny and

23   Celestron that would concern the FTC."  (TX 1301.002.)

24        In response, Defendant directed its lawyers to make multiple material misrepresentations to

25   the FTC regarding Synta's, Celestron's, and Ningbo Sunny's involvement in the Meade

26   acquisition, including that "David Shen has no role in the proposed acquisition of Meade by

27   Sunny." (TX 1393.)  This was obviously not true because Sky Rainbow, which was owned in part

28

1  by Mr. Shen (and his horizontal competitor, Mr. Ni), funded the transaction – except for the

2  payment that came from Mr. Shen's company, Celestron.

3       Defendant ultimately acquired Meade.  Defendant's acquisition of Meade caused the

4  relevant market's HHI, which already showed that the market was overconcentrated, to increase by

5  over 1,000 points.  (TX 1939.)

6       Mr. Ni testified under oath as follows:

7            Question: When did Mr. Shen stop consulting with Ningbo Sunny
          about Meade's products, technology and advantages?

8            Answer: I don't recall exactly. Maybe around July or August.

9            Question: July or August 2013?

          Answer: Yes.

10            Question: Shortly before the deal closed?

11            Answer: It was before the decision to acquire Meade."

12  (Borden Decl. **Ex. 5** (P. Ni Dep.) at 73:2-11, read into record at Trial Tr. 618:19-619:5.)

13       Mr. Ni's sworn testimony was false.  Once the acquisition closed, Peter Ni sent virtually all

14  of Meade's sensitive pricing, cost and confidential business information and strategies to Mr. Shen.

15  (TX 1017, TX 1286, TX 1660.)  Mr. Ni confirmed that he sent all of Meade's prices to Shen.

16  (Trial Tr. 680:11-16.)  Mr. Ni directed Meade executives, including Mr. Lupica and Victor

17  Aniceto, not to disrupt Synta or Celestron business when pricing their products.  (TX 1085.)  David

18  Shen and Peter Ni repeatedly met at Meade and Celestron's respective headquarters to discuss sales

19  strategies and other sensitive business information.  (TX 1306 (2013 Peter Ni, David Shen, and Joe

20  Lupica meeting agenda re Meade strategy); TX 1533; TX 1082 (2013 visit); TX 1313 (2014 visit);

21  TX 1208 (2016 visit).)

22      **B.**    **Defendant Unlawfully Colluded with Synta to Fix Prices and Divide Markets**

23       Communications between Peter Ni and David Shen show that they were dividing customers

24  between them.  (TX 1769.001 ("Bidding with Costco between May and June (compete with

25  Celestron for the price).  This is a very important issue.  This needs Director Ni to communicate

26  face-to-face with DAVE [Anderson] when he goes to the United States.  Don't bid.  If you let the

27  thing go by doing this, how would you deal with everything in the future? . . . Following a conflict,

28  celestron would not trust sunny any longer."); *id*. at -001 (Mr. Shen writing that Dave Anderson

1    "understands that Director Ni will not be a competitor and is trustworthy when it comes to

2    business.").)

3         Defendant's internal contemporaneous emails reflect Defendant's anticompetitive intent.

4    Meade CEO Joe Lupica wrote that he understood Peter Ni and David Shen's vision "of how the

5    four companies are to cooperate for the benefit of the entire group of companies (Sunny, Synta,

6    Meade, and Celestron)."  (TX 1311.)  Mr. Lupica also described how "the four companies can

7    dominate the telescope industry."  (TX 1805.)

8         At the urging of Celestron's CEO Corey Lee, Defendant shared the volume and prices paid

9    by Orion and other Celestron competitors directly with Celestron, despite understanding that these

10   were "trade secrets."  (TX 1762 (Mr. Lee asking for and receiving Orion's "order statistics"); TX

11   1180.)

12        Defendant colluded with Synta to coordinate the weaponization of intellectual property held

13   by Defendant against potential competitors.  (TX 1792.)  These discussions describe "subduing our

14   opponent without a weapon" as "[t]he optimal solution."  (*Id*.)

15        Defendant's emails with Synta employee Joyce Huang[3] show that Sunny and Synta

16   communicated regarding "avoiding conflict with Celestron products" and "considering the strategy

17   of . . . adopting different product prices to protect Celestron."  (TX 1347.)  Defendants and the

18   Synta Entities fixed prices and advantaged Celestron by forcing Orion and other non-Celestron

19   distributors to purchase all Sunny goods through Joyce Huang.  (TX 1864 (Ms. Huang directs Mr.

20   Chiu to raise prices offered to a customer because "Suzhou's price" was higher; Mr. Chiu

21   complies).)  The object of this conspiracy was to ensure that Celestron paid significantly lower

22   prices to advantage it in the market over Orion and other competitors.  (TX 1935.)  The affected

23   products were among Celestron's most successful products, including the AstroMaster.  (*Compare*

24   TX 1935 *with* TX 1307.003.)  Defendant and Entities knew that this conduct was unlawful; when

25

26   ─────────────────
     [3] Peter Ni admitted David Shen controlled "Good Advance" and that Joyce Huang was Shen's
     employee.  (Trial Tr. 432:13-433:23.)  And Good Advance's address is the same as David Shen's
27   business address.  (*Compare* TX 1779.007 (noting addresses of Sky Rainbow equity holders,
     including David Shen) *with* TX 2091.002 (noting Good Advance's address) *and* TX 1402 (Joyce
28   Huang business card noting the same address).)

1  Orion first gave notice of potential claims, Joyce Huang wrote James Chiu to say that "Mr. Shen is

2  afraid that Orion may check Good Advance account."  (TX 1265.)

3      Defendant's communications with Synta show that Defendant had agreed to divide the

4  market for telescopes and accessories.  (TX 1193 (David Shen to Peter Ni, James Chiu, Dave

5  Anderson, Laurence Huen, and David Shen's sister, Sylvia Shen: "The best way in the future is to

6  divide the products and sell them into different markets to reduce conflicts . . . .  No company can

7  replace CELESTRON…SKYWATCHER…MEADE."); TX 1765 ("We will take prompt action to

8  avoid conflict in the astronomical market.").)  Defendant and Synta could make competing lines of

9  telescopes.  (Trial Tr. 1856:11-1857:2; TX 1927 (describing Ningbo Sunny's factory capabilities);

10  TX 1438 (same).)  Defendant, however, did not make lines of telescopes that were made by Synta

11  at the same time.  (*E.g.*, Trial Tr. 1864:11-21.)

12      Defendant's communications with Synta show that Defendant jointly withdrew credit terms

13  to prevent Orion from acquiring Telescopes.com and other assets from Hayneedle.  On June 4,

14  2014, Synta sent an email to Orion withdrawing credit terms.  (TX 1773.002.)  David Shen and

15  Joyce Huang directed Defendant to do the same.  *Id*. at -001 ("Hence, the payment terms should be

16  the same as Suzhou.").  James Chiu complied, and admitted he did so because he was told to do so

17  by David Shen.  (TX 1775; Trial Tr. 1466:15-22.)

18      **C.      Defendant's Unlawful Acts Injured Orion**

19      After Orion signed a settlement agreement with Synta in September 2016, Defendant cut off

20  Orion's supply.  As a result, Synta now provides roughly 75% of Orion's products.  After a brief

21  price reset, Synta began raising Orion's prices to the point that it now pays more for telescopes than

22  it ever did.  (Trial Tr. 1738:11-21, 1767:1768:15, 1769:23-1770:14.)

23      Orion suffered millions of dollars in injury and damages as a result of Defendants' unlawful

24  collusion, attempted monopolization, and conspiracy to monopolize the market.  (*E.g.*, Trial Tr.

25  2056:17-23 ("Q. Sure. And I'm referring to the damages that you summarized in your table at page

26  59, the overcharge damages that resulted from the alleged conduct of the conspiracy and the

27  monopolization here; right? A. The one that comes to 38.5 million? Q. Yes. A. Yes.").)

28

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

# ARGUMENT

**I.   ORION'S REQUESTED INJUNCTION**

Orion requests an Order requiring Defendant to:

1.   Supply Meade at non-discriminatory (*i.e.*, most-favored-customer) terms for five years;

2.   Supply Orion at non-discriminatory terms for five years;

3.   Refrain from communicating with Synta about the prices of telescopes and accessories;

4.   Refrain from sharing customer information with Synta, including but not limited to statistics about which products Defendant's customers are buying, how much Defendant is charging for those products, and the volume of purchases from Defendant;

5.   Refrain from communicating with Synta about which products Defendant and Synta will manufacture;

6.   Refrain from participating in any internal meetings or strategy sessions in which any representative from a competitor, including David Shen or any employee of Synta, is in attendance.

Orion has filed an accompanying Proposed Order reflecting its request for relief.[4]

**II.   THE PREREQUISITES TO INJUNCTIVE RELIEF ARE SATISFIED**

Orion has shown that it is entitled to injunctive relief under both Section 16 of the Clayton Act and California's Unfair Competition Law.

**A.   Orion is Entitled to Injunctive Relief Under the Clayton Act**

Orion is entitled to the requested equitable relief under the authority provided the Court by the Clayton Act.

---

[4] Defendant has represented to Orion that it will be divesting itself of Meade through its bankruptcy. In reliance on that representation, Orion is not seeking an injunction requiring divestment under the Clayton Act.  Should Defendant change position on this point, Orion reserves the right to move for further equitable relief to force divestment, as it is entitled to do.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 656 (E.D. Va. 2018) (ordering divestiture under Clayton Act pursuant to claim brought by private litigant).

### 1.    Legal Standard

Section 16 of the Clayton Act sets forth courts' remedial powers for violations of the antitrust laws.  15 U.S.C. § 26.  To obtain injunctive relief under Section 16, a party must make a threshold showing of "threatened loss or damage by a violation of the antitrust laws." *Id.*; *see also Zenith Radio Corp. v Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (equitable relief available under Section 16 if plaintiff shows "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur").

In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court reiterated the four general factors that a plaintiff must satisfy under traditional equity principles to be entitled to a permanent injunction: (1) irreparable injury; (2) for which monetary damages are inadequate; (3) the balance of hardships between plaintiff and defendant warrants equitable relief; and (4) the public interest would not be disserved by a permanent injunction.  *Id.* at 391.  In the present case, Orion easily satisfies Section 16 and the *eBay* factors.

### 2.    Defendant's Continuing Violations of the Antitrust Laws Warrant Injunctive Relief

Section 16's prerequisites are fully satisfied because absent relief from the Court, a significant threat of injury and antitrust violations exists.  The jury has already found that Defendant violated the antitrust laws by conspiring with Synta and others to harm competition in the telescope and accessory manufacturing market, and by attempting to monopolize that market and achieving a dangerous probability of success.  There is no evidence that this conspiracy ever stopped.  Defendant conceded as much when it withdrew its request for the jury to be instructed on withdrawal from conspiracy:

> THE COURT: Number 8 is next, and this is on Page 14, Withdrawal. Is there any evidence of withdrawal from a conspiracy?  Does this need to be given? . . . .

> MR. BALLARD: Your Honor, this can be withdrawn.

(Trial Tr. 2273:25-2274:9.)

Further, since the jury rendered its verdict, Defendant's own actions have demonstrated that its violations are "likely to continue or recur."  As detailed in Orion's motion for an Order to Show Cause, Defendant has attempted to maintain the conspirators' stranglehold on the market by

making false statements to the Court to avoid paying monetary relief to Orion.  (ECF No. 578.)  It has transferred assets out of the country to avoid the Court's Judgment.  (*Id.*)  It has also cut off Meade's supply of product to remove Meade as a future competitor.  Defendant has also refused to supply product to Orion since this lawsuit began, thereby hindering Orion's ability to fairly compete.  Orion continues to buy and sell telescopes.  Without affirmative relief to correct the market, Orion (and all telescope consumers) will continue to pay supracompetitive prices for telescopes and continue to suffer from all the other harms brought on by antitrust violations, *e.g.*, lack of choice, or lack of innovation.

### 3. Orion Will Suffer Irreparable Injury that Money Damages Cannot Remedy Absent Relief

The first two *eBay* elements (irreparable harm and the insufficiency of money damages) are easily satisfied. The jury found and the evidence at trial proved that the structural taint in the telescope market caused by Defendant's misconduct caused injury to Orion's business and property.  (*E.g.*, Verdict Form at 3:11-13 (jury finding that Defendant's attempted monopolization injured Orion).)  If the structural problems caused by Defendant go uncorrected, Orion faces the danger of losing its business – a forty-five-year-old, employee-owned company.  Courts recognize that the threatened loss of a business constitutes irreparable harm for which there is no adequate remedy at law.  *See, e.g., hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019) ("[T]he threat of being driven out of business is sufficient to establish irreparable harm.") (citation omitted).

Orion additionally is suffering from irreparable and non-compensable harm because Defendant is engaged in a judgment avoidance scheme and is actively attempting to destroy the value of Meade, the lone remaining stateside asset available to satisfy Orion's judgment.  The fact that the destruction of Orion's business and the U.S. telescope market can technically be reduced to dollars and cents does not render that harm reparable via money damage.  Courts have recognized that the "[a]bility to calculate damages does not make that remedy adequate, however, if the plaintiff cannot collect the award." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) (Easterbrook, J.); *see also In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

1  1467, 1480 (9th Cir. 1994) ("[A] district court has authority to issue a preliminary injunction where

2  the plaintiffs can establish that money damages will be an inadequate remedy due to impending

3  insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating

4  assets to avoid judgment."); *Palmer v. City of Chicago*, 806 F.2d 1316, 1319 (7th Cir. 1986) ("To

5  show irreparable harm it is enough to show that there was a danger . . . that the fees would

6  disappear into insolvent hands."); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.

7  Supp. 2d 1197, 1219-20 (C.D. Cal. 2007) ("Damages are no remedy at all if they cannot be

8  collected, and most courts sensibly conclude that a damage judgment against an insolvent

9  defendant is an inadequate remedy.") (quoting Douglas Laycock, *The Death of the Irreparable

10  Injury Rule*, 103 Harv. L.Rev. 687, 716 (1990)).

11      Finally, the harm suffered by Orion is irreparable absent injunctive relief because

12  Defendant's unlawful acquisition of Meade fundamentally changed the U.S. telescope market.  But

13  for Defendant's illegal acts, another competitor or Orion would have acquired Meade when it came

14  up for sale in 2013, and the telescope market would have had an independent manufacturer and

15  brand to compete with the likes of Sunny and Synta.  Instead, Defendant's unlawful acts turned

16  Meade into a captive entity dependent on its supply for survival—one that Defendant is now

17  destroying by withdrawing all supply from Meade, despite Orion offering to refrain from collecting

18  receivables incurred by sales to Meade.  (Borden Decl. **Ex. 6**.)  Notably, the effect of Defendant's

19  sudden refusal to supply Meade is to ***reduce*** Defendant's profits, and the only possible motivation

20  for its behavior is to ensure that Meade is not a viable brand or competitor in the future.  That harm

21  to the market is irreparable.

22          **4.      The Balance of Hardships and the Public Interest Favor Injunctive
                Relief**

23      The final two *eBay* factors—the balance of hardships and the public interest—likewise

24  overwhelmingly favor the requested injunction.  Orion is only asking the Court to Order that

25  Defendant (1) continue supplying Meade and Orion with product on nondiscriminatory terms,

26  which will promote competition in the market for consumer telescope sales (and be profitable for

27

28

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

1  Defendant), and (2) refrain from further violating the antitrust laws, including by refraining from

2  sharing pricing and other commercially sensitive information with its competitor.

3       The proposed injunction would impose no hardship on Defendant.  Selling products on non-

4  discriminatory terms would be profitable for Defendant, and any harm accruing to Defendant from

5  discontinuing its unlawful act is not cognizable.  In contrast, Orion and American telescope

6  consumers will continue to suffer from the effects of Defendant's continuing unlawful behavior, as

7  well as the structural damage Defendant inflicted on the U.S. telescope market, absent the

8  requested relief.

9       Accordingly, Orion is entitled to injunctive relief under Section 16 of the Clayton Act.

10     **B.**    **Orion is Entitled to Judgment and Injunctive Relief Under Its UCL Claim**

11       The UCL proscribes any "unlawful business practice," and, in so doing, "borrows violations

12  of other laws" and makes them independently actionable.  *Alvarez v. Chevron Corp.*, 656 F.3d 925,

13  933, n.8 (9th Cir. 2011) (citing *Cel-Tech Communs., Inc. v. Los Angeles Cellular Tel. Co.,* 20

14  Cal.4th 163, (1999)).  Because the jury found that Defendant violated the Sherman, Clayton, and

15  Cartwright Acts, each such violation therefore also constitutes a violation of the UCL.[5]

16       The UCL's remedies include injunctive relief, Cal. Bus. & Prof. Code Section 17203, which

17  provides the Court with "broad equitable power" to remedy violations of the statute.  *Monster*

18  *Energy Co. v. Integrated Supply Network, LLC*, No. ED CV 17-548-CBM-RAOX, 2019 WL

19  2781402, at *2 (C.D. Cal. July 2, 2019) (citing *Cortez v. Purolator Air Filtration Prod. Co.*, 23

20  Cal. 4th 163, 180 (2000)).

21       Accordingly, the threshold for injunctive relief under the UCL is less demanding than the

22  standard set forth in *eBay*.  "The standard for an injunction under California law differs from the

23  federal standard.  In California, 'the plaintiff must prove (1) the elements of a cause of action

24  involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as,

25  inadequacy of the remedy at law."  *Haas Automation, Inc. v. Denny*, No. 2:12-CV-4779 (CBM)

26  (PLAx), 2014 WL 2966989, at *9 (C.D. Cal. Jul. 1, 2014) (quoting *City of S. Pasadena v. Dep't of*

27   

---

28  [5] Orion is therefore entitled to judgment in its favor on its UCL claim under Federal Rules of Civil
Procedure 54(b) and 58(b)(2)(B), and requests partial entry of judgment pursuant thereto.

1  *Transp.*, 29 Cal. App. 4th 1280, 1293 (1994)).  Further, "'[A] showing of threatened future harm or

2  continuing violation is required' before a court can impose an injunction under the UCL." *Id.*

3  (citation omitted).

4        In *Haas*, the court declined to issue an injunction under the federal Lanham Act because it

5  found that the plaintiff had failed to show irreparable injury and therefore could not satisfy the

6  *eBay* factors in that case.  *Id.* at *7.  It found that the requested injunction was, however,

7  appropriate under the UCL, which did not require a showing of irreparable injury.  *Id.*  The court

8  exercised its "very broad discretion in formulating equitable relief in unfair competition law

9  actions" to issue the injunction.  *Id.* at *9.

10       Here, Orion has already established "the elements of a cause of action involving the

11  wrongful act sought to be enjoined," because the jury found Defendant liable for violating the

12  Sherman, Clayton, and Cartwright Acts.  *See Haas*, 2014 WL 2966989 at *9 (plaintiff proved the

13  elements of its cause of action for purposes of injunction under the UCL where the court granted its

14  motion for partial summary judgment on its federal claim).  Indeed, Orion based its UCL claim on

15  the exact same factual allegations on which the jury found Defendant liable under the Sherman,

16  Clayton and Cartwright Acts.  (First Amended Complaint ¶¶ 139-41 (ECF. No. 41).)  The jury's

17  factual findings are binding on the Court.  *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir.

18  2011) (citation omitted) ("where legal claims tried by the jury and equitable claims tried by the

19  court are 'based on the same set of facts, the Seventh Amendment requires the trial judge to follow

20  the jury's implicit or explicit factual determinations.'").  And, as explained above, Orion has no

21  adequate monetary remedy at law for Defendant's violations of the antitrust laws.

22       Accordingly, Orion is entitled judgment on its UCL claim and injunctive relief under the

23  UCL.

24  **III.   THE REQUESTED INJUNCTION APPROPRIATELY REMEDIES DEFENDANT'S
         ANTICOMPETITIVE CONDUCT**

25       The Supreme Court has long held that a remedies decree in an antitrust case should seek to

26  "unfetter a market from anticompetitive conduct." *Ford Motor Co. v. United States*, 405 U.S. 562,

27  577 (1972) (citation omitted).  "It is, of course, established that, in a § 2 case, upon appropriate

28

findings of violation, it is the duty of the court to prescribe relief which will terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future….The trial court is charged with inescapable responsibility to achieve this objective[.]" *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (citations omitted).

When it comes to crafting an injunction, district courts are "clothed with 'large discretion' to fit the decree to the special needs of the individual case," *Ford Motor*, 405 U.S. at 573 (citing *Int'l Salt Co. v. United States*, 332 U.S. 392, 400-01 (1947)), and "empowered to fashion appropriate restraints on [a defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 697 (1978) (citation omitted). "[A]dequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act." *United States v. Grinnell Corp.*, 384 U.S. 563, 577 (1966). Thus, it is "entirely appropriate" for a court to order an injunction "beyond a simple proscription against the precise conduct previously pursued." *Prof'l Engineers*, 435 U.S. at 698.

Because the jury has already found that Defendant's misconduct caused grave harm to competition in the telescope supply market, these authorities establish that the Court has both a duty to protect future competition in that market and broad power to issue an appropriate injunction to do so. Orion respectfully submits that the relief below should therefore be granted.

### A. Defendant Should Be Ordered to Supply Meade and Orion on Nondiscriminatory Terms for Five Years

The Court is fully empowered to order Defendant to supply Meade and Orion on non-discriminatory most-favored-customer terms for five years. This relief is essential to remedying the damage inflicted by Defendant on the U.S. telescope market.

### 1. The Court Is Empowered to Order Defendant to Supply Meade and Orion Under the Clayton Act

Under Ninth Circuit law, if a party is found liable under the Sherman Act, a court can issue a permanent injunction requiring it to sell products to particular parties on nondiscriminatory terms.

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

1  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997). The jury in *Kodak*

2  found that Kodak had monopolized the market for servicing its photocopiers and micrographic

3  equipment by refusing to sell repair parts to independent service organizations ("ISOs"). The

4  district court entered a ten-year permanent injunction requiring Kodak to sell its parts to ISOs on

5  "reasonable and nondiscriminatory terms and prices." *Id.* at 1201. The Ninth Circuit affirmed,

6  with one change relevant here: The court explained that the "reasonable prices" requirement would

7  involve the court "in a matter generally considered beyond our function, namely, direct price

8  administration." *Id.* at 1225. It therefore directed the district court to modify the injunction to

9  require "nondiscriminatory pricing," which raised no such concerns. *Id.* at 1226.

10      *Kodak*'s holding extends to ordering defendants to supply a party who was not a plaintiff in

11  the action. The *Kodak* injunction required Kodak to sell its parts not only to the ISO plaintiffs, but

12  to *all* ISOs. On appeal, the Ninth Circuit rejected Kodak's challenge to the injunction on the

13  grounds that it included non-plaintiffs. It found that "[i]njunctive relief covering nonparty ISOs is

14  proper under these circumstances," *i.e.*, where necessary to preserve competition. *Id.* at 1226

15  (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1971) and *Bresgal v. Brock,* 843 F.2d 1163,

16  1170–72 (9th Cir.1987) (relief in favor of nonparties appropriate where the same defendant was

17  enjoined and broad scope was necessary to give prevailing parties relief)).

18      Other circuits have also affirmed injunctions requiring antitrust defendants to supply parties

19  on nondiscriminatory terms. In *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th

20  Cir. 1980) (per curiam), the district court found that the defendants violated Section 1 by cutting off

21  the plaintiff's supply of watches pursuant to a price-fixing agreement with the plaintiff's

22  competitors. The court then permanently enjoined them from refusing to deal with the plaintiff on

23  the same terms as other retailers. In affirming, the Seventh Circuit rejected an argument that the

24  defendants had a right to refuse to deal with anyone they chose as long as they did not fix prices.

25  *Id.* The court explained, "It is settled that once a Sherman Act violation is proven, the district court

26  'has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects

27  of the illegal conduct, and assure the public freedom from its continuance. Such action is not

28

1    limited to prohibition of the proven means by which the evil was accomplished, but may range

2    broadly through practices connected with acts actually found to be illegal.'"  *Id.* (citation omitted).

3         The *Trabert* court also noted that injunctions against future refusals to deal with an injured

4    company have "repeatedly been upheld where necessary to cure past and to prevent future Sherman

5    Act violations."  *Id.* at 485-86 (citing *United Shoe Mach.*, 391 U.S. at 246; *Lorain Journal Co. v.*

6    *United States*, 342 U.S. 143 (1951); and *Int'l Salt Co. v. United States*, 332 U.S. 392, 400 (1947));

7    *see also Paschall v. Kansas City Star Co.*, 695 F.2d 322, 335 (8th Cir. 1982) (affirming permanent

8    injunction requiring defendant to sell its newspapers at wholesale to independent carriers), *rev'd en*

9    *banc on other grounds*, 727 F.2d 692 (8th Cir. 1984); *Phillips v. Crown Central Petro. Corp.*, 602

10   F.2d 616 (4th Cir. 1979) (affirming permanent injunction requiring defendant to enter new three-

11   year leases with dealers); *Bergen Drug Co. v. Parke, Davis & Co.*, 307 F.2d 725, 727 (3rd Cir.

12   1962) (reversing denial of preliminary injunction requiring sales to plaintiff during suit and noting

13   that if plaintiff proved monopoly, it would be entitled to permanent injunctive relief); *Feesers, Inc.*

14   *v. Michael Foods, Inc.*, No. 1:CV-04-576, 2009 WL 1475270, at *6 (M.D. Pa. May 26, 2009)

15   (enjoining defendant from refusing to deal with plaintiff after it terminated sales to avoid

16   complying with initial injunction requiring nondiscriminatory pricing), *rev'd on other grounds*, 591

17   F.3d 191, 208 (3rd Cir. 2010); *Todhunter-Mitchell &Co., Ltd. v. Anheuser-Busch, Inc.*, 375 F.Supp.

18   610, 626 (E.D. Pa. 1974) (enjoining defendant from restraining its wholesalers from selling

19   products on "customary and nondiscriminating terms" to plaintiff), *modified on other grounds*, 383

20   F.Supp. 586 (E.D. Pa. 1974).

21        In sum, the Court is vested with the authority to order Defendant to supply Meade and

22   Orion on non-discriminatory terms.  It should do so to protect further consolidation of the telescope

23   market.

24              **2.      The UCL Independently Empowers the Court to Order Defendant to
                          Supply Meade and Orion on Non-Discriminatory Terms**

25        The Court's equitable powers under the UCL exceed even its broad powers under the

26   Clayton Act.  "The UCL 'governs anti-competitive business practices . . . and has as a major

27   purpose the preservation of fair business competition.'" *Law Offices of Mathew Higbee v.*

28

ORION'S NOTICE OF MOTION AND MOTION FOR EQUITABLE RELIEF AND JUDGMENT ON UCL CLAIM

1  *Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 561 (2013) (quoting *Cel–Tech Comm'ns,*

2  *Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).)  The grant of equitable authority by the

3  UCL is intentionally broad:

4
> The Legislature worded the UCL so as to permit tribunals to enjoin on-
5
> going wrongful business conduct in whatever context such activity
> might occur. Indeed, it was intentionally framed in its broad, sweeping
6
> language, precisely to enable judicial tribunals to deal with the
> innumerable new schemes which the fertility of man's invention would
7
> contrive.

8  *Id.* at 564 (quoting Cel-Tech, 20 Cal. 4th at 181) (quotations and alterations omitted).

9        Federal courts applying the UCL have recognized that it provides "broad equitable power"

10  to remedy violations of the statute.  *Monster Energy Co. v. Integrated Supply Network, LLC*, No.

11  ED CV 17-548-CBM-RAOX, 2019 WL 2781402, at *2 (C.D. Cal. July 2, 2019) (citing *Cortez v.*

12  *Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 180 (2000)).

13        Accordingly, the Court is vested with authority to require Defendant to supply Meade and

14  Orion on non-discriminatory terms.

15            **3.      Requiring Defendant to Supply Meade is Critical to Restoring
                     Competition and Ending Defendant's Conspiracy**

16        An injunction requiring Defendant to supply Meade for at least five years is critical to

17  restoring and protecting competition in the U.S. telescope industry.  The jury has already found that

18  Defendant unlawfully increased market concentration by conspiring with Synta to acquire Meade

19  for itself instead of allowing a new competitor to enter the market.  As soon as the jury rendered its

20  verdict a few months ago, Defendant began working to swiftly eliminate Meade as a future

21  competitor by cutting off all sales to it, thereby ███████████████████████████  If

22  Defendant is allowed to continue starving Meade out of existence, then it will succeed in

23  maintaining the same market concentration that the jury already found is anticompetitive and

24  unlawful.

25        An injunction requiring Defendant to supply Meade is also crucial to protecting Orion's

26  rights in this matter.  As the Court is aware, Meade recently entered bankruptcy proceedings in the

27  Central District of California and is attempting to find a buyer for the company.  The proceeds from

28  a sale of Meade could be used to satisfy some of the more than $50 million in damages that the jury

1   awarded Orion. ████████████████████████████████████████

2   ██████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████

8   ████████████████████

9       The Court should not allow Defendant to further manipulate the market to preserve its

10  unlawful monopoly, or purposely destroy Meade to avoid satisfying the Judgment.  It should

11  instead require Defendant to resume and continue supplying product to Meade, and it should

12  require Defendant to offer Meade the same terms it offers its most favored customer.

13          **4.      Requiring Defendant to Supply Orion is Also Critical to Restoring Competition**

14      Since Orion filed this suit, Defendant has exercised its unlawfully obtained market power to

15  harm Orion by refusing to supply it products.  This was intended to harm Orion and consolidate

16  Defendant's control of the U.S. telescope market by preventing it from competing with Meade and

17  its co-conspirator Celestron.

18      To restore competition and cure the structural harm Defendant has inflicted on the U.S.

19  telescope market, the Court should require Defendant to supply Orion on non-discriminatory terms,

20  *i.e.*, the same terms it offers to Celestron or any other most favored customer.  As set forth above in

21  Section III.0.1-2, the Court has broad authority to order Defendant to supply a party where, as here,

22  such an injunction is necessary to restore competition.  And as the Ninth Circuit explained in

23  *Kodak*, the Court is fully empowered to order Defendant to deal with Orion on a non-

24  discriminatory basis.  *See* 125 F.3d at 1225-26.  The Court should therefore issue the requested

25  injunction.

26      **B.      Defendant Should Be Enjoined from Continuing To Collude**

27

28

At trial, the jury found that Defendant engaged in price fixing and market allocation, both of which are *per se* illegal under the Sherman Act.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000) ("Foremost in the category of *per se* violations is horizontal price-fixing among competitors."); *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("A market allocation agreement between competitors at the same market level is a classic *per se* antitrust violation.").  It also found that Defendant conspired to monopolize and attempted to monopolize the telescope market.  Specifically, the jury found that Defendant engaged in, among other things, the following misconduct in violation of the antitrust laws:

- Defendant engaged in anticompetitive conduct, with a specific intent to achieve monopoly power in the telescope manufacturing market, and achieved a dangerous probability that it would actually monopolize that market (Jury Instr., ECF No. 499, No. 35);Defendant knowingly conspired to obtain monopoly power in the telescope manufacturing market (*id.*, No. 41); and

- Defendant and Synta conspired to acquire Meade; shared sensitive price and cost information with one another; shared Orion's order volume and price history from Defendant; and forced Orion to purchase Defendant's telescopes through the Synta entities, all in order to fix prices and advantage Defendant, Synta, and their wholly-owned subsidiaries Meade and Celestron (Jury Instr., *id.*, No. 20);

- Defendant and the Synta Entities violated the Sherman Act by agreeing to allocate customers and product markets for which they would otherwise have competed (*id.*, Nos. 30 & 31);

- Defendant's conspiracy to acquire Meade violated the Clayton Act because it unlawfully concentrated the market for telescope manufacturing services.  (*Id.* No. 44.)

The jury's explicit and implicit factual findings are binding on the Court when deciding Orion's claims for equitable relief.  *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011) (citation omitted) ("[W]here legal claims tried by the jury and equitable claims tried by the court

1  are 'based on the same set of facts, the Seventh Amendment requires the trial judge to follow the

2  jury's implicit or explicit factual determinations.'").

3      Accordingly, Orion respectfully requests that the Court enjoin Defendant from continuing

4  to engage in any of the conduct on which the jury found it liable.  Specifically, Orion requests that

5  the Court enjoin Defendant from continuing to (1) communicate with Synta about the prices of

6  telescopes and accessories; (2) share customer information with Synta or Celestron, including but

7  not limited to statistics about which products Defendant's customers are buying, how much

8  Defendant is charging for those products, and the volume of purchases from Defendant; (3)

9  communicate with Synta about which products Defendant and Synta will manufacture; and (4)

10  participate in any internal meetings or strategy sessions in which any representative from a

11  competitor, including David Shen or any employee of Synta, is in attendance.

## CONCLUSION

13      For all the foregoing reasons, Orion's motion should be granted as set forth in the

14  accompanying Proposed Order.

16  Dated:  February 20, 2020                    BRAUNHAGEY & BORDEN LLP

18                                               By:  _/s/ Matthew Borden_____
                                                      Matthew Borden

19                                               Attorneys for Plaintiff OPTRONIC
20                                               TECHNOLOGIES, INC. d/b/a Orion
                                                 Telescopes & Binoculars